## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**RISE GENERAL CONTRACTORS, LLC,**

     *Plaintiff,*

**v.**

**UNITED STATES FIRE INSURANCE
COMPANY,**

     *Defendant.*

_____/

CIVIL ACTION

Case No.: 3:24-cv-00602

## AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff RISE General Contractors, LLC ("Plaintiff" or "RISE"), by and through the undersigned counsel, and pursuant to the Federal Rules of Civil Procedure hereby files this Complaint against Defendant United States Fire Insurance Company ("Defendant" or "USFIC") and in support thereof states as follows:

## JURISDICTION, VENUE, AND PARTIES

1.

At all times relevant to this Complaint, RISE was, and is, a for-profit limited liability company authorized to, and so doing, business in Polk County, Florida. At all times relevant to this Complaint, RISE held, and still holds, a valid Florida Certified General Contractor's license.

2.

At all times relevant to this action, RISE was, and is, comprised of three members whose collective ownership interests in RISE equal 100% of RISE's equity, including:

1

(a) Gregory R. Blais, a citizen of the State of Florida with his personal or individual domicile located in Florida;

(b) R. Gregory Hunter, a citizen of the State of Georgia with his personal or individual domicile located in Georgia; and

(c) AHH Investments, LLC, a limited liability formed in Georgia, that is owned 100% by Amanda H. Holmes, a citizen of the State of Florida with her personal or individual domicile located in Florida.

3.

At all times relevant to this Complaint, Defendant was, and is, a Delaware insurance company licensed and registered to do business in Florida. Defendant maintains a principal address at 305 Madison Avenue, Morriston, New Jersey 07960, and can be served with process through the Florida Insurance Commissioner at 200 East Gaines Street, Tallahassee, Florida 32399.

4.

The District Court has subject matter jurisdiction over this civil action arising under 28 U.S.C. § 1332(a)(3) because this suit involves complete diversity between citizens of different states (i.e., Florida, Georgia, Delaware, and New Jersey) with the matter exceeding $75,000.00.

5.

Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to RISE's claim occurred in this district and the Property that is the subject of this action is situated within this district.

2

4860-0949-5500, v. 1

6.

RISE has complied with and fulfilled all conditions precedent and prerequisites prior to bringing this action and filing this Complaint.

## FACTS

### Parties

7.

At all times relevant to this Complaint, acting under a valid Florida Certified General Contractor's License, RISE served as the general contractor for Citrus Ridge Properties II, LLC (the "Owner"), for the construction of a 222-unit townhouse development (the "Project") upon the Owner's property located at U.S. Highway 27 and Citrus Ridge Drive, Davenport, Florida 33837 (the "Property").

8.

At all times relevant to this Complaint, Defendant was a compensated corporate surety licensed to issue surety bonds in the State of Florida.

### On-Site Payment & Performance Bonds

9.

RISE is the "Obligee" under Bond Number 6061025223 issued by Defendant, as "Surety," on April 12, 2022, which includes: (i) a Subcontract Performance Bond in the penal amount of $3,920,736.77 (the "On-Site Performance Bond"), and (ii) a Subcontract Payment Bond in the penal amount of $3,920,736.77 (the "On-Site Payment Bond"; and together with the On-Site Performance Bond, the "On-Site Bonds"). True and accurate copies of the On-Site Bonds are attached hereto as EXHIBIT "A".

3

10.

The On-Site Bonds were issued by Defendant to, and for the benefit of, RISE as security for the payment and performance by McKenzie Contracting, LLC ("Principal"),[1] of its obligations under that certain "Subcontract Agreement" between RISE and Principal dated January 21, 2022 (the "On-Site Subcontract"), whereby Principal agreed to "[f]urnish all labor, materials, permits, equipment, services," and the like, to facilitate the land clearing, grading, surveying, underground utility work, concrete curbs, sidewalks, asphalt paving, parking and striping for that portion of the Project to be constructed on the Property, *i.e.*, "on-site" (collectively, the "On-Site Scope"). A true and accurate copy of the On-Site Subcontract is attached hereto as EXHIBIT "B".

11.

Specifically, under the terms of the On-Site Performance Bond, Defendant is jointly and severally bound and liable unto RISE for the full and timely performance of Principal's obligations under the On-Site Subcontract, up to the penal amount of $3,920,736.77.

12.

The On-Site Performance Bond was expressly conditioned such that, if Principal "perform[ed] the [On-Site Subcontract], then [the On-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect."

13.

Under the terms of the On-Site Payment Bond, Defendant is jointly and severally bound and liable unto RISE for the full and timely payment of all costs for labor, materials

---

[1] McKenzie has filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Middle District of Florida (Tampa Division), Case No. 8:24-bk-01255-RCT. This Complaint does not seek any relief against McKenzie or any assets of McKenzie's Estate.

4

and equipment furnished for use in performance of the On-Site Subcontract, up to the penal amount of $3,920,736.77.

14.

The On-Site Payment Bond is conditioned such that, if Principal "shall promptly make payment directly or indirectly to all Claimants…, for all labor, materials and equipment furnished for use in performance of [the On-Site Subcontract], then [the On-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect…"

**Off-Site Payment & Performance Bonds**

15.

RISE is also the "Obligee" under Bond Number 6061025232 issued by Defendant, as "Surety," on April 20, 2022, which includes: (i) a Subcontract Performance Bond in the penal amount of $1,594,032.85 (the "Off-Site Performance Bond"), and (ii) a Subcontract Payment Bond in the penal amount of $1,594,032.85 (the "Off-Site Payment Bond"; and together with the Off-Site Performance Bond, the "Off-Site Bonds"). True and accurate copies of the Off-Site Bonds are attached hereto as EXHIBIT "C". The On-Site Payment Bond and the Off-Site Payment Bond are collectively referred to as, the "Payment Bonds;" the On-Site Performance Bond and Off-Site Performance Bond are collectively referred to as, the "Performance Bonds;" and the On-Site Bonds and Off-Site Bonds (which included the Payment Bonds and Performance Bonds) are collectively referred to as, the "Bonds."

5

16.

The Off-Site Bonds were issued by Defendant to, and for the benefit of, RISE as security for the payment and performance by Principal of its obligations under another "Subcontract Agreement" between RISE and Principal dated March 3, 2022 (the "Off-Site Subcontract"), whereby Principal agreed to "[f]urnish all labor, materials, permits, equipment, services," and the like, to facilitate the land clearing, grading, surveying, underground utility work, concrete curbs, sidewalks, asphalt paving, parking, and striping required for that portion of the Project located on a parcel adjacent to the Property, *i.e.*, "off-site" (collectively, the "Off-Site Scope"). A true and accurate copy of the Off-Site Subcontract is attached hereto as EXHIBIT "D". The Off-Site Subcontract and On-Site Subcontract are collectively referred to as, the "Subcontracts;" and the Off-Site Scope and On-Site Scope are collectively referred to hereinafter as, the "Combined Scope."

17.

Specifically, under the terms of the Off-Site Performance Bond, Defendant is jointly and severally bound and liable unto RISE for the full and timely performance of Principal's obligations under the Off-Site Subcontract, up to the penal amount of $1,594,032.85.

18.

The Off-Site Performance Bond states, and is expressly conditioned such that, if Principal "perform[ed] the [Off-Site Subcontract], then [the Off-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect."

19.

Under the terms of the Off-Site Payment Bond, Defendant is jointly and severally bound and liable unto RISE for the full and timely payment of all costs for labor, materials

and equipment furnished for use in performance of the Off-Site Subcontract, up to the penal amount of $1,594,032.85.

20.

The Off-Site Payment Bond states, and is expressly conditioned such that, if Principal "shall promptly make payment directly or indirectly to all Claimants…, for all labor, materials and equipment furnished for use in performance of [the Off-Site Subcontract], then [the Off-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect…"

**Principal's Performance and Breach of Subcontracts**

21.

Following the execution of the Subcontracts and issuance of the Bonds, Principal commenced performance of the Combined Scope.

22.

Sections 12(a)-(b) of both Subcontracts provided, in relevant part, that:

> (a) Scheduled Completion. The Project is scheduled to be finally complete on or before July 21, 2023. For purpose of clarification, the Subcontractor does not necessarily have until that date to complete all of the Work prescribed in this Subcontract but must comply and maintain progress in accordance with the work of the Contractor and other Subcontractors so as to ensure that the Project is finally complete by the date referenced above.

> (b) Coordination. Subcontractor agrees to punctually and diligently perform all parts of Subcontractor's Work at the time scheduled by Contractor, which shall be subject to change, at no additional cost, by Contractor as deemed necessary or convenient to overall progress of the Project.

23.

Section 12(d) of both Subcontracts provided, in relevant part, that:

7

(d) <u>Subcontractor Delays</u>. If Subcontractor is behind in the Work, fails or refuses to supply sufficient workers or deliver materials or equipment on schedule, and delays progress of the Work; or if the different parts thereof are not commenced, performed, finished and delivered on time, then in addition to any other remedies of Contractor as provided for herein, Contractor shall have the right to direct Subcontractor to furnish additional labor and expedite deliveries of material and equipment at Subcontractor's cost and expense…Should Contractor's work schedule be changed, Subcontractor will proceed in strict accordance with Contractor's directions. In the event Subcontractor fails or refuses to furnish such additional labor, materials and equipment or to work overtime or additional shifts as directed by Contractor hereunder, Contractor shall be entitled to have such labor, materials and equipment furnished on Subcontractor's behalf and the costs associated with the same shall be charged to Subcontractor and be deducted from the Contract Price or be immediately payable to Contractor by Subcontractor at Contractor's option.

24.

Within a few months of commencement, starting in or around June 2022, RISE determined that Principal's performance of both the On-Site Scope and Off-Site Scope was falling behind any reasonable schedule that would allow for final completion of the entire Project by July 1, 2024.

25.

Between June and September 2023, RISE issued *numerous* directives to Principal to commence and/or expedite portions of Combined Scope with which Principal failed or refused to comply; including, without limitation, directives by RISE on August 2nd, August 25th and September 14th, to procure and install 4" pipe and sweeps for fire line per instructions from the Polk County Fire Marshall.   True and accurate copies of the Directives issued by RISE are attached hereto as <u>EXHIBIT "E"</u>.

8

26.

On or about September 16, 2022, when Principal had failed to comply with RISE's prior directives regarding the completion of work and procurement of materials, RISE issued a written notice of delay to Principal for failure to maintain the schedule.  A true and accurate copy of the Notice of Delay is attached hereto as EXHIBIT "F".

27.

RISE again notified Principal on October 2, 2022, of various missed deadlines and delays in performance of the Combined Scope; to which Principal responded that it would implement 12-hour workdays to recover the agreed-upon schedule.

28.

On October 5, 2022, Principal provided an update on its anticipated schedule for completion of various items within the Combined Scope, but failed to adhere to such schedule thereafter.

29.

On January 31, 2023, RISE sent another directive to Principal regarding delays and defective work on the Project.

30.

In February 2023, RISE and Principal agreed upon a revised schedule for completion of various portions of the On-Site Scope and adopted the same by execution of a Change Order to the On-Site Subcontract.  A true and accurate copy of the February 2023 revised schedule is attached hereto as EXHIBIT "G".

9

31.

However, Principal failed to comply with virtually all of the critical completion deadlines that were previously agreed upon.

32.

In addition, Principal's work was repeatedly found to be defective – including, without limitation, issues with LBRs, incorrect installation of a lift station wet well, incorrect installation of storm system improvements – requiring significant re-work and correction.

33.

Principal also failed or refused to pay its subcontractors and vendors for labor, materials and equipment provided in connection with the Combined Scope – including, specifically, Flash-Rite, Fortiline, GW Trucking, Michael D. Crow Associates, and Hydro Conduit, LLC d/b/a Rinker (collectively, the "Claimants").

34.

Principal's defective work and failure to pay amounts due to its subcontractors and vendors contributed to and exacerbated delays in the completion of the Combined Scope.

35.

RISE notified Principal on multiple occasions of its defective work and delays in performance of the Combined Scope, and made multiple demands that Principal cure the same and expedite completion of the Combined Scope in accordance with the requirements of the Subcontracts.

36.

Principal had ample notice of and opportunity to cure its defaults under the Subcontract, but failed to do so, thereby breaching the Subcontracts.

37.

As a result of Principal's continuing and uncured defaults, on June 8, 2023, RISE sent a Notice of Termination to Principal (the "Notice of Termination") terminating both of the Subcontracts, each pursuant to Section 21 thereof.  A true and accurate copy of the Notice of Termination is attached hereto as EXHIBIT "H".

38.

Principal's delays in performance of the Combined Scope, and subsequent default under the Subcontract, caused significant delays in the completion of the overall Project – as other portions of the Project could not be commenced until the site-work of the Combined Scope was completed.

39.

In addition, as a result of Principal's failure to pay the Claimants amounts due, the Claimants filed claims of lien on the Property totaling $637,686.31 (collectively, the "Liens").  True and accurate copies of the Liens are attached hereto as EXHIBIT "I".

**Defendant's Breach of Bonds**

40.

Each of the Bonds constitutes a separate contract between RISE and Defendant. Alternatively, each of the Bonds constitutes a separate contract between Principal and Defendant, of which RISE is an express intended third-party beneficiary.

41.

Pursuant to Article 1 of the Performance Bonds, "The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the [respective Subcontract]".

11

42.

Further, Article 4 of the Performance Bonds provides, "[w]henever the Principal shall be, and is declared by the Obligee to be in default under the [respective Subcontract], with the Obligee having performed its obligations in the [respective Subcontract], the Surety may promptly remedy the default, or shall promptly…" either complete or cause the completion of, or pay RISE the amount required to correct and/or complete, Principal's obligations under the respective Subcontract.

43.

Defendant received a copy of the Notice of Termination on or about June 8, 2023.

44.

The Notice of Termination, received by Defendant, described Principal's various defaults under the Subcontracts and RISE's intent to pursue claims for recovery on the Bonds.

45.

For approximately one month after its receipt of the Notice of Termination, Defendant took no action under the Bonds and made no attempt to contact RISE regarding completion.

46.

On or about July 11, 2023, Defendant sent two (2) letters to RISE (the "Initial USFIC Letters") advising that Defendant did not intend to pay out the claim under the Bonds.

4860-0949-5500, v. 1

47.

At this time, RISE was accruing ongoing costs and delays to complete the construction at issue.

48.

RISE thereafter made good faith efforts to collect, organize, and produce the substantial documentation requested by Defendant in the Initial USFIC Letters, while also managing the assessment, correction, and completion Principal's obligations under the Subcontracts as well as the work required to complete other portions of the Project.

49.

Similarly, during this time, Plaintiff and Defendant cooperated to facilitate site visits on the Property to examine the remaining Combined Scope of work.

50.

On or around October 3, 2023, RISE sent a written letter to Defendant (the "October Letter") advising of its electronic production of documents requested in the Initial USFIC Letters and informing Defendant, *inter alia*, of its ongoing efforts to evaluate the extent of defects in Principal's work and to correct and/or complete Principal's obligations under the Subcontracts. Accordingly, RISE expressly reserved the right to amend and supplement the documentation and information provided to Defendant in response to the Initial USFIC Letters.  Concurrent with the October Letter, RISE provided Defendant, its counsel, and construction consultant with access to an electronic Sharefile wherein documents requested by the Initial USFIC Letters were produced.

51.

In the October Letter, RISE also made clear its demand that Defendant take action under the Bonds by discharging the Liens and reimbursing RISE for the costs incurred by and accruing to RISE to correct and/or complete Principal's obligations under the Subcontracts.

52.

Defendant did not discharge the Liens or reimburse RISE in any amount in response to the October Letter.

53.

On or about December 8, 2023, RISE sent another letter to Defendant (the "December Letter") requesting a response to its October Letter, and reiterating its demand that Defendant take action on the Bonds by discharging the Liens and reimbursing RISE for the costs incurred by and accruing to RISE to correct and/or complete Principal's obligations under the Subcontracts.

54.

Over two months after receipt of the October Letter, on or about December 15, 2023, Defendant responded to RISE by written letter alleging that, based on documentation produced by RISE in October 2023, RISE's costs to correct and/or complete Principal's Combined Scope did not exceed the aggregate amounts RISE agreed to pay Principal for completion of the Combined Scope under the Subcontracts (collectively and in the aggregate, the "Subcontract Price").

14

55.

Defendant stated in the December 15, 2023 letter that it was not liable under the Bonds unless and until RISE provided documentation of costs incurred in excess of the Subcontract Price.

56.

On or about March 21, 2024, RISE sent another letter and additional documentation to Defendant (the "March Letter"), thereby supplementing its prior accounting of the costs to correct and complete Principal's Combined Scope and showing that RISE had, at that point, incurred total costs to correct and/or complete Principal's Combined Scope in excess of the Subcontract Price by no less than $580,411.09.

57.

In the March Letter, RISE once again demanded that Defendant reimburse RISE for the Completion Costs incurred and accruing and discharge the Liens on the Property.

58.

Since the Initial USFIC Letters in July 2023, Defendant's independent construction consultant has made multiple visits to the Property to evaluate the condition and status of Principal's Combined Scope, in each instance with RISE's full cooperation and consent.

59.

During such visits to the Property, Defendant's construction consultant observed first-hand the substantial defects in Principal's work and the significant efforts undertaken by RISE to correct and complete Principal's Combined Scope and has witnessed first hand that RISE has complied with all obligations to collect under the Bonds.

60.

In a letter dated May 24, 2024, some seven (7) months after RISE first demanded Defendant resolve lien claims, Defendant advised RISE that it had resolved all lien claims with the Claimants, except for the largest lien filed by Fortiline which totaled $551,758.58.

61.

On or around June 10, 2024, after the filing of RISE's original Complaint in this present action, Defendant notified RISE that it settled and discharged the lien filed by Fortiline by payment to Fortiline in the amount of $551,758.58.

62.

Upon resolving this final lien claim, Plaintiff and Defendant have complied with all of their contractual obligations under the On-Site Payment Bond and the Off-Site Payment Bond, save and except Defendant's remaining obligation to remit payment to Plaintiff for the lien bond premiums Plaintiff was required to purchase to remove the liens filed by Claimants from attaching to the Property prior to Defendant's resolution of the Liens.

63.

To date, Defendant has not reimbursed RISE under the terms of the Performance Bonds for any portion of the costs incurred to correct and completion Principal's obligations under the Subcontracts.

64.

RISE has complied with all requests by Defendant in connection with its investigation of RISE's claims against Principal and under the Bonds.

16

65.

RISE has satisfied any and all conditions precedent to Defendant's performance on the Bonds.

66.

Defendant has had sufficient notice and opportunity to investigate RISE's claims against Principal, and Principal's alleged defenses thereto, but has failed or refused to perform, and thus materially breached, its obligations toward RISE under terms of the Bonds.

**RISE's Damages**

67.

Section 21 of the Subcontracts provides, that, in the event of Principal's termination for default:

> Subcontractor hereby authorizes Contractor to perform and complete the Work, and in connection therewith, Contractor may (i) eject Subcontractor; (ii) take possession of all materials, appliances, tools and equipment already at the Job Site, as well as all materials in the course of preparation, wherever located, and all rights under contracts of Subcontractor; and (iii) go into the open market and secure a replacement subcontractor or secure materials and employ workers necessary to complete the Work, all at Subcontractor's expense. Subcontractor shall not be entitled to receive any further payment until completion of the Project and then only after the direct and indirect costs incurred by Contractor to complete Subcontractor's Work, including but not limited to attorneys' fees, plus a reasonable allowance for profit for Contractor, have been determined. The direct and indirect costs and the allowances for profit shall apply against the Contract Price, and, if in excess of the balance due Subcontractor, the amount of the excess shall be a debt immediately due and owing from Subcontractor to Contractor. If the balance of the Contract Price shall exceed Contractor's direct and indirect costs, plus a reasonable allowance for profit, as above provided, such excess shall be paid to

Subcontractor within thirty-five (35) days after final completion of the Project.

68.

In an effort to mitigate its own damages as a result of Principal's Defaults, RISE was forced exercise its rights under Section 21 of the Subcontracts and hire replacement subcontractors to correct and complete Principal's obligations thereunder, thereby incurring aggregate costs of not less than $580,411.09 in excess of the Subcontract Price (collectively, the "Completion Costs"). To promote cost control and efficient supervision, the labor, materials, and services required to correct and/or complete Principal's obligations under the Subcontracts were performed or procured by RISE collectively as to the entire Subcontract Scope. Accordingly, RISE's Completion Costs and other damages sought in this action are not specifically allocated to either the On-Site Subcontract or the Off-Site Subcontract, but represent the aggregate costs incurred by RISE to correct and/or complete the entire Subcontract Scope.

69.

Pursuant to Sections 10 and 21 of the Subcontracts, Section 32 of Exhibit A to the Subcontracts, and all related change orders for the work required to correct and/or complete Principal's obligations thereunder, RISE is entitled to compensation in an amount equal to 10% of the Completion Costs, or not less than $87,061.65, as overhead and profit (the "Default OH&P").

70.

Section 34 of the Subcontracts provides that:

> If any liens (mechanics' or material men's), attachments, garnishments, claims against any payment bond furnished by Contractor, or suits affecting title to real property are filed against the Project, or any portion thereof, in connection with

18

claims for labor or material incurred by Subcontractor, or anyone claiming by or through Subcontractor, in the performance of this Subcontract, Subcontractor shall, within ten (10) days after written demand by Contractor, cause the effect of such lien, claim, attachment or suit to be removed from the Project or otherwise discharged, or any portion thereof, and Subcontractor shall defend, indemnify and hold Contractor harmless against any liabilities and claims made in connection therewith, including, without limitation any costs and expenses for attorney's fees,  bond premiums and all incidental and consequential damages resulting there from. In the event Subcontractor shall fail to promptly cause the effect of any such lien, claim, attachment or suit to be so removed, Contractor is hereby authorized to use whatever means Contractor may deem best to cause the lien, claim, attachment or suit, together with its effect upon the title, to be removed, discharged, satisfied, compromised or dismissed, and the cost thereof including attorney's fees incurred by Contractor, shall become immediately due from Subcontractor to Contractor. Subcontractor may contest any such lien, attachment or suit, provided Subcontractor causes the effect thereof to be removed from the Project or any part thereof, or resolved as to any claim asserted against a payment bond furnished by Contractor. Should Subcontractor fail to make any payments required under this Paragraph, Contractor may make such payments on behalf of Subcontractor, and Subcontractor shall reimburse Contractor for the amount actually paid on demand.

71.

As a result of Defendant's substantial delay in performance under the Payment Bonds, RISE was forced to exercise its rights under Section 34 of the Subcontracts and procure lien release bonds for the Liens at RISE's own direct costs and expenses, including but not limited to the premiums paid to procure the lien release bonds to discharge the Liens from the Property (collectively, the "Lien Bond Costs").

72.

Section 12(e) of the Subcontracts provides that:

If Subcontractor's failure to timely prosecute its Work causes the contract time to be  extended beyond the time allowed by

19

the contract with Owner, the Subcontractor shall pay to the Contractor all liquidated and/or actual damages assessed against the Contractor by the Owner for which the Subcontractor is liable and shall also pay to the Contractor such actual damages as it may incur.

73.

Section 21(f) of the Subcontracts provides that:

Should Subcontractor default in the proper performance of Subcontractor's Work, thereby causing delay to the Project, Subcontractor shall be liable for any and all losses and damages to or incurred by Contractor including, without limitation, any liquidated damages agreed upon by Contractor and Subcontractor. Subcontractor shall be liable under this Paragraph even though such default is caused by strikes, lockouts, acts of God, or other reasons beyond the control of Subcontractor, unless Subcontractor gives written notice of the delay to Contractor within forty-eight (48) hours following the start of the alleged occurrence.

74.

As a direct result of Principal's Defaults under the Subcontracts, RISE has also incurred actual damages under its agreement with Owner for delays on the Project (the "Delay Damages") in an amount to be determined at trial, which shall not exceed the penal amount on the Bonds.

75.

Accordingly, due to Defendant's breach of the Bonds, RISE has incurred damages, and is entitled to payment from Defendant, in the amount of the Completion Costs and Default OH&P thereon, the Lien Bond Costs, the Delay Damages, plus interest thereon, attorneys' fees, court costs, and other actual damages.

20

76.

Without limitation of the foregoing, RISE is further entitled to recovery of its reasonable attorney's fees in connection with this action pursuant to Fla. Stat. § 627.756(1).

## Count I –
## Action for Breach of Contract
## (On-Site Performance Bond & On-Site Payment Bond)
## (Bond No. 6061025223)

77.

RISE reincorporates and realleges Paragraphs one (1) through seventy-six (76) of the Complaint as if fully restated herein.

78.

RISE, as "Obligee," and Defendant, as "Surety," are parties to the On-Site Bonds.

79.

Pursuant to the terms of the On-Site Performance Bond, Defendant is jointly and severally obligated and liable to RISE for the performance of On-Site Subcontract, up to the penal amount of $3,920,736.77.

80.

The On-Site Performance Bond is conditioned such that, if Principal "perform[ed] the Subcontract, then [the On-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect."

81.

Pursuant to the terms of the On-Site Payment Bond, Defendant is jointly and severally obligated and liable to RISE for payment of all costs for labor, materials and

21

equipment furnished for use in performance of the On-Site Subcontract, up to the penal amount of $3,920,736.77.

82.

The On-Site Payment Bond is conditioned such that, if Principal "shall promptly make payment directly or indirectly to all Claimants as defined in [the On-Site Payment Bond], for all labor, materials and equipment furnished for use in performance of [the On-Site Subcontract], then [the On-Site Payment Bond] shall be null and void; otherwise it shall remain in full force and effect…"

83.

Principal defaulted under the On-Site Subcontract and RISE terminated the On-Site Subcontract by delivery of the Notice of Termination on or about June 8, 2023.

84.

The Claimants filed Liens on the Property.

85.

There are no provisions in On-Site Bonds that required RISE to give prior notice to Defendant of Principal's defaults under the On-Site Subcontract.

86.

Notwithstanding, RISE gave reasonable and sufficient notice to Defendant of Principal's defaults under the On-Site Subcontract and the termination thereof by delivery of a copy of the Notice of Termination on or about June 8, 2023.

87.

RISE also gave Defendant reasonable and sufficient notice of the Liens filed by the Claimants as a result of Principal's failure to make payment due for labor, materials and equipment furnished for use in performance of the On-Site Subcontract.

88.

RISE made a clear and timely demand that Defendant perform upon its obligations under the On-Site Bonds in the Notice of Termination (and again thereafter in the October Letter, the December Letter and the March Letter), by discharging the Liens and reimbursing RISE for Completion Costs and related damages arising from Principal's default under the On-Site Subcontract.

89.

Defendant materially breached its obligations under the On-Site Payment Bond by failing to make prompt payment to Claimants so as to procure a timely discharge of the Liens.

90.

Defendant materially breached its obligations under the On-Site Performance Bond by failing to make payment to RISE for costs incurred by RISE to correct Principal's defective work and complete Principal's obligations under the On-Site Subcontract, as well as legal and design professional costs and actual damages incurred by RISE as the result of Principal's default under the On-Site Subcontract.

91.

RISE has been damaged by Defendant's breach of the On-Site Bonds and is entitled to damages from Defendant for Completion Costs in an amount to be determined

23

at trial, OH&P thereon, the Lien Bond Costs, the Delay Damages, and other actual damages, plus interest thereon, attorneys' fees, court costs, which amount shall not exceed the penal amount of the On-Site Bonds.

## Count II –
### Action for Breach of Contract
### (Off-Site Performance Bond & Off-Site Performance Bonds)
### (Bond No. 60610252323)

92.

RISE reincorporates and realleges Paragraphs one (1) through seventy-six (76) of the Complaint as if fully restated herein.

93.

RISE, as "Obligee," and Defendant, as "Surety," are parties to the Off-Site Bonds.

94.

Pursuant to the terms of the Off -Site Performance Bond, Defendant is jointly and severally obligated and liable to RISE for the performance of Off-Site Subcontract, up to the penal amount of $3,920,736.77.

95.

The Off-Site Performance Bond is conditioned such that, if Principal "perform[ed] the Subcontract, then [the Off-Site Performance Bond] shall be null and void; otherwise it shall remain in full force and effect."

96.

Pursuant to the terms of the Off-Site Payment Bond, Defendant is jointly and severally obligated and liable to RISE for payment of all costs for labor, materials and equipment furnished for use in performance of the Off-Site Subcontract, up to the penal amount of $1,594,032.85.

97.

The Off-Site Payment Bond is conditioned such that, if Principal "shall promptly make payment directly or indirectly to all Claimants as defined in [the Off-Site Payment Bond], for all labor, materials and equipment furnished for use in performance of [the Off-Site Subcontract], then [the Off-Site Payment Bond] shall be null and void; otherwise it shall remain in full force and effect…"

98.

Principal defaulted under the Off-Site Subcontract on account of its failure or refusal to correct defective work, failure to complete the Off-Site Scope in accordance with the schedule established under the terms of the Off-Site Subcontract and failure to pay its subcontractors and vendors – including the Claimants identified herein above - for labor, materials and equipment furnished for use in performance of the Off-Site Subcontract.

99.

As a result of such defaults by Principal, RISE terminated the Off-Site Subcontract by delivery of the Notice of Termination on or about June 8, 2023.

100.

The Claimants filed Liens on the Property.

101.

There are no provisions in Off-Site Bonds that require RISE to give prior notice to Defendant of Principal's defaults under the Off-Site Subcontract.

102.

Notwithstanding, RISE gave timely notice to Defendant of Principal's defaults under the Off-Site Subcontract and the termination thereof by delivery of a copy of the Notice of Termination on or about June 8, 2023.

103.

RISE also gave Defendant timely notice of the Liens filed by the Claimants as a result of Principal's failure to make payment due for labor, materials and equipment furnished for use in performance of the Off-Site Subcontract.

104.

RISE made a clear and timely demand that Defendant perform upon its obligations under the Off-Site Bonds in the Notice of Termination (and again thereafter in the October Letter, the December Letter and the March Letter), by discharging the Liens and reimbursing RISE for Completion Costs and related damages arising from Principal's default under the Off-Site Subcontract.

105.

Defendant materially breached its obligations under the Off-Site Payment Bond by failing to make prompt payment to Claimants so as to procure a timely discharge of the Liens.

106.

Defendant materially breached its obligations under the Off-Site Performance Bond by failing to make payment to RISE for costs incurred by RISE to correct Principal's defective work and complete Principal's obligations under the Off-Site Subcontract, as

26

well as legal and design professional costs and actual damages incurred by RISE as the result of Principal's default under the Off-Site Subcontract.

107.

RISE has been damaged by Defendant's breach of the Off-Site Bonds and is entitled to damages from Defendant for Completion Costs in an amount to be determined at trial, OH&P thereon, the Lien Bond Costs, the Delay Damages, and other actual damages, plus interest thereon, attorneys' fees, court costs, which amount shall not exceed the penal amount of the Off-Site Bonds.

### Count III – Breach of Third-Party Intended Beneficiary Contracts - On-Site Payment and Performance Bonds (Bond No. 6061025223)
### *In the Alternative to Count I*

108.

Plaintiff reincorporates and realleges Paragraphs one (1) through seventy-six (76) of the Complaint as if fully restated herein.

109.

Principal and Defendant are parties to the On-Site Bond with Bond Number 6061025223 with the amount of $3,920,736.77

110.

Principal and Defendant expressly named RISE as the "Obligee" on the On-Site Bonds, manifesting a clear intent that the On-Site Bonds were entered into primarily and directly for the benefit and security of Plaintiff for Principal's full and timely performance of the Subcontracts.

4860-0949-5500, v. 1

111.

Plaintiff gave timely notice to Defendant of Principal's defaults under the Subcontracts and the termination thereof and demanded that Defendant perform upon its clear obligations under the On-Site Bonds.

112.

Defendant materially breached its obligations under the On-Site Bonds by failing to make payment of amounts due to Principal's subcontractors and suppliers in the discharge of the Liens and to make prompt payment to RISE for all labor, material, and equipment used in the correction and completion of Principal's scope of work under the Subcontracts.

113.

RISE has been damaged by Defendant's breach of the On-Site Bonds and is entitled to damages from Defendant for Completion Costs in an amount to be determined at trial, OH&P thereon, the Lien Bond Costs, the Delay Damages, and other actual damages, plus interest thereon, attorneys' fees, court costs, which amount shall not exceed the penal amount of the On-Site Bonds.

### Count IV – Breach of Third-Party Intended Beneficiary Contracts - Off-Site Payment and Performance Bonds (Bond No. 6061025232)
*In the Alternative to Count II*

114.

Plaintiff reincorporates and realleges Paragraphs one (1) through seventy-six (76) of the Complaint as if fully restated herein.

4860-0949-5500, v. 1

115.

Principal and Defendant are parties to the Off-Site Bonds with Bond Number 6061025232 with the amount of $1,594,032.85.

116.

Principal and Defendant expressly named RISE as the "Obligee" on the Off-Site Bonds, manifesting a clear intent that the Off-Site Bonds were entered into primarily and directly for the benefit and security of Plaintiff for Principal's full and timely performance of the Subcontracts.

117.

Plaintiff gave timely notice to Defendant of Principal's defaults under the Subcontracts and the termination thereof and demanded that Defendant perform upon its clear obligations under the Off-Site Bonds.

118.

Defendant materially breached its obligations under the Off-Site Bonds by failing to make payment of amounts due to Principal's subcontractors and suppliers in the discharge of the Liens and to make prompt payment to RISE for all labor, material, and equipment used in the correction and completion of Principal's scope of work under the Subcontracts.

119.

RISE has been damaged by Defendant's breach of the Off-Site Bonds and is entitled to damages from Defendant for Completion Costs in an amount to be determined at trial, OH&P thereon, the Lien Bond Costs, the Delay Damages, and other actual

damages, plus interest thereon, attorneys' fees, court costs, which amount shall not exceed the penal amount of the Off-Site Bonds.

**WHEREFORE**, for the foregoing reasons, RISE requests that the Court enter judgment in its favor and against Defendant United States Fire Insurance Company as follows:

a. Awarding to RISE damages for Completion Costs, OH&P, Delay Damages, and other actual damages in an amount to be determined at trial by a jury totaling at least $551,758.58;

b. Awarding to RISE reasonable attorney fees;

c. Awarding to RISE damages associated with the Lien Bond Costs;

d. Awarding to RISE court costs; and

e. Awarding to RISE any further relief as this Court deems just and appropriate.

Dated: June 28, 2024.                    **COLEMAN TALLEY LLP**

*/s/ Mark A. Gilbert*
Mark A. Gilbert
Florida Bar No. 1013517
mark.gilbert@colemantalley.com
Gregory M. Ohl
Florida Bar No. 1039100
gregory.ohl@colemantalley.com
(904) 456-8966
1 Independent Drive, Suite 3130
Jacksonville, Florida 32202
*Attorney for RISE*

## CERTIFICATE OF SERVICE

I do by here certify that on June 28, 2024, I electronically filed the foregoing

Amended Complaint for Damages, along with this Certificate of Service with the Clerk

of the Court using electronic court filing system, which will send notification of such

filing to all Counsel of Record and served the same upon counsel for United States Fire

Insurance Company, James S. Myers, via electronic mail at JMyers@mdmc-law.com.


/s/Gregory M. Ohl

Gregory M. Ohl
Florida Bar No.: 1039100
COLEMAN TALLEY

EXHIBIT "A"

<u>On-Site Bonds</u>

4860-0949-5500, v. 1

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



# SUBCONTRACT PERFORMANCE BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL *(SUBCONTRACTOR)***
*(Name and Address):*
MCKENZIE CONTRACTING LLC
7712 E Broadway Ave
Tampa, Florida 33619

**SURETY *(Name and Address):***
UNITED STATES FIRE INSURANCE COMPANY
305 Madison Ave, Morristown NJ 07960

**OBLIGEE *(CONTRACTOR)***
*(Name and Address):*
RISE GENERAL CONTRACTORS LLC
4312 Pablo Professional Court
Jacksonville, Florida 32224

**SUBCONTRACT**
Date:     3/3/2022
Amount: $ 3,920,736.77
Description of Project *(Name and Location):*   Citrus Ridge - Site Work Contract#784-SC-005

**BOND**
Date *(Not earlier than Subcontract Date):*   4/12/2022
Penal Amount: $ 3,920,736.77

Bond No.   6061025223

**SUBCONTRACTOR AS PRINCIPAL**
Company:                                    (Corporate Seal)
MCKENZIE CONTRACTING LLC

Signature:
Name and Title:   OLIVER D. FERNANDEZ, JR.,
                          Managing Member

Witness:
*(Any additional signatures appear on page attached)*

**SURETY**
United States Fire Insurance Company (Corporate Seal)

Signature:
Name and Title: GLADYS KEITH, ATTORNEY-IN-FACT

Attach Power of Attorney

Witness:

FOR INFORMATION ONLY AGENT or BROKER: *(Name, Address and Telephone)*
  FSB AGENCY INC, 7971 RIVIERA BLVD, #211 MIRAMAR FL 33023, 954-589-1639

©1988, The Associated General Contractors of America

## Articles

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the Subcontract, which is incorporated in this bond by reference. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect.

3. **ALTERATION NOTICE WAIVER.** The Surety hereby waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by Paragraph 5 hereunder.

4. **PRINCIPAL DEFAULT.** Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:

   4.1 **COMPLETE SUBCONTRACT** Complete the Subcontract in accordance with its terms and conditions; or

   4.2 **OBTAIN NEW CONTRACTORS.** Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and upon determination by the Surety of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee. The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The cost of completion includes responsibilities of the Principal for correction of defective work and completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

   4.3 **PAY OBLIGEE.** Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

   4.4 **DENY LIABILITY** Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.

5. **TIME FOR SUIT** Any suit under this bond must be instituted before the expiration of two (2) years from the date of substantial completion as established by the contract documents.

6. **RIGHT OF ACTION.** No right of action shall accrue on this bond to or for the use of any person or entity other than the Obligee named herein, its heirs, executors, administrators or successors.

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



# SUBCONTRACT PAYMENT BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL** *(SUBCONTRACTOR)*
*(Name and Address):*
MCKENZIE CONTRACTING LLC
7712 E Broadway Ave
Tampa, Florida 33619

**SURETY** *(Name and Address).*
UNITED STATES FIRE INSURANCE COMPANY
305 Madison Ave, Morristown NJ 07960

**OBLIGEE** *(CONTRACTOR)*
*(Name and Address):*
RISE GENERAL CONTRACTORS LLC
4312 Pablo Professional Court
Jacksonville, Florida 32224

SUBCONTRACT
   Date:      3/3/2022
   Amount: $ 3,920,736.77
   Description of Project *(Name and Location):*   Citrus Ridge - Site Work Contract#784-SC-005

BOND
   Date *(Not earlier than Subcontract Date):* 4/12/2022
   Penal Amount: $ 3,920,736.77

   Bond No. 6061025223

**SUBCONTRACTOR AS PRINCIPAL**
Company:                                    (Corporate Seal)
MCKENZIE CONTRACTING LLC

Signature:
Name and Title: OLIVER D. FERNANDEZ, JR.,
                        Managing Member

Witness:
*(Any additional signatures appear on page attached)*

**SURETY**
United States Fire Insurance Company (Corporate Seal)

Signature:
Name and Title:  GLADYS KEITH, ATTORNEY-IN-FACT
Attach Power of Attorney

Witness:

FOR INFORMATION ONLY AGENT or BROKER: *(Name, Address and Telephone)*
   FSB AGENCY INC, 7971 RIVIERA BLVD, #211 MIRAMAR FL 33023   954-589-1631

**Articles**

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee to pay for labor, materials and equipment furnished for use in the performance of the Subcontract, which is incorporated in this bond by reference and pursuant to which this bond is issued. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal shall promptly make payment directly or indirectly to all Claimants as defined in this bond, for all labor, material and equipment used in the performance of the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

   2.1 **TIME FOR CLAIM.** The Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, for which claim is made, may have a right of action on this bond. The Obligee shall not be liable for the payment of any costs or expenses including attorneys' fees which the Obligee may incur in connection with its defense of any such right of action.

   2.2 **RIGHT OF ACTION.** No suit or action shall be commenced on this bond by any Claimant:

      2.2.1 Unless Claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: Principal, Obligee, or the Surety above named, within ninety (90) days after such Claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Obligee or Surety, at any place within the United States where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid Project is located, however, such service need not be made by a public officer.

      2.2.2 After the expiration of one (l) year from the date (l) on which the Claimant gave the notice required by Subparagraph 2.2.1, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone on the Project, whichever first occurs. Any limitation embodied in this bond, which is prohibited by any law controlling the Project, shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

      2.2.3 Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in which the Project, or any part thereof, is situated, and not elsewhere.

3. **CLAIMANT** A Claimant is defined as an individual or entity having a direct contract with the Principal to furnish labor, materials or equipment for use in the performance of the Subcontract or any individual or entity having valid lien rights which may be asserted in the jurisdiction where the Project is located. The intent of this bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Subcontract, architectural and engineering services required for performance of the work of the Principal, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

4. **AMOUNT OF BOND.** The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith by the Surety.

5. **ALTERATION NOTICE WAIVER.** The Surety waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by Paragraph 2.2 hereunder.

©1988, The Associated General Contractors of America

**POWER OF ATTORNEY**
UNITED STATES FIRE INSURANCE COMPANY
PRINCIPAL OFFICE - MORRISTOWN, NEW JERSEY

0244022

KNOW ALL MEN BY THESE PRESENTS: That United States Fire Insurance Company, a corporation duly organized and existing under the laws of the state of Delaware, has made, constituted and appointed, and does hereby make, constitute and appoint:

*Gladys Keith, Margaret Hall, Levan Porter Jr., Shantinell Porter*

each, its true and lawful Attorney(s)-In-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver: Any and all bonds and undertakings of surety and other documents that the ordinary course of surety business may require, and to bind United States Fire Insurance Company thereby as fully and to the same extent as if such bonds or undertakings had been duly executed and acknowledged by the regularly elected officers of United States Fire Insurance Company at its principal office, in amounts or penalties not exceeding: **Seven Million, Five Hundred Thousand Dollars ($7,500,000).**

This Power of Attorney limits the act of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind United States Fire Insurance Company except in the manner and to the extent therein stated.

This Power of Attorney revokes all previous Powers of Attorney issued on behalf of the Attorneys-In-Fact named above and expires on January 31, 2023.

This Power of Attorney is granted pursuant to Article IV of the By-Laws of United States Fire Insurance Company as now in full force and effect, and consistent with Article III thereof, which Articles provide, in pertinent part:

Article IV, Execution of Instruments - Except as the Board of Directors may authorize by resolution, the Chairman of the Board, President, any Vice-President, any Assistant Vice President, the Secretary, or any Assistant Secretary shall have power on behalf of the Corporation:

(a)  to execute, affix the corporate seal manually or by facsimile to, acknowledge, verify and deliver any contracts, obligations, instruments and documents whatsoever in connection with its business including, without limiting the foregoing, any bonds, guarantees, undertakings, recognizances, powers of attorney or revocations of any powers of attorney, stipulations, policies of insurance, deeds, leases, mortgages, releases, satisfactions and agency agreements;

(b)  to appoint, in writing, one or more persons for any or all of the purposes mentioned in the preceding paragraph (a), including affixing the seal of the Corporation.

Article III, Officers, Section 3.11, Facsimile Signatures.  The signature of any officer authorized by the Corporation to sign any bonds, guarantees, undertakings, recognizances, stipulations, powers of attorney or revocations of any powers of attorney and policies of insurance issued by the Corporation may be printed, facsimile, lithographed or otherwise produced.  In addition, if and as authorized by the Board of Directors, dividend warrants or checks, or other numerous instruments similar to one another in form, may be signed by the facsimile signature or signatures, lithographed or otherwise produced, of such officer or officers of the Corporation as from time to time may be authorized to sign such instruments on behalf of the Corporation.  The Corporation may continue to use for the purposes herein stated the facsimile signature of any person or persons who shall have been such officer or officers of the Corporation, notwithstanding the fact that he may have ceased to be such at the time when such instruments shall be issued.

IN WITNESS WHEREOF, United States Fire Insurance Company has caused these presents to be signed and attested by its appropriate officer and its corporate seal hereunto affixed this 28th day of September, 2021.

UNITED STATES FIRE INSURANCE COMPANY

_____
Matthew E. Lubin, President

State of New Jersey   }
County of Morris }

On this 28th day of September, 2021, before me, a Notary public of the State of New Jersey, came the above named officer of United States Fire Insurance Company, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seal of United States Fire Insurance Company thereto by the authority of his office.

> MELISSA H. D'ALESSIO
> NOTARY PUBLIC OF NEW JERSEY
> Commission # 50125833
> My Commission Expires 4/7/2025

_____
Melissa H. D'Alessio                                    (Notary Public)

I, the undersigned officer of United States Fire Insurance Company, a Delaware corporation, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy is still in force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of United States Fire Insurance Company on the ___12___ day of ___APrIL___ 20 __22__

UNITED STATES FIRE INSURANCE COMPANY

_____
Alfred N. Wright, Senior Vice President



## COVID-19 PERFORMANCE BOND RIDER

THIS RIDER is hereby incorporated into, and forms a part of, the Performance Bond, identified by number as ___6061025223_____ (the "BOND").

WHEREAS, this RIDER is created, effective, and issued contemporaneously with the BOND, and the SURETY and PRINCIPAL rely upon the effectiveness of this RIDER and the incorporation of its terms and obligations into the BOND at the time of its formation as an inducement to its agreement of the terms and obligations of the BOND; and,

WHEREAS, the COVID-19 global pandemic is an unforeseeable public health emergency of unknown duration or pattern.

NOW THEREFORE, this RIDER modifies the BOND as follows:

1.  Neither the SURETY nor the PRINCIPAL shall be liable to the OBLIGEE under the BOND, for claims and/or damages, or anything, caused by, relating to, or in connection with, directly or indirectly, the COVID-19 global Pandemic, and/or related directives from national, state, and/or local officials, including but not limited to, delay damages, additional costs in performance, costs related to requested accelerations, and/or damages due to default or termination of the Contract.

2.  The provisions of this RIDER shall be in full force and effect notwithstanding whether or not the PRINCIPAL has complied with the terms and conditions of the Contract with respect to any claims and/or defenses regarding default and/or termination of the Contract arising out of, directly or indirectly, the COVID-19 global pandemic, and/or related directives from national, state, and/or local officials. The PRINCIPAL's failure, in whole or in part, to comply with the applicable terms and conditions of the Contract shall not bar the SURETY from exercising its rights set forth in this RIDER.

3.  If the Contract requires notice to the OBLIGEE from the PRINCIPAL and/or the SURETY of COVID-19-related impacts on the Project, the OBLIGEE is deemed to have sufficient notice upon issuance of this RIDER and waives any further notice.

4.  Any agreement between PRINCIPAL and OBLIGEE to which the SURETY is not a party, related to the subject matter of this RIDER, shall have no force and effect as to the SURETY or the BOND, absent the SURETY's express consent.

5.  For purposes of this RIDER, the following definitions are added:
    a.  COVID-19 means coronavirus disease 2019, or any other disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (previously known as 2019-nCoV), or any disease caused by any mutation or variation of SARS-CoV-2.

**COVID-19 PERFORMANCE BOND RIDER**                                                      1



**CRUM & FORSTER**
A FAIRFAX COMPANY

    b.  <u>Pandemic</u> means a widespread occurrence of a communicable disease, including COVID-19, as has been declared, assessed or characterized as a pandemic by the World Health Organization, in any public statement.

      It is further understood and agreed that all other terms and conditions of the BOND shall remain unchanged.

SIGNED, SEALED AND DATED THIS <u>12</u> day of <u>APRIL</u>, 20<u>22</u>.

**COVID-19 PERFORMANCE BOND RIDER**          2

EXHIBIT "B"

<u>On-Site Subcontract</u>



SUBCONTRACT AGREEMENT

| TRADE: | SUB NAME.: | COST CODE: | CONTRACT AMOUNT: |
|---|---|---|---|
| Site Contractor | McKenzie Contracting LLC. | 02-31-1000 | $3,920,736.77 |

| JOB NO.: | P/P BONDS REQUIRED | SUB CODE | RETAINAGE |
|---|---|---|---|
| 007-BR-784 | Yes | | 10% |

THIS SUBCONTRACT AGREEMENT (this "Subcontract") is made and entered into this ___21___ day of ___January___, in the year 20__22__, and between Contractor and Subcontractor.

**PROJECT INFORMATION**

PROJECT NAME ("Project"):  Citrus Ridge

PROJECT ADDRESS/PROPERTY DESCRIPTION ("Jobsite"):  US HWY 27 & Citrus Ridge Drive  Davenport, FL 33837

NAME OF CONTRACTOR ("Contractor")  RISE General Contractors, LLC

ADDRESS:  10161 Centurion Parkway N    Jacksonville, FL 32256

TELEPHONE/FAX NUMBER:  TEL.: 904-373-1741

NAME OF PROJECT OWNER ("Owner"):  Citrus Ridge Properties, LLC

ADDRESS:  129 N. Patterson St., Valdosta, GA 31601

NAME OF PROJECT ARCHITECT:  Dwell Design Studio

---

**SUBCONTRACTOR INFORMATION**

NAME OF SUBCONTRACTOR:  McKenzie Contracting LLC.

PRIMARY CONTACT PERSON/Email:  Oliver D. Fernandez Jr.

ADDRESS:  7712 E. Broadway Ave., Tampa, Florida 33619

TELEPHONE: 857-222-4452          FAX: _____        EMAIL: _____

[✓] CORPORATION     [ ] PARTNERSHIP     [ ] PROPRIETORSHIP

IF PARTNERSHIP/PROPRIETORSHIP, NAME (S) OF PARTNERS OR CONTRACTORS:

IF CORPORATION, NAME (S) OF PRINCIPAL OFFICERS:

TAX I.D. NO. (FED. I.D. # OR SSN):

STATE CONTRACTORS LICENSE NO.: _____   CITY BUSINESS LICENSE NO.: _____

WORKER'S COMPENSATION INSURANCE CARRIER:

POLICY NO.: _____   EXPIRATION DATE:

GENERAL LIABILITY INSURANCE CARRIER:

POLICY NO:      EXPIRATION DATE:

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

Page 1 of 12

A REAL ESTATE COMPANY

## CONTRACT SECTION HEADINGS AND EXHIBITS

SECTION 1:     CONTRACT DOCUMENTS
SECTION 2:     SUBCONTRACTOR'S INVESTIGATION
SECTION 3:     COMMENCEMENT AND IME OF ESSENCE
SECTION 4:     CONTRACT PRICE
SECTION 5:     PAYMENTS TO SUBCONTRACTOR
SECTION 6:     LIST OF SUPPLIERS
SECTION 7:     ADDITIONS, CHANGES AND MODIFICATIONS TO SUBCONTRACT
SECTION 8:     OPTIONS
SECTION 9:     ADHERENCE TO PLANS AND SPECIFICATIONS
SECTION 10:    EXTRAS
SECTION 11:    TAXES
SECTION 12:    TIMING OF WORK
SECTION 13:    INSPECTIONS AND APPROVALS
SECTION 14:    LINES, GRADES AND MEASUREMENTS
SECTION 15:    RELATED WORK
SECTION 16:    INTERRUPTION OF WORK/FORCE MAJEURE
SECTION 17:    CORRECTIONS OF DEFECTS IN MATERIAL OR WORK
SECTION 18:    DAMAGES TO RELATED WORK
SECTION 19:    DEFECTS AND WORKMANSHIP – INDEMNIFICATION
SECTION 20:    GUARANTEE/WARRANTY
SECTION 21:    TERMINATION OF SUBCONTRACT
SECTION 22:    REMOVAL OF CONDEMNED WORK
SECTION 23:    DEFENSE OF PATENTS
SECTION 24:    CUTTING, FITTING AND PATCHING; WORK OF OTHERS
SECTION 25:    CLAIMS FOR DELAY OR DAMAGE
SECTION 27:    INDEMNIFICATION
SECTION 28:    INDEPENDENT SUBCONTRACTOR RELATIONSHIP
SECTION 29:    CLEAN-UP
SECTION 30:    USE OF CONTRACTOR'S EQUIPMENT
SECTION 31:    PERMITS AND LAWS
SECTION 32:    HAZARDOUS MATERIALS
SECTION 33:    ASSIGNMENT
SECTION 34:    LIENS
SECTION 35:    FINANCIAL STATUS
SECTION 36:    DEATH OF SUBCONTRACTOR
SECTION 37:    TITLE
SECTION 38:    RIGHT TO DEMAND BOND
SECTION 39:    NO DELAY
SECTION 40:    SAFETY
SECTION 41:    DISPUTE RESOLUTION
SECTION 42:    LABOR RELATIONS
SECTION 43:    MISCELLANEOUS
EXHIBIT "A"     GENERAL REQUIREMENTS/SCOPE OF WORK
EXHIBIT "B-1"   PAYMENT SCHEDULE/APPLICATION FOR PAYMENT
EXHIBIT "B-2"   SUPPLIER/SUB-SUBCONTRACTOR LIST
EXHIBIT "C"     STATEMENT OF INSURANCE REQUIREMENTS
EXHIBIT "D"     SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT
EXHIBIT "E"     SUBCONTRACTOR'S INTERIM AFFIDAVIT UPON PAYMENT
EXHIBIT "F"     SUPPLIER/SUB-SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT
EXHIBIT "G"     SUBCONTRACTORS'S WAIVER AND RELEASE UPON FINAL PAYMENT
EXHIBIT "H"     SUBCONTRACTOR'S FINAL AFFIDAVIT
EXHIBIT "I"     SUPPLIER/SUB-SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT
EXHIBIT "J"     CONTRACT DOCUMENTS

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**1. CONTRACT DOCUMENTS**. The "Contract Documents" shall refer to and consist of all documents listed on Exhibit J, including this Subcontract, all exhibits, plans, drawings and specifications, and any amendments, change orders or addenda hereto executed in accordance with the terms hereof, all of which are hereby incorporated herein by this reference. The Contract Documents describe the work to be performed by Subcontractor under this Subcontract (the "Work"). The Contract Documents are intended to supplement each other as if the Work was described in all such documents. The intention of the Contract Documents is to include all labor, material, equipment, permits, licenses, appliances and other items necessary for the proper execution and completion of the Work. Subcontractor acknowledges that it has carefully examined and studied the Contract Documents in their entirety and that Subcontractor fully understands the character of the Work to be performed under the Contract Documents.

**2. SUBCONTRACTOR'S INVESTIGATION**. Subcontractor acknowledges that Subcontractor has made an independent investigation of the Job Site, the soil conditions at the Job Site and all other conditions which might affect the progress and cost of the Work and has satisfied itself that such conditions will not interfere with Subcontractor's execution and completion of the Work consistent with the Contract Documents for the Contract Price. The "Contract Price" (defined below) as set forth in the "Payment Schedule" attached hereto as Exhibit B-1 includes payment for all work, labor, materials, equipment, permits, licenses and other items and matters which may be necessary for Subcontractor to complete the Work. Any information which Contractor may furnish to Subcontractor about underground conditions or other job conditions is for the convenience of Subcontractor only, and Contractor does not warrant that the conditions are as so indicated. Subcontractor agrees to perform the Work in a good and workmanlike manner, and to furnish all labor, materials, supplies, equipment, services, machinery, tools and other facilities required for the prompt and efficient execution of the Work in conformance with the Contract Documents, to the full satisfaction and acceptance of Contractor, for the Contract Price. Subcontractor has satisfied itself as to the availability of materials, labor and all other conditions affecting and impacting its Work on the Project and agrees that the Work can be performed for the Contract Price. All materials shall be new unless otherwise specified in writing by Contractor. Subcontractor shall be obligated to perform the Work in strict compliance with the Contract Documents and all applicable laws, codes, ordinances and regulations.

**3. COMMENCEMENT AND TIME OF ESSENCE**. Contractor shall give Subcontractor seven (7) days advance notice of the date upon which Subcontractor is to commence the performance of the Work. Time is of the essence in this Contract and Subcontractor shall commence the performance of the Work immediately upon receipt of the notice to proceed by Contractor.

**4. CONTRACT PRICE**. For the strict, full and complete performance of the Work ("substantial performance" shall not be sufficient) by Subcontractor of all of Subcontractor's obligations under the Contract Documents, and subject to the terms of this Subcontract, Contractor shall pay to Subcontractor the "Contract Price" set forth in Exhibit "B-1". The Contract Price is intended to include all costs associated and necessary for the performance of the Work, including all increases in costs, foreseen and unforeseen, including, without limitation, taxes, labor, materials, storage and transportation costs, all of which are to be borne solely by Subcontractor. All loss or damage arising from any Work performed under this Subcontract through unforeseen or unusual conditions, obstructions, difficulties or delays which may be encountered in the prosecution of the Work, or through the action of the elements including abnormal or adverse weather, shall be borne by Subcontractor.

**5. PAYMENTS TO SUBSUBCONTRACTOR**. So long as

payments will be made for Work completed at the times and in the amounts set forth below.

(a) **Progress Payments and Final Payment**. Contractor agrees to make progress payments to Subcontractor for portions of the Work completed, subject to subparagraphs (b) and (c) below, based upon the applicable pro rata portion of the Contract Price, less applicable retentions as set forth in the Payment Schedule. Final payment shall be made (as set forth in subparagraph (d) below, have been satisfied, and satisfactory proof that all claims, including, without limitation, taxes, growing out of the Work (and any liens related thereto) have been released or otherwise discharged.

(b) **Requests for Payment**.

Forms: Subcontractor shall prepare and present to Contractor, for Contractor's approval, a Payment Schedule in the form provided by Contractor showing the amount due for each payment period. Each Payment Schedule must be date stamped "RECEIVED" by Contractor on or before the applicable date specified in the Payment Schedule.

Conditions Precedent. Contractor is not required to make any payment to Subcontractor unless and until the following conditions have occurred: (a) Subcontractor shall previously have provided Contractor with the following: (i) the Certificates of Insurance required by Paragraph 26 of this Subcontract; (ii) Conditional Lien Waivers from Subcontractor and all persons (including second and third tier sub-subcontractors and material suppliers) who may have mechanic's lien rights, or labor and material bond rights against the Project with respect to amounts being requested for payment together with Unconditional Lien Waivers from such parties covering amounts for which prior payment has previously been received, in the forms attached hereto as Exhibits "D" and "F", (iii) if requested by Contractor, certified payrolls and any other related information and evidence demonstrating that Subcontractor has satisfied its payment obligations through the current progress billing date; and (iv) Subcontractor has furnished an Interim Affidavit Upon Payment in the form attached hereto as Exhibit "E"; and (b) Contractor has received payment from the Project's Owner for the Work performed by Subcontractor. Subcontractor expressly acknowledges and agrees that receipt of payment by the Owner is an express condition precedent to Subcontractor's entitlement to payment for any Work performed hereunder.

(c) **Withholding of Payments**. Contractor may withhold payments, in whole or in part, in order to protect Contractor from loss because of:

1. Defective work not remedied, materials not furnished, clean-up not performed;
2. Claims filed or reasonable evidence indicating probable filing of claims (including claims covered by insurance, until such claims are accepted by the insurance carrier);
3. Failure of Subcontractor to make payments properly to its Subcontractors, suppliers or employees for labor, materials or equipment, transportation or shipping costs, taxes, fees, payments to labor unions and union trust funds or other claims arising out of the Work;
4. Reasonable doubt that the Work can be completed for the unpaid balance of the Contract Price;
5. Damage to another Subcontractor, or to Contractor;
6. Reasonable indication that the Work will not be completed on schedule;
7. Unsatisfactory prosecution of the Work by Subcontractor;

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

8. Failure to deliver written guarantees or warranties;

9. Failure to obtain the approvals required by any authority having jurisdiction; or

10. Defaults which have not been cured by Subcontractor.

When the above grounds are removed by Subcontractor to the reasonable satisfaction of Contractor, the applicable amounts withheld (less costs incurred by Contractor (including attorneys' fees) shall be paid. Contractor may require that Subcontractor furnish releases in forms satisfactory to Contractor for all claims made under (c) 2 and (c) 3 above, together with supporting invoices, receipts or other records to substantiate the amounts owing or paid as Contractor may require.

(d) _Final Payment_. Final payment including retention shall be made to Subcontractor upon (i) completion of the Subcontractor's Work in strict accordance with the Contract Documents, including all punch list work; (ii) the occurrence of any and all conditions precedent to Subcontractor's entitlement to final payment as provided in the Contract Documents; (iii) receipt by Contractor of payment from Owner for Subcontractor's Work, this being an express condition precedent, so as to permit Contractor to make the final payment to Subcontractor; (iv) the delivery to Contractor of all required documents such as warranty forms, guaranties, and as-built drawings; (v) certification from Subcontractor that all labor (including fringe benefits) and payments due under collective bargaining agreements have been paid in full; and (vi) the providing to Contractor of Waivers and Releases Upon Final Payment from Subcontractor and all sub-subcontractors and suppliers of any tier in the forms attached as Exhibits "G" and "I"; and (vii) a Final Affidavit from Subcontractor in the form attached as Exhibit "H".

(e) _Subcontractor Application of Payments_. Before application to any other purpose, any and all funds payable to Subcontractor hereunder are hereby declared to constitute trust funds in the hands of Subcontractor to be applied first to the payment of (i) claims of Subcontractor's Subcontractors, architects, engineers, surveyors, laborers and material men arising out of the described Work, (ii) claims for utilities furnished and taxes imposed, and (iii) premiums on surety bonds, other bonds filed, and insurance accruing during the construction of the Work.

(f) _Subcontractor Receipt of Payments_. Any payment made hereunder, or advances made by Contractor prior to full completion and final acceptance of the Work shall not be construed as evidence of acceptance of any of Subcontractor's Work by Contractor. If construction loan funds are deposited in a joint control account, Subcontractor agrees to accept payments from such account, and any payment order given by Contractor to Subcontractor thereon shall be deemed payment by Contractor and a release of Contractor in the amount of any such order. Contractor shall have the right to make payments from the Subcontractor's progress payments or final payment directly to Subcontractor's employees, subcontractors, suppliers, laborers, material suppliers or the like in payment of material, labor, equipment and machinery rental and other services incorporated into the Work.

**6. LIST OF SUPPLIERS AND SUBCONTRACTORS**. Subcontractor shall within ten (10) days of execution of this Subcontract provide in writing a list of names and addresses of all suppliers and subcontractors who will supply material labor, equipment, machinery, and/or services to Subcontractor in connection with the Work. The written list of suppliers shall, upon receipt, approval and execution by Contractor, be attached to this Contract as Exhibit "B-2" and shall be made a part hereof. Subcontractor warrants that the list of suppliers who will supply material to Subcontractor shall be Subcontractor's only suppliers (of any tier) related to the Work and agrees to defend, indemnify and hold harmless Contractor from and against any and all claims and damages sustained as a result of the inaccuracy or breach of such warranty.

**7. ADDITIONS, CHANGES AND MODIFICATIONS TO SUBCONTRACT**. The terms and conditions of this Subcontract are not subject to modification or change unless such addition, modification or change is made in writing by a duly authorized representative of Contractor pursuant to an "_Authorization for Extra Work and Change Order_." Any addition, change or modification made by any other person or persons shall not be binding upon Contractor, nor shall Contractor have any responsibility or liability for unauthorized additions, changes or modifications to this Contract. All Authorizations for Extra Work and Change Orders shall be made a part of this Subcontract and subject to all terms and conditions set forth herein. No officer, employee, or agent of Contractor has any authority to direct any addition, change or modification by oral order or directive. Under no circumstances shall Subcontractor be entitled to an adjustment of the Contract Price in the absence of an Authorization for Extra Work and Change Order executed by Contractor _prior_ to Subcontractor having incurred any such costs.

**8. OPTIONS.** Subcontractor hereby acknowledges and agrees that the construction of upgrades and options may require modifications to the scope of the Work, which, if not already provided for in _Exhibit "A"_ attached hereto, shall require a change in the scope of the Work in accordance with the terms of Paragraph 7 and 9 hereof.

**9. ADHERENCE TO PLANS AND SPECIFICATIONS**. Subcontractor shall adhere strictly to the plans and specifications for the Work unless an Authorization for Extra Work and Change Order is made as provided above. In such case, the terms of said Authorization for Extra Work and Change Order shall be understood and agreed upon in writing by Contractor and Subcontractor before commencement of the revised Work. Additional work or deviation from the plans and specifications performed without an Authorization for Extra Work and Change Order will not receive reimbursement. Disputed Work indicated or necessary to complete the Project shall be promptly performed as ordered by Contractor and time slips, work orders, invoices, and all documents necessary to support the costs claimed therefore shall be submitted weekly to Contractor for review and consideration. All time slips, work orders and other supporting documents must be signed by the Subcontractor prior to the submission of any Change Order to Contractor for consideration. Should the plans vary from the specifications, then the specifications shall govern. Should there be any discrepancy between the plans or the specifications, or both, and any governmental laws or regulations, then those which are more stringent shall govern. Contractor assumes no responsibility for failure of the plans or the specifications to meet with governmental laws or regulations, and it is conclusively presumed that Subcontractor is familiar with said governmental laws or regulations, regardless of the provisions of the plans or specifications. Subcontractor agrees that should any change be required by any governmental authority, such change shall be made by Subcontractor without additional charge. If any of the Contract Documents provide for a method of work contrary to any such laws and regulations, Subcontractor shall be required to notify Contractor in writing prior to the installation of the Work.

**10. EXTRAS.** It is agreed that all labor, materials and equipment furnished by Subcontractor shall be deemed to be included within the Contract Price even though the labor, materials and equipment are not specifically required or demanded in this Contract or the plans and specifications, and that the same nevertheless shall be deemed to be included within the scope of labor, materials and equipment properly and necessarily required for the performance of the Work. Contractor, at any time during the progress of the Project, may order in writing changes, additions or modifications to the plans and specifications in accordance with Paragraph 7 hereof, and the same shall not void this Subcontract. Unless otherwise requested by Contractor in writing, Subcontractor, prior to commencement of any such revised Work, shall submit within seven (7) days to Contractor written copies of Subcontractor's cost or credit proposal for such revised Work. Subcontractor will support all claims for extras with a detailed breakdown showing differences in quality, and value of labor and material involved. Failure to timely submit a request for additional

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

compensation shall constitute a representation by Subcontractor that no additional compensation for the change or revision is being sought and shall constitute a waiver and release of any such request. The "Construction Sequence Schedule" (as defined in Section 12 below) will remain fixed, unless expressly otherwise agreed to in an Authorization for Extra Work and Change Order. If the time is extended and Contractor so notifies Subcontractor in writing, all added Work performed by Subcontractor on a time and material basis (in lieu of unit prices or for a negotiated lump sum) shall be performed by Subcontractor at Subcontractor's actual net cost plus overhead and profit, with or without a maximum guarantee total cost, at Contractor's option. Subcontractor's markup for overhead and profit will not exceed that permitted by the contract documents (including field supervision, tools and equipment) unless agreed to by contractor in advance of the commencement of such revised work.

**11. TAXES.** The Contract Price includes the payment by Subcontractor of (i) any tax under any state sales or use tax law, or any amendments thereto, or any law now existing, or which may hereafter be adopted by Federal, State and Local or other governmental authority, which tax services, or labor and material furnished; or (ii) any other taxes levied by reason of the Work.

**12. TIMING OF WORK.**

(a) Scheduled Completion. The Project is scheduled to be finally complete on or before ___July 21, 2023___. For purpose of clarification, the Subcontractor does not necessarily have until that date to complete all of the Work prescribed in this Subcontract but must comply and maintain progress in accordance with the work of the Contractor and other Subcontractors so as to ensure that the Project is finally complete by the date referenced above.

(b) Coordination. Subcontractor agrees to punctually and diligently perform all parts of Subcontractor's Work at the time scheduled by Contractor, which shall be subject to change, at no additional cost, by Contractor as deemed necessary or convenient to overall progress of the Project. In this regard, Subcontractor agrees that Subcontractor will keep itself continually informed of the progress of the Project and will, upon Subcontractor's own initiative, confer with Contractor so as to plan Subcontractor's Work in coordinated sequence with the work of Contractor and of others and so as to be able to expeditiously undertake and perform Subcontractor's Work at the time most beneficial to the entire Project; however, Subcontractor shall not proceed with any phase of its Work ahead of the time designated by Contractor unless authorized by Contractor.

(c) Approvals and Order of Installation. Subcontractor shall prepare and obtain approval as required by the Contract Documents for all shop drawings, details and samples, and do all other things necessary and incidental to the prosecution of Subcontractor's Work in conformance with the Construction Sequence Schedule. Contractor shall have control of the Job Site and shall have the right to decide the time or order in which the various portions of the Work shall be installed or the priority of the work of other Subcontractors, and in general, all matters respecting the timely and orderly conduct of the work of Subcontractors on the Job Site. If the Project or the Work is divided into parts, Subcontractor will perform several or all parts simultaneously, if required by Contractor.

(d) Subcontractor Delays. If Subcontractor is behind in the Work, fails or refuses to supply sufficient workers or deliver materials or equipment on schedule, and delays progress of the Work; or if the different parts thereof are not commenced, performed, finished and delivered on time, then in addition to any other remedies of Contractor as provided for herein, Contractor shall have the right to direct Subcontractor to furnish additional labor and expedite deliveries of material and equipment at Subcontractor's cost and expense. If such additional labor is not available, Contractor has the right to require Subcontractor at Subcontractor's cost, to work overtime or additional shifts (and/or weekends and holidays)

and/or to employ additional Subcontractors to such an extent as will be sufficient to speed up and complete the Work on schedule. Should Contractor's work schedule be changed, Subcontractor will proceed in strict accordance with Contractor's directions. In the event Subcontractor fails or refuses to furnish such additional labor, materials and equipment or to work overtime or additional shifts as directed by Contractor hereunder, Contractor shall be entitled to have such labor, materials and equipment furnished on Subcontractor's behalf and the costs associated with the same shall be charged to Subcontractor and be deducted from the Contract Price or be immediately payable to Contractor by Subcontractor at Contractor's option.

(e) Damages. If Subcontractor's failure to timely prosecute its Work causes the contract time to be extended beyond the time allowed by the contract with Owner, the Subcontractor shall pay to the Contractor all liquidated and/or actual damages assessed against the Contractor by the Owner for which the Subcontractor is liable and shall also pay to the Contractor such actual damages as it may incur.

**13. INSPECTIONS AND APPROVALS.** The Work shall be subject to inspection and approval by Contractor and all applicable governmental authorities. Subcontractor shall be required to furnish, for the approval of Contractor and all applicable governmental authorities such samples, shop drawings and patterns, as may be required for the Work, and all Work shall be in accordance therewith. Subcontractor shall provide sufficient, safe and proper facilities during the progress of the Work for inspections by Contractor and all applicable governmental authorities in the field, at shops or at any place where materials required hereunder are in course of preparation, manufacture, treatment or storage. Contractor shall be afforded access to Subcontractor's records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda and similar data relating to this Contract, and Subcontractor shall preserve all such records for a period of four (4) years, or for such longer period as may be required by law, after the Final Payment Date.

**14. LINES, GRADES AND MEASUREMENTS.** Subcontractor assumes full responsibility for the accuracy of all lines, grades, levels and measurements and their relation to benchmarks, property lines, reference lines and the work of Contractor or other Subcontractors. In all cases where dimensions are governed by conditions already established, the responsibility for correct knowledge of the conditions shall rest entirely on Subcontractor. No variation from specified lines or grades or dimensions shall be made except on written authority of Contractor. All work shall be made to conform to actual, final conditions as they develop in the course of construction.

**15. RELATED WORK.** By commencing Work, Subcontractor acknowledges that all related, adjacent or dependent work, services, utilities or materials are acceptable to Subcontractor, and Subcontractor waives any and all claims for damages or extras with respect to defects or failure thereof.

**16. INTERRUPTION OF WORK/FORCE MAJEURE.** If, as a result of fire, earthquake, acts of God, war, strikes, picketing, boycott, lockouts, or other causes or conditions beyond the control of Contractor, Contractor shall consider it inadvisable to proceed with the Work, then Subcontractor shall, upon receipt of written notice from Contractor, immediately discontinue any further Work until such time as Contractor may deem it advisable to resume the Work. Subcontractor will resume the Work promptly upon receiving written notice from Contractor to do so, and Subcontractor shall not be entitled to any damages or compensation on account of cessation of Work as a result of any of the causes mentioned above. If Subcontractor wishes to make a time extension request for such cessation of Work, it must present such request in writing to the Contractor within five (5) calendar days after the commencement of such event. Subcontractor will receive any extension Contractor receives from the Owner.

**17. CORRECTION OF DEFECTS IN MATERIAL OR WORK.** All defects in materials used or Work performed shall, upon

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

inspection and notice from Contractor or a designated City, State or County inspector, be immediately (24 hours) corrected by Subcontractor to the satisfaction of Contractor and the designated inspector, at Subcontractor's sole expense, without cost to Contractor.

**18. DAMAGE TO RELATED WORK**. Should Subcontractor damage the Work or installations or work of Contractor or any other subcontractor, Subcontractor shall promptly pay Contractor or such subcontractor, as the case may be, all costs incurred in repairing the damage. Subcontractor shall take all action necessary to insure that its suppliers and subcontractors do not damage drives, paving, curbs and sidewalks or any of the Work, and Subcontractor shall be responsible for any such damage.

**19. DEFECTS AND WORKMANSHIP -INDEMNIFICATION**. Subcontractor hereby indemnifies, defends and holds Contractor, Owner and other parties indemnified by Contractor under its contract with Owner, and their respective agents, representatives, and assigns, and sureties harmless from any and all liability, claims and damages caused by defective workmanship or materials, or the delays caused thereby, and will pay and/or reimburse Contractor for any and all such liability, claim or damages. Should any dispute arise as to Subcontractor's workmanship or the quality of materials furnished, the decision of Contractor reasonably made and arrived at shall be binding and final on Subcontractor. Such indemnity shall survive the acceptance of Subcontractor's Work by Contractor and shall be binding upon Subcontractor and its successors and assigns until any applicable statute of limitations has run.

**20. GUARANTEE/WARRANTY**. Subcontractor guarantees and warranties all materials and workmanship of Subcontractor and agrees to replace at its sole cost and expense and to the reasonable satisfaction of Contractor, any or all materials adjudged defective or improperly installed and additionally guarantees and warranties the same against liability, losses, or damage for one (1) year from final completion of the entire Project (the "Correction Period"). If, however, the period of guarantee or warranty is stipulated in excess of one (1) year by the Contract Documents, Subcontractor shall be bound thereby, and the Correction Period shall be for such longer period. All guarantees and warranties, including equipment warranties, will inure to the benefit of Contractor, the Owner and their respective successors and assigns. Nothing set forth in this paragraph shall be construed to limit or modify Subcontractor's obligation to complete the Work in accordance with the requirements of the Contract Documents and this Subcontract. Subcontractor shall, at is sole expense, take all commercially reasonable measures to obtain all guarantees and warranties of materials furnished to from any manufacturer or supplier in connection with the Subcontractor's Work. All such warranties shall be deemed to run to the benefit of Owner. Subcontractor shall and does hereby assign to Owner the benefits of any warranties furnished to it, but such assignment shall not relieve Subcontractor of its warranty obligations to Contractor or Owner under this Subcontract or any other Contract Document. Prior to final acceptance of the Work by Contractor or Owner, Subcontractor shall deliver to Contractor all warranties on materials furnished by all manufacturers and suppliers to Subcontractor and its sub-subcontractors, with duly executed instruments properly assigning the Warranties to Owner. Subcontractor shall obtain from all manufacturers and suppliers warranties upon the optimum terms and longest periods reasonably obtainable.

(a) Additional terms applicable to Roofing, Sheet metal, Caulking and/or Waterproofing Contract. Subcontractor agrees to maintain roofing, waterproofing, gravel stops, flashings and counter flashings in watertight condition for the number of years specified in the Contract Documents and in any case not less than two (2) years from the date of final completion of the entire Project. If the roofing or waterproofing leaks, Subcontractor agrees to make the necessary permanent repairs immediately to produce a watertight condition and agrees to reimburse Contractor and its successors and assigns, for any

costs required to repair water damage to the walls, ceilings, fixtures, furnishings, paintings, decorating, and the like, caused by the leaks. Subcontractor will remove and replace any work necessary to gain access to the roofing or waterproofing membranes being maintained hereunder.

(b) Additional terms applicable to Plumbing, Heating, Air Conditioning, Electrical and Process Piping Subcontracts. Subcontractor shall be responsible for all damages to building, furnishings, and all improvements located on the Job Site caused by leaks in the piping or conduit systems installed hereunder, or due to leaks where pipes or conduit go through walls or slabs where the joints around such pipes or conduit are to be watertight. Subcontractor shall repair at Subcontractor's expense all damage so caused, and will reimburse Contractor and Construction Manager, and their successors and assigns, for any costs required to repair water damage to the walls, ceilings, fixtures, furnishings, paintings, decorating, or the like, caused by such leaks.

(c) Additional terms applicable to Glass and Glazing, Curtain or Window Wall, or Storefront Contract. Subcontractor will be responsible for all damages to the Project and furnishings, and to all improvements, caused by leaks through, under or around such work. Subcontractor will remove and replace any work as required to gain access to sources of leakage to be corrected hereunder.

(d) Corrections. During Subcontractor's Correction Period, Subcontractor shall respond and correct deficiencies within twenty-four (24) hours after notification by Contractor. After this twenty-four (24) hour period, the problem may be corrected by Contractor. All costs for time and materials plus fifteen percent (15%) overhead thus incurred by Contractor shall become a debt immediately due and payable by Subcontractor, and Subcontractor shall reimburse Contractor for any such costs within fifteen (15) days after written demand from Contractor to do so. Alternatively, Contractor may back-charge Subcontractor for the amount owed. Emergencies will be corrected by Subcontractor immediately. Subcontractor agrees that upon notification of defects from Contractor, Subcontractor shall proceed with due diligence, at Subcontractor's expense, to replace any defective material or perform any labor necessary to correct any defect in the Work.

**21. TERMINATION OF CONTRACT**.

(a) Failure to Correct Work. Upon notification from Contractor (which notice may be in writing or in person or by telephone and confirmed in writing) that (i) an "Event of Default" (as described below) has occurred, (ii) Subcontractor's performance under this Subcontract in any respect is unsatisfactory to Contractor, (iii) Subcontractor has failed to comply fully with the terms of this Subcontract, or (iv) Subcontractor's Work needs correction or has been damaged, Subcontractor shall promptly take all action necessary to fully comply with the terms of the Contract Documents and the requirements of Contractor. Should Subcontractor fail to do so within twenty-four (24) hours after receipt of such written notification, Contractor shall have the option of either providing such materials, supplies, equipment, labor and supervision as may be necessary, pay for same and deduct the amount from any money then or thereafter due Subcontractor, or terminate this Subcontract and Subcontractor's rights hereunder. In the event of such termination, Subcontractor hereby authorizes Contractor to perform and complete the Work, and in connection therewith, Contractor may (i) eject Subcontractor; (ii) take possession of all materials, appliances, tools and equipment already at the Job Site, as well as all materials in the course of preparation, wherever located, and all rights under contracts of Subcontractor; and (iii) go into the open market and secure a replacement subcontractor or secure materials and employ workers necessary to complete the Work, all at Subcontractor's expense. Subcontractor shall not be entitled to receive any further payment until completion of the Project and then only after the direct and indirect costs incurred by Contractor to complete Subcontractor's Work, including but not limited to attorneys' fees, plus a reasonable allowance for profit for Contractor, have been determined. The direct and indirect

INITIALED BY CONTRACTOR: ___
INITIALED BY SUBCONTRACTOR: ___

costs and the allowances for profit shall apply against the Contract Price and, if not in excess of the balance then due Subcontractor, the amount of the excess shall be a debt immediately due and owing from Subcontractor to Contractor. If the balance of the Contract Price shall exceed Contractor's direct and indirect costs, plus a reasonable allowance for profit, as above provided, such excess shall be paid to Subcontractor within thirty-five (35) days after final completion of the Project.

(b) <u>Termination for Convenience</u>. Contractor shall have the right to terminate Subcontractor, as to all or any part of its Work, by written notice and without Subcontractor being at fault, for any cause or for its own or the Owner's convenience and require Subcontractor to immediately stop Work. In the event of such termination, Contractor shall pay Subcontractor only for that portion of the Work actually performed (not to exceed a pro rata share of the contract price based upon the percentage of completion of Subcontractor's Work). Contractor shall not be liable, at law or equity, to Subcontractor for any other costs or damages nor for prospective profits on Work not performed. There shall be deducted from such sums as provided in this Paragraph the amount of any payments made to Subcontractor prior to the date of termination of this Subcontract. Subcontractor shall not be entitled to any claim against Contractor for any additional compensation or damages in the event of such termination. At Contractor's election, this Subcontract shall become null and void and of no force or effect in the event financing for the Project is or becomes unavailable, or if for any reason beyond Contractor's control, Contractor shall be unable to undertake the Project. Any default termination of Subcontractor by Contractor subsequently determined to have been unjustified or erroneous, shall be deemed to be a termination for convenience under this subparagraph.

(c) <u>Cross-Default</u>. Contractor and Subcontractor acknowledge and agree that Contractor's continued confidence in the ability of Subcontractor to properly and expeditiously perform the Work is a substantial and material concern to Contractor. Consequently, in the event Contractor and Subcontractor enter into or have entered into any other contracts or agreements, and Subcontractor defaults under this Contract, or any other contract or agreement between Contractor and Subcontractor, Contractor may, at its election, terminate this Subcontract and any or all other contracts or agreements between Contractor and Subcontractor and, if this Subcontract relates to a multi-phase project, Contractor may elect to reduce the scope of the Work to be performed by Subcontractor hereunder to the phase then in progress, in which event the provisions of this Subcontract relating to subsequent phases shall become null and void, and Contractor's maximum obligation to Subcontractor shall be for payment to Subcontractor of the amounts which would be paid to Subcontractor in the event of a termination of this Contract as described in Paragraph21(b), above. In all events, Contractor shall have the right to offset against payments due Subcontractor under this Subcontract and any other contracts or agreements between Contractor and Subcontractor, such amounts as may be reasonably necessary to protect Contractor against loss, cost, damage or liability which Contractor may be reasonably anticipated to suffer as a result of Subcontractor's default hereunder or thereunder.

(d) <u>Event of Default</u>. The occurrence of any of the following shall be deemed an "<u>Event of Default</u>":

(i) Failure of Subcontractor to commence the Work on the date specified by Contractor, or failure of Subcontractor to perform the Work or any portion thereof in accordance with the provisions of the Project Schedule.

(ii) Failure of Subcontractor to make timely payments for any labor, materials, equipment, transportation, shipping, taxes or fees, or to labor unions and union trust funds.

(iii) Failure of Subcontractor to perform the Work or any portion thereof in accordance with the Contract Documents or refusal to or failure of Subcontractor to supply enough properly skilled workers or proper materials

to complete the Work.

(iv) Failure of Subcontractor to abide by and comply with the terms and provisions contained in the Contract Documents.

(v) Failure of Subcontractor to correct defective or nonconforming Work as required hereby after receipt of notice to do so.

(vi) Failure of Subcontractor to abide by and comply with the terms and conditions of any other contract or agreement between Contractor and Subcontractor, or the occurrence of any "event of default" under any such other contract or agreement.

(vii) The insolvency or bankruptcy of Subcontractor, a general assignment by Subcontractor for the benefit of its creditors, the allowance by Subcontractor of a receiver to be appointed because of its insolvency, or Subcontractor is unable to pay Subcontractor's obligations as they become due.

(viii) The disregard of any law or ordinance relating to the Work, the Project or completion thereof specifically including, without limitation, the provisions of other laws relating to the use, storage and disposal of toxic or hazardous materials, substances or wastes.

(e) <u>Equipment and Supplies</u>. If Subcontractor's rights under the Contract Documents are terminated by Contractor and Contractor has elected not to take possession of Subcontractor's equipment and supplies pursuant to Paragraph 21(a)(ii) above, Subcontractor shall promptly, or within ten (10) days after service of written notice by Contractor to do so, remove all Subcontractor's equipment and supplies from any property owned or controlled by Contractor. Should Subcontractor fail to so remove Subcontractor's equipment or supplies, Contractor may remove the same and store them in a safe place at the sole cost and expense of Subcontractor. Should Subcontractor fail to pay Contractor the cost and expense of such removal and storage within seven (7) days after written demand therefore has been provided to Subcontractor by Contractor, Contractor may sell such equipment and supplies at public or private sale, and account to Subcontractor for the net proceeds of such sale, after deduction of any costs of storage or sale of such equipment and supplies.

(f) <u>Liability for Losses</u>. Should Subcontractor default in the proper performance of Subcontractor's Work, thereby causing delay to the Project, Subcontractor shall be liable for any and all losses and damages to or incurred by Contractor including, without limitation, any liquidated damages agreed upon by Contractor and Subcontractor. Subcontractor shall be liable under this Paragraph even though such default is caused by strikes, lockouts, acts of God, or other reasons beyond the control of Subcontractor, unless Subcontractor gives written notice of the delay to Contractor within forty-eight (48) hours following the start of the alleged occurrence.

**22. REMOVAL OF CONDEMNED WORK.** Subcontractor shall, within twenty-four (24) hours after delivery of written notice, proceed with due diligence to remove from the Site all materials condemned by Contractor or any applicable governmental authority, and shall take down all portions of the Work which Contractor or any applicable governmental authority has condemned as unsound or improper, or which in any way fail to conform to the Contract Documents, and shall make good all work in other trades damaged by such removal. In the event that all or any portion of the Work so condemned shall be of such a nature, or the time available to complete the whole Work shall be so limited, that in the judgment of Contractor it will not be expedient to order the same replaced or corrected, Contractor, at its option, may deduct from the payments due or to become due to Subcontractor an amount that shall represent the difference between the fair and reasonable value of the Work so condemned and its value had the Work been executed in conformity with the Contract Documents.

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

[3668742/2]

**23. DEFENSE OF PATENTS.** Subcontractor shall defend all suits or claims for infringement of patent rights that may be brought against Contractor, Owner or the Project architect arising out of the Work, and shall hold Contractor, Owner and the Project architect harmless from loss on account thereof, except that Subcontractor shall not be responsible for such loss when a particular process or product of a particular manufacturer or manufacturers is specified by Contractor, Owner or the Project architect, provided Subcontractor is unaware of the infringement.

**24. CUTTING, FITTING AND PATCHING; WORK OF OTHERS.** Subcontractor shall, as part of the Contract Price, do all cutting, fitting, and patching of its Work that may be required to make Subcontractor's several parts come together properly, and to fit such parts to receive or be received by the work of other agents or Subcontractors, shown upon or reasonably implied by the Contract Documents. Subcontractor agrees to protect the work of others from damage as a result of Subcontractor's operations. Should Subcontractor cause damage to the work of any other Subcontractor on the Project, Subcontractor agrees, upon due notice, to compensate such Subcontractor to the extent of the damage, and the cost of repairing the damage shall be paid by Subcontractor.

**25. CLAIMS FOR DELAY OR DAMAGE.** Subcontractor expressly waives any and all rights to make claims or to be entitled to receive any compensation or damages for failure of Contractor or other Subcontractors to have related portions of the project completed in time for the Work of Subcontractor to proceed. Contractor shall not be liable to Subcontractor for losses or damages resulting from strikes, lockouts, acts of God, pandemics or other public health emergencies, or other reasons beyond the control of Contractor, or for Contractor's delays, or for modification or extension of the Construction Schedule made at the sole discretion of Contractor, or for losses or damages resulting from an Authorization for Extra Work and Change Order issued by Contractor, or for delays caused by the Owner or Owner's Design Professionals or by other Subcontractors, or for delays caused by any defective or improper work performed by any other Subcontractor. It is expressly acknowledged by Subcontractor that all such delay claims, including but not limited to any lost productivity claims, claims relating to Subcontractor being required to perform the Work in a sequence or manner other than that originally anticipated, are and have been expressly waived by Subcontractor.

**26. INSURANCE.**

(a) **Certificates.** Before Subcontractor commences any work at or prepares or delivers material to the Job Site, Subcontractor shall provide Contractor with both Certificates of Insurance and additional insured endorsements evidencing coverage and all specifications as set forth on the attached Statement of Insurance Requirements attached as Exhibit "C" and incorporated herein.

(b) **Failure to Obtain.** Should Subcontractor fail to obtain the insurance coverage required under the Contract Documents, or should Subcontractor fail to timely renew the insurance coverage required under the Contract Documents, Contractor shall have the right, at Contractor's election, without obligation, (i) to obtain such coverage on Subcontractor's behalf, at Subcontractor's expense, from any insurance carrier selected by Contractor in Contractor's sole discretion; or (ii) to terminate this Contract as provided in Paragraph 21, above. Contractor shall have the right to offset the costs of premiums for such insurance against any sums payable to Subcontractor under this Contract.

**27. INDEMNIFICATION.** All Work performed by Subcontractor related to this Subcontract, and all Work performed by Subcontractor related to Subcontractor providing, preparing or delivering materials, equipment or services to or for the Project, shall be at the sole risk of Subcontractor. Subcontractor shall, to the fullest extent permitted by law, with respect to all such Work which is covered by or incidental to this Subcontract,

defend through legal counsel acceptable to Contractor, and indemnify, defend, and hold harmless Project Lender, Owner and other parties indemnified by Contractor under its contract with Owner, Contractor and Contractor's Surety, if any, and any other interested party designated by Contractor, and their agents, employees and representatives (collectively, "Indemnities") from and against any claim, liability, loss, damage, cost, expense (including attorneys' fees), awards, fines or judgments arising by reason of the death or personal injury to persons, or injury or damage to the Job Site property (including, without limitation, the loss of use there from), whether or not caused in part by an Indemnities; provided, however, that Subcontractor shall not be obligated under this Subcontract to indemnify the Indemnities with respect to damages which are ultimately determined to be due to the sole negligence or willful misconduct of the Indemnities. In any and all claims against the Indemnities by any employee of Subcontractor, any Subcontractor of Subcontractor, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, the indemnification obligation under this paragraph shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable under any workers' compensation acts, disability benefit acts, or other employee benefit acts. Said indemnity is intended to apply during the period of this Subcontract and until such time as action on account of any matter covered by such indemnity is barred by the applicable statute of limitations or statute of repose.

**28. INDEPENDENT CONTRACTOR RELATIONSHIP.** The relationship of Subcontractor to Contractor during the term of this Contract shall be that of an independent contractor. Subcontractor shall remain and maintain said independent Subcontractor relationship, and Subcontractor shall at no time be considered an employee of Contractor. Subcontractor, during the progress of the Work shall furnish skilled labor, adequate and suitable materials and a qualified superintendent or foreman to act as the representative of Subcontractor on the Job Site, who is authorized to receive orders, to make decisions regarding the Work, and be responsible for the total scope of Work included in this Subcontract. Such superintendent or foreman shall at all times be satisfactory to Contractor and shall not be changed without the written consent of Contractor. If such superintendent or foreman is unsatisfactory to Contractor, Subcontractor shall promptly replace same.

**29. CLEAN-UP.** At all times during the course of construction, Subcontractor shall perform the Work so as to maintain the Job Site in a clean, safe and orderly condition. Upon completion of the Work, Subcontractor shall remove from the Job Site all temporary structures, debris and waste incident to Subcontractor's operations, and shall clean all surfaces, fixtures, equipment, and the like relative to the performance of the Work. Contractor may order Subcontractor to clean up areas at any time Contractor deems such action necessary. If Subcontractor fails to perform a clean-up function within twenty-four (24) hours after notification from Contractor to do so, Contractor may proceed with that function as Contractor deems necessary and in the manner Contractor deems expedient, and the cost thereof shall be charged to Subcontractor and deducted from monies due under this Subcontract. In the event Contractor is unable to determine which Subcontractor is responsible for the clean-up of any debris, Contractor may apportion the cost of such clean up in such manner as Contractor may determine to be equitable. Such determination shall be final and binding upon Subcontractor.

**30. USE OF CONTRACTOR'S EQUIPMENT.** Subcontractor is not authorized to use or operate any equipment owned or leased by Contractor without the written consent of Contractor and the delivery of evidence that Subcontractor's insurance will insure any loss to person or property, including Contractor's equipment, resulting from Subcontractor's use of Contractor's equipment. Subcontractor assumes all responsibility for and agrees to hold Contractor harmless from any claims or damages whatsoever resulting from the use of Contractor's equipment, whether such damage results to Subcontractor, Subcontractor's own employees or properties, or to other

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

persons or the employees or property of other persons. If the Subcontractor is unable to provide any equipment needed to complete the Work, Contractor must be immediately notified. If Contractor, in its sole discretion, determines that Subcontractor is unable to provide the equipment needed to complete the Work, Contractor may hire others to perform such portion of the Work and deduct the cost thereof from Subcontractor's progress or final payments.

**31. PERMITS AND LAWS**. Except as otherwise instructed by Contractor, Subcontractor shall promptly obtain, at Subcontractor's expense, and before commencing the Work, all permits, and licenses required for the Work. Subcontractor shall comply, at Subcontractor's expense, with all laws, ordinances, rules, regulations, orders and requirements of the City, County, State and Federal government, any Board or Commission, or any other duly qualified body, having jurisdiction over the Project, which shall or might affect or apply to the Work, and Subcontractor shall exhibit each such permit or license to Contractor or Construction Manager upon their request. Subcontractor shall be responsible for requesting and obtaining all necessary inspections and approvals of Subcontractor's Work required by Contractor and applicable governmental agencies. Subcontractor hereby certifies that Subcontractor is in full compliance with the provisions of the Immigration Reform and Control Act of 1986 in the hiring of its employees, has instituted procedures for compliance with laws relating to toxic or hazardous wastes, substances or materials and Federal and State Hazard Communication Standard and "Right to Know" laws) and Subcontractor agrees to indemnify, hold harmless and defend Contractor and other Indemnitees against any and all claims, liabilities, losses, costs, damages and expenses (including, without limitation, attorneys' fees and costs) arising out of Subcontractor's failure to comply with any such laws. It is hereby understood that Contractor is entering into this Subcontract based on the representation that Subcontractor is licensed under all applicable state and local laws to perform the Work, and Contractor would not enter into the Subcontract if this representation were false.

**32. HAZARDOUS MATERIALS**. Subcontractor shall strictly comply with all Federal, State or Local Laws, ordinances or regulations regarding the use and discharge of "toxic" or "hazardous" materials, wastes or substances. Subcontractor shall immediately notify Contractor if Subcontractor, or any of Subcontractor's employees, agents, Subcontractors, or suppliers, (collectively, "Subcontractor's Affiliates") brings a chemical within the Project which has been defined under Federal, State, or Local Laws, ordinances or regulations as a "toxic" or "hazardous" material, waste or substance ("Listed Chemical"). Subcontractor shall, in addition, provide Contractor with copies of all warning labels and Material Safety Data Sheets on products Subcontractor and/or Subcontractor's affiliates are using. Subcontractor shall immediately notify Contractor of any spill, release or discharge of any Listed Chemical caused by or brought to the attention of Subcontractor or any of Subcontractor's Affiliates. Subcontractor shall immediately take all reasonable and necessary actions to prevent the further spread of any spill, release or discharge of a Listed Chemical which is brought to the attention of Subcontractor. As to any spill, release or discharge of a Listed Chemical which is caused by Subcontractor or Subcontractor's Affiliates, whether caused intentionally, negligently or accidentally, Subcontractor shall, at Subcontractor's sole cost and expense, take immediate action to clean up said spill, release or discharge in full compliance with all applicable laws and regulations, in addition to any directions from Contractor. All work, labor, services or materials necessary to comply with this Section will be furnished by Subcontractor as part of the Work without any additional compensation. Neither Subcontractor nor any of Subcontractor's Affiliates shall clean or service any tools, equipment, vehicles or materials with any Listed Chemicals, and any unused paint, adhesives or other construction materials shall be collected and gathered up by Subcontractor and removed from the Project and disposed of in accordance with all applicable laws and regulations. Subcontractor agrees to indemnify, defend and hold Contractor and the other

Indemnitees free and harmless from and against all liability, loss, claims, demands, damages, expense and cost, including, without limitation, attorneys' fees, of every kind or nature arising out of any failure of Subcontractor or Subcontractor's Affiliates to perform and observe the requirements of all or any part of any law, regulation, rule, contractual obligation or the like arising out of or in connection with Subcontractor's performance of Work hereunder, except such loss or damage which is caused solely by the negligence of Contractor.

**33. ASSIGNMENT**. (a) Subcontractor shall neither assign nor subcontract the whole or any portion of this Subcontract or the payments or the rights to collect any payments hereunder without first obtaining in each and every instance consent in writing from Contractor which consent may be given or withheld in Contractor's sole discretion, and then only subject to, and upon the same terms and conditions of, the provisions of this Subcontract. Any permission granted by Contractor shall not be deemed permission to any subsequent assignment. Any assignment by Subcontractor made without the consent of Contractor as herein provided shall be null and void and shall, at the option of Contractor, be grounds for termination of this Subcontract, and Contractor shall have the right to elect to proceed in accordance with the provisions Paragraph 21(a) of this Subcontract. Any such subcontract shall contain all the provisions of this Subcontract and shall require the Subcontractor hereunder to be directly liable to Contractor and in all respect as herein required of Subcontractor. Any assignments of this Subcontract or assignment of payments permitted by Contractor shall be submitted to Contractor for Contractor's prior written approval and shall not be binding upon Contractor until so approved. No assignment shall relieve Subcontractor from Subcontractor's duties, obligations and liabilities hereunder, unless specifically relieved in writing by Contractor. Subcontractor acknowledges and agrees that at any point during or after the course of performance of the Work hereunder, Contractor shall, in its sole and absolute discretion, have the right to assign this Subcontract to Owner or Owner's designee without Subcontractor's prior consent (the "Owner Assignment"). Contractor shall give notice to Subcontractor of any Owner Assignment within five (5) days of the effective date thereof. Upon any Owner Assignment, Subcontractor covenants and agrees that it shall deal with Owner or its designee in the place and stead of Contractor and that it shall perform all of its obligations under this Subcontract and complete the Work in accordance with the Contract Documents. Subcontractor further covenants and agrees that upon any Owner Assignment, Owner or its designee may enforce the obligations of Subcontractor hereunder with the same force and effect as if enforced by Contractor, provided that as part of the Owner Assignment, Owner or its designee assumes the payment obligations of Contractor hereunder. Following any Owner Assignment, Owner or its designee shall have the right to further assign this Subcontract in the same manner and under the same conditions as the Contractor's assignment to Owner or its designee.

**34. LIENS**. Subcontractor shall pay when due all claims for labor or material incurred by it in the performance of this Subcontract. If any liens (mechanics' or material men's), attachments, garnishments, claims against any payment bond furnished by Contractor, or suits affecting title to real property are filed against the Project, or any portion thereof, in connection with claims for labor or material incurred by Subcontractor, or anyone claiming by or through Subcontractor, in the performance of this Subcontract, Subcontractor shall, within ten (10) days after written demand by Contractor, cause the effect of such lien, claim, attachment or suit to be removed from the Project or otherwise discharged, or any portion thereof, and Subcontractor shall defend, indemnify and hold Contractor harmless against any liabilities and claims made in connection therewith, including, without limitation any costs and expenses for attorney's fees, bond premiums and all incidental and consequential damages resulting there from. In the event Subcontractor shall fail to promptly cause the effect of any such lien, claim, attachment or suit to be so removed, Contractor is hereby authorized to use whatever means Contractor may deem best to cause the lien, claim, attachment or suit, together with its effect upon the title,

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

to be removed, discharged, satisfied, compromised or dismissed, and the costs thereof, including attorney's fees incurred by Contractor, shall become immediately due from Subcontractor to Contractor. Subcontractor may contest any such lien, attachment or suit, provided Subcontractor causes the effect thereof to be removed from the Project or any part thereof, or resolved as to any claim asserted against a payment bond furnished by Contractor. Should Subcontractor fail to make any payments required under this Paragraph, Contractor may make such payments on behalf of Subcontractor, and Subcontractor shall reimburse Contractor for the amount actually paid on demand.

**35. FINANCIAL STATUS**. Subcontractor hereby authorizes all financial institutions, material men and individuals to disclose to Contractor Subcontractor's financial status, credit and manner of meeting obligations. Should Subcontractor fail for any reason to make available any financial statements as herein above required, Contractor may, at Contractor's option, terminate this Subcontract.

**36. DEATH OF SUBCONTRACTOR**. If Subcontractor is a sole proprietor, his/her death shall automatically terminate this Contract.

**37. TITLE**. Title to all work completed and in the course of construction, and all materials on the Job Site shall, as between Subcontractor and Contractor, be held by Contractor.

**38. RIGHT TO DEMAND BOND**. Contractor has the right, at its expense and at any time, to require Subcontractor to furnish Contractor with a Performance Bond and/or a Labor and Material Bond executed by a surety company satisfactory to Contractor. Contractor will pay the premium of any such bond, and if Subcontractor is unable to deliver the bond within ten (10) days after notice to do so from Contractor, Contractor has the right to terminate this Subcontract, pay Subcontractor the reasonable value of Work then accomplished on the Job Site by Subcontractor (not to exceed a pro-rata share of the Contract Price based upon the percentage of completion of Subcontractor's Work), and at Contractor's option to have the Project finished by others.

**39. NO DELAY**. Notwithstanding the fact that a dispute, controversy or question shall have arisen in (a) the interpretation of any provision of the Contract Documents, (b) the performance of any Work, (c) the delivery of any material, (d) the payment of any monies to Subcontractor, or otherwise, Subcontractor agrees that Subcontractor will not directly or indirectly stop or delay any Work required to be performed, or stop or delay the delivery of any materials required to be furnished hereunder, pending the determination of such dispute or controversy, regardless of whether such controversy, dispute or question is subject to arbitration, litigation or judicial reference.

**40. SAFETY**. Subcontractor shall at Subcontractor's own cost and expense protect Subcontractor's own employees, employees of Contractor, and all other persons from risk of death or bodily harm arising out of or in any way connected with the Work, and Subcontractor shall strictly comply with all safety orders, rules, regulations and requirements of all federal, state and local government agencies exercising safety jurisdiction over the Work including, without limitation, applicable OSHA regulations. Subcontractor shall indemnify, defend and hold Contractor harmless from any liability, loss, cost, damage or expense, including, without limitation, attorney's fees, which Contractor may suffer or incur as a result of any cause of action, proceeding, citation or work stoppage arising out of or in any way connected with an alleged violation by Subcontractor of any such safety order, rule, regulation or requirement, whether such violation is ultimately proved or not. Subcontractor shall supply Contractor with a copy of its Safety Program manual to be filed at the construction jobsite.

**41. DISPUTE RESOLUTION.**

(a) At the sole discretion of the Contractor, any and all claims, disputes, controversies and other matters in question

arising out of, or relating to, this Subcontract, or the breach thereof, shall initially be referred to mediation. The parties shall share the costs of the mediator equally, each party shall be responsible for payment of its own attorneys' fees incurred in connection with the mediation and the mediation shall be conducted in Jacksonville, Florida. If there is a mediation, and it is unsuccessful, the following dispute resolution procedures shall be followed.

(b) Any unresolved dispute between Contractor and Subcontractor arising out of, or relating to, this Subcontract, or the breach thereof, shall be resolved by binding arbitration. Such arbitration shall be conducted pursuant to the Construction Arbitration Rules of the American Arbitration Association then in effect. The locale of the arbitration shall be Valdosta, Georgia.

(c) With respect to any arbitration proceeding, each party shall initially bear its own costs, including but not limited to its attorneys' fees. However, the allocation of such costs shall be considered and made a part of any final award by the Arbitrator(s) in accordance with the requirements of this Subcontract.

**42. LABOR RELATIONS**. Subcontractor agrees that at all times during the performance of the Work under this Subcontract, Subcontractor shall maintain labor relations policies satisfactory to Contractor, which policies may be established in Contractor's sole discretion. Subcontractor agrees that if the status of Subcontractor's labor relations change from the manner in which they existed as of the date of this Subcontract; Subcontractor shall immediately notify Contractor. Contractor may terminate this Subcontract immediately upon any change in the labor relations policies maintained by Subcontractor, and in the event of such termination, Contractor's sole obligation to Subcontractor shall be for payment to Subcontractor of the amounts which would be paid to Subcontractor in the event of a termination of this Subcontract for convenience, as described in Paragraph 21(b), above. Subcontractor recognizes that in the performance of the Work, Subcontractor will be required to work side by side with other Subcontractors on the Job Site, who may or may not be signatory to collective bargaining agreements with labor organizations. Contractor reserves the right to establish a "two gate" system (union trades and non-union trades) at any time during the course of construction on the Job Site. In the event a two-gate system is established, it shall be the affirmative obligation of Subcontractor as a material consideration of this Subcontract to ensure that its employees and suppliers use only the gate or entry way designated by Contractor. Subcontractor agrees to cooperate fully with Contractor and Contractor's representatives and attorneys with respect to any labor dispute that should arise on the Job Site, including, without limitation, giving testimony and evidence to an agent or judge of the National Labor Relations Board. Subcontractor shall not be relieved of Subcontractor's obligations to supply sufficient, properly skilled workers to perform the Work without delay or interruption as a result of any labor dispute or grievance, whether between Subcontractor and its employees, or between any other employers and employees on the Project. Subcontractor represents and warrants that Subcontractor is not delinquent in making payments or reports to any union fringe benefit trust fund and that Subcontractor does not appear on any delinquency list published by any union fringe benefit trust fund. In the event Subcontractor becomes delinquent in such payment, or appears on any such delinquency list, such event shall be deemed to be a material default under this Subcontract, thereby entitling Contractor to exercise any rights and remedies available to it under this Contract. Subcontractor agrees to defend, indemnify and hold Construction Manager and Contractor harmless from claims, demands and liability for union fringe benefit trust fund obligations arising out of Subcontractor's Work on the Project.

**43. MISCELLANEOUS**.

(a) Rights; Cumulative. All rights, options and remedies of Contractor contained in this Subcontract shall be construed and held to be cumulative, and no one of them shall be exclusive of

[3668742/2]

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

the other, and Contractor shall have the right to pursue any one or all of such remedies and any other relief provided by law, or as be provided by law, whether or not stated in this Subcontract.

(b)  Notices.  Notices, requests and other communications hereunder shall be effective when received, but if sent by registered or certified mail, postage prepaid, shall be deemed effective and received five (5) business days after being deposited in the United States mail.

Notices hereunder and all correspondence in connection herewith should be addressed to the parties at the locations set forth herein.  The parties hereto may change their addresses by giving written notice thereof to one another.

(c)  Waiver.  No express waiver by Contractor of a breach of any of the terms, covenants or conditions of this Subcontract by Subcontractor shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition herein contained.  No waiver of any default of Subcontractor hereunder shall be implied from any omission by Contractor to take any action on account of such default, even if such default persists or is repeated, and no express waiver shall waive or affect a default other than as specified in said waiver.  The consent or approval by Contractor to or of any act by Subcontractor requiring Contractor's consent or approval shall not be deemed to waive or render unnecessary Contractor's consent or approval to or of any subsequent similar act by Subcontractor.

(d)  Attorneys' Fees.  In the event either Contractor or Subcontractor brings an action or proceeding, by way of complaint, cross-complaint, counterclaim or otherwise, or institutes an arbitration or judicial referee proceeding hereunder against the other party, or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the party which prevails in such action, proceeding or arbitration shall be entitled to recover from the other its reasonable attorneys' fees, which shall be determined by the court, arbitrator or referee and included in the judgment in such action or proceeding or in the arbitrator's or referee's award.  Should Contractor intend to engage legal counsel to pursue any claim or demand which could result in recovery for Subcontractor, Contractor, may notify Subcontractor thereof.  After such notice, Subcontractor shall have the following options:

(i)  engage Subcontractor's own legal counsel at Subcontractor's expense to represent Subcontractor's interest either in conjunction with or separate from Contractor; or

(ii)  share in Contractor's expenses, including attorneys' fees, and share in any recovery, both upon an agreed basis.  Should Subcontractor fail to notify Contractor of Subcontractor's exercise of either of the above options, Contractor shall have no obligation to pursue any claim or demand on behalf of Subcontractor.

(e)  Binding Effect.  Each and all of the covenants and conditions of this Subcontract shall insure to the benefit and shall be binding upon the successors in interest of Contractor and subject to the restrictions upon assignment herein, the successors and assigns of Subcontractor.

(f)  Severability.  In the event any of the provisions of this Subcontract shall be held to be invalid and unenforceable, the remaining provisions shall be valid and binding upon the parties.

(g)  Entire Agreement.  This Subcontract contains the entire agreement between the parties respecting the subject matter of this Subcontract and supersedes all prior understandings and agreements, whether oral or in writing, between the parties respecting the subject matter of this Subcontract.

(h)  Amendment.  This Subcontract may not be amended except by a written document referencing this Subcontract and signed by the parties hereto.

(i)  Headings.  Headings in this Subcontract are inserted for convenience only and shall not affect the meaning or interpretation of this Subcontract or any provision hereof.

(j)  Governing Law.  This Subcontract shall be construed in accordance with and governed by the laws of the State of the location of the Project.

(k)  Owner.  Owner shall be deemed a third-party beneficiary of this Subcontract, and all terms of this Subcontract shall benefit Owner as if Owner was a party to this Subcontract.

(l)  Controlling Document.  In the event of any conflict between the terms of this Subcontract and the terms of any other agreement or document (including, without limitation, the attachments hereto and the other Contract Documents) relating to the subject matter hereof, the terms of this Subcontract shall control and prevail unless the conflicting agreement or document is signed by the parties hereto and expressly (by reference) modifies or amends a specified term of this Subcontract.

(m)  Confidentiality.  This Subcontract and all related information, discussion, working papers, memoranda, drafts and final reports, and related materials are strictly confidential and shall not be used or discussed by Subcontractor in any manner outside of Contractor's presence without Contractor's prior approval.  However, discussions between Subcontractor and Subcontractor's employees about the Work shall not be a breach of this provision.

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

"CONTRACTOR"                                    "SUBCONTRACTOR"

**RISE GENERAL CONTRACTORS, LLC**

Print Name:  Earl Childs                        Print Name:  Oliver D. Fernandez Jr.

Title:      DOC                                 Title:       Owner/Member

Signature:  *Earl Childs*                       Signature:   *Oliver D. Fernandez Jr.*
            DocuSigned by:                                   DocuSigned by:
            C7B63DB6ABBA409...                               E3C6EBDB38A0467...

Date:       3/4/2022                            Date:        3/3/2022

IN WITNESS WHEREOF, this Subcontract shall be effective as of the date and year first referenced above

[3668742/2]

**EXHIBIT "A":**
**SCOPE OF WORK / GENERAL REQUIREMENTS**

## 1   SCOPE OF WORK:

Furnish all labor, materials, permits, equipment, supervision, services, labor taxes, material taxes, insurance, licenses, and any other related costs necessary for the complete execution of ***Land Clearing, Grading, Surveying, Underground Utility Work, Concrete Curbs, Sidewalks, Asphalt Paving, Parking and Striping,*** all in its entirety and strict accordance with the Contract Documents enumerated in <u>Exhibit "J"</u> to this Agreement, and strict compliance with the requirements of all Federal, State and Local governing authorities. This Subcontract is also to be inclusive of, but not limited to, the following items:

<u>**THE PROJECT:**</u>

- (222) Town House Units
- Building Type A - with 8 units, 13 ea.
- Building Type B - with 8 units, 14 ea.
- Building Type C - with 6 units,  1 ea.
- Building types A, B and C = Total of 222 units
- Maintenance Building
- Trash Compactor Building
- Lift Station and Force Main
- Clubhouse-Leasing Office
- Pool, Playground & Amenities Area
- Monument Sign
- Mail Kiosk

<u>**SPECIAL PROVISIONS:**</u>

- A payment and performance bond is required on this scope of work. All parties hereby agree that Subcontractor shall furnish performance and payment bonds for the entire amount of this agreement. The premiums for these bonds have been included in this agreement amount, and no additional consideration is required. Bonds shall be in place prior to any work being performed on-site or any monies being distributed. Bond will be listed as a separate line item within this Subcontractor's schedule of values. The bond must be presented within two weeks of contract signing. This payment and performance bond is required to have Dual Obligee's with RISE General Contractors, LLC. listed as the Obligee and the Owner as listed on page one of this agreement as the Dual Obligee.

    *A Dual / Multiple Obligee Rider is required*:

    **OBLIGEE:**
    RISE General Contractors, LLC
    10161 Centurion Parkway N
    Jacksonville, FL 32256
    **DUAL OBLIGEE:**
    Citrus Ridge Properties II, LLC – Project Owner/Borrower
    129 N Patterson Street
    Valdosta, GA 31601
    **LENDER:**
    IberiaBank, ISAOA, ATIMA – Lender
    200 West Congress Street
    Lafayette, LA 70501

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

- **FTP PROVISIONS – All project documents are filed and maintained on PROCORE. RISE General Contractors, LLC preferred document management system. An invitation link and user instructions will be forwarded to you.**
  - This project will utilize Procore's (www.procore.com ) project management and collaboration system for all project documentation. Applicable team members of this Subcontractor will be invited to and are required to create a Procore username (email) and password if they do not already have one. This Subcontractor will be expected to obtain drawings, sketches, RFIs, meeting minutes, coordination drawings, change information, etc. via this application. Contractor will notify subcontractors as relevant items are added. It will be the responsibility of this Subcontractor to regularly check and review updated documents as they are added. Applicable team members of this Subcontractor are required to complete a free, one-hour subcontractor training certification course located at http://learn.procore.com/procore-certification-subcontractor within (2) two weeks following contract execution. There will be no cost to this Subcontractor for use of Procore.
  - It is recommended that this Subcontractor provide mobile iOS or Android devices with the Procore App installed to at least one individual on-site to provide real-time access to current posted drawings, specifications, RFIs, submittals, project documents, as well as any deficient observations or punch list items. Providing mobile access will improve communication, efficiency, and productivity for all parties.
- All parties hereby agree Subcontractor shall furnish and install all approved materials required for the Owner Mock-up, as it relates to this scope of work. The purpose of the Mock-up is to demonstrate Subcontractor means and methods of Subcontractor scope of work. Subcontractor agrees that the mock-up may require additional / separate mobilizations. Mock-up completion may also involve rework by this Subcontractor or others at no additional cost to Contractor.

## START OF WORK:

- The Project's workflow shall be continuous and non-stop until all work is completed.
- The Sequence of Work shall be:
  - MOBILIZATION/DEMOBILIZATION/IN-HOUSE SET UPS
  - TEMPORARY CONSTRUCTION ENTRANCE
  - NPDES MONITORING AND REPORTING
  - SILT FENCE
  - TREE REMOVAL (OPEN BURN ON-SITE)
  - REMOVE TOPSOIL AND BEGIN EARTHWORKS OPERATIONS DEDICATED TO PHASE 1 AND CLUBHOUSE WHERE AT ALL POSSIBLE.
  - CUT RETENTION PONDS TO GRADE TO ENABLE MODULAR BLOCK WALL TO BE INSTALLED.
  - INSTALL STORM, SEWER, WATER, FIRE HYDRANTS AND RECLAIMED WATER TO REMAINDER OF PHASES. (THIS SEQUENCING NEEDS TO BE AGREED UPON BY RISE AND MCKENZIE IN ORDER TO FACILITATE GETTING FORCE MAIN FUNCTIONAL BEFORE TURN OF 1ST PHASE).
  - AS REQUIRED BY THIS SPECIFIC SCOPE OF WORK
- As coordinated and directed by Contractor's Project Management Team.
- **Contractor's Project Superintendent**
  - **Director of Construction: Earl Childs,** earl.childs@risere.com cell: (425) 892-4048
  - **Project Manager: Larry Murphy,** larry.murphy@risere.com cell: (281) 386-2597
  - **Asst. Project Manager**: **Shawn Ruffner**, *shawn.ruffner@risere.com cell: (352) 340-9887*
  - **Senior Superintendent: *Kevin Foster,*** *kevin.foster@risere.com; cell: (305) 331-1705*

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

1) Prior to mobilizing, the Subcontractor's designated Superintendent, who is familiar with the plans and specification, shall attend a preconstruction, scope review conference with the Contractor's Superintendent to review the Contract Documents and to ensure that materials, samples, equipment, safety, coordination, etc. conform to the Contract Documents. Any delays in start of construction caused by Subcontractor's failure to attend the meetings or be prepared shall be the responsibility of the Subcontractor.

2) Subcontractor will provide one (1) complete set of electronic submittals / shop drawing Subdivided in a logical manner and agreed to by Contractor for submittal to the Architect/Engineer of Record for this scope of work within ten (10) days of receipt of this Contract. Subcontractor agrees that no time extensions will be allowed due to Subcontractor not providing Contractor with complete and accurate submittals, in a timely manner. All copies of product data will be in the form of manufacturer's catalog sheets, showing illustrated cuts of the items to be furnished, scaled details, sizes, dimensions, performance characteristics, capacities, wiring diagrams and controls. Subcontractor acknowledges that the Contractor's and Architect's/Engineer's review and approval of Subcontractor's submittals does not relieve Subcontractor from any obligations to construct this scope of work in accordance with the Contract Documents. Any product substitutions will be submitted on a separate Substitution Request submittal. Subcontractor will provide all information required by Architect/Engineer to complete their review.

3) Subcontractor agrees to notify the Contractor's onsite management team of his presence and amount of work force, immediately upon arrival on-site, each day. This shall also be part of the Subcontractor's Safety protocol.

4) Subcontractor is to take necessary steps to avoid tracking of mud onto public roads, especially Citrus Ridge Dr and US 27 Blvd. If Subcontractor's vehicles track out due to failure on the part of Subcontractor, this Subcontractor shall be responsible for immediately cleaning the road.

5) All parties hereby agree that the trees on the jobsite are of extreme importance to the value of the property. All parties further agree that Subcontractor shall be fully liable for any damage caused to these trees by this Subcontractor including, but not limited to, consequential damages resulting therefrom.

6) Contractor may provide, in locations determined to be appropriate for the project, temporary electrical, temporary water and temporary toilet services. Further, Subcontractor shall make use of the services as provided. However, the inability of Subcontractor to make use of the services as provided or the temporary unavailability of services, shall not release Subcontractor's obligation to complete the work included in this Subcontract Agreement, on schedule, or by supplying at Subcontractor's own expense any additional utilities or services it may require to perform its scope of work in accordance with the project schedule

7) Contractor may furnish a designated area for a laydown, (not guaranteed) which Subcontractor may utilize for the storage of their materials. Subcontractor shall be responsible for storage containers, racks, or other storage facilities within the provided laydown area. Subcontractor will keep the designated laydown area clean and organized. Subcontractor will not store material in building other than what can be used in *one (1) week*. No material will be stored outside of the designated area without written approval of the Contractor's project Superintendent.

8) Subcontractor must notify in advance of any intentions to store materials on site. Contractor, Owner and Lender must approve all these requests in advance. Stored materials and or the payment thereof, if approved, shall not exceed the amount of materials that will be installed within *forty-five (45) days*. Payment to Subcontractor for stored materials is for the Subcontractor's convenience and shall not create any liability to Contractor for storage, protection, etc. Value of stored materials will be supported with copies of material suppliers/manufacturers invoices or Bill of Sale.

9) Subcontractor is to relocate / remove this Subcontractor's storage trailers, and containers on project site as directed by Contractor within (48 hours) of notice at no additional cost.

10) Subcontractor shall coordinate all major equipment and material deliveries in advance with Contractor's Project Management Team.

11) Subcontractor agrees no concrete or pump trucks will impede Citrus Ridge and US 27. at any time. Subcontractor will be responsible for any traffic infractions or citations incurred as a result.

12) If at any time the construction entrance must be closed off due to this Subcontractor's work, Subcontractor will coordinate a mutually-agreed-upon plan with Contractor's Superintendent. At no time will Subcontractor block construction entrances with equipment of an overnight nature. At least one passable lane throughout the project must always be maintained and kept open for emergency vehicle access.

13) Subcontractor shall provide excavation, trenching, shoring, base material, backfill, and compaction for

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

Subcontractor's work. Subcontractor shall remove spoils to a central location on site (outside of the building footprint) as directed by Contractor.

14) All parties hereby agree Subcontractor has reviewed all Geotechnical Engineering reports included in this Subcontract Agreement.

15) Subcontractor shall provide all core-drilling, saw cutting, GPR and X-ray surveys, and design review fees as required by the Structural Engineer of Record for any items misplaced by this Subcontractor.

16) Subcontractor shall submit an itemized Schedule of Values, for Contractor's approval, with sufficient values for separate work items on a phased basis. Subcontractor agrees that no application for payment may be made for areas of work that are not complete, including appropriate punch list items, if applicable, per the Schedule of Values. Subcontractor shall submit his monthly draw request on or before the *twentieth (20th)* of the month.

17) All work performed on this project shall be in accordance with the Contract Documents including all specifications, notes, details, schedules ("Construction Details") on all pages. Subcontractor agrees, where multiple details or conflicts in the Contract Documents are existent, then the more stringent application is included in this agreement. Any alternates or substitutions must be approved in writing by the design team, Contractor and Owner in order to be incorporated into the project.

18) Subcontractor shall use "Good Construction Practice" in the execution of Subcontractor's Work, and that any miscellaneous and or incidental items required to effectively complete this scope of work whether referenced or not, in this scope of work or on the Contract Documents, are included.

19) Subcontractor shall employ a competent English-fluent superintendent and necessary assistants all approved by Contractor who shall be in attendance at the project site full-time during the progress of the work included in this Subcontract Agreement.

20) Multiple mobilizations will be required to complete this scope of work. Subcontractor agrees that all mobilizations required are included in this Subcontract Agreement. Subcontractor further acknowledges that certain portions of his work may be sporadic in nature and that in no event shall Contractor be held responsible or penalized for any delays.

21) RFIs (request for information) shall be submitted and answered via email / Procore. It is the Subcontractor's responsibility to notify the Contractor within *seven (7) days* of issued response if there are impacts to Subcontractor Scope of work. Contractor shall provide update to contract documents electronically. It is the responsibility of the Subcontractor to review each item sent by Contractor for impact related to your scope of work. RFI and other construction documents shall be allotted *seven (7) days* to note and submit any cost or schedule adjustments impact. It is this Subcontractor's responsibility to verify this Subcontractor is working from the most current set of documents, with all revisions.

22) Subcontractor shall inspect all buildings or areas prior to placing its work, for dimension and conformity with the Contract Documents. Any conflicts or discrepancies or required field modifications shall immediately be brought to the attention of Contractor's Project Management Team (in writing). Placement of materials prior to notifying Contractor's Project Management Team in writing constitutes acceptance of prior work, completed by others, and subsequent rework or replacement shall be the responsibility of this Subcontractor.

23) Changes to the contract may only be authorized by the Contractor's authorized representative. All requests for an "Authorization for Extra Work and Change Order." must be presented to the Contractor in writing prior to starting extra work, with sufficient back up supporting Subcontractor request. No extra work shall be executed or paid without a fully executed Change Order modifying Subcontract agreement.

24) Contractor will not act as a broker for charges by one Subcontractor against another. Do not invoice RISE General Contractors, LLC. for work, which you have performed for another party. Invoices received, which are of this nature, will be returned unpaid.

25) A Mandatory *Look-Ahead Meeting* will be held every *two (2) weeks*, the time and date to be determined by the Contractor's Project Manager. The *Look-Ahead Meeting* purpose is to review the projects progress, schedule, logistics, etc. The *Look-Ahead Schedule* is what will be followed by all Subcontractors. All Subcontractor/Vendor Project Managers, Foremen, Superintendents are required to attend the *Look-Ahead Meeting* to ensure Project Schedule adherence. Subcontractor shall adhere to all requirements indicated and shall provide and maintain adequate manpower to prevent delays. When a Subcontractor fails to maintain the schedule, it is the Subcontractor's responsibility to develop their own plan of how they will get back into compliance with the OPS prior to the next *Look-Ahead Meeting*. Failure to maintain the schedule for *ten (10) workdays* will require an officer of the company to attend the next meeting. Subcontractor shall always provide a competent person while the Subcontractor is working on site, who will attend and be present at the *Daily* and/or *Weekly* morning Progress Meetings, to discuss project scheduling and give notice to any issues or lead time of materials.

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:

Meeting time, date and frequency shall be determined by the Contractor's onsite Superintendent.

26) Subcontractor shall not use chalk lines, concrete nails, chipping, or other activity that may cause damage to the concrete slab of amenities, leasing office, fitness, or areas noted to receive stain or sealed concrete finish or any other exposed finishes.

27) Subcontractor is responsible for their field crews to refrain from any type of music source playing onsite (i.e., No music speaker, no Bluetooth speakers, headphones, etc.). Listening to music may produce a safety hazard by masking environmental sounds that need to be heard.

28) Subcontractor shall provide its own task lighting for Subcontractor's work.

29) Subcontractor's foreman shall inspect work and complete Subcontractor's own pre-punch list prior to Contractor's punch walk. Subcontractor shall complete all punch list items pertaining to this Subcontractors scope as directed by Contractor. The Subcontractor shall commence with the timely correction of all punch list items within (24 hours) and agrees that the punch crew shall be of sufficient size as requested by Contractor, to complete said work within (24 hours). Subcontractor's punch out crew shall be independent from production crews, but if / when required by Contractor, production workers shall fall back to remedy such punch out that is required to maintain Contractor's schedule.

30) Subcontractor shall be responsible for policing his work and correcting deficiencies prior to Contractor or Owner punch lists being generated. Subcontractor may be required to provide one (1) or more qualified employees to walk the final punch list with the Contractor and Owner. This employee will need to have the proper materials and tools on hand to fix, repair, or touch-up minor items found during the Owner's walk.

31) All parties hereby agree Subcontractor shall provide close-out documentation required by the Contract Documents including but not limited to warranties, guarantees, as-built drawings, operation and maintenance manuals, model numbers and serial numbers for all fixtures/equipment etc. shall be submitted within *thirty (30)* days of completion of work or within *thirty (30)* days prior to Substantial Completion, whichever occurs first. Model numbers and serial numbers shall be submitted to Contractor's representative on a unit-by-unit basis prior to Contractor's final punch list.

32) Subcontract Change Order Requests shall include a maximum 10% Overhead & Profit, unless otherwise governed by Prime Contract.

## PROJECT SPECIFIC SCOPE OF WORK:

1) All parties hereby agree this is a 'turn-key' sitework and utility package, which includes but is not limited to, all approved plans, specs, shop drawings, current local and state building codes and professional "trade-specific knowledge".

2) All parties hereby agree that scope of work includes the "existing infrastructure" which is not existing currently in the approved site plans, drawing C08.0 and C09.0 indicate that there is, at Pond 1 (North).

3) All parties hereby agree that Subcontractor shall be responsible for locating and protecting all existing utility services on the project site and notifying and coordinating with all local utilities for removal, relocation, and repair prior to commencement of work. Further, all parties agree that Subcontractor shall be responsible for repairs of any existing utilities or structures damaged by Subcontractor's operations at no additional cost to the Owner or Contractor. It is understood that the locations of existing utilities shown on the Contract Documents are approximate. To safeguard existing utilities the contractor shall furnish any special equipment required to work in the neighborhood of the utilities. It is understood that Owner will be responsible for all relocation fees and providing approved Construction Documents from local utility providers.

4) All parties hereby agree that prior to commencing any excavation, Subcontractor will locate and identify nearest utility shutoff for all water lines adjacent to the site.

5) All parties hereby agree that Subcontractor acknowledges that the tracking of mud and dirt onto adjacent pavement and other properties may be a problem. In the event this becomes a problem on this project, it will be the Subcontractor's responsibility to have a construction entrance with a gravel apron at each site entry and make arrangements for wash down of Subcontractor's vehicles or equipment in order to prevent mud and dirt from being carried off-site and onto existing streets. Further, it shall be the Subcontractor's responsibility for removal or sweeping as required to remove said mud and dirt from adjacent pavement or other properties and returning them to their original condition as required by Subcontractor's own equipment and labor pertains to this Subcontractor's scope of work.

6) All parties hereby agree that in the event dust becomes a problem or a nuisance to the public, or neighbors, and to other work being performed on or near the site, Subcontractor shall implement SWPPP best practice

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

measures immediately to prevent dust problems if this is caused by their portion of the work.

7) All parties hereby agree that Subcontractor to verify topo prior to commencement of construction.

8) It is this Subcontractor's responsibility to maintain their site survey coordination's (e.g., GPS, CADD files). All changes made will include changes to the GPS.

9) All parties hereby agree that Subcontractor shall follow all procedures/recommendations as per Geotechnical Exploration Report or by the project onsite Geotechnical Consultant as required by Contract Documents and authorities having jurisdiction if more stringent requirements are necessary. This shall include but not limited to the *"Site Preparation" recommendations and "Compaction"* requirements.

10) Geotechnical Consultant shall be provided by Contractor. Coordination of testing by Geotechnical Consultant will be the responsibility of the Subcontractor through the Contractor's Jobsite Management Team.

11) All parties hereby agree that Subcontractor is responsible for any hand compacted backfilling operations that may be required to install this scope of work.

12) All parties hereby agree that if water is encountered while trenching, the water should be filtered to remove any sediment before being pumped back into any drainage systems and in accordance with *ESC* standard for sediment and erosion control measures.

13) All parties hereby agree that all notes in the Contract Documents *Civil Sheets* that reference "Contractor" shall mean this Subcontractor unless stated otherwise or defined in this agreement.

14) All parties herby agree that Subcontractor shall be responsible for the immediate replacement of any Erosion Control measure or devices, barricades, fences, etc. that are damaged by or removed for temporary access by this Subcontractor's vehicles and/or equipment. This shall include this Subcontractor's Supplier/Vendor(s).

15) All parties hereby agree that Subcontractor shall provide all traffic control signage as indicated as indicated on Contract Documents, *Civil Sheets 15 "Signing and Pavement Marking Plan", FDOT* and governing authorities. This shall include any additional traffic control signage as needed to keep the entrances into this project site safe for passing motorists and persons entering or leaving the site. It is hereby agreed it is the responsibility of this Subcontractor to generate and submit any Site-Specific MOT Plan required for this Subcontractor's scope of work.

16) All parties hereby agree that Subcontractor shall be responsible for coordinating and directing all haul in and haul out trucks and assuring that the adjacent properties, businesses, and tenants are not harmed, inconvenienced, or damaged. All parties herby agree that the *General Building Permits* shall be furnished by others; however, Subcontractor shall be required to provide specialized permits and licenses as required by governing authorities as required to complete scopes listed in this Subcontract Agreement.

17) All parties hereby agree that Subcontractor will comply with the phasing plans for the project and complete / commission sitework and utilities so certificates of occupancy can be achieved in accordance with the Contractor's schedule. Subcontractor shall follow the construction sequence as directed by Contractor's Project Management Team.

18) All cutting and patching of sidewalks, curbing, and paving (asphalt or concrete) required for this scope work is included.

19) All parties hereby agree that Subcontractor shall repair or replace any damaged pavement, curb and gutter, or sidewalk damaged by this Subcontractor's activities.

20) All parties hereby agree that Subcontractor shall provide mechanical tamping at all trench excavations during backfilling operations from the bottom to the top until proper compaction has been reached. Further, this shall be accomplished under the direction and approval of Contractor and Geotechnical Consultant.

21) All parties hereby agree that Subcontractor shall furnish and install all usable backfill material when material excavated from utility trenches is not acceptable as backfill material. Acceptable backfill materials will be garnered achieved from onsite activities.

22) All parties hereby agree that at the direction of Contractor, Subcontractor shall gather and incorporate into the work all residual material remaining as a result of the installation of utilities, at no additional cost to Contractor.

23) All parties hereby agree that this Subcontractor shall be specifically bound by all notes and details shown or illustrated ("Construction Details") of the Contract Documents, *City of Davenport, FL Utilities Standards, and City of Davenport, FL Utilities "Plan Review" comments*. All materials must comply with current *City of Davenport, FL Utilities Standards*. Subcontractor shall coordinate and schedule all required pre-installation meetings, pre-installation inspections and approvals prior to commencing utility work, including but not limited

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

to Sanitary, Storm, and Domestic Water and Fire Line services.

24) All parties hereby agree that Subcontractor has provided provisions for all dewatering measures or activities associate with this Subcontract Agreement. This shall include, but not limited to, de-watering equipment, pumping, permitting, and any required downstream protection. Subcontractor will provide sound abatement or quiet pumps if required for overnight use. All turbidity discharge shall be contained, filtered, and conveyed to the outfall in a manner which prevents erosion and transportation of suspended solids to the receiving outfall. In short Subcontractor shall provide sediment and erosion control measures in strict compliance of Contract Documents, *Southwest Florida Water Management District (SFWMD)* standards.

25) All parties hereby agree Subcontractor shall provide site specific Trench Safety Plan and comply with all provisions of the Trench Safety Act and OSHA standards. Subcontractor shall provide safety plan to Contractor prior to any excavations.

26) All parties hereby agree Subcontractor shall participate in composite clean-up efforts, if required, as applicable and while mobilized.

27) Retainage will be held on materials unless materials are specifically quantified and values listed separately in the Subcontractor's Schedule of Values.

28) The above Project Specific Scope of Work portion of this subcontract agreement is applicable for each section listed below.

## **SURVEYING**

1) All parties herby agree that Subcontractor shall provide all necessary surveying required for the proper layout of their entire Scope of Work as outlined in this Agreement, including all required as-builts and certifications. Contractor shall supply property corners and a benchmark.

2) All parties hereby agree that Subcontractor is responsible for all necessary "construction staking" to install the scope of work included in this Subcontract Agreement and the cost of same is included herein.

## **EROSION CONTROL, SITE CLEARING, GRADING AND GRUBBING**

1) All parties hereby agree that Subcontractor shall be responsible for furnishing and maintaining all sediment and sediment and erosion control measures and tree protection systems per Contract Documents, *Southwest Florida Water Management District* (*SFWMD*) or governing authority. This shall include but not limited to installation, maintenance, monitoring and removal of all sediment erosion control measures: e.g., sediment barriers, turbidity controls, coir bale drop inlet sediment filter, gravel and wire inlet sediment filters, filter barriers, silt fence, coir bale barrier, detention ponds, tree protection fencing, seeding, or required sod along slopes of stormwater management facility, etc. All disturbed areas shall be cleaned, graded, and stabilized by temporary grassing or seed/straw as required immediately after the utility or slope installation. Grassing will be in strict accordance with governing authorities minimum grassing specifications.

2) All parties hereby agree Subcontractor shall perform NPDES monitoring and reporting for the duration of Project. Subcontractor shall be present and take a lead role in any NPDES or erosion control inspections on the jobsite. Includes daily observation and maintenance of all erosion control measures while on site and continue to assist Contractor as required.

3) All parties hereby agree that it shall be the Subcontractor's responsibility for the installation and maintenance of the required construction entrance area per the Contract Documents and governing authorities. This responsibility will remain in effect from the time that clearing begins, until the Subcontractor's work is substantially complete. It is understood this requirement pertains to this Subcontractor's scope of work. If another contractor damages the construction entrance so that it must be repaired, the Subcontractor would be due compensation. Subcontractor shall repair construction entrance on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

4) All parties hereby agree that Subcontractor shall furnish and install all initial, intermediate, and final sediment and erosion control measures contained or listed in the Contract Documents. This shall be construed as taking the jobsite from present condition (at start) and handling all sediment and erosion control measures until the job is ready to be permanently landscaped and therefore stabilized (permanent landscaping is of course by others).

5) Any fines or penalties resulting from incorrect, improper, failed, poorly maintained, or otherwise poor sediment and erosion control measures shall be the sole responsibility of the Subcontractor. Although the Subcontractor shall be responsible for normal upkeep of the sediment and erosion control measures, the Subcontractor is not responsible for damage to their sediment and erosion control measures caused by the

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

negligence of others. If another contractor damages the sediment and erosion control measures so they must be replaced, the Subcontractor may be due compensation. If damages are determined due to negligence of another subcontractor so that it must be repaired, this Subcontractor may due compensation. Subcontractor shall repair areas on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

6) Due to grade changes during the site development of the project, the Subcontractor shall be responsible for adjusting the sediment and erosion control measures (silt fences, filter barriers, seeding, etc.) if required, to prevent erosion at no additional cost to Contractor.

7) All parties hereby agree that temporary diversion berms and/or ditches will be provided during construction to protect work areas from upslope runoff and/or to divert sediment laden water to appropriate traps or stable outlets and such areas shall be maintained throughout all phases of construction.

8) All parties hereby agree that Subcontractor shall sweep the existing/new streets as required to assure compliance with all Contract Documents and authorities having jurisdiction. Subcontractor has the sole responsibility to keep the roads and parking lots free of tracked mud, dirt, debris, gravel, or other material which could cause safety concerns or violations, and in compliance with governing authorities. This responsibility will remain in effect from the time that clearing begins, until the **Subcontractor's work is substantially complete.**

9) All parties hereby agree that Subcontractor shall perform all clearing and grubbing of all roadways, parking, and drainage and utility corridors and easements complete, as necessary to facilitate and complete construction as shown on the Contract Documents.

10) All parties hereby agree that Subcontractor shall submit "burn permit" to Contractor's Project Management Team, when applicable. Further, if a "burn permit" cannot be obtained from Governing Authorities then Subcontractor shall accomplish the completion of the project at no additional cost to Contractor.

11) All parties hereby agree that the Subcontractor shall remove any additional trees in their entirety as required by the Contract Documents.

12) All parties hereby agree that Subcontractor is responsible for disposal of any trees, brush, debris and any other matter which is in the clearing limits.

13) Construct embankments, perform dewatering and temporary water control including making provisions to control surface waters during construction in accordance with all permits, compact usable fill material; spread, compact and grade to lines, slopes and grades shown on the Contract Documents, and provide overall grading within and outside the roadways as shown on the Contract Documents; excavate temporary ditches for dewatering, if required, clear and grade electric utility transformer pad locations and clean-up of Subcontractor's debris as required throughout the project.

14) All parties hereby agree that Subcontractor shall strip existing topsoil and fill site as necessary to achieve final grades. This topsoil will be re-spread and fine graded to within plus or minus one-tenth of a foot by Subcontractor. Subcontractor will dress excess topsoil to the satisfaction of the Authority Having Jurisdiction. Additional topsoil not used will be removed from the project site by the Subcontractor and is included in the Subcontract Agreement. Bare ground areas are to be minimized during construction.

15) All parties hereby agree that grading of the project shall be completed in its entirety by the Subcontractor. This shall include but not limited to all fill and building pads in place as required by Contract Documents. The Subcontractor shall complete grading of all roadways, parking, sidewalks, retention ponds, courtyards, dog walks, trash compactor, maintenance, drainage and utility corridors and easements complete, as necessary to facilitate and complete construction as specified and shown on the Contract Documents. All work shall be performed in strict accordance with Geotechnical Exploration Report and Authorities Having Jurisdiction.

16) Subcontractor recognizes that grading activities will be required on multiple phases for the project. The first instance being the rough grading of project site to second grading occurrence shall be performed just prior to the exterior scaffolding being installed. The intention is that the Subcontractor shall perform the second fine grading while their equipment is mobilized on site.

17) All parties hereby agree that Subcontractor shall provide final grades as indicated on the Contract Documents or as directed by Engineer of Record. Where no grade is indicated, Subcontractor shall shape the finished surface to drain away from buildings or structures as directed by. Minimal hand raking and finishing may be required in restricted areas and is included in this Subcontractor.

18) All parties hereby agree that Subcontractor shall furnish and install all building pads 5-feet beyond the building line itself. Excavated materials onsite (or hauled-in usable material) used in structural fill areas shall

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

meet and placed per all requirements defined by Geotechnical Exploratory Report or Geotechnical Consultant recommendations. Subcontractor shall provide rough grading for the Dog Park +/- 1/10".

19) All parties hereby agree that Subcontractor shall clear and excavate in a manner and sequence that would always provide drainage and temporary water runoff. This shall include positive drainage away from all buildings during project construction. Further, Subcontractor shall be responsible to back-blade and seal with rubber-tired roller areas of work at the end of each day and maintain proper water runoff over the entire site including the utilization of temporary diversion swales, or mechanical water pumping to immediately de-water problem areas including ponding and standing water at no additional cost to Contractor.

20) All parties agree that excavations must not be left open overnight and must be backfilled daily.

21) Provide necessary allowance for re-spread all excess spoils generated by footings/pits/pools excavation, plumbing trenching, and electrical utility trenching. Other subcontractors shall stockpile materials outside the building pads and away from utility structures at an agreeable location by both parties. If determined that this excess material cannot be utilized on the project site, it will be this Subcontractor's responsibility for hauling it to the designated spoil site. Any material haul-off associated with this item shall be on unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

22) All parties hereby agree that the Subcontractor furnish and maintain specified construction storage areas, temporary parking and gravel work area grade and stabilize the parking areas where the Contractor will have their trailer complex. Subcontractor shall have loads of rock or gravel imported to this location, and the Subcontractor shall spread and roll stone prior to Contractor installing their trailers. During the course of the project, after the Contractor has de-mobilized their trailer complex, the Subcontractor shall grade and install any dirt, base and/or paving in this area and finalize construction.

23) All parties hereby agree that Subcontractor shall be responsible for coordinating with the other subcontractors that are performing work in overlapping areas at concurrent times within the public right-of-way unless otherwise directed by Contractor

24) All parties hereby agree that Subcontractor shall be responsible for the installation of any landscape berms as per Contract Documents (*Civil, Landscape, Hardscape sheets*)

25) All parties hereby agree that Subcontractor shall be responsible for providing proper elevation for road subgrades and stabilization of same. Further, all parties agree that Subcontractor shall be responsible for the maintenance of permanent and temporary roadways (with onsite materials) for project duration. Any damage caused by others will be corrected as directed Contractor. Any costs will be mutually agreed upon prior to commencement of repairs.

26) All parties hereby agree that Subcontractor shall proof roll the subgrade areas to receive paving and structures on fill in accordance with Geotechnical Exploration Reports.

27) All parties hereby agree that Subcontractor shall properly barricade open holes and depressions occurring as part of this Subcontract Agreement. Further, Subcontractor shall protect structures, utilities, sidewalks, curbs, pavements, and any other product from damage caused by settlement, lateral movement, wash outs, or any other problems created by the operations under this scope of work.

28) All parties hereby agree that Subcontractor shall be responsible for the holding and protection of any berms or any other areas even if it requires a complete remobilization to correct this work.

29) All parties hereby agree that Subcontractor assumes responsibility for balancing the site without adjusting the benchmark. Any excess or surplus material will be the responsibility of this Subcontractor to place on site, haul off, or haul in, as necessary.

30) All parties hereby agree that Subcontractor shall remove all construction debris and back fill with planting soil and temporary seed all areas as indicated on Contract Documents, Permanent plantings and grasses will be by others.

31) All parties hereby agree that Subcontractor shall specifically provide proper finished grades and slopes for this scope of work as they pertain to ADA accessible routes. Subcontractor shall immediately notify Contractor of any discrepancies.

32) All parties hereby agree that any undercutting of pond to excavate usable fill is included. Subcontractor may replace undercut material with materials in accordance with Geotechnical Exploration Reports.

33) All parties hereby agree that any excess dirt or materials from utility installation or any other source from the Subcontractor's scope shall be utilized as fill removed from jobsite or disposed of as directed by Contractor.

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

34) All parties hereby agree that Subcontractor shall perform excavation of every type of material encountered and properly fill and compact all areas under building structures, roads and parking areas necessary for construction of the structures shown, conforming to the elevations and dimensions shown on Contract Documents. *Rock excavation is not anticipated according to the boring, therefore shall be excluded from this scope of work.*

35) All parties hereby agree that all excavation, tie-in, and complete restoration of all disturbed areas are included in this Subcontract Agreement.

36) All parties herby agree that the Contract Documents and Geotechnical Exploration Reports and *Site Assessments which noted irregularities and/or concern that possible contaminated soils may be present at the site.* Subcontractor shall perform remedial work as directed by Geotechnical Consultant on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

   a) This work shall be performed under the direction of Contractor and the Geotechnical Consultant. Prior to removal of the unusable material, an agreement upon all costs associated with the removal shall be made with the Contractor. Subcontractor explicitly includes all special handling and proper disposal of hazardous compounds, including any required documentation or chain-of-custody paperwork. Any materials removed and replaced without approval will be the sole responsibility of the Subcontractor to bear all associated costs.

## SANITARY SEWER

1) All parties hereby agree that Subcontractor shall complete the Wastewater Pump Station Sewage System. Provide and install a complete turnkey system, including but not limited to connection to existing manholes, raising and/or lowering of existing manholes, all pipe, manholes, valves, DIP & PVC, cleanouts, service connections, dewatering, television and lamp testing, removal of unusable material and replacement (where required), backfilling and compacting with usable onsite material, all piping, catch basin and manholes to lines and grades as shown on Contract Documents is included in this Subcontract Agreement. Cleanup and the furnishing of redline "As- Built" drawings and warranty bonds as required.

2) All parties hereby agree that Subcontractor will furnish and install a complete Sanitary Sewer collection system as indicated on Contract Documents, *Civil Sheets 11.0, 11.1, 11.2, 11.3, 26.0, 27.2 "Master Utility Plan, Utility and Lift Station".*

3) All parties hereby agree that all Sewer laterals will be run to within *5- feet* of the buildings and properly terminated, protected, and identified for plumbing Subcontractor to make final connections.

4) All project sewer lines must comply with specifications required by *City of Davenport, FL Utilities* and authorities having jurisdiction.

5) All parties hereby agree that all required thrust blocks, concrete encasements around sanitary clean-outs, standard concrete collars, and concrete bases as required included in this Subcontract Agreement in accordance with all notes and details on the Contract Documents and *City of Davenport, FL Utilities.*

6) All parties hereby agree that Subcontractor shall furnish Contractor with all required As-Builts, certified surveys of utilities, warranty bonds if required and final releases necessary to dedicate all utilities to governing authorities, if applicable, prior to completion of all contract work.

7) All parties hereby agree that any required clean-outs per plans and specifications are included in this Subcontract Agreement including end of service line as applicable.

8) All parties hereby agree that Subcontractor will furnish and install all pipe bedding, backfill, and compact all trenches in strict accordance with all Contract Documents and *City of Davenport, FL Utilities.*

9) All parties hereby agree that Subcontractor will field verify and adjust top elevation of proposed sanitary sewer manholes to match proposed finished grade of roadways, parking lot and/or landscaped areas.

10) All parties hereby agree that Contractor will only pay for a complete sewer system only after all positive test results have been achieved by Subcontractor, therefore 15% of SOV line items will be held until provided with positive test results.

11) All parties hereby agree that any required TV, pressure, deflection, and inspection tests needed for complete acceptance from governing authority are included in this Subcontract Agreement.

12) All parties agree that Subcontractor is responsible for all utility tie-ins downstream regardless of location downstream.



INITIALED BY CONTRACTOR: _____

INITIALED BY SUBCONTRACTOR: _____

13) All parties hereby agree that Subcontractor shall furnish and install *8-inch property service line and connection as indicated on Civil Sheet 104 "Utility Plan"*.

14) All parties hereby agree that all utilities (water, sewer, storm) services to adjacent neighborhood of the project must always remain in service and proper notice will be given of any planned interruptions. In addition, all neighbors and Contractor's Project Management staff must be notified immediately of any unforeseen/emergency/accidental disruptions.

15) All parties hereby agree Subcontractor shall provide and install all temporary and permanent line plugs and caps as required for constructability purposes.

16) All parties hereby agree Subcontractor has included all temporary bypass lines, valves, and materials to provide all utility services, as necessary.

17) All utility licenses will be in place if required by local governing authorities prior to beginning installation of the utility systems.

18) All parties hereby agree that any required clean-outs per Contract Documents are included in this Subcontract Agreement. End of service line, if applicable. Installations of all sanitary sewer laterals are to local construction and specifications as the standards and guidelines. Subcontractor will be responsible for adjusting all sanitary sewer clean outs to finish grade.

## SITE DOMESTIC WATER DISTRIBUTION

1) All parties hereby agree that Subcontractor shall furnish and install a complete all "On-Site" and "Off-Site" Domestic Water Distribution System as indicated on Contract Document and per *City of Davenport, FL Utilities standards/details*. The shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide.

2) Subcontractor shall furnish all "As-Built" drawings warranty bonds and final releases necessary to dedicate all water lines to governing authorities, if applicable, prior to completion of all contract work.

3) All parties hereby agree that upon completion of installation of site water main, Subcontractor shall run all service laterals for each building, including dog park, trash compactor and maintenance as required for the project to within 5-feet of building service. locations. Cap service to dog park, trash compactor and maintenance building and mark end of service. This Subcontractor shall coordinate with plumbing subcontractor and provide excavation for building tie-ins of "site" water system with plumber's "building' water system (to connect within 5-feet of the building).

4) Subcontractor has included installation of irrigation line as indicated on Contract Documents, *City of Davenport, FL Utilities* and *Landscape Sheet 102, 103 "Irrigation Plan"*. They shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide. Cap service and mark end of service line.

5) Subcontractor has included installation of Fire Protection Main and Fire Hydrant Lateral lines as indicated on Contract Documents, *City of Davenport, FL Utilities*, Civil Sheets and Fire Protection Sheets. This shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide.

6) All parties agree that Subcontractor shall provide all fire hydrants assemblies per Contract Documents, *City of Davenport, FL Utilities*, Fire Marshal, or governing authorities. Adjustment to hydrants and hydrant valve boxes may be necessary upon completion of installation of hard surfaces and paving activities necessary and included in this Subcontractor's scope of work.

7) All parties hereby agree Subcontractor shall mark all fire hydrants in accordance with and conforming to the standard colors required by Contract Documents, *City of Davenport, FL Utilities*, Fire Marshal, or governing authorities.

8) Subcontractor has included install of lateral line for each building fire protection system as per Contract Documents and governing authorities. This scope shall include but not limited to install of building 2-inch lateral stub up to 1-foot above finished floor with a hub in designated "Pump Room", termination point to be coordinated and identified with fire protection subcontractor. Subcontractor shall coordinate all inspections of

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

underground services and ensure all assemblies meet all standards and approved by Fire Marshal and governing authorities.

9) All utility crossings shall be in accordance with separations crossing tables requirements indicated in Contract Documents, *City of Davenport, FL Utilities* and governing authorities.

10) All connections of onsite and offsite water are to be coordinated with the *City of Davenport, FL Utilities* and governing authorities for such and shall be Subcontractor's responsibility to coordination and receive approvals of all connections.

11) All parties hereby agree that Subcontractor will provide temporary water line at or near the construction trailer as required by Contractor.

12) Site water lines, fittings, service connections, meters, and backflows must comply to specifications as indicated by Contract Documents and *City of Davenport, FL Utilities*.

13) All parties hereby agree that all required backflow preventers and proper insulation are included in this Subcontract Agreement as shown on Contract Documents and in accordance with *City of Davenport, FL Utilities standards/details*.

14) All parties hereby agree that any required valves, valve assemblies, manifolds, valve boxes, and traffic bearing valve covers (if required) per plans and specifications are included in this Subcontract Agreement as per Contract Documents.

15) All parties hereby agree that all required flushing, sterilizing, pressure testing and chlorinating of new potable water piping and/or fire riser piping is included in this Subcontract Agreement. All test reports to be submitted to the Authority Having Jurisdiction, State Health Department (if required) and *City of Davenport, FL Utilities*. This shall be done in a timely manner to prevent delays in building hookups.

16) All parties hereby agree that Subcontractor shall leave a "valve key" on site at all times during the construction process.

17) All parties hereby agree that Contractor will only pay for a complete water transmission system only after all positive test results have been achieved by Subcontractor, therefore 15% of SOV line items will be held until provided with positive test results.

18) All parties hereby agree the Subcontractor shall protect all cleanouts, valve boxes and fire hydrants until such items or systems have been turned over and accepted by the Owner or local utility company or entities. Negligent work causing damage by others is considered a reimbursable cost to Subcontractor.

## STORM DRAINAGE SYSTEM

1) All parties hereby agree that Subcontractor shall furnish and install the Storm Drainage System Complete including but not limited to, inlets, catch basins, manholes, detention pond outlet structure, filtration boxes, raising and/or lowering of existing manholes, and storm pipe, pipes, mitered end sections, concrete flume, inlets and any other structures required to provide a complete turnkey storm drainage system. Subcontractor shall be responsible for backfilling in accordance with the Contract Documents and *City of Davenport, FL Utilities standards/details* and authorities having jurisdiction. This shall include but not limited to removal and replacement of unusable material in pipe trenches and/or under structures as needed to facilitate construction of the work.

2) All parties hereby agree that this Subcontractor will ensure all storm drainage outside the right of way has a minimum coverage per Contract Documents and *City of Davenport, FL Utilities*. Subcontractor to contact Contractor and engineer of record should an irregularity occur. Subcontractor shall install pipe to lines and grades shown on plans.

3) All parties hereby agree that Subcontractor acknowledges final acceptance of all storm drainage lines shall be based on final approval and acceptance by *City of Davenport, FL Utilities* and all Federal, State, and Local governing authorities over this project. Further, Subcontractor shall be responsible for ensure final acceptance by these authorities.

4) All parties hereby agree that all necessary de-watering, pumping, permitting, and downstream protection required to complete this scope of work is included in this Subcontract Agreement.

5) All parties hereby agree that Subcontractor will perform a final clean of storm system including pipe and structures upon completion of paving operations All parties hereby agree that Subcontractor shall properly barricade open holes and depressions occurring as part of its work. Subcontractor shall further protect structures and utilities from damage caused by settlement, lateral movement, washouts, and other problems created by its operations.

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

6) All parties hereby agree that Subcontractor has reviewed the site conditions and fully understands sequencing required to maintain temporary storm drainage and utility service to adjacent businesses while constructing new utility services and permanent stormwater pond, in accordance with Contract Documents and Civil Sheet 10.1 "Utility Plan".

7) All parties hereby agree that Subcontractor has included all *underdrain stub outs* as required by Contract Documents and per *General Notes on Civil Sheet 02.0 "General Construction Notes Plan"*.

## SIDEWALKS ADA RAMPS, CURB & GUTTER and/or CURBING

1) All parties hereby agree that it shall be the responsibility of Subcontractor to install all curb and gutter to the elevations, lines and grades as shown on Contract Documents and Authorities Having Jurisdiction. All types of curbing types indicated on Contract Documents are included in scope of work.

2) All parties hereby agree that Subcontractor shall install curb and gutter to all catch basins and make any final adjustments to said catch basins. Any such adjustments shall have the approval of Engineer of Record (EOR).

3) All parties hereby agree that curbing installation adjacent to handicapped ramps shall be installed in accordance with all Contract Documents and governing authority. This shall include but not limited to all detectable warnings, tactile surfaces, required colors and shapes etc. Subcontractor shall assure all curbs, walks and ramps comply with associated ADA and FHA requirements.

4) All parties hereby agree that Subcontractor shall furnish and install all required curb backfill. Further, Subcontractor shall be responsible for the fine grading of these backfilled areas as required to meet intent of Contract Documents.

5) All parties herby agree that Subcontractor shall furnish and install all *"On-Site"* and *"ROW"* concrete sidewalks as indicated on Contract Documents. This shall include but not limited to: turndown sidewalks concrete aprons, handicap ramps, required concrete steps, all aspects of a complete sidewalk package, all in their entirety and in strict accordance with the Contract Documents, FDOT and governing authorities. Subcontractor shall make sure that all sidewalks, ramps, and civil work comply with the Civil drawing details, ADA requirements, and governing authorities' requirements. Any items poured or constructed in non-compliance with the authorities having jurisdiction shall be replaced by the Subcontractor.

6) All parties hereby agree that all *"On-Site"* and *"ROW"* sidewalks finishes shall be finished in a manner acceptable by Contract Documents, FDOT and governing authorities. All parties hereby agree that all form materials shall be removed promptly, and concrete rubbed to present a uniform finish. Subcontractor shall furnish and install all expansion joint materials between sidewalks and curbs, and between sidewalks and other structures.

7) All parties hereby agree that all curbs, sidewalks and handicap ramps stone subbase or bedding materials required by Contract Documents and Authority Having Jurisdiction is included in this Subcontract Agreement.

8) All parties hereby agree that Subcontractor shall be responsible for all reinforcing or formwork required for this scope of work.

9) All parties hereby agree that any required concrete pumping is included in this Subcontract Agreement. This shall pertain directly to this Subcontractor's scope of work.

10) All parties hereby agree that Subcontractor shall always adhere to the specified Concrete Mix Design and the recommendations of the Geotechnical Consultant. Concrete mix designs to be approved thru the Submittal Process prior to any pours.

11) All parties hereby agree that Subcontractor shall protect fresh or recently placed concrete from extreme hot or cold temperatures and raining conditions. In addition, this Subcontractor shall properly protect and cure all freshly poured curb and gutter as directed by Contract Documents and Engineer of Record (EOR).

12) All parties hereby agree that Subcontractor shall repair or replace any chipped, honeycombed, or broken areas of curb and gutter failing to comply with Contract Requirements. This does not apply to areas excessively damaged or broken by other subcontractors.

13) All parties hereby agree that any patching material used by Subcontractor shall be submitted for approval by Engineer of Record (EOR) prior to being used on the project.

14) All parties hereby agree that Subcontractor shall immediately notify Contractor of any modification to curbs, sidewalks or ramps that prohibit installation per Contract Documents.

15) All parties hereby agree that Subcontractor is to repair any "bird bath" areas as directed by Contractor and/or



INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

16) All parties hereby agree that all sidewalks shall be placed on compacted fill and edges thickened as necessary to prevent any cracking along the edges or on corners. Included in this agreement, sidewalk and ramp assembly as indicated in Contract Documents.

17) All parties hereby agree that the Subcontractor includes any required saw-cuts or demolition to adjacent existing conditions to provide a clean, smooth tie-in to the existing conditions.

18) All parties hereby agree that Subcontractor shall be responsible for obtaining an approved area from Contractor for the cleaning of concrete trucks as well as the disposing of excess concrete when concrete trucks are being cleaned and washed out at job site. Concrete wash will be in dumpsters provided by Contractor and washout process will meet all Contract Documents and governing authorities' standards.

19) All parties hereby agree that Subcontractor shall immediately remove any excess concrete left, splashed, or spilled at the job site by its work force upon direction of Contractor during the time frame of Subcontractor's scope of work.

20) All parties hereby agree that Subcontractor has included any handrails, if required, at sidewalks and specifically within or adjacent to FDOT Right of Way.

## ASPHALT PAVING & BASE

1) All parties hereby agree that Subcontractor shall provide all rigid (Concrete Paving) or flexible (Asphalt Paving Heavy & Light Duty) pavement sections as indicate on Contract Documents, Geotechnical Exploration Report and most recent FDOT standard. This shall include but not limited to roadways, drives, surface parking areas and required roadway repairs, compaction, stabilization, and grading activities of these areas, base course as required to completing the project.

2) All parties hereby agree that Subcontractor shall install paving in areas as sequenced by Contractor. Subcontractor fully understands this could require additional mobilizations to project to complete the entire paving process and any required mobilizations to install this scope of work is included in this Subcontract Agreement. Scope of work includes *four (4) each mobilization for 1-inch "binder" & four (4) each mobilization for 1-inch "surface" layer*. Surface paving layer will be installed immediately prior to the turnover of each phase for the project. Any required adjustments to manhole frames, covers, and valve boxes shall occur at this time.

3) All parties hereby agree that Subcontractor shall be responsible for identification and proper elevation for road subgrades and stabilization of same. Further, all parties agree that Subcontractor shall be responsible for the maintenance of permanent and temporary roadways in order for them to remain passable for all construction equipment for project duration.

4) The price of asphalt paving included in this subcontract is based on the *Florida Department of Transportation "FDOT" monthly "Fuel and Bituminous Average Price Index" for November 2020*. The material price will be adjusted up or down based on the *FDOT Bituminous Materials Index* at the time of placing paving materials. Subcontractor shall notify Contractor in writing of monthly changes to *FDOT Bituminous Materials Index*.

5) Where pavement terminates a neat and professional finish will be expected by the Contractor.

6) All parties hereby agree that Subcontractor shall not install any base material on a roadway or parking lot until the storm sewer, sub-grade, and utilities have been inspected and approved by Contractor and all required governing authorities.

7) All parties hereby agree that after Subcontractor installs this scope of work then Subcontractor shall repair any "bird bath" areas that do not conform with Contract Documents standards, identified by Engineer of Record and authorities having jurisdiction.

8) All parties hereby agree that Subcontractor shall install any asphalt meeting driveways, aprons, or garages flush with the lip of existing concrete. Protect all existing concrete edges from tack coat operations

9) All parties hereby agree that Subcontractor shall clean asphalt machinery only in areas as designated by Contractor. This process will meet all Contract Documents and governing authorities' standards.

10) All parties hereby agree that Subcontractor shall remove all asphalt spoils from the jobsite.

11) All parties hereby agree that any asphalt attached to curbs or other surfaces deemed inappropriate shall be fully and completely removed by Subcontractor to the extent that there is no visual evidence of this incident having ever occurred

12) All parties hereby agree that Subcontractor shall be responsible for repairs/remediation to binder course

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

caused by this Subcontractor's activities prior to final placement of wearing course at no additional charge to Contractor.

13) All parties hereby agree that Subcontractor shall taper pavement to sidewalk grades as required.

14) All parties hereby agree that after this scope of work has been installed Contractor shall have the right to inspect the *compacted "Lime rock or equivalent" base* course for correctness. Subcontractor shall perform any corrective action required by Contractor at no additional cost to Contractor.

15) All parties hereby agree that Subcontractor shall coordinate with Contractor and Geotechnical Consultant to verify the paving base sections are in compliance with the Contract Documents once base has been completed.

16) All parties hereby agree that Subcontractor shall install all "On-Site" and "ROW" street signage, handicap parking signage, all traffic markings, pavement stripping and handicap striping as indicated on Contract Documents, FDOT, and governing authorities. This shall include but not limited to providing an appropriate parking and driving area required for Certificate(s) of Occupancy, in addition this may include Temporary or Partial Certificates of Occupancy based on project schedule.

17) All parties hereby agree that it shall be the responsibility of Subcontractor shall provide all final sweeping, washing and/or blowing, including all necessary handwork required to prepare the base, prime coat and initial layer of asphalt to receive the finish asphalt surface course installation with the exception of debris and materials belonging to other trades.

18) All parties hereby agree that Contractor may require Subcontractor to run base and binder in areas prior to placement of curbing for schedule reasons or to satisfy local authorities. If Contractor decides to sequence the work in this manner, the excess base and asphalt poured past the curb line would be priced and agreed upon prior to installation.

19) All parties hereby agree Subcontractor includes installation of any site sleeves as required by others (ex: irrigation or electrical sleeves). These conduit sleeves will be provided by others but installed under sidewalks and driveways related to this scope of work.

20) Contractor has eliminated the dumpster concrete pad scope of work from this subcontract agreement and shall be installed by others. Subcontractor shall be responsible for all other grading, utilities, etc.

**PROJECT LINE ITEM**:

| | CITRUS RIDGE ON-SITE SCOPE | |
|---|---|---|
| | **McKENZIE CONTRACTING LLC** | |
| | | Lump Sum |
| 1 | P&P BOND | $ 65,188.77 |
| 2 | MAINTENANCE OF TRAFFIC | $ 12,755.00 |
| 3 | NPDES MONITORING AND REPORTING | $ 40,000.00 |
| 4 | SURVEY / AS-BUILTS | $ 118,250.00 |
| 5 | INLET PROTECTION | $ 13,090.00 |
| 6 | SAW CUT | $ 1,720.00 |
| 7 | STOCK PILE EXCESS FILL ON-SITE | $ 28,957.50 |
| 8 | BAHIA SOD AT POND SLOPES ONLY | $ 30,555.00 |
| 9 | PROOF ROLL | $ 9,375.00 |
| 10 | SITE EXCAVATION AND GRADING | $ 94,134.00 |
| 11 | BUILDING PAD COMPACTION | $ 46,800.00 |
| 12 | FINAL GRADING (ONE TIME ONLY) | $ 50,400.00 |
| 13 | 8" HDPE AND FITTINGS | $ 86,580.00 |
| 14 | 10" HDPE AND FITTINGS | $ 41,360.00 |
| 15 | 12" HDPE AND FITTINGS | $ 26,240.00 |
| 16 | 15" HDPE AND FITTINGS | $ 7,200.00 |
| 17 | 18" RCP | $ 110,192.00 |
| 18 | 24" RCP | $ 76,120.00 |
| 19 | 30" RCP | $ 34,008.00 |
| 20 | 36" RCP | $ 33,600.00 |
| 21 | 42" RCP | $ 61,088.00 |
| 22 | YARD DRAIN INLETS | $ 165,816.00 |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

| 23 | TYPE "C" BUBBLER BOX | $ 31,500.00 |
| 24 | TYPE "D" INLET | $ 182,574.00 |
| 25 | TYPE "H" BUBBLER BOX | $ 7,938.00 |
| 26 | STORM MANHOLE | $ 28,476.00 |
| 27 | SAND AND MUD TRAP | $ 7,821.00 |
| 28 | 6" SDR-26 SEWER PVC | $ 34,048.00 |
| 29 | 8" SDR-26 SEWER PVC | $ 167,328.00 |
| 30 | 6" PVC CLEANOUTS | $ 19,320.00 |
| 31 | SANITARY MANHOLES | $ 128,784.00 |
| 32 | TV 8" GRAVITY SEWER | $ 17,430.00 |
| 33 | DEWATERING / STONE BEDDING | $ 22,000.00 |
| 34 | 8"X8" WATER WET TAP | $ 8,400.00 |
| 35 | 2" PE WATER SEVICE | $ 189,810.00 |
| 36 | 2" PE FIRE SERVICE LINE | $ 182,952.00 |
| 37 | LIFT STATION WATER SERVICE | $ 6,183.00 |
| 38 | 6" DR18 PVC WATER LINE AND FITTINGS | $ 6,672.00 |
| 39 | 8" DR18 PVC WATER LINE AND FITTINGS | $ 261,564.00 |
| 40 | 8" GATE VALVE AND BOX | $ 52,080.00 |
| 41 | FIRE HYDRANT ASSEMBLY | $ 68,445.00 |
| 42 | 8" JUMPER | $ 8,424.00 |
| 43 | 8" MASTER METER ASSEMBLY | $ 118,750.00 |
| 44 | SAMPLE POINT | $ 4,800.00 |
| 45 | TEMPORARY WATER BLOW OFF | $ 8,235.00 |
| 46 | PRESSURE TEST AND CHLORINATE WATER LINE | $ 37,344.00 |
| 47 | 8"X4" RECLAIMED WET TAP | $ 6,700.00 |
| 48 | 2" PE RECLAIMED SERVICE | $ 61,560.00 |
| 49 | 4" DR18 PVC RECLAIMED LINE AND FITTINGS | $ 130,200.00 |
| 50 | 4" HDPE RECLAINED LINE | $ 3,800.00 |
| 51 | 4" HDD RECLAIMED LINE | $ 10,200.00 |
| 52 | 4" GATE VALVE AND BOX | $ 26,475.00 |
| 53 | 4" RECLAIMED METER | $ 18,422.95 |
| 54 | RECLAIMED TEMPORARY BLOW OFF | $ 1,830.00 |
| 55 | PRESSURE TEST RECLAIMED LINE | $ 16,800.00 |
| 56 | 1" SP-9.5 ASPHALT 1ST LIFT | $ 99,861.30 |
| 57 | 1" SP-9.5 ASPHALT 2ND LIFT | $ 99,861.30 |
| 58 | 6" CRUSHED CONCRETE BASE | $ 233,442.00 |
| 59 | 9" STABILIZED SUBGRADE LBR-40 | $ 100,509.75 |
| 60 | TYPE "D" CURB | $ 65,683.20 |
| 61 | TYPE "F" CURB | $ 3,348.00 |
| 62 | 12"X8" RIBBON CURB | $ 46,455.00 |
| 63 | 4" CONCRETE SIDEWALK W/FIBER | $ 147,156.00 |
| 64 | 12" COMPACTED SUB-GRADE UNDER SIDEWALK | $ 29,925.00 |
| 65 | ADA RAMPS | $ 31,200.00 |
| 66 | STRIPING (PAINT) | $ 33,000.00 |

**Any Unforeseen Extra Work Unit Pricing: Prior Approval Required**

| | CITRUS RIDGE ON-SITE SCOPE | | |
| | McKENZIE CONTRACTING LLC | | |
| | | | Unit Cost |
| 1 | SAW CUT | LF | $8.60 |
| 3 | BAHIA SOD AT POND SLOPES ONLY | SF | $1.05 |
| 4 | 8" HDPE AND FITTINGS | LF | $37.00 |
| 5 | 10" HDPE AND FITTINGS | LF | $44.00 |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

| | | | |
|---|---|---|---|
| 6 | 12" HDPE AND FITTINGS | LF | $43.00 |
| 7 | 15" HDPE AND FITTINGS | LF | $72.00 |
| 8 | 18" RCP | LF | $71.00 |
| 9 | 24" RCP | LF | $86.50 |
| 10 | 30" RCP | LF | $109.00 |
| 11 | 36" RCP | LF | $140.00 |
| 12 | 42" RCP | LF | $166.00 |
| 13 | 6" SDR-26 SEWER PVC | LF | $38.00 |
| 14 | 8" SDR-26 SEWER PVC | LF | $48.00 |
| 16 | 6" DR18 PVC WATER LINE AND FITTINGS | LF | $55.60 |
| 17 | 8" DR18 PVC WATER LINE AND FITTINGS | LF | $61.40 |
| 18 | 4" DR18 PVC RECLAIMED LINE AND FITTINGS | LF | $42.00 |
| 19 | 4" HDPE RECLAIMED LINE | LF | $38.00 |
| 20 | 1" SP-9.5 ASPHALT Patch | SY | $7.70 |
| 21 | TYPE "D" CURB | LF | $17.60 |
| 22 | TYPE "F" CURB | LF | $18.00 |
| 23 | 12"X8" RIBBON CURB | LF | $9.50 |
| 24 | 4" CONCRETE SIDEWALK W/FIBER | SF | $6.00 |
| 25 | 12" COMPACTED SUB-GRADE UNDER SIDEWALK | SY | $5.00 |

*All unit cost work shall be logged daily for verification of quantities. All scopes, quantities and cost shall be agreed upon prior to commencement of work. Quantities shall be documented on approved tracking log and/or haul tickets (Documentation). All documentation shall require the signature of Contractor's Senior Site Management Team Member, Subcontractor's foremen and Geotechnical Consultant. Executed Verification logs and/or tickets shall be required to support Subcontractor's "Request for Change". Any work performed without approval will be the sole responsibility of the Subcontractor to bear.*

**PROJECT SPECIFIC EXCLUSIONS**:

- Dumpsters
- Concrete pavers indicated on Hardscape Drawings.

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:

2.1 A redacted copy of the Prime Contract is available upon request from Contractor.

2.2 At the onset of Finishes being installed in any structure, no food or drink will be allowed inside the structure. Failure to comply with this item may be grounds for removal of any Subcontractor employee from the Project as directed by Contractor. Use of tobacco products are expressly prohibited except in designated areas.

2.3 Each Subcontractor shall include all layouts and engineering required to perform the work of each Subcontract. Benchmarks and baselines will be provided by others. It is each Subcontractor's responsibility to use and maintain these control points throughout the completion of the project.

2.4 All parties hereby agree the Work Schedule, use of the site and coordination of all on-site personnel will be performed under the complete direction of the Contractor's supervisory personnel. Contractor may enforce upon Subcontractor any of the following actions in order to expedite or coordinate work. However, Contractor does not assume any liability for delays to Subcontractor or third parties in connection with coordination of on-site personnel. These actions include, but are not limited to, the following:

2.4.1 Designated storage, designated unloading, and parking areas.

2.4.2 Require unacceptable materials, equipment, or vehicles to be removed from the project.

2.4.3 Limit the use of the site by Subcontractor's equipment, vehicles, personnel, or stored materials.

2.4.4 Temporarily or permanently bar specific personnel from the site. Listed below is a partial list of reasons to deny a person access to the project.

2.4.4.1 Drug or alcohol use

2.4.4.2 Fighting, possession of weapons

2.4.4.3 Theft

2.4.4.4 Harassment of anyone associated with project, while on or off the project site

2.4.4.5 Personal use of the areas near the project limits for parking, eating, sleeping, etc.

2.4.4.6 Failure to cooperate with Contractor's supervisory personnel or comply with project documents

2.4.4.7 Failure to follow Contractor's Safety Procedures

2.5 All parties hereby agree that Subcontractor is responsible for all related work, no matter what sections of the Contract Documents and Specifications it is detailed, to complete the scope of work as listed in Exhibit "A" to this Subcontract Agreement.

2.6 All parties hereby agree that this Subcontract Agreement hereby supersedes any prior proposal, both written and verbal, therefore any prior written or verbal proposal hereby becomes null and void at the signing of this Subcontract Agreement.

2.7 Each Subcontractor is responsible for providing all hoisting, lifting, loading, unloading, and scaffolding required to perform their scope of work. Each Subcontractor shall provide their own equipment and scaffolding for this Project. All must meet OSHA standards before being used and any equipment leaking fluid of any sort must be repaired before use or removed from the site. Remediation due to fluid leaks or spills will be at the expense of the responsible subcontractor.

2.8 Each Subcontractor is responsible to provide, install and remove all temporary protection of its Work. All protection will remain in place until substantial completion unless directed otherwise by the Contractor.

2.9 Each Subcontractor will coordinate all phases of construction with other Subcontractors to ensure smooth, continuous operations, productivity, and timely inspections.

2.10 Each Subcontractor will schedule all applicable inspections and tests of his Work as required by agencies having jurisdiction or industry standards. Each Subcontractor will notify the Contractor a minimum of 24 hours prior to inspections and/or tests.

2.11 Each Subcontractor will provide isolation for dissimilar materials in all instances where required.

2.12 If responsibility of connections is not specifically described in the Contract Documents, the Subcontractor providing the material, equipment or fixture that connects to the Service shall be responsible for performing the connection or termination. Additionally, if the Contract Documents do not specifically define which Subcontractor is to provide valves, disconnects or the like, then the Subcontractor providing the service is to furnish and install the valve, disconnect or the like.

2.13 Unless specifically indicated in the Contract Documents, all inserts (i.e., embeds, anchor bolts, hangers, etc.) are to be provided by the Subcontractor connecting to the insert. The Subcontractor that is constructing the assembly that receives the insert will install. The provider will furnish location and elevation information and be responsible for verifying and maintaining accuracy during and after installation.

2.14 Access Doors are to be provided by each trade requiring access doors but installed by the Subcontractor responsible for installing the assembly that will receive the access door. Location of access doors is to be determined by the Subcontractor requiring the access door and coordinated through the Contractor.

2.15 Each Subcontractor shall procure and pay for all applicable permits to perform his work.

2.16 Daily clean-up of all work areas is "Mandatory", and the cost shall be included in the bid. Each Subcontractor will include a line item in his Schedule of Values for cleanup of his work. Clean-up is to be a

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

daily activity and a prerequisite to being permitted to start the following day's work. A thorough clean up is to be conducted for all windblown construction materials and trash. Each Subcontractor is to include final cleaning of all areas and systems of their work prior to Final Acceptance.

2.17 Each Subcontractor shall maintain, on-site, accurately detailed as-built drawings indicating any changes, deviations, actual dimensions, locations, and any field modifications. As-builts will be reviewed monthly and are a condition of monthly payments.

2.18 Each Subcontractor acknowledges that equipment for portions of the work may be started, tested, run and otherwise utilized prior to the start of the warranty period. Each Subcontractor will be responsible for all costs associated with securing warranties effective from the time of substantial completion.

2.19 Each Subcontractor is responsible for all safety, clean up, shoring, bracing, barricades, and field quality control requirements necessary to perform their work safely and productively.

2.20 Each Subcontractor is responsible for all demolition, excavation, dewatering, backfill and compaction required for his work. This includes all grading after backfilling and compaction. The subcontractor shall remove excess material from excavations from the building confines and properly dispose of material off the site.

2.21 No cutting or drilling of holes in structural members will be permitted unless written permission has been obtained from the Architect/Engineer.

2.22 Each Subcontractor, at his own expense, may place on site an office trailer. Set up and demobilization will be at the Subcontractor's expense. Location will be coordinated with the Contractor's Project Superintendent. Telephone, water, sewage, and power service installation, maintenance, and usage will be at the Subcontractor's expense and coordinated with the proper authorities.

2.23 Location of employee and equipment parking, job signs or any temporary trailers will be subject to approval by the Contractor's Project Superintendent.

2.24 Each Subcontractor is responsible for all caulk, waterproofing, damp proofing, fire-safing, and fire rated caulk as specifically required to perform his respective scope of work unless described otherwise in Section 1 of Exhibit "A".

2.24.1 Each subcontractor is responsible for all fire caulking associated with penetrations for their work that goes through or in fire and smoke rated walls.

2.25 If the Stamp of a Registered Engineer is required per Contract Documents or industry standards, the Engineer must be registered in the State of Florida. Subcontractors are responsible for any engineering required to perform their scope of work.

2.26 Subcontractor to review the submittal data from all associated structural, electrical, roofing, partitions, and other Subcontractors. Coordinate the interface of this work with that of these other trades. Connections, tie-ins, dimensions, rough-openings, clear access requirements shall be identified and highlighted so that no gaps, omissions, or errors will result after commencing work. Notify the Contractor and associated Subcontractors immediately if any deficiencies are identified. Further, the cost of any work performed or reliance on information other than in compliance with written instructions or information provided by Contractor's authorized representative, shall be borne by Subcontractor and any such cost is included in the Subcontract Agreement.

2.27 Any damage to other subcontractors' work, caused by the negligence of this Subcontractor and its employees, will be repaired at this Subcontractor's expense.

2.28 Wall assemblies will not be closed-up until each subcontractor has had sufficient time to perform their Work within the assembly and inspections have taken place. Work must be coordinated and performed in a timely fashion to not hold up scheduled progress.

2.29 Each subcontractor superintendent must have a mobile phone and that number provided to the Contractor's field staff. Mobile phone use on the project by workers making and receiving personal calls or texting should be discouraged by each subcontractor.

2.30 Items installed below grade where future tie-in or exposure is necessary will need to be identified with a 4x4 vertical post with three feet above grade exposed and color coded. Each subcontractor will be responsible for installing the posts at the time of burial. These locations must also be identified on as-built drawings maintained by each subcontractor and the Contractor.

2.31 Unless specifically stated otherwise, temporary water, electricity and portable toilets will be provided by the Contractor. Each subcontractor is responsible for providing their own non-leaking hoses, heavy duty

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR _____

to the subcontractor.

2.32  Each subcontractor is responsible for communicating and enforcing the rules of the project with their employees which will be posted and regularly discussed in weekly subcontractor meetings.

2.33  Graffiti of any kind, in any place, on the project will not be tolerated. This will be grounds for the responsible employee(s) being removed from the project and the employer being subject to all associated cleaning cost or replacement of damaged materials. This includes temporary toilets.

2.34  The Subcontractor will submit to Contractor, by 8:30 AM each workday, a complete Daily Report as required by Contractor for the incorporation into the RISE Daily Report.

2.35  Provide a competent representative at each weekly jobsite meeting, provided the subcontractor has work in progress or within 2 weeks of meeting date. This representative should be familiar with the project and should have the authority to make management decisions for the subcontractor with regard to crew size, equipment allocation, and execution of the project work. The name(s) of this person or persons shall be provided to RISE in writing prior to the start of work. Contractor shall be notified in writing for any change in this representative.

2.35.1  The sum of $300.00 will be deducted from the subcontract amount for each meeting not attended by the Subcontractor's authorized representative provided that: a) the subcontractor has work in progress or starting within two (2) weeks of the meeting date or b) the subcontractor has not received written approval from the RISE Project Manager to be absent.

**END OF EXHIBIT "A"**

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:

## CONTRACT PRICE

| | BASE BID | $3,920,736.77 |
|---|---|---|
| | | |
| | | |
| | TOTAL | $3,920,736.77 |

## PAYMENT SCHEDULE

Pay applications, along with, but not limited to, interim waivers and releases from all subcontractors and suppliers and payroll documents are due to the Contractor on the **_20th_** of each month. Any pay applications received after the **_25th_** of the month will not be processed until the following month billing cycle.

## APPLICATION FOR PAYMENT

Subcontractor shall within ten (10) days of execution of this subcontract provide a schedule of values totaling the contract price on the Subcontractor Application for Payment Form provided by Contractor. Contract price, at a minimum, will be broken out on the schedule of values by labor, material, subcontract, area, building, level, and type of work.  Once approved by Contractor, this document will become a part of this subcontract agreement Exhibit "B-1".

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

## SCHEDULE OF VALUES

SUBCONTRACTOR NAME: _____
JOB NAME: _____
JOB NUMBER: _____

APPLICATION NO: _____
APPLICATION DATE: _____
PERIOD TO: _____
ARCHITECT'S PROJECT NO: _____

In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Agreements where variable retainage for line items may apply.

| A ITEM NO. | A.1 Item Cost Code | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMLETED AND STORED TO DATE (D+E+F) | % (G / C) | H BALANCE TO FINISH (C - G) | I RETAINAGE 10% |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | Punch (5% of Scheduled Value Total) | | | | | | | | |
| | | Clean (5% Scheduled Value Total) | | | | | | | | |
| | | **GRAND TOTALS** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:



**RISE**

GENERAL CONTRACTORS

10161 Centurion Pkwy N Jacksonville, FL 32256

# SUBCONTRACTORS APPLICATION FOR PAYMENT

PROJECT NAME: _____
COMPANY: _____
INVOICE/PAY APP #: _____
REQUEST DATE: _____
PERIOD END DATE: _____
SUB-AGREEMENT #: _____

| EMAIL TO:  RISE General Contractors –  teresa.koscielney@risere.com |
|---|

| | STATEMENT OF SUBCONTRACTOR ACCOUNT | | | RISE USE ONLY |
|---|---|---|---|---|
| a) | Amount of original agreement | .............................................. | $_____ | _____ |
| b) | Net Change Orders #1 thru #_____ | .............................................. | $_____ | _____ |
| c) | Revised agreement amount (a+b) | .............................................. | $_____ | _____ |
| d) | Work completed to date | .............................................. | $_____ | _____ |
| e) | Value of stored materials (itemized inventory attached) | .............................................. | $_____ | _____ |
| f) | Total completed & stored to date (d+e) | .............................................. | $_____ | _____ |
| g) | Less previous applications (line f from previous draw) | .............................. | $_____ | _____ |
| h) | Current application (f-g) | .............................................. | $_____ | _____ |
| i) | Less _____ % retainage (h*%) | .............................................. | $_____ | _____ |
| j) | Less other deductions (2% state if applicable) | .............................. | $_____ | _____ |
| k) | Net amount this request (h-i-j) | .............................................. | $_____ | _____ |
| l) | Balance to complete agreement (c-f) | .............................................. | $_____ | _____ |
| m) | Job-To-Date Retainage Held | | | |

# CERTIFICATE OF THE SUBCONTRACTOR

I hereby certify that the work performed and the materials supplied to date, as shown on the above, represent the actual value of accomplishment under the terms of the subcontract (and all authorized changes thereto) between the undersigned and RISE General Contractors, LLC relating to the above referenced project

I also certify that all laborers, material suppliers, contractors and subcontractors use on or in connection with the performance of this subcontract have been paid in full, except as noted on reverse side.  I further certify I have complied with all Federal, State and Local tax laws, including Social Security laws insofar as applicable to the performance of this subcontract

| SIGNATURE MUST BE NOTARIZED |
|---|

Witness the hand and seal of the undersigned this _____ day of _____,20_____

By: _____

_____          _____          _____
Name of Company                              Signature                                          Title

_____                                                                          _____
Address                                                                                                          Phone

Before me, the undersigned authority, personally appeared _____ who, by me being first duly sworn, did acknowledge that

he or she is the _____ of _____ and as such has the authority to execute this document and that the facts

stated therein are true.

Dated this _____ date of _____, 20_____.  My Commission Expires: _____

STATE OF _____ COUNTY OF _____

_____
Notary Public

CHECK DELIVERY (CIRCLE ONE) * DELIVER TO JOB SITE * REGULAR MAIL * OVERNIGHT-FEDEX/UPS #

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR _____

**EXHIBIT "B-2"**
**SUPPLIER/SUB-SUBCONTRACTOR LIST**

**LIST OF ALL SUPPLIERS AND SUBCONTRACTORS**

SUBCONTRACTOR:_____          DATE:_____

LOWER---TIER SUBCONTRACTOR/SUPPLIER INFORMATION

| Company Name | Contact Name | Mailing Address | Office # | Fax # | Cell # | Email |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Contractor's Signature:_____          Printed Name:_____

[3668742/2]                                   PAGE 1 OF 1

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

1) Subcontractors and Consultant Insurance Limits

   a) General Contractor is responsible for ensuring all of its contractors, subcontractors, consultants, and vendors maintain the following insurance policies and limits:

| General Liability (GL) Per Occ/Agg | Umbrella / Excess | Professional Liability (E&O) | Workers' Comp | Employers Liability | Auto | Pollution |
|---|---|---|---|---|---|---|
| | | | | | | |
| $1MM/$2MM | See Chart in Section 2 (c) below | If Applicable | Statutory | $1MM | $1MM | $5MM for EIFS, Demolition, & Asbestos Contractors; Others as Applicable |

   b) Any policy required by this section must meet the coverage requirements in Section 1 above, except for limits, which are dictated in this section. General Contractor is responsible for requiring any additional coverage that is commercially reasonable for the scope of subcontracted work.

   c) Subcontractor/Trade Contractor Excess/Umbrella Insurance Limits:
      i) Ten Million ($10,000,000) for all Demolition, Excavation, Cranes & Hoists
      ii) Five Million ($5,000,000) for all Carpentry, Caulking/Waterproofing, Dewatering, Electrical, Elevators/Vertical Transportation, Exterior Brickwork/Façade, Foundations, HVAC, Metalwork, Plumbing, Pools, Powered Doors/Gates/Garage Doors, Railings, Roofing, Skylights, Spray Fireproofing, Stucco/EIFS, Structural Work (any and all), Window Washing (Exterior (3+ Stories), and all other subcontracts valued at over $750,000
      iii) Two Million ($2,000,000) for all other subcontracts valued at $750,000 or less.

2) **General Insurance Requirements Applicable to Contractor, Subcontractors, and Consultants**: The following requirements are applicable to all insurance coverages required under this Agreement, except where indicated otherwise.

   a) Insurer Requirements: Except for any state workers' compensation funds, each insurer providing insurance coverage as required in this Agreement shall be a licensed, admitted insurer authorized to issue such coverage in the state in which the Project is located, and shall have an A.M. Best rating of not less than "A-" and Financial Size Category Rating of not less than "VIII" according to the latest edition of Best's Key Rating Guide.

   b) Additional Insureds: All insurance required by this Agreement (excluding only Workers' Compensation and Professional Liability insurance) shall name Owner, the following parties, and each of their respective parents, members, affiliates, lenders, directors, officers, representatives, agents, and employees, and all other parties reasonably requested by Owner as additional insureds (hereinafter, collectively the "Additional Insureds"). Those parties include:

   - *Citrus Ridge Properties II, LLC – Project Owner/Borrower*
   - *Citrus Ridge Properties I JV, LLC – JV Entity (owns 100% of Project Owner)*
   - *CRP Citrus Ridge Properties I Member, LLC – Equity Investor*
   - *IberiaBank, ISAOA, ATIMA – Lender*
     *200 West Congress Street*
     *Lafayette, LA 70501*

   c) All policies (including General Liability, Umbrella/Excess, and Auto Liability) shall state that the insurance provided to the Additional Insureds is primary and non-contributory to any other insurance maintained by or available to the additional insureds. With respect to the Commercial General Liability policy required under this Agreement, additional on ISO forms CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations), or equivalent endorsements that do not limit Additional Insured status to persons/entities in contractual privity with the named insured.

[3677082/1]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

d) <u>Scope of Coverage and Limits of Insurance</u>: The coverage provided to the Additional Insureds must be at least as broad as that provided to the first named insured on each policy. In the event that any policy provided in compliance with this Agreement states that the coverage provided to an additional insured shall be no broader than that required by contract, or words of similar meaning, the parties agree that nothing in this Agreement is intended to restrict or limit the breadth of such coverage. The limits of insurance stated above for each type of insurance are minimum limits only. If Contractor's or Subcontractor's policy provides greater limits, then the Additional Insureds shall be entitled to, or to share in, the full limits of such policy, and this Agreement shall be deemed to require such full limits.

e) <u>Severability of Interests (Cross Liability)</u>: No cross-liability exclusions are permitted that apply to the Additional Insureds, and there may not be any restrictions in any policy that limits coverage for a claim brought by an additional insured against a named insured.

f) <u>Waiver of Subrogation</u>: To the fullest extent permitted by law, all insurance maintained by Contractor and all subcontractors, in compliance with this Agreement, shall include a waiver of subrogation in favor of the Additional Insureds.

g) <u>Claims-Made Policies</u>: Any insurance policy written on a claims-made bases must include a retroactive date prior to the start of the work and must be maintained for or include an extended reporting period for at least ten (10) years after substantial completion and acceptance of the Project, or to the expiration of any applicable State of Repose in the jurisdiction where the Project is located, whichever is shorter

h) <u>Notice of Cancellation</u>: All policies required under this Agreement shall contain endorsements that confirm that said insurance policies shall not be cancelled, not renewed, or materially changed except upon thirty (30) days prior written notice to Owner (except for cancelation due to lack of payment of premium, for which a ten (10) day notice is allowed). If information concerning cancellation, non-renewal, or material change is not furnished by the insurer, Contractor shall, with reasonable promptness, provide Owner with such information.

i) <u>Deductibles & Self-Insured Retentions</u>: Contractor/subcontractors shall be responsible for any deductible under any insurance it provides, and the coverage afforded to the Additional Insureds shall not be conditioned on the payment of any deductible.

j) <u>Owner's Right to Procure Insurance</u>: In the event of a failure of Contractor to furnish and maintain any of the insurance required under this Agreement or to furnish satisfactory evidence thereof, Owner shall have the right, but not the obligation, to procure such insurance on Contractor's behalf, and Contractor shall furnish all necessary information in connection with Owner's procurement and either pay the costs thereof to Owner immediately upon presentation of a bill therefor, or have the cost thereof deducted from any payment otherwise due to Contractor at Owner's option.

k) <u>No Limitation</u>: The insurance coverages maintained by Contractor shall not limit any of Contractor's indemnity obligations or other liabilities under this or any other Agreement. Contractor agrees that any limitation of liability contained in the Agreement shall not apply to the extent that such liability is covered by Contractor's insurance.

3) **<u>Proof of Coverage:</u>**

a) <u>Prior to Contractor commencing any work under the Agreement, it shall furnish Owner with the following:</u>

   i) Certificates of insurance, on forms acceptable to Owner, evidencing that insurance policies are in full force and effect with the required limits, and that all parties required by this Agreement are named as additional insureds;

   ii) Full copies of all General and Umbrella/Excess Liability Policies (redacted for premium and other sensitive information)

[3677082/1]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

policies, and Auto Liability policies adding the required parties as additional insureds;

    iv) A copy of the provisions/endorsements in the Commercial General Liability and Excess/Umbrella policies providing that coverage for the Additional Insureds will be on a primary and noncontributory basis;

    v) A copy of the provisions/endorsements in the Commercial General Liability, Excess/Umbrella, and Workers' compensation policies providing that subrogation has been waived as to the Additional Insureds.

b) Contractor shall provide an updated certificate of insurance at least 5 days before the expiration of the term of any insurance required of it under this Agreement; if Contractor changes insurance carriers at any time, a full copy of the new policy is required.

c) Owner's failure to require Contractor to provide evidence of the insurance required under this Agreement, or Owner's acceptance of evidence that indicates that Contractor's insurance fails to satisfy the requirements of this Agreement, will not constitute a waiver of those requirements.

4) **No Waiver of Insurance Requirements:** Any waiver or modification of the insurance requirements stated in this Agreement must be agreed to, in writing, by Owner.

5) **Severability and Conformance to Law:** Each provision of this Agreement shall be construed in such a manner to be valid and enforceable under applicable law. If any provision of this Agreement is deemed invalid, illegal or otherwise unenforceable, then that provision will be deemed ineffective without impairing enforceability of the remaining provisions. If applicable law limits any of the insurance requirements in this Agreement, then Contractor shall be required to comply with the foregoing requirements to the fullest extent of coverage and limits allowed by applicable law.

6) **Consultants and Subcontractors:** Unless otherwise approved by Owner in writing, Contractor shall require its consultants and subcontractors to obtain and maintain the insurance consistent with this exhibit. Contractor acknowledges that it is responsible for defending and indemnifying Owner and all other Additional Insureds for all losses arising out of subcontractor acts or omissions, regardless of whether those acts are covered by any insurance. To the extent allowed by law, Contractor agrees to fully defend and indemnify Owner and all other Additional Insureds in the event of any claim made against Owner or another Additional Insured by one of Contractor's employees, subcontractors, subcontractors' employees, or sub-contractors.

7) **Waiver of Right of Recovery:** Contractor hereby waives, and will ensure that all subcontractors and consultants waive, all rights of recovery against the Owner, its liability insurers, and all Additional Insureds, on account of loss or damage occasioned to Contractor or others under Contractor's control or for whom it is responsible to the extent such loss or damage is insured against under any of Contractor's insurance policies which may be in force at the time of the loss or damage or would have been insured against if Contractor had complied with its obligations under this section.

8) **Priority:** The insurance requirements contained in this Insurance Exhibit will supersede any differences or conflicts that may exist or arise in this Agreement or in any attachments or amendments thereto. Any insurance provisions or other attachments that differ from those required by this Insurance Exhibit are not acknowledged by Owner as replacement or accepted changes and the requirements set forth herein will govern.



INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

EXHIBIT "D"

## SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT
### *FLORIDA WAIVER AND RELEASE OF LIEN*
### *UPON PROGRESS PAYMENT*

The undersigned lienor, in consideration of the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished through _____ to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

       Job Name

       Job Address

       City, State, Zip

This waiver and release does not cover any retention or labor, services, or materials furnished after the date specified.

       DATED on _____, 20_____.

                               _____
                                (Subcontractor's Name)

                               By: _____

                               Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20__, by_____, as _____ of _____, who is:
       (Subcontractor's Name)

       _____Personally known

       _____Produced Identification

       Type of Identification Produced_____

                                 _____
                                NOTARY PUBLIC

                                My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:



**EXHIBIT "H"**

## SUBCONTRACTOR'S INTERIM AFFIDAVIT UPON PAYMENT

STATE OF _____
COUNTY OF _____

The undersigned subcontractor has been employed by <u>RISE GENERAL CONTRACTORS, LLC</u> ("**Contractor**") to furnish _____ (describe materials and/or labor) for the construction of improvements known as _____ (title of the project or building) which is located in the City of _____, County of _____ ("**the Property**"), which is owned by _____ _____ (name of owner) ("**Owner**").

The undersigned states that not including the payment referenced in its [Interim Waiver and Release Upon Payment/Waiver and Release of Lien Upon Progress Payment]  (signed contemporaneously herewith), it thus far has been paid $_____ in the aggregate for its work and improvement to the Property, and the undersigned hereby acknowledges receipt of such payments for such work, and pursuant to its agreement for work at the Property the undersigned states that it is entitled to payment of (the amount referenced in its [Interim Waiver and Release Upon Payment/Waiver and Release of Lien Upon Progress Payment]  signed contemporaneously herewith), plus an additional amount of $_____ for work still to be performed at the Property, plus $_____ being held in retainage.

The undersigned does hereby indemnify and save harmless Owner, Contractor, Contractor's Surety and their agents, representatives, affiliates, successors and assigns, from and against all loss, cost, damage or expense (including, without limitation, attorneys' fees) by reason of any and all manner of liens, claims or demands which anyone may have for labor performed, for material or equipment furnished or for, upon or by any reason or any matter, cause or thing whatsoever arising out of the undersigned's work at the Property.

The undersigned affirms, warrants and represents that the list attached hereto as <u>Attachment "B-2"</u> contains the names of all of the laborers, materialmen, mechanics, manufacturers, suppliers, and subcontractors who have furnished services, labor, fixture or materials, or any one of these items to the undersigned, and the undersigned further affirms, warrants and represents that all persons or entities listed on <u>Attachment "B-2"</u> hereto have been paid in full for all work performed and all materials, fixtures or services supplied to the undersigned for use at the Property through and including the date hereof, and that the undersigned is not indebted to any person or entity for labor or materials used in connection with or as a part of such construction job in any amount whatsoever through and including the date hereof, except as noted on <u>Attachment "A"</u> hereto.

Upon receipt of the current payment of $_____, the undersigned does hereby waive, release and discharge any and all claims, claims of lien, payment bond claims, lien rights and rights to file preliminary notices of lien which the undersigned may have in connection with the above-described project with respect to the Property.

The undersigned recognizes and acknowledges that security deed holders, subsequent transferees of and holder. of title to the Property, title insurance companies, Contractor, Contractor's surety and agents of title insurance companies shall and shall be entitled to rely on this instrument and the assertions, statements and averments made herein in making loans, the repayment of which are or may be secured in part or in full by the Property or in issuing title insurance policies covering or the subject of which is said Property.

Given under hand and seal this _____ day of _____, 20__.

(Name of Party)

_____[seal]

Sworn to and subscribed before me
this ____ day of _____, 20__.

_____

Notary Public My Commission expires: _____

[3668742/2]

PAGE 1 OF 1

INITIALED BY CONTRACTOR _____
INITIALED BY SUBCONTRACTOR _____

**SUPPLIER/SUB-SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT**
*FLORIDA WAIVER AND RELEASE OF LIEN*
*UPON PROGRESS PAYMENT*

The undersigned lienor, having received payment in the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished through _____ to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

> Job Name
> Job Address
> City, State, Zip

This waiver and release does not cover any retention or labor, services, or materials furnished after the date specified.

DATED on _____, 20_____.

_____
(Subcontractor's Name)

By: _____
Printed Name_____

STATE OF FLORIDA
COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20__, by_____, as _____of _____, who is:

(Subcontractor's Name)

_____Personally known

_____Produced Identification

Type of Identification Produced_____

_____
NOTARY PUBLIC
My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

EXHIBIT G

## SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT
### *FLORIDA WAIVER AND RELEASE OF LIEN*
### *UPON FINAL PAYMENT*

The undersigned lienor, in consideration of the final payment in the amount of $\$$_____, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

        Job Name

        Street Address

        City, State, Zip

[This waiver and release is expressly conditioned on receipt of payment in the amount noted above. This waiver and release shall be void and of no further force and effect if payment is not received.]

        DATED on _____, 20\_\_\_\_\_.

                    _____
                           (Subcontractor's Name)

                    By: _____

                    Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20\_\_\_, by_____, as _____ of _____, who is:

        (Subcontractor's Name)

        _____Personally known

        _____Produced Identification

        Type of Identification Produced_____

                    _____

                    NOTARY PUBLIC

                    My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]



INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**EXHIBIT "I"**

## SUBCONTRACTOR'S FINAL AFFIDAVIT

STATE OF _____
COUNTY OF _____

      In person before me, the undersigned officer authorized to administer oaths, came _____, who, being duly sworn, deposed upon oath and said:

1.    I am the authorized representative of _____ (the "Subcontractor") who, pursuant to a contract dated as of _____ (the "Subcontract") with RISE General Contractors, LLC (the "Contractor"), served as a _____ subcontractor in connection with the construction of a _____ and related improvements (the "Project") and improving the property owned by the _____ (the "Owner"), said property being located in the City of _____, _____ County, _____ (the "Property"), a full description of which is attached hereto and made a part hereof, marked Exhibit "A."

2.    I have personal knowledge of the matters herein stated, and I am authorized by Subcontractor and fully qualified to make this affidavit.

3.    Subcontractor has supervised the construction and completion of the improvements and buildings placed on the Property in accordance with the requirements of the Subcontract and, to the best of my knowledge and belief, said improvements have now been fully completed in accordance with the Subcontract.

4.    Upon receipt of $_____, representing the unpaid balance due Subcontractor pursuant to the terms of the Subcontract, the agreed price of all labor, services, or materials furnished shall have been paid to Subcontractor. Upon receipt of such final payment, all costs, bills, debts and other charges whatsoever incurred for the aforesaid Project will have been paid and satisfied in full or will be paid from the proceeds of such final payment, and no outstanding unpaid obligation or bill shall due any person, firm, or corporation for labor, services, materials or supplies furnished in connection with the Project. No subcontractor, laborer, or supplier or consultant has filed any claim or lien against the Property or any payment bond furnished by Contractor in connection with work performed or materials furnished to the Project that has not been previously satisfied. Upon receipt of the final payment referenced above and disbursement of the proceeds thereof, all subcontracts associated with the Project executed by Subcontractor and its subcontractors and consultants shall have been performed in full, and no disputes exist arising out of or regarding the Project.

5.    Upon receipt of the amount referenced in subparagraph 4 above, Subcontractor shall have received payment in full for all amounts due and owing for making improvements on the Property. Upon receipt of the amounts set forth in subparagraph 4 above, Subcontractor releases and waives any and claims, causes of actions, all liens, bond rights and claims, lien rights or claims of lien which it has or may have on or against the Property or Contractor's surety. Subcontractor agrees to indemnify and hold Contractor and its surety harmless from any and all costs, expenses, damages or losses, including reasonable attorneys' fees, by reason of any lien, claim of lien, bond claim or action for non-payment for work performed, materials furnished or equipment supplied in connection with the performance of the Project.

6.    This sworn statement is made to induce Contractor to make final disbursement of the contract price to Subcontractor, and also is made as part of a transaction involving a loan to be secured by the Property.

                     _____ (SEAL)
                     NAME

Sworn to and subscribed before
me this ____ day of
_____, 20__

_____
Notary Public (SEAL)
My Commission expires: _____

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

**EXHIBIT "I"**

**SUPPLIER/SUB-SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT**
***FLORIDA WAIVER AND RELEASE OF LIEN***
***UPON FINAL PAYMENT***

The undersigned lienor, having received the final payment, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

       Job Name

       Street Address

       City, State, Zip

[This waiver and release is expressly conditioned on receipt of payment in the amount noted above. This waiver and release shall be void and of no further force and effect if payment is not received.]

      DATED on _____, 20_____.

                         _____

                              (Subcontractor's Name)

                         By: _____

                         Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20___, by_____, as _____ of _____, who is:

(Subcontractor's Name)

         _____Personally known

         _____Produced Identification

       Type of Identification Produced_____

                         _____

                         NOTARY PUBLIC

                         My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

## EXHIBIT "J"
## TOWNE GROVE AT CITRUS RIDGE

| Drawing Number | Drawing Title | DD SET | PERMIT SUBMITTAL |
|---|---|---|---|
| | | Date | Date |
| **GENERAL - TOWNHOMES** | | | |
| CS-01 | COVER SHEET | 8/2/2021 | 9/27/2021 |
| CS-02A | SHEET INDEX & GENERAL NOTES | 8/2/2021 | 9/27/2021 |
| CS-02B | SHEET INDEX & GENERAL NOTES | 8/2/2021 | 9/27/2021 |
| CS-02C | SHEET INDEX & GENERAL NOTES | 8/2/2021 | 9/27/2021 |
| SP-01 | SITE PLAN | 8/2/2021 | 9/27/2021 |
| SP-02 | ADDRESS FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| SP-03 | PHASING PLAN | | 9/27/2021 |
| **CODE DATA - TOWNHOMES** | | | |
| CD-00 | CODE REVIEW | 8/2/2021 | 9/27/2021 |
| CD-01A | BUILDING A - EGRESS EXHIBIT | | 9/27/2021 |
| CD-01B | BUILDING B - EGRESS EXHIBIT | | 9/27/2021 |
| CD-01C | BUILDING C - EGRESS EXHIBIT | | 9/27/2021 |
| CD-02 | UNIT MIX | 8/2/2021 | 9/27/2021 |
| CD-11 | FLORIDA PRODUCT APPROVAL | | 9/27/2021 |
| CD-21 | WALL TYPES / ASSEMBLIES | 8/2/2021 | 9/27/2021 |
| **ARCHITECTURAL - TOWNHOMES** | | | |
| A0-00A | BUILDING A - OVERALL SLAB PLAN | 8/2/2021 | 9/27/2021 |
| A0-01A | BUILDING A - OVERALL FIRST FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A0-02A | BUILDING A - OVERALL SECOND FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A0-03A | BUILDING A - OVERALL THIRD FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A0-04A | BUILDING A - OVERALL ROOF PLAN | 8/2/2021 | 9/27/2021 |
| A1-00B | BUILDING B - OVERALL SLAB PLAN | 8/2/2021 | 9/27/2021 |
| A1-01B | BUILDING B - OVERALL FIRST FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A1-02B | BUILDING B - OVERALL SECOND FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A1-03B | BUILDING B - OVERALL THIRD FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A1-04B | BUILDING B - OVERALL ROOF PLAN | 8/2/2021 | 9/27/2021 |
| A2-00C | BUILDING C - OVERALL SLAB PLAN | 8/2/2021 | 9/27/2021 |
| A2-01C | BUILDING C - OVERALL FIRST FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A2-02C | BUILDING C - OVERALL SECOND FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A2-03C | BUILDING C - OVERALL THIRD FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A2-04C | BUILDING C - OVERALL ROOF PLAN | 8/2/2021 | 9/27/2021 |
| A3-00 | UNIT PLAN NOTES | 8/2/2021 | 9/27/2021 |
| A3-01 | UNIT PLANS - A.1 | 8/2/2021 | 9/27/2021 |
| A3-02 | UNIT PLANS - A.1 | 8/2/2021 | 9/27/2021 |
| A3-03 | UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |
| A3-04 | UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |
| A3-05 | UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |
| A3-06 | UNIT FINISH SCHEDULES | | 9/27/2021 |
| A4-01A | BUILDING ELEVATIONS | 8/2/2021 | 9/27/2021 |
| A4-01B | BUILDING ELEVATIONS | 8/2/2021 | 9/27/2021 |
| A4-01C | BUILDING ELEVATIONS | 8/2/2021 | 9/27/2021 |
| A5-01A | BUILDING SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-01B | BUILDING SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-01C | BUILDING SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-10 | TYPICAL WALL SECTIONS - INTERIOR | 8/2/2021 | 9/27/2021 |

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

| A5-20 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
|---|---|---|---|
| A5-21 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-22 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-23 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-24 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-25 | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-26 | TYPICAL WALL SECTIONS | | 9/27/2021 |
| A6-00 | FOUNDATION DETAILS | 8/2/2021 | 9/27/2021 |
| A6-01 | EXTERIOR FRAMING DETAILS - PLAN | 8/2/2021 | 9/27/2021 |
| A6-02 | EXTERIOR FRAMING DETAILS - SECTION | 8/2/2021 | 9/27/2021 |
| A6-03 | EXTERIOR FRAMING DETAILS | | 9/27/2021 |
| A6-04 | ROOF DETAILS | 8/2/2021 | 9/27/2021 |
| A6-05 | ROOF DETAILS | 8/2/2021 | 9/27/2021 |
| A6-06 | INTERIOR FRAMING DETAILS | 8/2/2021 | 9/27/2021 |
| A6-07 | FLASHING DETAILS | 8/2/2021 | 9/27/2021 |
| A6-08 | DETAILS | 8/2/2021 | 9/27/2021 |
| A6-09 | DOOR DETAILS | 8/2/2021 | 9/27/2021 |
| A6-10 | WINDOW HEAD, JAMB, AND SILL DETAILS | 8/2/2021 | 9/27/2021 |
| A6-11 | WINDOW FLASHING DETAILS | 8/2/2021 | 9/27/2021 |
| A7-00 | SCHEDULES | 8/2/2021 | 9/27/2021 |
| **STRUCTURAL - TOWNHOMES** | | | |
| S001 | STRUCTURAL GENERAL NOTES | 8/2/2021 | 9/27/2021 |
| S101A | FOUNDATION PLAN - BUILDING A | 8/2/2021 | 9/27/2021 |
| S101B | FOUNDATION PLAN - BUILDING B | 8/2/2021 | 9/27/2021 |
| S101C | FOUNDATION PLAN - BUILDING C | 8/2/2021 | 9/27/2021 |
| S102A | LEVEL 2 FRAMING PLAN - BUILDING A | 8/2/2021 | 9/27/2021 |
| S102B | LEVEL 2 FRAMING PLAN - BUILDING B | 8/2/2021 | 9/27/2021 |
| S102C | LEVEL 2 FRAMING PLAN - BUILDING C | 8/2/2021 | 9/27/2021 |
| S103A | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING A | 8/2/2021 | 9/27/2021 |
| S103B | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING B | 8/2/2021 | 9/27/2021 |
| S103C | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING C | 8/2/2021 | 9/27/2021 |
| S104A | ROOF FRAMING PLAN - BUILDING A | 8/2/2021 | 9/27/2021 |
| S104B | ROOF FRAMING PLAN - BUILDING B | 8/2/2021 | 9/27/2021 |
| S104C | ROOF FRAMING PLAN - BUILDING C | 8/2/2021 | 9/27/2021 |
| S201 | UNIT A.1 FOUNDATION AND FLOOR FRAMING PLANS | 8/2/2021 | 9/27/2021 |
| S202 | UNIT B.1 FOUNDATION AND FLOOR FRAMING PLANS | 8/2/2021 | 9/27/2021 |
| S301A | BUILDING A SHEAR WALL PLANS | | 9/27/2021 |
| S301B | BUILDING B SHEAR WALL PLANS | | 9/27/2021 |
| S301C | BUILDING C SHEAR WALL PLANS | | 9/27/2021 |
| S302 | SHEAR WALL DETAILS | 8/2/2021 | 9/27/2021 |
| S501 | TYPICAL FOUNDATION DETAILS | 8/2/2021 | 9/27/2021 |
| S701 | TYPICAL WOOD FRAMING DETAILS | 8/2/2021 | 9/27/2021 |
| S702 | WOOD FLOOR FRAMING DETAILS | 8/2/2021 | 9/27/2021 |
| S801 | WOOD ROOF FRAMING DETAILS | 8/2/2021 | 9/27/2021 |
| **MECHANICAL - TOWNHOMES** | | | |
| M0-01 | MECHANICAL LEGEND AND SPECIFICATIONS | 8/2/2021 | 9/27/2021 |
| M0-02 | MECHANICAL SCHEDULES | 8/2/2021 | 9/27/2021 |
| M1-01A | FIRST FLOOR MECHANICAL PLAN - CONFIG. A | 8/2/2021 | 9/27/2021 |
| M1-01B | FIRST FLOOR MECHANICAL PLAN - CONFIG. B | 8/2/2021 | 9/27/2021 |
| M1-01C | FIRST FLOOR MECHANICAL PLAN - CONFIG. C | 8/2/2021 | 9/27/2021 |
| M3-01 | MECHANICAL UNIT PLANS - A.1 | 8/2/2021 | 9/27/2021 |
| M3-02 | MECHANICAL UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

| | | | |
|---|---|---|---|
| M5-00 | MECHANICAL DETAILS | 8/2/2021 | 9/27/2021 |
| **PLUMBING  - TOWNHOMES** | | | |
| P0-01 | PLUMBING LEGEND AND SPECIFICATIONS | 8/2/2021 | 9/27/2021 |
| P0-02 | PLUMBING SCHEDULES | 8/2/2021 | 9/27/2021 |
| P1-01A | FIRST FLOOR SEWER & VENT PLAN - CONFIG. A | 8/2/2021 | 9/27/2021 |
| P1-01B | FIRST FLOOR SEWER & VENT PLAN - CONFIG. B | 8/2/2021 | 9/27/2021 |
| P1-01C | FIRST FLOOR SEWER & VENT PLAN - CONFIG. C | 8/2/2021 | 9/27/2021 |
| P2-01A | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. A | 8/2/2021 | 9/27/2021 |
| P2-01B | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. B | 8/2/2021 | 9/27/2021 |
| P2-01C | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. C | 8/2/2021 | 9/27/2021 |
| P3-01 | SEWER & VENT UNIT PLANS - A.1 | 8/2/2021 | 9/27/2021 |
| P3-02 | SEWER & VENT UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |
| P3-11 | DOMESTIC WATER UNIT PLANS - A.1 | 8/2/2021 | 9/27/2021 |
| P3-12 | DOMESTIC WATER UNIT PLANS - B.1 | 8/2/2021 | 9/27/2021 |
| P4-00 | PLUMBING RISER DIAGRAMS | 8/2/2021 | 9/27/2021 |
| P5-00 | PLUMBING DETAILS | 8/2/2021 | 9/27/2021 |
| **ELECTRICAL  - TOWNHOMES** | | | |
| E0-01 | SYMBOLS LEGENDS | 8/2/2021 | 9/27/2021 |
| E0-02 | ELECTRICAL SPECIFICATIONS | 8/2/2021 | 9/27/2021 |
| E1-00 | UNIT A.1 - ELECTRICAL PLANS | 8/2/2021 | 9/27/2021 |
| E1-01 | UNIT B.1 - ELECTRICAL PLANS | 8/2/2021 | 9/27/2021 |
| E2-00 | ELECTRICAL DETAILS | 8/2/2021 | 9/27/2021 |
| E3-00 | ONE-LINE DIAGRAM | 8/2/2021 | 9/27/2021 |
| E4-00 | ELECTRICAL SCHEDULES | 8/2/2021 | 9/27/2021 |
| **INTERIORS  - TOWNHOMES** | | | |
| I-1.0 | FINISH PLANS | 9/2/2021 | 9/27/2021 |
| I-1.1 | FINISH SCHEDULES | 9/2/2021 | 9/27/2021 |
| **GENERAL - CLUBHOUSE** | | | |
| CS-01 C | COVER SHEET | 8/2/2021 | 9/27/2021 |
| CS-02 C | SHEET INDEX & GENERAL NOTES | 8/2/2021 | 9/27/2021 |
| SP-01 C | ARCHITECTURAL SITE PLAN | 8/2/2021 | 9/27/2021 |
| SP-02 C | SITE DETAILS | | 9/27/2021 |
| **CODE DATA - CLUBHOUSE** | | | |
| CD-01 C | CODE REVIEW SUMMARY | 8/2/2021 | 9/27/2021 |
| CD-02 C | CODE REVIEW | 8/2/2021 | 9/27/2021 |
| CD-03 C | FLORIDA PRODUCT APPROVAL | | 9/27/2021 |
| CD-10 C | ACCESSIBLE STANDARDS | 8/2/2021 | 9/27/2021 |
| CD-11 C | ACCESSIBLE STANDARDS | 8/2/2021 | 9/27/2021 |
| CD-21 C | ASSEMBLIES | 8/2/2021 | 9/27/2021 |
| **ARCHITECTURAL - CLUBHOUSE** | | | |
| A0-00 C | OVERALL SLAB PLAN - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A0-01 C | FLOOR PLAN - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A0-02 C | TOWER PLAN - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A0-10 C | REFLECTED CEILING PLAN - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A0-20 C | ROOF PLAN - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A1-01 C | MAINTENANCE BUILDING FLOOR PLAN | 8/2/2021 | 9/27/2021 |
| A1-02 C | MAINTENANCE BUILDING RCP & ROOF PLAN | 8/2/2021 | 9/27/2021 |
| A2-02 C | MAIL KIOSK FLOOR PLAN & ELEVATIONS | | 9/27/2021 |
| A2-04 C | POOL EQUIPMENT FLOOR PLAN & ELEVATIONS | 8/2/2021 | 9/27/2021 |
| A3-03 C | TRASH COMPACTOR FLOOR PLAN & ELEVATIONS | 8/2/2021 | 9/27/2021 |
| A4-01 C | OVERALL BUILDING ELEVATIONS - CLUBHOUSE | 8/2/2021 | 9/27/2021 |
| A4-02 C | OVERALL BUILDING ELEVATIONS - MAINTENANCE BUILDING | 8/2/2021 | 9/27/2021 |

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

| A5-01 C | OVERALL BUILDING SECTIONS | 8/2/2021 | 9/27/2021 |
|---|---|---|---|
| A5-02 C | OVERALL BUILDING SECTIONS | | 9/27/2021 |
| A5-10 C | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A5-11 C | TYPICAL WALL SECTIONS | 8/2/2021 | 9/27/2021 |
| A6-00 C | FOUNDATION DETAILS | | 9/27/2021 |
| A6-01 C | EXTERIOR FRAMING DETAILS - PLAN | | 9/27/2021 |
| A6-02 C | ROOF DETAILS | | 9/27/2021 |
| A6-03 C | ROOF DETAILS | | 9/27/2021 |
| A6-04 C | FLASHING DETAILS | | 9/27/2021 |
| A6-05 C | DETAILS | | 9/27/2021 |
| A6-06 C | DOOR DETAILS | | 9/27/2021 |
| A6-07 C | WINDOW HEAD, JAMB, AND SILL DETAILS | | 9/27/2021 |
| A6-08 C | WINDOW FLASHING DETAILS | | 9/27/2021 |
| A7-00 C | SCHEDULES | 8/2/2021 | 9/27/2021 |
| A7-01 C | SCHEDULES | | 9/27/2021 |
| **STRUCTURAL - CLUBHOUSE** | | | |
| S001 | STRUCTURAL GENERAL NOTES | | 9/27/2021 |
| S002 | PLAN LOADING | | 9/27/2021 |
| S101 | CLUBHOUSE FOUNDATION PLAN | | 9/27/2021 |
| S102 | CLUBHOUSE ROOF FRAMING PLAN | | 9/27/2021 |
| S103 | CLUBHOUSE HIGH ROOF FRAMING PLAN | | 9/27/2021 |
| S111 | AUXILARY STRUCTURES FOUNDATION PLANS | | 9/27/2021 |
| S112 | AUXILARY STRUCTURES ROOF FRAMING PLANS | | 9/27/2021 |
| S301 | CLUBHOUSE SHEARWALL PLAN | | 9/27/2021 |
| S302 | CLUBHOUSE HIGH ROOF SHEARWALL PLAN | | 9/27/2021 |
| S311 | AUXILARY STRUCTURES SHEARWALL PLANS | | 9/27/2021 |
| S501 | TYPICAL FOUNDATION DETAILS | | 9/27/2021 |
| S701 | TYPICAL WOOD FRAMING DETAILS | | 9/27/2021 |
| S801 | WOOD ROOF FRAMING DETAILS | | 9/27/2021 |
| **MECHANICAL - CLUBHOUSE** | | | |
| M0-01 C | MECHANICAL LEGEND AND NOTES | 8/2/2021 | 9/27/2021 |
| M0-02 C | MECHANICAL SCHEDULES | 8/2/2021 | 9/27/2021 |
| M1-01 C | MECHANICAL CLUBHOUSE PLAN | 8/2/2021 | 9/27/2021 |
| M1-02 C | MECHANICAL MAINTENANCE PLAN | | 9/27/2021 |
| M5-00 C | MECHANICAL DETAILS | 8/2/2021 | 9/27/2021 |
| **PLUMBING - CLUBHOUSE** | | | |
| P0-01 C | PLUMBING LEGEND AND NOTES | 8/2/2021 | 9/27/2021 |
| P0-02 C | PLUMBING SCHEDULES | 8/2/2021 | 9/27/2021 |
| P0-03 C | PLUMBING SITE PLAN | 8/2/2021 | 9/27/2021 |
| P1-01 C | CLUBHOUSE PLAN - SEWER & VENT | 8/2/2021 | 9/27/2021 |
| P1-02 C | MAINTENANCE PLAN - SEWER & VENT | | 9/27/2021 |
| P2-01 C | CLUBHOUSE PLAN - WATER & GAS | 8/2/2021 | 9/27/2021 |
| P2-02 C | MAINTENANCE PLAN - WATER & GAS | | 9/27/2021 |
| P4-00 C | PLUMBING RISER DIAGRAMS | 8/2/2021 | 9/27/2021 |
| P5-00 C | PLUMBING DETAILS | 8/2/2021 | 9/27/2021 |
| **ELECTRICAL - CLUBHOUSE** | | | |
| E0-01 C | SYMBOLS LEGENDS | | 9/27/2021 |
| E1-01 C | LIGHTING CLUBHOUSE PLAN | | 9/27/2021 |
| E1-02 C | LIGHTING MAINTENANCE PLAN | | 9/27/2021 |
| E1-03 C | ELECTRICAL MAILROOM PLANS | | 9/27/2021 |
| E2-01 C | POWER CLUBHOUSE PLAN | | 9/27/2021 |
| E2-02 C | POWER MAINTENANCE PLAN | | 9/27/2021 |

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:



| | | | |
|---|---|---|---|
| E4-00 C | ELECTRICAL DETAILS | | 9/27/2021 |
| E5-00 C | ONE-LINE DIAGRAM | | 9/27/2021 |
| E6-00 C | ELECTRICAL SCHEDULES | | 9/27/2021 |
| **INTERIORS - CLUBHOUSE** | | | |
| I-1.0 | FINISH PLAN | | 9/27/2021 |
| I-2.0 | REFLECTED CEILING PLAN, ELEVATIONS AND DETAILS | | 9/27/2021 |
| I-3.0 | ELEVATIONS | | 9/27/2021 |
| I-4.0 | SECTIONS AND DETAILS | | 9/27/2021 |
| **LANDSCAPE** | | | |
| L-1.0 | LANDSCAPE NOTES & SPECIFICATIONS | | 9/27/2021 |
| L-1.1 | PLANTING PLAN & DETAILS | | 9/27/2021 |
| L-1.2 | PLANTING PLAN | | 9/27/2021 |
| L-1.3 | PLANTING PLAN - AMENITY AREAS | | 9/27/2021 |
| LH-1.0 | HARDSCAPE NOTES & SPECIFICATIONS | | 9/27/2021 |
| LH-1.1 | HARDSCAPE PLAN - TOWNHOMES | | 9/27/2021 |
| LH-1.2 | HARDSCAPE PLAN - AMENITY AREAS | | 9/27/2021 |
| LH-1.3 | CITRUS RIDGE ENTRANCE | | 9/27/2021 |
| LH-1.4 | HARDSCAPE DETAILS | | 9/27/2021 |
| LH-1.5 | HARDSCAPE DETAILS | | 9/27/2021 |
| **CIVIL** | | | |
| C01.0 | COVER SHEET | | 10/3/2021 |
| C02.0 | GENERAL CONSTRUCTION  NOTES | | 10/3/2021 |
| C03.0 | AERIAL SITE PLAN | | 10/3/2021 |
| C04.0 | DEMOLITION & EROSION CONTROL PLAN | | 10/3/2021 |
| C05.0 | MASTER SITE PLAN | | 10/3/2021 |
| C06.0 | TYPICAL SECTIONS | | 10/3/2021 |
| C07.0 | GEOMETRY PLAN | | 10/3/2021 |
| C07.1 | GEOMETRY PLAN | | 10/3/2021 |
| C08.0 | MASTER DRAINAGE PLAN | | 10/3/2021 |
| C09.0 | PAVING & GRADING PLAN | | 10/3/2021 |
| C09.1 | PAVING & GRADING PLAN | | 10/3/2021 |
| C09.2 | PAVING & GRADING AMENITY PLAN | | 10/3/2021 |
| C10.0 | PAVING & GRADING DETAILS | | 10/3/2021 |
| C10.1 | PAVING & GRADING DETAILS | | 10/3/2021 |
| C11.0 | MASTER UTILITY PLAN | | 10/3/2021 |
| C11.1 | UTILITY PLAN | | 10/3/2021 |
| C11.2 | UTILITY PLAN | | 10/3/2021 |
| C11.3 | LIFT STATION PLAN | | 10/3/2021 |
| C12.0 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.1 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.2 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.3 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.4 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.5 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.6 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.7 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.8 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.9 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C12.10 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C13.0 | POND PLAN & DETAILS | | 10/3/2021 |
| C13.1 | POND PLAN & DETAILS | | 10/3/2021 |
| C14.0 | UTILITY DETAILS | | 10/3/2021 |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR



| C14.1 | UTILITY DETAILS | | 10/3/2021 |
|---|---|---|---|
| C14.2 | LIFTSTATION DETAILS | | 10/3/2021 |
| C14.3 | LIFTSTATION DETAILS | | 10/3/2021 |
| C14.4 | UTILITY DETAILS | | 10/3/2021 |
| C14.5 | UTILITY DETAILS | | 10/3/2021 |
| C14.6 | UTILITY DETAILS - NOT INCLUDED IN BID DOCUMENTS | | 10/3/2021 |
| C15.0 | SIGNING AND PAVEMENT MARKINGS | | 10/3/2021 |
| C16.0 | CURBING AND SIDEWALK MASTER PLAN | | 10/3/2021 |
| C17.0 | STREET LIGHTING CONCEPT PLAN | | 10/3/2021 |
| LP-101 | LANDSCAPE PLAN | | 10/3/2021 |
| LP- 102 | IRRIGATION PLAN | | 10/3/2021 |
| LP-103 | IRRIGATION PLAN | | 10/3/2021 |
| C18.0 | AERIAL SITE PLAN | | 10/3/2021 |
| C19.0 | DEMOLITION & EROSION CONTROL PLAN | | 10/3/2021 |
| C20.0 | MASTER SITE PLAN | | 10/3/2021 |
| C21.0 | TYPICAL CROSS SECTIONS | | 10/3/2021 |
| C22.0 | GEOMETRY PLAN | | 10/3/2021 |
| C23.0 | MASTER DRAINAGE PLAN | | 10/3/2021 |
| C24.0 | PAVING & GRADING PLAN | | 10/3/2021 |
| C24.1 | PAVING & GRADING PLAN | | 10/3/2021 |
| C25.0 | PAVING & GRADING DETAILS | | 10/3/2021 |
| C25.1 | PAVING & GRADING DETAILS | | 10/3/2021 |
| C25.2 | POND PLAN | | 10/3/2021 |
| C26.0 | MASTER UTILITY PLAN | | 10/3/2021 |
| C27.0 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C27.1 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C27.2 | ROADWAY PLAN & PROFILE | | 10/3/2021 |
| C28.0 | ROADWAY CROSS-SECTIONS | | 10/3/2021 |
| C28.1 | ROADWAY CROSS-SECTIONS | | 10/3/2021 |
| C28.2 | ROADWAY CROSS-SECTIONS | | 10/3/2021 |
| C28.3 | ROADWAY CROSS-SECTIONS | | 10/3/2021 |
| C28.4 | TEMPORARY ACCESS ROAD PLAN & PROFILE | | 10/3/2021 |
| C28.5 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | | 10/3/2021 |
| C28.6 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | | 10/3/2021 |
| C28.7 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | | 10/3/2021 |
| C28.8 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | | 10/3/2021 |
| C29.0 | UTILITY DETAILS | | 10/3/2021 |
| C29.1 | UTILITY DETAILS | | 10/3/2021 |
| C29.2 | UTILITY DETAILS | | 10/3/2021 |
| C29.3 | UTILITY DETAILS | | 10/3/2021 |
| C30.0 | SIGNING AND PAVEMENT MARKING PLAN | | 10/3/2021 |
| **GEOTECHNICAL EXPLORATION** | | | |
| | UES REPORT NO. 1893299V2 | | 8/26/2021 |



INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

EXHIBIT "C"

<u>Off-Site Bonds</u>

4860-0949-5500, v. 1

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



# SUBCONTRACT
# PERFORMANCE BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL** *(SUBCONTRACTOR)*
*(Name and Address):*
MCKENZIE CONTRACTING LLC
7712 E Broadway Ave
Tampa, Florida 33619

**SURETY** *(Name and Address):*

UNITED STATES FIRE INSURANCE COMPANY

305 Madison Ave, Morristown NJ 07960

**OBLIGEE** *(CONTRACTOR)*
*(Name and Address):*
RISE GENERAL CONTRACTORS LLC
4312 Pablo Professional Court
Jacksonville, Florida 32224

**SUBCONTRACT**
Date:   3/3/2022
Amount: $ 1,594,032.85
Description of Project *(Name and Location):*   Citrus Ridge - Off Site Work Contract#784-SC-006

**BOND**
Date *(Not earlier than Subcontract Date):*   4/20/2022
Penal Amount: $ 1,594,032.85

Bond No.  6061025232

**SUBCONTRACTOR AS PRINCIPAL**
Company:                                (Corporate Seal)
MCKENZIE CONTRACTING LLC

Signature:
Name and Title:  OLIVER D. FERNANDEZ, JR.,
                 Managing Member

Witness:
*(Any additional signatures appear on page attached)*

**SURETY**
United States Fire Insurance Company (Corporate Seal)

Signature:
Name and Title: GLADYS KEITH, ATTORNEY-IN-FACT

Attach Power of Attorney

Witness: margaret Hall

FOR INFORMATION ONLY AGENT or BROKER: *(Name, Address and Telephone)*
 FSB AGENCY INC, 7971 RIVIERA BLVD, #211 MIRAMAR FL 33023, 954-589-1639

## Articles

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the Subcontract, which is incorporated in this bond by reference. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect.

3. **ALTERATION NOTICE WAIVER.** The Surety hereby waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by Paragraph 5 hereunder.

4. **PRINCIPAL DEFAULT.** Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:

   4.1 **COMPLETE SUBCONTRACT** Complete the Subcontract in accordance with its terms and conditions; or

   4.2 **OBTAIN NEW CONTRACTORS.** Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and upon determination by the Surety of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee. The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The cost of completion includes responsibilities of the Principal for correction of defective work and completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

   4.3 **PAY OBLIGEE.** Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

   4.4 **DENY LIABILITY** Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.

5. **TIME FOR SUIT** Any suit under this bond must be instituted before the expiration of two (2) years from the date of substantial completion as established by the contract documents.

6. **RIGHT OF ACTION.** No right of action shall accrue on this bond to or for the use of any person or entity other than the Obligee named herein, its heirs, executors, administrators or successors.

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



# SUBCONTRACT
# PAYMENT BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL** *(SUBCONTRACTOR)*
*(Name and Address):*
MCKENZIE CONTRACTING LLC
7712 E Broadway Ave
Tampa, Florida 33619

**SURETY** *(Name and Address).*
UNITED STATES FIRE INSURANCE COMPANY
305 Madison Ave, Morristown NJ 07960

**OBLIGEE** *(CONTRACTOR)*
*(Name and Address):*
RISE GENERAL CONTRACTORS LLC
4312 Pablo Professional Court
Jacksonville, Florida 32224

SUBCONTRACT
　　　Date:　　　3/3/2022
　　　Amount: $ 1,594,032.85
　　　Description of Project *(Name and Location):*  Citrus Ridge - Off Site Work Contract#784-SC-006

BOND
　　　Date *(Not earlier than Subcontract Date):* 4/20/2022
　　　Penal Amount: $ 1,594,032.85

　　　Bond No. 6061025232

SUBCONTRACTOR AS PRINCIPAL
Company:　　　　　　　　　　　　　　(Corporate Seal)
MCKENZIE CONTRACTING LLC

Signature:
Name and Title: OLIVER D. FERNANDEZ, JR.,
　　　　　　　　Managing Member

Witness:
*(Any additional signatures appear on page attached)*

SURETY
United States Fire Insurance Company (Corporate Seal)

Signature:
Name and Title:  GLADYS KEITH, ATTORNEY-IN-FACT
Attach Power of Attorney

Witness: margaret Hall

FOR INFORMATION ONLY AGENT or BROKER: *(Name, Address and Telephone)*
　FSB AGENCY INC, 7971 RIVIERA BLVD, #211 MIRAMAR FL 33023   954-589-1631

AGC DOCUMENT NO. 607 • SUBCONTRACT PAYMENT BOND • 1988　　　　　　　　7
© 1988, The Associated General Contractors of America

**Articles**

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee to pay for labor, materials and equipment furnished for use in the performance of the Subcontract, which is incorporated in this bond by reference and pursuant to which this bond is issued. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal shall promptly make payment directly or indirectly to all Claimants as defined in this bond, for all labor, material and equipment used in the performance of the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

   2.1 **TIME FOR CLAIM.** The Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, for which claim is made, may have a right of action on this bond. The Obligee shall not be liable for the payment of any costs or expenses including attorneys' fees which the Obligee may incur in connection with its defense of any such right of action.

   2.2 **RIGHT OF ACTION.** No suit or action shall be commenced on this bond by any Claimant:

      2.2.1 Unless Claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: Principal, Obligee, or the Surety above named, within ninety (90) days after such Claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Obligee or Surety, at any place within the United States where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid Project is located, however, such service need not be made by a public officer.

      2.2.2 After the expiration of one (l) year from the date (l) on which the Claimant gave the notice required by Subparagraph 2.2.1, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone on the Project, whichever first occurs. Any limitation embodied in this bond, which is prohibited by any law controlling the Project, shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

      2.2.3 Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in which the Project, or any part thereof, is situated, and not elsewhere.

3. **CLAIMANT** A Claimant is defined as an individual or entity having a direct contract with the Principal to furnish labor, materials or equipment for use in the performance of the Subcontract or any individual or entity having valid lien rights which may be asserted in the jurisdiction where the Project is located. The intent of this bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Subcontract, architectural and engineering services required for performance of the work of the Principal, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

4. **AMOUNT OF BOND.** The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith by the Surety.

5. **ALTERATION NOTICE WAIVER.** The Surety waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by Paragraph 2.2 hereunder.

©1988, The Associated General Contractors of America

## DUAL OBLIGEE RIDER

To be attached to and form part of Bond No. __6061025232__ executed by McKenzie Contracting LLC____, as Principal, and _United States Fire Insurance Company_____ as Surety, in favor of _RISE General Contractors LLC_____ Obligee in the penalty of One Million Five Hundred Ninety Four Thousand Thirty Two and 85/100____ Performance, on or about the __3rd___ day of __March_____, _2022_ covering the Site Plan for improvements of _Citrus Ridge -- Off-site Contract#784-SC-006_____

SIGNED, SEALED AND DATED this __20th__ day of __April____, _2022_

WHEREAS, the Obligee, as evidenced by their signed approval of this rider, have requested and are agreeable to the Surety and the Principal amending the attached bond by adding _Citrus Ridge Properties II, LLC; Citrus Ridge Properties I, JV LLC; CRP Citrus Ridge Properties I Member, LLC and IberiaBank, ISAOA, ATIMA____ as Obligee(s).

PROVIDED, HOWEVER, that the Surety and Principal shall not be liable under the attached bond and the attached bond as amended by this rider to the Obligees, nor any of them, unless the Obligees or each of them shall perform all obligations by them or any of them to be performed under the terms of said contract, including but not limited to making all payments to the Principal in accordance with the terms of said contract.

PROVIDED, FURTHER, that nothing herein contained shall otherwise amend, alter or modify any of the terms and conditions of the attached bonds except as herein expressly amended; and

PROVIDED, FURTHER, that the aggregate liability of the Surety under the attached bond and the attached bond as amended by this rider, shall not exceed the sum of One Million Five Hundred Ninety Four Thousand Thirty Two and 85/100____Performance.

Accepted and Approved:

By: _____     By: _____
　　　　(Principal Obligee)　　　　　　　　　　　　　　(Principal)

Accepted and Approved:

By: _____
　　　　(Additional Obligee)

By: _____     By: _____
　　　　(Additional Obligee)　　　　　　　　　Attorney in Fact, Gladys Keith

By: _____
　　　　(Additional Obligee)

By: _____
　　　　(Additional Obligee)

POWER OF ATTORNEY

PRINCIPAL OFFICE - MORRISTOWN, NEW JERSEY

0244022

KNOW ALL MEN BY THESE PRESENTS: That United States Fire Insurance Company, a corporation duly organized and existing under the laws of the state of Delaware, has made, constituted and appointed, and does hereby make, constitute and appoint:

*Gladys Keith, Margaret Hall, Levan Porter Jr., Shantinell Porter*

each, its true and lawful Attorney(s)-In-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver: Any and all bonds and undertakings of surety and other documents that the ordinary course of surety business may require, and to bind United States Fire Insurance Company thereby as fully and to the same extent as if such bonds or undertakings had been duly executed and acknowledged by the regularly elected officers of United States Fire Insurance Company at its principal office, in amounts or penalties not exceeding: Seven Million, Five Hundred Thousand Dollars ($7,500,000).

This Power of Attorney limits the act of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind United States Fire Insurance Company except in the manner and to the extent therein stated.

This Power of Attorney revokes all previous Powers of Attorney issued on behalf of the Attorneys-In-Fact named above and expires on January 31, 2023.

This Power of Attorney is granted pursuant to Article IV of the By-Laws of United States Fire Insurance Company as now in full force and effect, and consistent with Article III thereof, which Articles provide, in pertinent part:

Article IV, Execution of Instruments - Except as the Board of Directors may authorize by resolution, the Chairman of the Board, President, any Vice-President, any Assistant Vice President, the Secretary, or any Assistant Secretary shall have power on behalf of the Corporation:

(a) to execute, affix the corporate seal manually or by facsimile to, acknowledge, verify and deliver any contracts, obligations, instruments and documents whatsoever in connection with its business including, without limiting the foregoing, any bonds, guarantees, undertakings, recognizances, powers of attorney or revocations of any powers of attorney, stipulations, policies of insurance, deeds, leases, mortgages, releases, satisfactions and agency agreements;

(b) to appoint, in writing, one or more persons for any or all of the purposes mentioned in the preceding paragraph (a), including affixing the seal of the Corporation.

Article III, Officers, Section 3.11, Facsimile Signatures. The signature of any officer authorized by the Corporation to sign any bonds, guarantees, undertakings, recognizances, stipulations, powers of attorney or revocations of any powers of attorney and policies of insurance issued by the Corporation may be printed, facsimile, lithographed or otherwise produced. In addition, if and as authorized by the Board of Directors, dividend warrants or checks, or other numerous instruments similar to one another in form, may be signed by the facsimile signature or signatures, lithographed or otherwise produced, of such officer or officers of the Corporation as from time to time may be authorized to sign such instruments on behalf of the Corporation. The Corporation may continue to use for the purposes herein stated the facsimile signature of any person or persons who shall have been such officer or officers of the Corporation, notwithstanding the fact that he may have ceased to be such at the time when such instruments shall be issued

IN WITNESS WHEREOF, United States Fire Insurance Company has caused these presents to be signed and attested by its appropriate officer and its corporate seal hereunto affixed this 28th day of September, 2021.

UNITED STATES FIRE INSURANCE COMPANY

Matthew E. Lubin, President

State of New Jersey }
County of Morris }

On this 28th day of September, 2021, before me, a Notary public of the State of New Jersey, came the above named officer of United States Fire Insurance Company, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seal of United States Fire Insurance Company thereto by the authority of his office.

MELISSA H. D'ALESSIO
NOTARY PUBLIC OF NEW JERSEY
Commission # 50125833
My Commission Expires 4/7/2026

Melissa H. D'Alessio                    (Notary Public)

I, the undersigned officer of United States Fire Insurance Company, a Delaware corporation, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy is still in force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of United States Fire Insurance Company on the 20 day of April 2022.

UNITED STATES FIRE INSURANCE COMPANY

Alfred N. Wright, Senior Vice President

EXHIBIT "D"

Off-Site Subcontract

34

**RISE**
A REAL ESTATE COMPANY

### SUBCONTRACT AGREEMENT

| TRADE: | SUB NAME.: | COST CODE: | CONTRACT AMOUNT: |
|---|---|---|---|
| Site Contractor | McKenzie Contracting LLC. | 02-31-1000 | $1,594,032.85 |

| JOB NO.: | P/P BONDS REQUIRED | SUB CODE | RETAINAGE |
|---|---|---|---|
| 007-BR-784 | Yes | | 10% |

THIS SUBCONTRACT AGREEMENT (this "Subcontract") is made and entered into this ___3rd___ day of ___March___, in the year 20__22__, and between Contractor and Subcontractor.

#### PROJECT INFORMATION

PROJECT NAME ("Project"):  Citrus Ridge

PROJECT ADDRESS/PROPERTY DESCRIPTION ("Jobsite"):  2003 Palmer Rd Davenport, FL 33837

NAME OF CONTRACTOR ("Contractor")  RISE General Contractors, LLC

ADDRESS:  10161 Centurion Parkway N     Jacksonville, FL 32256

TELEPHONE/FAX NUMBER:  TEL.: 904-373-1741

NAME OF PROJECT OWNER ("Owner"):  Citrus Ridge Properties, LLC

ADDRESS:  129 N. Patterson St., Valdosta, GA 31601

NAME OF PROJECT ARCHITECT:  Dwell Design Studio

---

#### SUBCONTRACTOR INFORMATION

NAME OF SUBCONTRACTOR:  McKenzie Contracting LLC.

PRIMARY CONTACT PERSON/Email:  Oliver D. Fernandez Jr

ADDRESS:  7712 E. Broadway Ave., Tampa, Florida 33619

TELEPHONE: 857-222-4452        FAX: _____        EMAIL: Dan.Fernandez@mckenziecont

[✓] CORPORATION     [ ] PARTNERSHIP     [ ] PROPRIETORSHIP

IF PARTNERSHIP/PROPRIETORSHIP, NAME (S) OF PARTNERS OR CONTRACTORS:

IF CORPORATION, NAME (S) OF PRINCIPAL OFFICERS:

TAX I.D. NO. (FED. I.D. # OR SSN):

STATE CONTRACTORS LICENSE NO.: _____     CITY BUSINESS LICENSE NO.: _____

WORKER'S COMPENSATION INSURANCE CARRIER:

POLICY NO.: _____     EXPIRATION DATE:

GENERAL LIABILITY INSURANCE CARRIER:

POLICY NO: _____     EXPIRATION DATE:

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:

**CONTRACT SECTION HEADINGS AND EXHIBITS**

| | |
|---|---|
| SECTION 1: | CONTRACT DOCUMENTS |
| SECTION 2: | SUBCONTRACTOR'S INVESTIGATION |
| SECTION 3: | COMMENCEMENT AND IME OF ESSENCE |
| SECTION 4: | CONTRACT PRICE |
| SECTION 5: | PAYMENTS TO SUBCONTRACTOR |
| SECTION 6: | LIST OF SUPPLIERS |
| SECTION 7: | ADDITIONS, CHANGES AND MODIFICATIONS TO SUBCONTRACT |
| SECTION 8: | OPTIONS |
| SECTION 9: | ADHERENCE TO PLANS AND SPECIFICATIONS |
| SECTION 10: | EXTRAS |
| SECTION 11: | TAXES |
| SECTION 12: | TIMING OF WORK |
| SECTION 13: | INSPECTIONS AND APPROVALS |
| SECTION 14: | LINES, GRADES AND MEASUREMENTS |
| SECTION 15: | RELATED WORK |
| SECTION 16: | INTERRUPTION OF WORK/FORCE MAJEURE |
| SECTION 17: | CORRECTIONS OF DEFECTS IN MATERIAL OR WORK |
| SECTION 18: | DAMAGES TO RELATED WORK |
| SECTION 19: | DEFECTS AND WORKMANSHIP – INDEMNIFICATION |
| SECTION 20: | GUARANTEE/WARRANTY |
| SECTION 21: | TERMINATION OF SUBCONTRACT |
| SECTION 22: | REMOVAL OF CONDEMNED WORK |
| SECTION 23: | DEFENSE OF PATENTS |
| SECTION 24: | CUTTING, FITTING AND PATCHING; WORK OF OTHERS |
| SECTION 25: | CLAIMS FOR DELAY OR DAMAGE |
| SECTION 27: | INDEMNIFICATION |
| SECTION 28: | INDEPENDENT SUBCONTRACTOR RELATIONSHIP |
| SECTION 29: | CLEAN-UP |
| SECTION 30: | USE OF CONTRACTOR'S EQUIPMENT |
| SECTION 31: | PERMITS AND LAWS |
| SECTION 32: | HAZARDOUS MATERIALS |
| SECTION 33: | ASSIGNMENT |
| SECTION 34: | LIENS |
| SECTION 35: | FINANCIAL STATUS |
| SECTION 36: | DEATH OF SUBCONTRACTOR |
| SECTION 37: | TITLE |
| SECTION 38: | RIGHT TO DEMAND BOND |
| SECTION 39: | NO DELAY |
| SECTION 40: | SAFETY |
| SECTION 41: | DISPUTE RESOLUTION |
| SECTION 42: | LABOR RELATIONS |
| SECTION 43: | MISCELLANEOUS |
| EXHIBIT "A" | GENERAL REQUIREMENTS/SCOPE OF WORK |
| EXHIBIT "B-1" | PAYMENT SCHEDULE/APPLICATION FOR PAYMENT |
| EXHIBIT "B-2 | SUPPLIER/SUB-SUBCONTRACTOR LIST |
| EXHIBIT "C" | STATEMENT OF INSURANCE REQUIREMENTS |
| EXHIBIT "D" | SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT |
| EXHIBIT "E" | SUBCONTRACTOR'S INTERIM AFFIDAVIT UPON PAYMENT |
| EXHIBIT "F" | SUPPLIER/SUB-SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT |
| EXHIBIT "G" | SUBCONTRACTORS'S WAIVER AND RELEASE UPON FINAL PAYMENT |
| EXHIBIT "H" | SUBCONTRACTOR'S FINAL AFFIDAVIT |
| EXHIBIT "I" | SUPPLIER/SUB-SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT |
| EXHIBIT "J" | CONTRACT DOCUMENTS |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:

**1. CONTRACT DOCUMENTS.** The "Contract Documents" shall refer to and consist of all documents listed on Exhibit J, including this Subcontract, all exhibits, plans, drawings and specifications, and any amendments, change orders or addenda hereto executed in accordance with the terms hereof, all of which are hereby incorporated herein by this reference. The Contract Documents describe the work to be performed by Subcontractor under this Subcontract (the "Work"). The Contract Documents are intended to supplement each other as if the Work was described in all such documents. The intention of the Contract Documents is to include all labor, material, equipment, permits, licenses, appliances and other items necessary for the proper execution and completion of the Work. Subcontractor acknowledges that it has carefully examined and studied the Contract Documents in their entirety and that Subcontractor fully understands the character of the Work to be performed under the Contract Documents.

**2. SUBCONTRACTOR'S INVESTIGATION.** Subcontractor acknowledges that Subcontractor has made an independent investigation of the Job Site, the soil conditions at the Job Site and all other conditions which might affect the progress and cost of the Work and has satisfied itself that such conditions will not interfere with Subcontractor's execution and completion of the Work consistent with the Contract Documents for the Contract Price. The "Contract Price" (defined below) as set forth in the "Payment Schedule" attached hereto as Exhibit B-1 includes payment for all work, labor, materials, equipment, permits, licenses and other items and matters which may be necessary for Subcontractor to complete the Work. Any information which Contractor may furnish to Subcontractor about underground conditions or other job conditions is for the convenience of Subcontractor only, and Contractor does not warrant that the conditions are as so indicated. Subcontractor agrees to perform the Work in a good and workmanlike manner, and to furnish all labor, materials, supplies, equipment, services, machinery, tools and other facilities required for the prompt and efficient execution of the Work in conformance with the Contract Documents, to the full satisfaction and acceptance of Contractor, for the Contract Price. Subcontractor has satisfied itself as to the availability of materials, labor and all other conditions affecting and impacting its Work on the Project and agrees that the Work can be performed for the Contract Price. All materials shall be new unless otherwise specified in writing by Contractor. Subcontractor shall be obligated to perform the Work in strict compliance with the Contract Documents and all applicable laws, codes, ordinances and regulations.

**3. COMMENCEMENT AND TIME OF ESSENCE.** Contractor shall give Subcontractor seven (7) days advance notice of the date upon which Subcontractor is to commence the performance of the Work. Time is of the essence in this Contract and Subcontractor shall commence the performance of the Work immediately upon receipt of the notice to proceed by Contractor.

**4. CONTRACT PRICE.** For the strict, full and complete performance of the Work ("substantial performance" shall not be sufficient) by Subcontractor of all of Subcontractor's obligations under the Contract Documents, and subject to the terms of this Subcontract, Contractor shall pay to Subcontractor the "Contract Price" set forth in Exhibit "B-1". The Contract Price is intended to include all costs associated and necessary for the performance of the Work, including all increases in costs, foreseen and unforeseen, including, without limitation, taxes, labor, materials, storage and transportation costs, all of which are to be borne solely by Subcontractor. All loss or damage arising from any Work performed under this Subcontract through unforeseen or unusual conditions, obstructions, difficulties or delays which may be encountered in the prosecution of the Work, or through the action of the elements including abnormal or adverse weather, shall be borne by Subcontractor.

**5. PAYMENTS TO SUBSUBCONTRACTOR.** So long as

Subcontractor is not in default under this Subcontract,
Filed 06/28/24    Page 9 of 19    PageID 247
the amounts set forth below.

(a) **Progress Payments and Final Payment.** Contractor agrees to make progress payments to Subcontractor for portions of the Work completed, subject to subparagraphs (b) and (c) below, based upon the applicable pro rata portion of the Contract Price, less applicable retentions as set forth in the Payment Schedule. Final payment shall be made (as set forth in subparagraph (d) below, have been satisfied, and satisfactory proof that all claims, including, without limitation, taxes, growing out of the Work (and any liens related thereto) has been released or otherwise discharged.

(b) **Requests for Payment.**

**Forms:** Subcontractor shall prepare and present to Contractor, for Contractor's approval, a Payment Schedule in the form provided by Contractor showing the amount due for each payment period. Each Payment Schedule must be date stamped "RECEIVED" by Contractor on or before the applicable date specified in the Payment Schedule.

**Conditions Precedent.** Contractor is not required to make any payment to Subcontractor unless and until the following conditions have occurred: (a) Subcontractor shall previously have provided Contractor with the following: (i) the Certificates of Insurance required by Paragraph 26 of this Subcontract; (ii) Conditional Lien Waivers from Subcontractor and all persons (including second and third tier sub-subcontractors and material suppliers) who may have mechanic's lien rights, or labor and material bond rights against the Project with respect to amounts being requested for payment together with Unconditional Lien Waivers from such parties covering amounts for which prior payment has previously been received, in the forms attached hereto as Exhibits "D" and "F", (iii) if requested by Contractor, certified payrolls and any other related information and evidence demonstrating that Subcontractor has satisfied its payment obligations through the current progress billing date; and (iv) Subcontractor has furnished an Interim Affidavit Upon Payment in the form attached hereto as Exhibit "E"; and (b) Contractor has received payment from the Project's Owner for the Work performed by Subcontractor. Subcontractor expressly acknowledges and agrees that receipt of payment by the Owner is an express condition precedent to Subcontractor's entitlement to payment for any Work performed hereunder.

(c) **Withholding of Payments.** Contractor may withhold payments, in whole or in part, in order to protect Contractor from loss because of:

1. Defective work not remedied, materials not furnished, clean-up not performed;
2. Claims filed or reasonable evidence indicating probable filing of claims (including claims covered by insurance, until such claims are accepted by the insurance carrier);
3. Failure of Subcontractor to make payments properly to its Subcontractors, suppliers or employees for labor, materials or equipment, transportation or shipping costs, taxes, fees, payments to labor unions and union trust funds or other claims arising out of the Work;
4. Reasonable doubt that the Work can be completed for the unpaid balance of the Contract Price;
5. Damage to another Subcontractor, or to Contractor;
6. Reasonable indication that the Work will not be completed on schedule;
7. Unsatisfactory prosecution of the Work by Subcontractor;

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

8. Failure to deliver written guarantees or warranties;

9. Failure to obtain the approvals required by any authority having jurisdiction; or

10. Defaults which have not been cured by Subcontractor.

When the above grounds are removed by Subcontractor to the reasonable satisfaction of Contractor, the applicable amounts withheld (less costs incurred by Contractor (including attorneys' fees) shall be paid. Contractor may require that Subcontractor furnish releases in forms satisfactory to Contractor for all claims made under (c) 2 and (c) 3 above, together with supporting invoices, receipts or other records to substantiate the amounts owing or paid as Contractor may require.

(d)   Final Payment.  Final payment including retention shall be made to Subcontractor upon (i) completion of the Subcontractor's Work in strict accordance with the Contract Documents, including all punch list work; (ii) the occurrence of any and all conditions precedent to Subcontractor's entitlement to final payment as provided in the Contract Documents; (iii) receipt by Contractor of payment from Owner for Subcontractor's Work, this being an express condition precedent, so as to permit Contractor to make the final payment to Subcontractor; (iv) the delivery to Contractor of all required documents such as warranty forms, guaranties, and as-built drawings; (v) certification from Subcontractor that all labor (including fringe benefits) and payments due under collective bargaining agreements have been paid in full; and (vi) the providing to Contractor of Waivers and Releases Upon Final Payment from Subcontractor and all sub-subcontractors and suppliers of any tier in the forms attached as Exhibits "G" and "I"; and (vii) a Final Affidavit from Subcontractor  in the form attached as Exhibit "H".

(e)   Subcontractor Application of Payments.   Before application to any other purpose, any and all funds payable to Subcontractor hereunder are hereby declared to constitute trust funds in the hands of Subcontractor to be applied first to the payment of (i) claims of Subcontractor's Subcontractors, architects, engineers, surveyors, laborers and material men arising out of the described Work, (ii) claims for utilities furnished and taxes imposed, and (iii) premiums on surety bonds, other bonds filed, and insurance accruing during the construction of the Work.

(f)   Subcontractor Receipt of Payments.   Any payment made hereunder, or advances made by Contractor prior to full completion and final acceptance of the Work shall not be construed as evidence of acceptance of any of Subcontractor's Work by Contractor.  If construction loan funds are deposited in a joint control account, Subcontractor agrees to accept payments from such account, and any payment order given by Contractor to Subcontractor thereon shall be deemed payment by Contractor and a release of Contractor in the amount of any such order.  Contractor shall have the right to make payments from the Subcontractor's progress payments or final payment directly to Subcontractor's employees, subcontractors, suppliers, laborers, material suppliers or the like in payment of material, labor, equipment and machinery rental and other services incorporated into the Work.

**6.   LIST   OF   SUPPLIERS   AND   SUBCONTRACTORS**. Subcontractor shall within ten (10) days of execution of this Subcontract provide in writing a list of names and addresses of all suppliers and subcontractors who will supply material labor, equipment, machinery, and/or services to Subcontractor in connection with the Work.  The written list of suppliers shall, upon receipt, approval and execution by Contractor, be attached to this Contract as Exhibit "B-2" and shall be made a part hereof.  Subcontractor warrants that the list of suppliers who will supply Subcontractor shall be Subcontractor's only suppliers (of any tier) related to the Work and agrees to defend, indemnify and hold harmless Contractor from and against any and all claims and damages sustained as a result of the inaccuracy or breach of such warranty.

**7.   ADDITIONS,   CHANGES   AND   MODIFICATIONS   TO**

**SUBCONTRACT**.  The terms and conditions of this Subcontract are not subject to modification or change unless such addition, modification or change is made in writing by a duly authorized representative of Contractor pursuant to an "Authorization for Extra Work and Change Order."  Any addition, change or modification made by any other person or persons shall not be binding upon Contractor, nor shall Contractor have any responsibility or liability for unauthorized additions, changes or modifications to this Contract.  All Authorizations for Extra Work and Change Orders shall be made a part of this Subcontract and subject to all terms and conditions set forth herein.  No officer, employee, or agent of Contractor has any authority to direct any addition, change or modification by oral order or directive.  Under no circumstances shall Subcontractor be entitled to an adjustment of the Contract Price in the absence of an Authorization for Extra Work and Change Order executed by Contractor prior to Subcontractor having incurred any such costs.

**8.   OPTIONS.**   Subcontractor hereby acknowledges and agrees that the construction of upgrades and options may require modifications to the scope of the Work, which, if not already provided for in Exhibit "A" attached hereto, shall require a change in the scope of the Work in accordance with the terms of Paragraph 7 and 9 hereof.

**9.   ADHERENCE   TO   PLANS   AND   SPECIFICATIONS**. Subcontractor shall adhere strictly to the plans and specifications for the Work unless an Authorization for Extra Work and Change Order is made as provided above.  In such case, the terms of said Authorization for Extra Work and Change Order shall be understood and agreed upon in writing by Contractor and Subcontractor before commencement of the revised Work.  Additional work or deviation from the plans and specifications performed without an Authorization for Extra Work and Change Order will not receive reimbursement. Disputed Work indicated or necessary to complete the Project shall be promptly performed as ordered by Contractor and time slips, work orders, invoices, and all documents necessary to support the costs claimed therefore shall be submitted weekly to Contractor for review and consideration. All time slips, work orders and other supporting documents must be signed by the Subcontractor prior to the submission of any Change Order to Contractor for consideration. Should the plans vary from the specifications, then the specifications shall govern.   Should there be any discrepancy between the plans or the specifications, or both, and any governmental laws or regulations, then those which are more stringent shall govern. Contractor assumes no responsibility for failure of the plans or the specifications to meet with governmental laws or regulations, and it is conclusively presumed that Subcontractor is familiar with said governmental laws or regulations, regardless of the provisions of the plans or specifications. Subcontractor agrees that should any change be required by any governmental authority, such change shall be made by Subcontractor without additional charge.  If any of the Contract Documents provide for a method of work contrary to any such laws and regulations, Subcontractor shall be required to notify Contractor in writing prior to the installation of the Work.

**10.  EXTRAS.**   It is agreed that all labor, materials and equipment furnished by Subcontractor shall be deemed to be included within the Contract Price even though the labor, materials and equipment are not specifically required or demanded in this Contract or the plans and specifications, and that the same nevertheless shall be deemed to be included within the scope of labor, materials and equipment properly and necessarily required for the performance of the Work. Contractor, at any time during the progress of the Project, may order in writing changes, additions or modifications to the plans and specifications in accordance with Paragraph 7 hereof, and the same shall not void this Subcontract.  Unless otherwise requested by Contractor in writing, Subcontractor, prior to commencement of any such revised Work, shall submit within seven (7) days to Contractor written copies of Subcontractor's cost or credit proposal for such revised Work.  Subcontractor will support all claims for extras with a detailed breakdown showing differences in quality, and value of labor and material involved.  Failure to timely submit a request for additional

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

compensation shall constitute a representation by Subcontractor that no additional compensation for the change or revision is being sought and shall constitute a waiver and release of any such request. The "Construction Sequence Schedule" (as defined in Section 12 below) will remain fixed, unless expressly otherwise agreed to in an Authorization for Extra Work and Change Order. If the time is extended and Contractor so notifies Subcontractor in writing, all added Work performed by Subcontractor on a time and material basis (in lieu of unit prices or for a negotiated lump sum) shall be performed by Subcontractor at Subcontractor's actual net cost plus overhead and profit, with or without a maximum guarantee total cost, at Contractor's option. Subcontractor's markup for overhead and profit will not exceed that permitted by the contract documents (including field supervision, tools and equipment) unless agreed to by contractor in advance of the commencement of such revised work.

**11. TAXES.** The Contract Price includes the payment by Subcontractor of (i) any tax under any state sales or use tax law, or any amendments thereto, or any law now existing, or which may hereafter be adopted by Federal, State and Local or other governmental authority, which tax services, or labor and material furnished; or (ii) any other taxes levied by reason of the Work.

**12. TIMING OF WORK.**

(a) Scheduled Completion. The Project is scheduled to be finally complete on or before ___July 21, 2023___. For purpose of clarification, the Subcontractor does not necessarily have until that date to complete all of the Work prescribed in this Subcontract but must comply and maintain progress in accordance with the work of the Contractor and other Subcontractors so as to ensure that the Project is finally complete by the date referenced above.

(b) Coordination. Subcontractor agrees to punctually and diligently perform all parts of Subcontractor's Work at the time scheduled by Contractor, which shall be subject to change, at no additional cost, by Contractor as deemed necessary or convenient to overall progress of the Project. In this regard, Subcontractor agrees that Subcontractor will keep itself continually informed of the progress of the Project and will, upon Subcontractor's own initiative, confer with Contractor so as to plan Subcontractor's Work in coordinated sequence with the work of Contractor and of others and so as to be able to expeditiously undertake and perform Subcontractor's Work at the time most beneficial to the entire Project; however, Subcontractor shall not proceed with any phase of its Work ahead of the time designated by Contractor unless authorized by Contractor.

(c) Approvals and Order of Installation. Subcontractor shall prepare and obtain approval as required by the Contract Documents for all shop drawings, details and samples, and do all other things necessary and incidental to the prosecution of Subcontractor's Work in conformance with the Construction Sequence Schedule. Contractor shall have control of the Job Site and shall have the right to decide the time or order in which the various portions of the Work shall be installed or the priority of the work of other Subcontractors, and in general, all matters respecting the timely and orderly conduct of the work of Subcontractors on the Job Site. If the Project or the Work is divided into parts, Subcontractor will perform several or all parts simultaneously, if required by Contractor.

(d) Subcontractor Delays. If Subcontractor is behind in the Work, fails or refuses to supply sufficient workers or deliver materials or equipment on schedule, and delays progress of the Work; or if the different parts thereof are not commenced, performed, finished and delivered on time, then in addition to any other remedies of Contractor as provided for herein, Contractor shall have the right to direct Subcontractor to furnish additional labor and expedite deliveries of material and equipment at Subcontractor's cost and expense. If such additional labor is not available, Contractor has the right to require Subcontractor at Subcontractor's cost, to work overtime or additional shifts (and/or weekends and holidays)

and/or to employ additional Subcontractors to such an extent as will be sufficient to speed up and complete the Work on schedule. Should Contractor's work schedule be changed, Subcontractor will proceed in strict accordance with Contractor's directions. In the event Subcontractor fails or refuses to furnish such additional labor, materials and equipment or to work overtime or additional shifts as directed by Contractor hereunder, Contractor shall be entitled to have such labor, materials and equipment furnished on Subcontractor's behalf and the costs associated with the same shall be charged to Subcontractor and be deducted from the Contract Price or be immediately payable to Contractor by Subcontractor at Contractor's option.

(e) Damages. If Subcontractor's failure to timely prosecute its Work causes the contract time to be extended beyond the time allowed by the contract with Owner, the Subcontractor shall pay to the Contractor all liquidated and/or actual damages assessed against the Contractor by the Owner for which the Subcontractor is liable and shall also pay to the Contractor such actual damages as it may incur.

**13. INSPECTIONS AND APPROVALS.** The Work shall be subject to inspection and approval by Contractor and all applicable governmental authorities. Subcontractor shall be required to furnish, for the approval of Contractor and all applicable governmental authorities such samples, shop drawings and patterns, as may be required for the Work, and all Work shall be in accordance therewith. Subcontractor shall provide sufficient, safe and proper facilities during the progress of the Work for inspections by Contractor and all applicable governmental authorities in the field, at shops or at any place where materials required hereunder are in course of preparation, manufacture, treatment or storage. Contractor shall be afforded access to Subcontractor's records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda and similar data relating to this Contract, and Subcontractor shall preserve all such records for a period of four (4) years, or for such longer period as may be required by law, after the Final Payment Date.

**14. LINES, GRADES AND MEASUREMENTS.** Subcontractor assumes full responsibility for the accuracy of all lines, grades, levels and measurements and their relation to benchmarks, property lines, reference lines and the work of Contractor and other Subcontractors. In all cases where dimensions are governed by conditions already established, the responsibility for correct knowledge of the conditions shall rest entirely on Subcontractor. No variation from specified lines or grades or dimensions shall be made except on written authority of Contractor. All work shall be made to conform to actual, final conditions as they develop in the course of construction.

**15. RELATED WORK.** By commencing Work, Subcontractor acknowledges that all related, adjacent or dependent work, services, utilities or materials are acceptable to Subcontractor, and Subcontractor waives any and all claims for damages or extras with respect to defects or failure thereof.

**16. INTERRUPTION OF WORK/FORCE MAJEURE.** If, as a result of fire, earthquake, acts of God, war, strikes, picketing, boycott, lockouts, or other causes or conditions beyond the control of Contractor, Contractor shall consider it inadvisable to proceed with the Work, then Subcontractor shall, upon receipt of written notice from Contractor, immediately discontinue any further Work until such time as Contractor may deem it advisable to resume the Work. Subcontractor will resume the Work promptly upon receiving written notice from Contractor to do so, and Subcontractor shall not be entitled to any damages or compensation on account of cessation of Work as a result of any of the causes mentioned above. If Subcontractor wishes to make a time extension request for such cessation of Work, it must present such request in writing to the Contractor within five (5) calendar days after the commencement of such event. Subcontractor will receive any extension Contractor receives from the Owner.

**17. CORRECTION OF DEFECTS IN MATERIAL OR WORK.** All defects in materials used or Work performed shall, upon

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

inspection and notice from Contractor or a designated City, State or County inspector, be immediately (24 hours) corrected by Subcontractor to the satisfaction of Contractor and the designated inspector, at Subcontractor's sole expense, without cost to Contractor.

**18. DAMAGE TO RELATED WORK.** Should Subcontractor damage the Work or installations or work of Contractor or any other subcontractor, Subcontractor shall promptly pay Contractor or such subcontractor, as the case may be, all costs incurred in repairing the damage. Subcontractor shall take all action necessary to insure that its suppliers and subcontractors do not damage drives, paving, curbs and sidewalks or any of the Work, and Subcontractor shall be responsible for any such damage.

**19. DEFECTS AND WORKMANSHIP -INDEMNIFICATION.** Subcontractor hereby indemnifies, defends and holds Contractor, Owner and other parties indemnified by Contractor under its contract with Owner, and their respective agents, representatives, and assigns, and sureties harmless from any and all liability, claims and damages caused by defective workmanship or materials, or the delays caused thereby, and will pay and/or reimburse Contractor for any and all such liability, claim or damages. Should any dispute arise as to Subcontractor's workmanship or the quality of materials furnished, the decision of Contractor reasonably made and arrived at shall be binding and final on Subcontractor. Such indemnity shall survive the acceptance of Subcontractor's Work by Contractor and shall be binding upon Subcontractor and its successors and assigns until any applicable statute of limitations has run.

**20. GUARANTEE/WARRANTY.** Subcontractor guarantees and warranties all materials and workmanship of Subcontractor and agrees to replace at its sole cost and expense and to the reasonable satisfaction of Contractor, any or all materials adjudged defective or improperly installed and additionally guarantees and warranties the same against liability, losses, or damage for one (1) year from final completion of the entire Project (the "Correction Period"). If, however, the period of guarantee or warranty is stipulated in excess of one (1) year by the Contract Documents, Subcontractor shall be bound thereby, and the Correction Period shall be for such longer period. All guarantees and warranties, including equipment warranties, will inure to the benefit of Contractor, the Owner and their respective successors and assigns. Nothing set forth in this paragraph shall be construed to limit or modify Subcontractor's obligation to complete the Work in accordance with the requirements of the Contract Documents and this Subcontract. Subcontractor shall, at is sole expense, take all commercially reasonable measures to obtain all guarantees and warranties of materials furnished to from any manufacturer or supplier in connection with the Subcontractor's Work. All such warranties shall be deemed to run to the benefit of Owner. Subcontractor shall and does hereby assign to Owner the benefits of any warranties furnished to it, but such assignment shall not relieve Subcontractor of its warranty obligations to Contractor or Owner under this Subcontract or any other Contract Document. Prior to final acceptance of the Work by Contractor or Owner, Subcontractor shall deliver to Contractor all warranties on materials furnished by all manufacturers and suppliers to Subcontractor and its sub-subcontractors, with duly executed instruments properly assigning the Warranties to Owner. Subcontractor shall obtain from all manufacturers and suppliers warranties upon the optimum terms and longest periods reasonably obtainable.

(a) Additional terms applicable to Roofing, Sheet metal, Caulking and/or Waterproofing Contract. Subcontractor agrees to maintain roofing, waterproofing, gravel stops, flashings and counter flashings in watertight condition for the number of years specified in the Contract Documents and in any case not less than two (2) years from the date of final completion of the entire Project. If the roofing or waterproofing leaks, Subcontractor agrees to make the necessary permanent repairs immediately to produce a watertight condition and agrees to reimburse Contractor and its successors and assigns, for any

costs required to repair water damage to the walls, ceilings, fixtures, furnishings, paintings, decorating, and the like, caused by the leaks. Subcontractor will remove and replace any work necessary to gain access to the roofing or waterproofing membranes being maintained hereunder.

(b) Additional terms applicable to Plumbing, Heating, Air Conditioning, Electrical and Process Piping Subcontracts. Subcontractor shall be responsible for all damages to building, furnishings, and all improvements located on the Job Site caused by leaks in the piping or conduit systems installed hereunder, or due to leaks where pipes or conduit go through walls or slabs where the joints around such pipes or conduit are to be watertight. Subcontractor shall repair at Subcontractor's expense all damage so caused, and will reimburse Contractor and Construction Manager, and their successors and assigns, for any costs required to repair water damage to the walls, ceilings, fixtures, furnishings, paintings, decorating, or the like, caused by such leaks.

(c) Additional terms applicable to Glass and Glazing, Curtain or Window Wall, or Storefront Contract. Subcontractor will be responsible for all damages to the Project and furnishings, and to all improvements, caused by leaks through, under or around such work. Subcontractor will remove and replace any work as required to gain access to sources of leakage to be corrected hereunder.

(d) Corrections. During Subcontractor's Correction Period, Subcontractor shall respond and correct deficiencies within twenty-four (24) hours after notification by Contractor. After this twenty-four (24) hour period, the problem may be corrected by Contractor. All costs for time and materials plus fifteen percent (15%) overhead thus incurred by Contractor shall become a debt immediately due and payable by Subcontractor, and Subcontractor shall reimburse Contractor for any such costs within fifteen (15) days after written demand from Contractor to do so. Alternatively, Contractor may back-charge Subcontractor for the amount owed. Emergencies will be corrected by Subcontractor immediately. Subcontractor agrees that upon notification of defects from Contractor, Subcontractor shall proceed with due diligence, at Subcontractor's expense, to replace any defective material or perform any labor necessary to correct any defect in the Work.

**21. TERMINATION OF CONTRACT.**

(a) Failure to Correct Work. Upon notification from Contractor (which notice may be in writing or in person or by telephone and confirmed in writing) that (i) an "Event of Default" (as described below) has occurred, (ii) Subcontractor's performance under this Subcontract in any respect is unsatisfactory to Contractor, (iii) Subcontractor has failed to comply fully with the terms of this Subcontract, or (iv) Subcontractor's Work needs correction or has been damaged, Subcontractor shall promptly take all action necessary to fully comply with the terms of the Contract Documents and the requirements of Contractor. Should Subcontractor fail to do so within twenty-four (24) hours after receipt of such written notification, Contractor shall have the option of either providing such materials, supplies, equipment, labor and supervision as may be necessary, pay for same and deduct the amount from any money then or thereafter due Subcontractor, or terminate this Subcontract and Subcontractor's rights hereunder. In the event of such termination, Subcontractor hereby authorizes Contractor to perform and complete the Work, and in connection therewith, Contractor may (i) eject Subcontractor; (ii) take possession of all materials, appliances, tools and equipment already at the Job Site, as well as all materials in the course of preparation, wherever located, and all rights under contracts of Subcontractor; and (iii) go into the open market and secure a replacement subcontractor or secure materials and employ workers necessary to complete the Work, all at Subcontractor's expense. Subcontractor shall not be entitled to receive any further payment until completion of the Project and then only after the direct and indirect costs incurred by Contractor to complete Subcontractor's Work, including but not limited to attorneys' fees, plus a reasonable allowance for profit for Contractor, have been determined. The direct and indirect

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

costs and the allowances for profit shall apply against the Contract Price, and, if the cost exceeds the balance due Subcontractor, the amount of the excess shall be a debt immediately due and owing from Subcontractor to Contractor. If the balance of the Contract Price shall exceed Contractor's direct and indirect costs, plus a reasonable allowance for profit, as above provided, such excess shall be paid to Subcontractor within thirty-five (35) days after final completion of the Project.

(b) <u>Termination for Convenience</u>. Contractor shall have the right to terminate Subcontractor, as to all or any part of its Work, by written notice and without Subcontractor being at fault, for any cause or for its own or the Owner's convenience and require Subcontractor to immediately stop Work. In the event of such termination, Contractor shall pay Subcontractor only for that portion of the Work actually performed (not to exceed a pro rata share of the contract price based upon the percentage of completion of Subcontractor's Work). Contractor shall not be liable, at law or equity, to Subcontractor for any other costs or damages nor for prospective profits on Work not performed. There shall be deducted from such sums as provided in this Paragraph the amount of any payments made to Subcontractor prior to the date of termination of this Subcontract. Subcontractor shall not be entitled to any claim against Contractor for any additional compensation or damages in the event of such termination. At Contractor's election, this Subcontract shall become null and void and of no force or effect in the event financing for the Project is or becomes unavailable, or if for any reason beyond Contractor's control, Contractor shall be unable to undertake the Project. Any default termination of Subcontractor by Contractor subsequently determined to have been unjustified or erroneous, shall be deemed to be a termination for convenience under this subparagraph.

(c) <u>Cross-Default</u>. Contractor and Subcontractor acknowledge and agree that Contractor's continued confidence in the ability of Subcontractor to properly and expeditiously perform the Work is a substantial and material concern to Contractor. Consequently, in the event Contractor and Subcontractor enter into or have entered into any other contracts or agreements, and Subcontractor defaults under this Contract, or any other contract or agreement between Contractor and Subcontractor, Contractor may, at its election, terminate this Subcontract and any or all other contracts or agreements between Contractor and Subcontractor and, if this Subcontract relates to a multi-phase project, Contractor may elect to reduce the scope of the Work to be performed by Subcontractor hereunder to the phase then in progress, in which event the provisions of this Subcontract relating to subsequent phases shall become null and void, and, Contractor's maximum obligation to Subcontractor shall be for payment to Subcontractor of the amounts which would be paid to Subcontractor in the event of a termination of this Contract as described in Paragraph21(b), above. In all events, Contractor shall have the right to offset against payments due Subcontractor under this Subcontract and any other contracts or agreements between Contractor and Subcontractor, such amounts as may be reasonably necessary to protect Contractor against loss, cost, damage or liability which Contractor may be reasonably anticipated to suffer as a result of Subcontractor's default hereunder or thereunder.

(d) <u>Event of Default</u>. The occurrence of any of the following shall be deemed an "<u>Event of Default</u>":

(i) Failure of Subcontractor to commence the Work on the date specified by Contractor, or failure of Subcontractor to perform the Work or any portion thereof in accordance with the provisions of the Project Schedule.

(ii) Failure of Subcontractor to make timely payments for any labor, materials, equipment, transportation, shipping, taxes or fees, or to labor unions and union trust funds.

(iii) Failure of Subcontractor to perform the Work or any portion thereof in accordance with the Contract Documents or refusal to or failure of Subcontractor to supply enough properly skilled workers or proper materials

to complete the Work.

(iv) Failure of Subcontractor to abide by and comply with the terms and provisions contained in the Contract Documents.

(v) Failure of Subcontractor to correct defective or nonconforming Work as required hereby after receipt of notice to do so.

(vi) Failure of Subcontractor to abide by and comply with the terms and conditions of any other contract or agreement between Contractor and Subcontractor, or the occurrence of any "event of default" under any such other contract or agreement.

(vii) The insolvency or bankruptcy of Subcontractor, a general assignment by Subcontractor for the benefit of its creditors, the allowance by Subcontractor of a receiver to be appointed because of its insolvency, or Subcontractor is unable to pay Subcontractor's obligations as they become due.

(viii) The disregard of any law or ordinance relating to the Work, the Project or completion thereof specifically including, without limitation, the provisions of other laws relating to the use, storage and disposal of toxic or hazardous materials, substances or wastes.

(e) <u>Equipment and Supplies</u>. If Subcontractor's rights under the Contract Documents are terminated by Contractor and Contractor has elected not to take possession of Subcontractor's equipment and supplies pursuant to Paragraph 21(a)(ii) above, Subcontractor shall promptly, or within ten (10) days after service of written notice by Contractor to do so, remove all Subcontractor's equipment and supplies from any property owned or controlled by Contractor. Should Subcontractor fail to so remove Subcontractor's equipment or supplies, Contractor may remove the same and store them in a safe place at the sole cost and expense of Subcontractor. Should Subcontractor fail to pay Contractor the cost and expense of such removal and storage within seven (7) days after written demand therefore has been provided to Subcontractor by Contractor, Contractor may sell such equipment and supplies at public or private sale, and account to Subcontractor for the net proceeds of such sale, after deduction of any costs of storage or sale of such equipment and supplies.

(f) <u>Liability for Losses</u>. Should Subcontractor default in the proper performance of Subcontractor's Work, thereby causing delay to the Project, Subcontractor shall be liable for any and all losses and damages to or incurred by Contractor including, without limitation, any liquidated damages agreed upon by Contractor and Subcontractor. Subcontractor shall be liable under this Paragraph even though such default is caused by strikes, lockouts, acts of God, or other reasons beyond the control of Subcontractor, unless Subcontractor gives written notice of the delay to Contractor within forty-eight (48) hours following the start of the alleged occurrence.

**22. REMOVAL OF CONDEMNED WORK.** Subcontractor shall, within twenty-four (24) hours after delivery of written notice, proceed with due diligence to remove from the Site all materials condemned by Contractor or any applicable governmental authority, and shall take down all portions of the Work which Contractor or any applicable governmental authority has condemned as unsound or improper, or which in any way fail to conform to the Contract Documents, and shall make good all work in other trades damaged by such removal. In the event that all or any portion of the Work so condemned shall be of such a nature, or the time available to complete the whole Work shall be so limited, that in the judgment of Contractor it will not be expedient to order the same replaced or corrected, Contractor, at its option, may deduct from the payments due or to become due to Subcontractor an amount that shall represent the difference between the fair and reasonable value of the Work so condemned and its value had the Work been executed in conformity with the Contract Documents.

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

~~or claims for infringement of patent rights that may be brought against Contractor. Owner or the Project Architect. In any event,~~ the Work, and shall hold Contractor, Owner and the Project architect harmless from loss on account thereof, except that Subcontractor shall not be responsible for such loss when a particular process or product of a particular manufacturer or manufacturers is specified by Contractor, Owner or the Project architect, provided Subcontractor is unaware of the infringement.

**24. CUTTING, FITTING AND PATCHING; WORK OF OTHERS.** Subcontractor shall, as part of the Contract Price, do all cutting, fitting, and patching of it's Work that may be required to make Subcontractor's several parts come together properly, and to fit such parts to receive or be received by the work of other agents or Subcontractors, shown upon or reasonably implied by the Contract Documents. Subcontractor agrees to protect the work of others from damage as a result of Subcontractor's operations. Should Subcontractor cause damage to the work of any other Subcontractor on the Project, Subcontractor agrees, upon due notice, to compensate such Subcontractor to the extent of the damage, and the cost of repairing the damage shall be paid by Subcontractor.

**25. CLAIMS FOR DELAY OR DAMAGE.** Subcontractor expressly waives any and all rights to make claims or to be entitled to receive any compensation or damages for failure of Contractor or other Subcontractors to have related portions of the project completed in time for the Work of Subcontractor to proceed. Contractor shall not be liable to Subcontractor for losses or damages resulting from strikes, lockouts, acts of God, pandemics or other public health emergencies, or other reasons beyond the control of Contractor, or for Contractor's delays, or for modification or extension of the Construction Schedule made at the sole discretion of Contractor, or for losses or damages resulting from an Authorization for Extra Work and Change Order issued by Contractor, or for delays caused by the Owner or Owner's Design Professionals or by other Subcontractors, or for delays caused by any defective or improper work performed by any other Subcontractor. It is expressly acknowledged by Subcontractor that all such delay claims, including but not limited to any lost productivity claims, claims relating to Subcontractor being required to perform the Work in a sequence or manner other than that originally anticipated, are and have been expressly waived by Subcontractor.

**26. INSURANCE.**

(a) Certificates. Before Subcontractor commences any work at or prepares or delivers material to the Job Site, Subcontractor shall provide Contractor with both Certificates of Insurance and additional insured endorsements evidencing coverage and all specifications as set forth on the attached Statement of Insurance Requirements attached as Exhibit "C" and incorporated herein.

(b) Failure to Obtain. Should Subcontractor fail to obtain the insurance coverage required under the Contract Documents, or should Subcontractor fail to timely renew the insurance coverage required under the Contract Documents, Contractor shall have the right, at Contractor's election, without obligation, (i) to obtain such coverage on Subcontractor's behalf, at Subcontractor's expense, from any insurance carrier selected by Contractor in Contractor's sole discretion; or (ii) to terminate this Contract as provided in Paragraph 21, above. Contractor shall have the right to offset the costs of premiums for such insurance against any sums payable to Subcontractor under this Contract.

**27. INDEMNIFICATION.** All Work performed by Subcontractor related to this Subcontract, and all Work performed by Subcontractor related to Subcontractor providing, preparing or delivering materials, equipment or services to or for the Project, shall be at the sole risk of Subcontractor. Subcontractor shall, to the fullest extent permitted by law, with respect to all such Work which is covered by or incidental to this Subcontract,

indemnify, and defend and hold harmless Project Lender, and at the request of Contractor, made to Subcontractor with Owner, Contractor and Contractor's Surety, if any, and any other interested party designated by Contractor, and their agents, employees and representatives (collectively, "Indemnities") from and against any claim, liability, loss, damage, cost, expense (including attorneys' fees), awards, fines or judgments arising by reason of the death or personal injury to persons, or injury or damage to the Job Site property (including, without limitation, the loss of use there from), whether or not caused in part by an Indemnities; provided, however, that Subcontractor shall not be obligated under this Subcontract to indemnify the Indemnities with respect to damages which are ultimately determined to be due to the sole negligence or willful misconduct of the Indemnities. In any and all claims against the Indemnities by any employee of Subcontractor, any Subcontractor of Subcontractor, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, the indemnification obligation under this paragraph shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable under any workers' compensation acts, disability benefit acts, or other employee benefit acts. Said indemnity is intended to apply during the period of this Subcontract and until such time as action on account of any matter covered by such indemnity is barred by the applicable statute of limitations or statute of repose.

**28. INDEPENDENT CONTRACTOR RELATIONSHIP.** The relationship of Subcontractor to Contractor during the term of this Contract shall be that of an independent contractor. Subcontractor shall remain and maintain said independent Subcontractor relationship, and Subcontractor shall at no time be considered an employee of Contractor. Subcontractor, during the progress of the Work shall furnish skilled labor, adequate and suitable materials and a qualified superintendent or foreman to act as the representative of Subcontractor on the Job Site, who is authorized to receive orders, to make decisions regarding the Work, and be responsible for the total scope of Work included in this Subcontract. Such superintendent or foreman shall at all times be satisfactory to Contractor and shall not be changed without the written consent of Contractor. If such superintendent or foreman is unsatisfactory to Contractor, Subcontractor shall promptly replace same.

**29. CLEAN-UP.** At all times during the course of construction, Subcontractor shall perform the Work so as to maintain the Job Site in a clean, safe and orderly condition. Upon completion of the Work, Subcontractor shall remove from the Job Site all temporary structures, debris and waste incident to Subcontractor's operations, and shall clean all surfaces, fixtures, equipment, and the like relative to the performance of the Work. Contractor may order Subcontractor to clean up areas at any time Contractor deems such action necessary. If Subcontractor fails to perform a clean-up function within twenty-four (24) hours after notification from Contractor to do so, Contractor may proceed with that function as Contractor deems necessary and in the manner Contractor deems expedient, and the cost thereof shall be charged to Subcontractor and deducted from monies due under this Subcontract. In the event Contractor is unable to determine which Subcontractor is responsible for the clean-up of any debris, Contractor may apportion the cost of such clean up in such manner as Contractor may determine to be equitable. Such determination shall be final and binding upon Subcontractor.

**30. USE OF CONTRACTOR'S EQUIPMENT.** Subcontractor is not authorized to use or operate any equipment owned or leased by Contractor without the written consent of Contractor and the delivery of evidence that Subcontractor's insurance will insure any loss to person or property, including Contractor's equipment, resulting from Subcontractor's use of Contractor's equipment. Subcontractor assumes all responsibility for and agrees to hold Contractor harmless from any claims or damages whatsoever resulting from the use of Contractor's equipment, whether such damage results to Subcontractor, Subcontractor's own employees or properties, or to other

[3668742/2]

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

persons or the employees or property of other persons. If the Subcontractor is unable to provide any equipment needed to complete the Work, Contractor must be immediately notified. If Contractor, in its sole discretion, determines the Subcontractor is unable to provide the equipment needed to complete the Work, Contractor may hire others to perform such portion of the Work and deduct the cost thereof from Subcontractor's progress or final payments.

**31. PERMITS AND LAWS**. Except as otherwise instructed by Contractor, Subcontractor shall promptly obtain, at Subcontractor's expense, and before commencing the Work, all permits, and licenses required for the Work. Subcontractor shall comply, at Subcontractor's expense, with all laws, ordinances, rules, regulations, orders and requirements of the City, County, State and Federal government, any Board or Commission, or any other duly qualified body, having jurisdiction over the Project, which shall or might affect or apply to the Work, and Subcontractor shall exhibit each such permit or license to Contractor or Construction Manager upon their request. Subcontractor shall be responsible for requesting and obtaining all necessary inspections and approvals of Subcontractor's Work required by Contractor and applicable governmental agencies. Subcontractor hereby certifies that Subcontractor is in full compliance with the provisions of the Immigration Reform and Control Act of 1986 in the hiring of its employees, has instituted procedures for compliance with laws relating to toxic or hazardous wastes, substances or materials and Federal and State Hazard Communication Standard and "Right to Know" laws) and Subcontractor agrees to indemnify, hold harmless and defend Contractor and other Indemnitees against any and all claims, liabilities, losses, costs, damages and expenses (including, without limitation, attorneys' fees and costs) arising out of Subcontractor's failure to comply with any such laws. It is hereby understood that Contractor is entering into this Subcontract based on the representation that Subcontractor is licensed under all applicable state and local laws to perform the Work, and Contractor would not enter into the Subcontract if this representation were false.

**32. HAZARDOUS MATERIALS**. Subcontractor shall strictly comply with all Federal, State or Local Laws, ordinances or regulations regarding the use and discharge of "toxic" or "hazardous" materials, wastes or substances. Subcontractor shall immediately notify Contractor if Subcontractor, or any of Subcontractor's employees, agents, Subcontractors, or suppliers, (collectively, "Subcontractor's Affiliates") brings a chemical within the Project which has been defined under Federal, State, or Local Laws, ordinances or regulations as a "toxic" or "hazardous" material, waste or substance ("Listed Chemical"). Subcontractor shall, in addition, provide Contractor with copies of all warning labels and Material Safety Data Sheets on products Subcontractor and/or Subcontractor's affiliates are using. Subcontractor shall immediately notify Contractor of any spill, release or discharge of any Listed Chemical caused by or brought to the attention of Subcontractor or any of Subcontractor's Affiliates. Subcontractor shall immediately take all reasonable and necessary actions to prevent the further spread of any spill, release or discharge of a Listed Chemical which is brought to the attention of Subcontractor. As to any spill, release or discharge of a Listed Chemical which is caused by Subcontractor or Subcontractor's Affiliates, whether caused intentionally, negligently or accidentally, Subcontractor shall, at Subcontractor's sole cost and expense, take immediate action to clean up said spill, release or discharge in full compliance with all applicable laws and regulations, in addition to any directions from Contractor. All work, labor, services or materials necessary to comply with this Section will be furnished by Subcontractor as part of the Work without any additional compensation. Neither Subcontractor nor any of Subcontractor's Affiliates shall clean or service any tools, equipment, vehicles or materials with any Listed Chemicals, and any unused paint, adhesives or other construction materials shall be collected and gathered up by Subcontractor and removed from the Project and disposed of in accordance with all applicable laws and regulations. Subcontractor agrees to indemnify, defend and hold Contractor and the other

Indemnitees free and harmless from and against all liability, loss, claims, demands, damages, expense, and cost including, without limitation, attorneys' fees, of every kind or nature arising out of any failure of Subcontractor or Subcontractor's Affiliates to perform and observe the requirements of all or any part of any law, regulation, rule, contractual obligation or the like arising out of or in connection with Subcontractor's performance of Work hereunder, except such loss or damage which is caused solely by the negligence of Contractor.

**33. ASSIGNMENT**. (a) Subcontractor shall neither assign nor subcontract the whole or any portion of this Subcontract or the payments or the rights to collect any payments hereunder without first obtaining in each and every instance consent in writing from Contractor which consent may be given or withheld in Contractor's sole discretion, and then only subject to, and upon the same terms and conditions of, the provisions of this Subcontract. Any permission granted by Contractor shall not be deemed permission to any subsequent assignment. Any assignment by Subcontractor made without the consent of Contractor as herein provided shall be null and void and shall, at the option of Contractor, be grounds for termination of this Subcontract, and Contractor shall have the right to elect to proceed in accordance with the provisions Paragraph 21(a) of this Subcontract. Any such subcontract shall contain all the provisions of this Subcontract and shall require the Subcontractor hereunder to be directly liable to Contractor and in all respect as herein required of Subcontractor. Any assignments of this Subcontract or assignment of payments permitted by Contractor shall be submitted to Contractor for Contractor's prior written approval and shall not be binding upon Contractor until so approved. No assignment shall relieve Subcontractor from Subcontractor's duties, obligations and liabilities hereunder, unless specifically relieved in writing by Contractor. Subcontractor acknowledges and agrees that at any point during or after the course of performance of the Work hereunder, Contractor shall, in its sole and absolute discretion, have the right to assign this Subcontract to Owner or Owner's designee without Subcontractor's prior consent (the "Owner Assignment"). Contractor shall give notice to Subcontractor of any Owner Assignment within five (5) days of the effective date thereof. Upon any Owner Assignment, Subcontractor covenants and agrees that it shall deal with Owner or its designee in the place and stead of Contractor and that it shall perform all of its obligations under this Subcontract and complete the Work in accordance with the Contract Documents. Subcontractor further covenants and agrees that upon any Owner Assignment, Owner or its designee may enforce the obligations of Subcontractor hereunder with the same force and effect as if enforced by Contractor, provided that as part of the Owner Assignment, Owner or its designee assumes the payment obligations of Contractor hereunder. Following any Owner Assignment, Owner or its designee shall have the right to further assign this Subcontract in the same manner and under the same conditions as the Contractor's assignment to Owner or its designee.

**34. LIENS**. Subcontractor shall pay when due all claims for labor or material incurred by it in the performance of this Subcontract. If any liens (mechanics' or material men's), attachments, garnishments, claims against any payment bond furnished by Contractor, or suits affecting title to real property are filed against the Project, or any portion thereof, in connection with claims for labor or material incurred by Subcontractor, or anyone claiming by or through Subcontractor, in the performance of this Subcontract, Subcontractor shall, within ten (10) days after written demand by Contractor, cause the effect of such lien, claim, attachment or suit to be removed from the Project or otherwise discharged, or any portion thereof, and Subcontractor shall defend, indemnify and hold Contractor harmless against any liabilities and claims made in connection therewith, including, without limitation any costs and expenses for attorney's fees, bond premiums and all incidental and consequential damages resulting there from. In the event Subcontractor shall fail to promptly cause the effect of any such lien, claim, attachment or suit to be so removed, Contractor is hereby authorized to use whatever means Contractor may deem best to cause the lien, claim, attachment or suit, together with its effect upon the title,

INITIALED BY CONTRACTOR:

INITIALED BY SUBCONTRACTOR:

dismissed, and the cost thereof including attorney's fees incurred by Contractor shall become immediately due from Subcontractor to Contractor. Subcontractor may contest any such lien, attachment or suit, provided Subcontractor causes the effect thereof to be removed from the Project or any part thereof, or resolved as to any claim asserted against a payment bond furnished by Contractor. Should Subcontractor fail to make any payments required under this Paragraph, Contractor may make such payments on behalf of Subcontractor, and Subcontractor shall reimburse Contractor for the amount actually paid on demand.

**35. FINANCIAL STATUS.** Subcontractor hereby authorizes all financial institutions, material men and individuals to disclose to Contractor Subcontractor's financial status, credit and manner of meeting obligations. Should Subcontractor fail for any reason to make available any financial statements as herein above required, Contractor may, at Contractor's option, terminate this Subcontract.

**36. DEATH OF SUBCONTRACTOR.** If Subcontractor is a sole proprietor, his/her death shall automatically terminate this Contract.

**37. TITLE.** Title to all work completed and in the course of construction, and all materials on the Job Site shall, as between Subcontractor and Contractor, be held by Contractor.

**38. RIGHT TO DEMAND BOND.** Contractor has the right, at its expense and at any time, to require Subcontractor to furnish Contractor with a Performance Bond and/or a Labor and Material Bond executed by a surety company satisfactory to Contractor. Contractor will pay the premium of any such bond, and if Subcontractor is unable to deliver the bond within ten (10) days after notice to do so from Contractor, Contractor has the right to terminate this Subcontract, pay Subcontractor the reasonable value of Work then accomplished on the Job Site by Subcontractor (not to exceed a pro-rata share of the Contract Price based upon the percentage of completion of Subcontractor's Work), and at Contractor's option to have the Project finished by others.

**39. NO DELAY.** Notwithstanding the fact that a dispute, controversy or question shall have arisen in (a) the interpretation of any provision of the Contract Documents, (b) the performance of any Work, (c) the delivery of any material, (d) the payment of any monies to Subcontractor, or otherwise, Subcontractor agrees that Subcontractor will not directly or indirectly stop or delay any Work required to be performed, or stop or delay the delivery of any materials required to be furnished hereunder, pending the determination of such dispute or controversy, regardless of whether such controversy, dispute or question is subject to arbitration, litigation or judicial reference.

**40. SAFETY.** Subcontractor shall at Subcontractor's own cost and expense protect Subcontractor's own employees, employees of Contractor, and all other persons from risk of death or bodily harm arising out of or in any way connected with the Work, and Subcontractor shall strictly comply with all safety orders, rules, regulations and requirements of all federal, state and local government agencies exercising safety jurisdiction over the Work including, without limitation, applicable OSHA regulations. Subcontractor shall indemnify, defend and hold Contractor harmless from any liability, loss, cost, damage or expense, including, without limitation, attorney's fees, which Contractor may suffer or incur as a result of any cause of action, proceeding, citation or work stoppage arising out of or in any way connected with an alleged violation by Subcontractor of any such safety order, rule, regulation or requirement, whether such violation is ultimately proved or not. Subcontractor shall supply Contractor with a copy of its Safety Program manual to be filed at the construction jobsite.

**41. DISPUTE RESOLUTION.**

(a) At the sole discretion of the Contractor, any and all claims, disputes, controversies and other matters in question

thereof, shall initially be referred to a mediator. The parties shall share the costs of the mediation equally, each party shall be responsible for payment of its own attorneys' fees incurred in connection with the mediation and the mediation shall be conducted in Jacksonville, Florida. If there is a mediation, and it is unsuccessful, the following dispute resolution procedures shall be followed.

(b) Any unresolved dispute between Contractor and Subcontractor arising out of, or relating to, this Subcontract, or the breach thereof, shall be resolved by binding arbitration. Such arbitration shall be conducted pursuant to the Construction Arbitration Rules of the American Arbitration Association then in effect. The locale of the arbitration shall be Valdosta, Georgia.

(c) With respect to any arbitration proceeding, each party shall initially bear its own costs, including but not limited to its attorneys' fees. However, the allocation of such costs shall be considered and made a part of any final award by the Arbitrator(s) in accordance with the requirements of this Subcontract.

**42. LABOR RELATIONS.** Subcontractor agrees that at all times during the performance of the Work under this Subcontract, Subcontractor shall maintain labor relations policies satisfactory to Contractor, which policies may be established in Contractor's sole discretion. Subcontractor agrees that if the status of Subcontractor's labor relations change from the manner in which they existed as of the date of this Subcontract; Subcontractor shall immediately notify Contractor. Contractor may terminate this Subcontract immediately upon any change in the labor relations policies maintained by Subcontractor, and in the event of such termination, Contractor's sole obligation to Subcontractor shall be for payment to Subcontractor of the amounts which would be paid to Subcontractor in the event of a termination of this Subcontract for convenience, as described in Paragraph 21(b), above. Subcontractor recognizes that in the performance of the Work, Subcontractor will be required to work side by side with other Subcontractors on the Job Site, who may or may not be signatory to collective bargaining agreements with labor organizations. Contractor reserves the right to establish a "two gate" system (union trades and non-union trades) at any time during the course of construction on the Job Site. In the event a two-gate system is established, it shall be the affirmative obligation of Subcontractor as a material consideration of this Subcontract to ensure that its employees and suppliers use only the gate or entry way designated by Contractor. Subcontractor agrees to cooperate fully with Contractor and Contractor's representatives and attorneys with respect to any labor dispute that should arise on the Job Site, including, without limitation, giving testimony and evidence to an agent or judge of the National Labor Relations Board. Subcontractor shall not be relieved of Subcontractor's obligations to supply sufficient, properly skilled workers to perform the Work without delay or interruption as a result of any labor dispute or grievance, whether between Subcontractor and its employees, or between any other employers and employees on the Project. Subcontractor represents and warrants that Subcontractor is not delinquent in making payments or reports to any union fringe benefit trust fund and that Subcontractor does not appear on any delinquency list published by any union fringe benefit trust fund. In the event Subcontractor becomes delinquent in such payment, or appears on any such delinquency list, such event shall be deemed to be a material default under this Subcontract, thereby entitling Contractor to exercise any rights and remedies available to it under this Contract. Subcontractor agrees to defend, indemnify and hold Construction Manager and Contractor harmless from claims, demands and liability for union fringe benefit trust fund obligations arising out of Subcontractor's Work on the Project.

**43. MISCELLANEOUS.**

(a) Rights; Cumulative. All rights, options and remedies of Contractor contained in this Subcontract shall be construed and held to be cumulative, and no one of them shall be exclusive of

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

[3668742/2]

the other, and Contractor shall have the right to pursue any one or all of such remedies, in addition to any other remedies as may be provided by law, whether or not stated in this Subcontract.

(b) <u>Notices</u>. Notices, requests and other communications hereunder shall be effective when received, but if sent by registered or certified mail, postage prepaid, shall be deemed effective and received five (5) business days after being deposited in the United States mail.

Notices hereunder and all correspondence in connection herewith should be addressed to the parties at the locations set forth herein. The parties hereto may change their addresses by giving written notice thereof to one another.

(c) <u>Waiver</u>. No express waiver by Contractor of a breach of any of the terms, covenants or conditions of this Subcontract by Subcontractor shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition herein contained. No waiver of any default of Subcontractor hereunder shall be implied from any omission by Contractor to take any action on account of such default, even if such default persists or is repeated, and no express waiver shall waive or affect a default other than as specified in said waiver. The consent or approval by Contractor to or of any act by Subcontractor requiring Contractor's consent or approval shall not be deemed to waive or render unnecessary Contractor's consent or approval to or of any subsequent similar act by Subcontractor.

(d) <u>Attorneys' Fees</u>. In the event either Contractor or Subcontractor brings an action or proceeding, by way of complaint, cross-complaint, counterclaim or otherwise, or institutes an arbitration or judicial referee proceeding hereunder against the other party, or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the party which prevails in such action, proceeding or arbitration shall be entitled to recover from the other its reasonable attorneys' fees, which shall be determined by the court, arbitrator or referee and included in the judgment in such action or proceeding or in the arbitrator's or referee's award. Should Contractor intend to engage legal counsel to pursue any claim or demand which could result in recovery for Subcontractor, Contractor, may notify Subcontractor thereof. After such notice, Subcontractor shall have the following options:

(i) engage Subcontractor's own legal counsel at Subcontractor's expense to represent Subcontractor's interest either in conjunction with or separate from Contractor; or

(ii) share in Contractor's expenses, including attorneys' fees, and share in any recovery, both upon an agreed basis. Should Subcontractor fail to notify Contractor of Subcontractor's exercise of either of the above options, Contractor shall have no obligation to pursue any claim or demand on behalf of Subcontractor.

(e) <u>Binding Effect</u>. Each and all of the covenants and conditions of this Subcontract shall insure to the benefit and shall be binding upon the successors in interest of Contractor and subject to the restrictions upon assignment herein, the successors and assigns of Subcontractor.

(f) <u>Severability</u>. In the event any of the provisions of this Subcontract shall be held to be invalid and unenforceable, the remaining provisions shall be valid and binding upon the parties.

(g) <u>Entire Agreement</u>. This Subcontract contains the entire agreement between the parties respecting the subject matter of this Subcontract and supersedes all prior understandings and agreements, whether oral or in writing, between the parties respecting the subject matter of this Subcontract.

(h) <u>Amendment</u>. This Subcontract may not be amended except by a written document referencing this Subcontract and signed by the parties hereto.

(i) <u>Headings</u>. Headings in this Subcontract are inserted for convenience only and shall not affect the meaning or interpretation of this Subcontract or any provision hereof.

(j) <u>Governing Law</u>. This Subcontract shall be construed in accordance with and governed by the laws of the State of the location of the Project.

(k) <u>Owner</u>. Owner shall be deemed a third-party beneficiary of this Subcontract, and all terms of this Subcontract shall benefit Owner as if Owner was a party to this Subcontract.

(l) <u>Controlling Document</u>. In the event of any conflict between the terms of this Subcontract and the terms of any other agreement or document (including, without limitation, the attachments hereto and the other Contract Documents) relating to the subject matter hereof, the terms of this Subcontract shall control and prevail unless the conflicting agreement or document is signed by the parties hereto and expressly (by reference) modifies or amends a specified term of this Subcontract.

(m) <u>Confidentiality</u>. This Subcontract and all related information, discussion, working papers, memoranda, drafts and final reports, and related materials are strictly confidential and shall not be used or discussed by Subcontractor in any manner outside of Contractor's presence without Contractor's prior approval. However, discussions between Subcontractor and Subcontractor's employees about the Work shall not be a breach of this provision.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

"CONTRACTOR"                                    "SUBCONTRACTOR"

**RISE GENERAL CONTRACTORS, LLC**

Print Name: ___Earl Childs_____        Print Name: ___Oliver D. Fernandez Jr._____

Title:     ___Director of Construction_____        Title:     ___Owner/ Member_____

Signature: DocuSigned by:                            Signature: DocuSigned by:
           *Earl Childs*                                        *Oliver D. Fernandez Jr.*
           C7B63DB6ABBA409...                                   E3C6EBDB38A0467...

Date:      3/4/2022                                Date:      3/3/2022

IN WITNESS WHEREOF, this Subcontract shall be effective as of the date and year first referenced above

[3668742/2]

## EXHIBIT "A":
## SCOPE OF WORK / GENERAL REQUIREMENTS

## 1   SCOPE OF WORK:

Furnish all labor, materials, permits, equipment, supervision, services, labor taxes, material taxes, insurance, licenses, and any other related costs necessary for the complete execution of ***Land Clearing, Grading, Surveying, Underground Utility Work, Concrete Curbs, Sidewalks, Asphalt Paving, Parking Lot Signage and Striping,*** all in its entirety and strict accordance with the Contract Documents enumerated in Exhibit "J" to this Agreement, and strict compliance with the requirements of all Federal, State and Local governing authorities. This Subcontract is also to be inclusive of, but not limited to, the following items:

**THE PROJECT:**

- (222) Town House Units
- Building Type A - with 8 units, 13 ea.
- Building Type B - with 8 units, 14 ea.
- Building Type C - with 6 units,   1 ea.
- Building types A, B and C = Total of 222 units
- Maintenance Building
- Trash Compactor Building
- Lift Station and Force Main
- Clubhouse-Leasing Office
- Pool, Playground & Amenities Area
- Monument Sign
- Mail Kiosk

**SPECIAL PROVISIONS:**

- A payment and performance bond is required on this scope of work. All parties hereby agree that Subcontractor shall furnish performance and payment bonds for the entire amount of this agreement. The premiums for these bonds have been included in this agreement amount, and no additional consideration is required. Bonds shall be in place prior to any work being performed on-site or any monies being distributed. Bond will be listed as a separate line item within this Subcontractor's schedule of values. The bond must be presented within two weeks of contract signing. This payment and performance bond is required to have Dual Obligee's with RISE General Contractors, LLC. listed as the Obligee and the Owner as listed on page one of this agreement as the Dual Obligee.

  *A Dual / Multiple Obligee Rider is required:*
  **OBLIGEE:**
  RISE General Contractors, LLC
  10161 Centurion Parkway N
  Jacksonville, FL 32256
  **DUAL OBLIGEE:**
  Citrus Ridge Properties II, LLC – Project Owner/Borrower
  129 N Patterson Street
  Valdosta, GA 31601
  **LENDER:**
  IberiaBank, ISAOA, ATIMA – Lender
  200 West Congress Street
  Lafayette, LA 70501



- **FTP PROVISIONS – All project documents are filed and maintained on PROCORE. RISE General Contractors, LLC preferred document management system. An invitation link and user instructions will be forwarded to you.**

  o This project will utilize Procore's (www.procore.com ) project management and collaboration system for all project documentation. Applicable team members of this Subcontractor will be invited to and are required to create a Procore username (email) and password if they do not already have one. This Subcontractor will be expected to obtain drawings, sketches, RFIs, meeting minutes, coordination drawings, change information, etc. via this application. Contractor will notify subcontractors as relevant items are added. It will be the responsibility of this Subcontractor to regularly check and review updated documents as they are added. Applicable team members of this Subcontractor are required to complete a free, one-hour subcontractor training certification course located at http://learn.procore.com/procore-certification-subcontractor

  within (2) two weeks following contract execution. There will be no cost to this Subcontractor for use of Procore.

  o It is recommended that this Subcontractor provide mobile iOS or Android devices with the Procore App installed to at least one individual on-site to provide real-time access to current posted drawings, specifications, RFIs, submittals, project documents, as well as any deficient observations or punch list items. Providing mobile access will improve communication, efficiency, and productivity for all parties.

- All parties hereby agree Subcontractor shall furnish and install all approved materials required for the Owner Mock-up, as it relates to this scope of work. The purpose of the Mock-up is to demonstrate Subcontractor means and methods of Subcontractor scope of work. Subcontractor agrees that the mock-up may require additional / separate mobilizations. Mock-up completion may also involve rework by this Subcontractor or others at no additional cost to Contractor.

## START OF WORK:

- The Project's workflow shall be continuous and non-stop until all work is completed.

- The Sequence of Work shall be:

  o MOBILIZATION/DEMOBILIZATION/IN-HOUSE SET UPS

  o TEMPORARY CONSTRUCTION ENTRANCE

  o NPDES MONITORING AND REPORTING

  o SILT FENCE

  o TREE REMOVAL (OPEN BURN ON-SITE)

  o REMOVE TOPSOIL AND BEGIN EARTHWORKS OPERATIONS DEDICATED TO PHASE 1 AND CLUBHOUSE WHERE AT ALL POSSIBLE.

  o CUT RETENTION PONDS TO GRADE TO ENABLE MODULAR BLOCK WALL TO BE INSTALLED.

  o INSTALL STORM, SEWER, WATER, FIRE HYDRANTS AND RECLAIMED WATER TO REMAINDER OF PHASES. (THIS SEQUENCING NEEDS TO BE AGREED UPON BY RISE AND MCKENZIE IN ORDER TO FACILITATE GETTING FORCE MAIN FUNCTIONAL BEFORE TURN OF 1ST PHASE).

  o AS REQUIRED BY THIS SPECIFIC SCOPE OF WORK

- As coordinated and directed by Contractor's Project Management Team.

- **Contractor's Project Superintendent**

  o **Director of Construction: Earl Childs,** earl.childs@risere.com cell: (425) 892-4048

  o **Project Manager: Larry Murphy,** larry.murphy@risere.com cell: (281) 386-2597

  o **Asst. Project Manager: Shawn Ruffner,** *shawn.ruffner@risere.com* cell: *(352) 340-9887*

  o **Senior Superintendent: *Kevin Foster,*** *kevin.foster@risere.com; cell: (305) 331-1705*

  o **Assistant Superintendent: TBD**

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

**SCOPE OF WORK PROVISIONS: DO NOT CHANGE ITEMS IN THIS SECTION!**

1) Prior to mobilizing, the Subcontractor's designated Superintendent, who is familiar with the plans and specification, shall attend a preconstruction, scope review conference with the Contractor's Superintendent to review the Contract Documents and to ensure that materials, samples, equipment, safety, coordination, etc. conform to the Contract Documents. Any delays in start of construction caused by Subcontractor's failure to attend the meetings or be prepared shall be the responsibility of the Subcontractor.

2) Subcontractor will provide one (1) complete set of electronic submittals / shop drawing Subdivided in a logical manner and agreed to by Contractor for submittal to the Architect/Engineer of Record for this scope of work within ten (10) days of receipt of this Contract. Subcontractor agrees that no time extensions will be allowed due to Subcontractor not providing Contractor with complete and accurate submittals, in a timely manner. All copies of product data will be in the form of manufacturer's catalog sheets, showing illustrated cuts of the items to be furnished, scaled details, sizes, dimensions, performance characteristics, capacities, wiring diagrams and controls. Subcontractor acknowledges that the Contractor's and Architect's/Engineer's review and approval of Subcontractor's submittals does not relieve Subcontractor from any obligations to construct this scope of work in accordance with the Contract Documents. Any product substitutions will be submitted on a separate Substitution Request submittal. Subcontractor will provide all information required by Architect/Engineer to complete their review.

3) Subcontractor agrees to notify the Contractor's onsite management team of his presence and amount of work force, immediately upon arrival on-site, each day. This shall also be part of the Subcontractor's Safety protocol.

4) Subcontractor is to take necessary steps to avoid tracking of mud onto public roads, especially Citrus Ridge Dr and US 27 Blvd. If Subcontractor's vehicles track out due to failure on the part of Subcontractor, this Subcontractor shall be responsible for immediately cleaning the road.

5) All parties hereby agree that the trees on the jobsite are of extreme importance to the value of the property. All parties further agree that Subcontractor shall be fully liable for any damage caused to these trees by this Subcontractor including, but not limited to, consequential damages resulting therefrom.

6) Contractor may provide, in locations determined to be appropriate for the project, temporary electrical, temporary water and temporary toilet services. Further, Subcontractor shall make use of the services as provided. However, the inability of Subcontractor to make use of the services as provided or the temporary unavailability of services, shall not release Subcontractor's obligation to complete the work included in this Subcontract Agreement, on schedule, or by supplying at Subcontractor's own expense any additional utilities or services it may require to perform its scope of work in accordance with the project schedule

7) Contractor may furnish a designated area for a laydown, (not guaranteed) which Subcontractor may utilize for the storage of their materials. Subcontractor shall be responsible for storage containers, racks, or other storage facilities within the provided laydown area. Subcontractor will keep the designated laydown area clean and organized. Subcontractor will not store material in building other than what can be used in *one (1) week*. No material will be stored outside of the designated area without written approval of the Contractor's project Superintendent.

8) Subcontractor must notify in advance of any intentions to store materials on site. Contractor, Owner and Lender must approve all these requests in advance. Stored materials and or the payment thereof, if approved, shall not exceed the amount of materials that will be installed within *forty-five (45) days*. Payment to Subcontractor for stored materials is for the Subcontractor's convenience and shall not create any liability to Contractor for storage, protection, etc. Value of stored materials will be supported with copies of material suppliers/manufacturers invoices or Bill of Sale.

9) Subcontractor is to relocate / remove this Subcontractor's storage trailers, and containers on project site as directed by Contractor within (48 hours) of notice at no additional cost.

10) Subcontractor shall coordinate all major equipment and material deliveries in advance with Contractor's Project Management Team.

11) Subcontractor agrees no concrete or pump trucks will impede Citrus Ridge and US 27. at any time. Subcontractor will be responsible for any traffic infractions or citations incurred as a result.

12) If at any time the construction entrance must be closed off due to this Subcontractor's work, Subcontractor will coordinate a mutually-agreed-upon plan with Contractor's Superintendent. At no time will Subcontractor block construction entrances with equipment of an overnight nature. At least one passable lane throughout the project must always be maintained and kept open for emergency vehicle access.

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

13) ...Subcontractor shall provide all excavation, trenching, shoring, sloping, and backfill as required for Subcontractor's work. Subcontractor shall remove spoils to a central location on site (outside of the building footprint) as directed by Contractor.

14) All parties hereby agree Subcontractor has reviewed all Geotechnical Engineering reports included in this Subcontract Agreement.

15) Subcontract shall provide all core-drilling, saw cutting, GPR and X-ray surveys, and design review fees as required by the Structural Engineer of Record for any items misplaced by this Subcontractor.

16) Subcontractor shall submit an itemized Schedule of Values, for Contractor's approval, with sufficient values for separate work items on a phased basis. Subcontractor agrees that no application for payment may be made for areas of work that are not complete, including appropriate punch list items, if applicable, per the Schedule of Values. Subcontractor shall submit his monthly draw request on or before the *twentieth (20th)* of the month.

17) All work performed on this project shall be in accordance with the Contract Documents including all specifications, notes, details, schedules ("Construction Details") on all pages. Subcontractor agrees, where multiple details or conflicts in the Contract Documents are existent, then the more stringent application is included in this agreement. Any alternates or substitutions must be approved in writing by the design team, Contractor and Owner in order to be incorporated into the project.

18) Subcontractor shall use "Good Construction Practice" in the execution of Subcontractor's Work, and that any miscellaneous and or incidental items required to effectively complete this scope of work whether referenced or not, in this scope of work or on the Contract Documents, are included.

19) Subcontractor shall employ a competent English-fluent superintendent and necessary assistants all approved by Contractor who shall be in attendance at the project site full-time during the progress of the work included in this Subcontract Agreement.

20) Multiple mobilizations will be required to complete this scope of work. Subcontractor agrees that all mobilizations required are included in this Subcontract Agreement. Subcontractor further acknowledges that certain portions of his work may be sporadic in nature and that in no event shall Contractor be held responsible or penalized for any delays.

21) RFIs (request for information) shall be submitted and answered via email / Procore. It is the Subcontractor's responsibility to notify the Contractor within *seven (7) days* of issued response if there are impacts to Subcontractor Scope of work. Contractor shall provide update to contract documents electronically. It is the responsibility of the Subcontractor to review each item sent by Contractor for impact related to your scope of work. RFI and other construction documents shall be allotted *seven (7) days* to note and submit any cost or schedule adjustments impact. It is this Subcontractor's responsibility to verify this Subcontractor is working from the most current set of documents, with all revisions.

22) Subcontractor shall inspect all buildings or areas prior to placing its work, for dimension and conformity with the Contract Documents. Any conflicts or discrepancies or required field modifications shall immediately be brought to the attention of Contractor's Project Management Team (in writing). Placement of materials prior to notifying Contractor's Project Management Team in writing constitutes acceptance of prior work, completed by others, and subsequent rework or replacement shall be the responsibility of this Subcontractor.

23) Changes to the contract may only be authorized by the Contractor's authorized representative. All requests for an "Authorization for Extra Work and Change Order." must be presented to the Contractor in writing prior to starting extra work, with sufficient back up supporting Subcontractor request. No extra work shall be executed or paid without a fully executed Change Order modifying Subcontract agreement.

24) Contractor will not act as a broker for charges by one Subcontractor against another. Do not invoice RISE General Contractors, LLC. for work, which you have performed for another party. Invoices received, which are of this nature, will be returned unpaid.

25) A Mandatory *Look-Ahead Meeting* will be held every *two (2) weeks*, the time and date to be determined by the Contractor's Project Manager. The *Look-Ahead Meeting* purpose is to review the projects progress, schedule, logistics, etc. The *Look-Ahead Schedule* is what will be followed by all Subcontractors. All Subcontractor/Vendor Project Managers, Foremen, Superintendents are required to attend the *Look-Ahead Meeting* to ensure Project Schedule adherence. Subcontractor shall adhere to all requirements indicated shall and provide and maintain adequate manpower to prevent delays. When a Subcontractor fails to maintain the schedule, it is the Subcontractor's responsibility to develop their own plan of how they will get back into compliance with the OPS prior to the next *Look-Ahead Meeting*. Failure to maintain the schedule for *ten (10) workdays* will require an officer of the company to attend the next meeting. Subcontractor shall always provide a competent person while the Subcontractor is working on site, who will attend and be present at the *Daily* and/or *Weekly* morning

Progress Meetings, to discuss project scheduling and give notice to any issues or lead time of materials. Meeting time, date and frequency shall be determined by the Contractor's onsite Superintendent.

26) Subcontractor shall not use chalk lines, concrete nails, chipping, or other activity that may cause damage to the concrete slab of amenities, leasing office, fitness, or areas noted to receive stain or sealed concrete finish or any other exposed finishes.

27) Subcontractor is responsible for their field crews to refrain from any type of music source playing onsite (i.e., No music speaker, no Bluetooth speakers, headphones, etc.). Listening to music may produce a safety hazard by masking environmental sounds that need to be heard.

28) Subcontractor shall provide its own task lighting for Subcontractor's work.

29) Subcontractor's foreman shall inspect work and complete Subcontractor's own pre-punch list prior to Contractor's punch walk. Subcontractor shall complete all punch list items pertaining to this Subcontractors scope as directed by Contractor. The Subcontractor shall commence with the timely correction of all punch list items within (24 hours) and agrees that the punch crew shall be of sufficient size as requested by Contractor, to complete said work within (24 hours). Subcontractor's punch out crew shall be independent from production crews, but if / when required by Contractor, production workers shall fall back to remedy such punch out that is required to maintain Contractor's schedule.

30) Subcontractor shall be responsible for policing his work and correcting deficiencies prior to Contractor or Owner punch lists being generated. Subcontractor may be required to provide one (1) or more qualified employees to walk the final punch list with the Contractor and Owner. This employee will need to have the proper materials and tools on hand to fix, repair, or touch-up minor items found during the Owner's walk.

31) All parties hereby agree Subcontractor shall provide close-out documentation required by the Contract Documents including but not limited to warranties, guarantees, as-built drawings, operation and maintenance manuals, model numbers and serial numbers for all fixtures/equipment etc. shall be submitted within *thirty (30)* days of completion of work or within *thirty (30)* days prior to Substantial Completion, whichever occurs first. Model numbers and serial numbers shall be submitted to Contractor's representative on a unit-by-unit basis prior to Contractor's final punch list.

32) Subcontract Change Order Requests shall include a maximum 10% Overhead & Profit, unless otherwise governed by Prime Contract.

**PROJECT SPECIFIC SCOPE OF WORK:**

1) All parties hereby agree this is a 'turn-key' sitework and utility package, which includes but is not limited to, all approved plans, specs, shop drawings, current local and state building codes and professional "trade-specific knowledge".

2) All parties hereby agree that scope of work includes the "existing infrastructure" which is not existing currently in the approved site plans, drawing C08.0 and C09.0 indicate that there is, at Pond 1 (North).

3) All parties hereby agree that Subcontractor shall be responsible for locating and protecting all existing utility services on the project site and notifying and coordinating with all local utilities for removal, relocation, and repair prior to commencement of work. Further, all parties agree that Subcontractor shall be responsible for repairs of any existing utilities or structures damaged by Subcontractor's operations at no additional cost to the Owner or Contractor. It is understood that the locations of existing utilities shown on the Contract Documents are approximate. To safeguard existing utilities the contractor shall furnish any special equipment required to work in the neighborhood of the utilities. It is understood that Owner will be responsible for all relocation fees and providing approved Construction Documents from local utility providers.

4) All parties hereby agree that prior to commencing any excavation, Subcontractor will locate and identify nearest utility shutoff for all water lines adjacent to the site.

5) All parties hereby agree that Subcontractor acknowledges that the tracking of mud and dirt onto adjacent pavement and other properties may be a problem. In the event this becomes a problem on this project, it will be the Subcontractor's responsibility to have a construction entrance with a gravel apron at each site entry and make arrangements for wash down of Subcontractor's vehicles or equipment in order to prevent mud and dirt from being carried off-site and onto existing streets. Further, it shall be the Subcontractor's responsibility for removal and/or sweeping as required to remove said mud and dirt from adjacent pavement or other properties and returning them to their original condition as required by Subcontractor's own equipment and labor pertains to this Subcontractor's scope of work.

6) All parties hereby agree that in the event dust becomes a problem or a nuisance to the public, or neighbors,

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

and to other work being performed on or near the site, Subcontractor shall implement SWPPP best practice measures immediately to prevent dust problems if this is caused by their portion of the work.

7) All parties hereby agree that Subcontractor to verify topo prior to commencement of construction.

8) It is this Subcontractor's responsibility to maintain their site survey coordination's (e.g., GPS, CADD files). All changes made will include changes to the GPS.

9) All parties hereby agree that Subcontractor shall follow all procedures/recommendations as per Geotechnical Exploration Report or by the project onsite Geotechnical Consultant as required by Contract Documents and authorities having jurisdiction if more stringent requirements are necessary. This shall include but not limited to the *"Site Preparation" recommendations and "Compaction" requirements*.

10) Geotechnical Consultant shall be provided by Contractor. Coordination of testing by Geotechnical Consultant will be the responsibility of the Subcontractor through the Contractor's Jobsite Management Team.

11) All parties hereby agree that Subcontractor is responsible for any hand compacted backfilling operations that may be required to install this scope of work.

12) All parties hereby agree that if water is encountered while trenching, the water should be filtered to remove any sediment before being pumped back into any drainage systems and in accordance with *ESC* standard for sediment and erosion control measures.

13) All parties hereby agree that all notes in the Contract Documents *Civil Sheets* that reference "Contractor" shall mean this Subcontractor unless stated otherwise or defined in this agreement.

14) All parties herby agree that Subcontractor shall be responsible for the immediate replacement of any Erosion Control measure or devices, barricades, fences, etc. that are damaged by or removed for temporary access by this Subcontractor's vehicles and/or equipment. This shall include this Subcontractor's Supplier/Vendor(s).

15) All parties hereby agree that Subcontractor shall provide all traffic control signage as indicated as indicated on Contract Documents, *Civil Sheets 15 "Signing and Pavement Marking Plan"*, *FDOT* and governing authorities. This shall include any additional traffic control signage as needed to keep the entrances into this project site safe for passing motorists and persons entering or leaving the site. It is hereby agreed it is the responsibility of this Subcontractor to generate and submit any Site-Specific MOT Plan required for this Subcontractor's scope of work.

16) All parties hereby agree that Subcontractor shall be responsible for coordinating and directing all haul in and haul out trucks and assuring that the adjacent properties, businesses, and tenants are not harmed, inconvenienced, or damaged. All parties herby agree that the *General Building Permits* shall be furnished by others; however, Subcontractor shall be required to provide specialized permits and licenses as required by governing authorities as required to complete scopes listed in this Subcontract Agreement. This shall include but limited to permits for DOT or ROW, State, county, and city, etc.

17) All parties hereby agree that Subcontractor will comply with the phasing plans for the project and complete / commission sitework and utilities so certificates of occupancy can be achieved in accordance with the Contractor's schedule. Subcontractor shall follow the construction sequence as directed by Contractor's Project Management Team.

18) All cutting and patching of sidewalks, curbing, and paving (asphalt or concrete) required for this scope of work is included.

19) All parties hereby agree that Subcontractor shall repair or replace any damaged pavement, curb and gutter, or sidewalk damaged by this Subcontractor's activities.

20) All parties hereby agree that Subcontractor shall provide mechanical tamping at all trench excavations during backfilling operations from the bottom to the top until proper compaction has been reached. Further, this shall be accomplished under the direction and approval of Contractor and Geotechnical Consultant.

21) All parties hereby agree that Subcontractor shall furnish and install all usable backfill material when material excavated from utility trenches is not acceptable as backfill material. Acceptable backfill materials will be garnered achieved from onsite activities.

22) All parties hereby agree that at the direction of Contractor, Subcontractor shall gather and incorporate into the work all residual material remaining as a result of the installation of utilities, at no additional cost to Contractor.

23) All parties hereby agree that this Subcontractor shall be specifically bound by all notes and details shown or illustrated ("Construction Details") of the Contract Documents, *City of Davenport, FL Utilities Standards, and City of Davenport, FL Utilities "Plan Review" comments*. All materials must comply with current *City of*

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

DocuSign Envelope ID: 6AB46B49-CA54-4F3A-9F21-8C113BCA3034

*Davenport, FL Utilities Standards* Subcontractor shall coordinate and schedule all required pre-installation meetings, pre-installation inspections and approvals prior to commencing utility work, including but not limited to Sanitary, Storm, and Domestic Water and Fire Line services.

24) All parties hereby agree that Subcontractor has provided provisions for all dewatering measures or activities associate with this Subcontract Agreement. This shall include, but not limited to, de-watering equipment, pumping, permitting, and any required downstream protection. Subcontractor will provide sound abatement or quiet pumps if required for overnight use. All turbidity discharge shall be contained, filtered, and conveyed to the outfall in a manner which prevents erosion and transportation of suspended solids to the receiving outfall. In short Subcontractor shall provide sediment and erosion control measures in strict compliance of Contract Documents, *Southwest Florida Water Management District (SFWMD)* standards.

25) All parties hereby agree Subcontractor shall provide site specific Trench Safety Plan and comply with all provisions of the Trench Safety Act and OSHA standards. Subcontractor shall provide safety plan to Contractor prior to any excavations.

26) All parties hereby agree Subcontractor shall participate in composite clean-up efforts, if required, as applicable and while mobilized.

27) Retainage will be held on materials unless materials are specifically quantified and values listed separately in the Subcontractor's Schedule of Values.

28) The above Project Specific Scope of Work portion of this subcontract agreement is applicable for each section listed below.

## SURVEYING

1) All parties herby agree that Subcontractor shall provide all necessary surveying required for the proper layout of their entire Scope of Work as outlined in this Agreement, including all required as-builts and certifications. Contractor shall supply property corners and a benchmark.

2) All parties hereby agree that Subcontractor is responsible for all necessary "construction staking" to install the scope of work included in this Subcontract Agreement and the cost of same is included herein.

## EROSION CONTROL, SITE CLEARING, GRADING AND GRUBBING

1) All parties hereby agree that Subcontractor shall be responsible for furnishing and maintaining all sediment and sediment and erosion control measures and tree protection systems per Contract Documents, *Southwest Florida Water Management District* (*SFWMD*) or governing authority. This shall include but not limited to installation, maintenance, monitoring and removal of all sediment erosion control measures: e.g., sediment barriers, turbidity controls, coir bale drop inlet sediment filter, gravel and wire inlet sediment filters, filter barriers, silt fence, coir bale barrier, detention ponds, tree protection fencing, seeding, or required sod along slopes of stormwater management facility, etc. All disturbed areas shall be cleaned, graded, and stabilized by temporary grassing or seed/straw as required immediately after the utility or slope installation. Grassing will be in strict accordance with governing authorities minimum grassing specifications.

2) All parties hereby agree Subcontractor shall perform NPDES monitoring and reporting for the duration of Project. Subcontractor shall be present and take a lead role in any NPDES or erosion control inspections on the jobsite. Includes daily observation and maintenance of all erosion control measures while on site and continue to assist Contractor as required.

3) All parties hereby agree that it shall be the Subcontractor's responsibility for the installation and maintenance of the required construction entrance area per the Contract Documents and governing authorities. This responsibility will remain in effect from the time that clearing begins, until the Subcontractor's work is substantially complete. It is understood this requirement pertains to this Subcontractor's scope of work. If another contractor damages the construction entrance so that it must be repaired, the Subcontractor would be due compensation. Subcontractor shall repair construction entrance on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

4) All parties hereby agree that Subcontractor shall furnish and install all initial, intermediate, and final sediment and erosion control measures contained or listed in the Contract Documents. This shall be construed as taking the jobsite from present condition (at start) and handling all sediment and erosion control measures until the job is ready to be permanently landscaped and therefore stabilized (permanent landscaping is of course by others).

5) Any fines or penalties resulting from incorrect, improper, failed, poorly maintained, or otherwise poor sediment and erosion control measures shall be the sole responsibility of the Subcontractor. Although the

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

Case 3:24-cv-00602-MMH-PDB   Document 13   Filed 06/20/24   Page 119 of 185 PageID 294

Subcontractor shall be responsible for normal upkeep for the sediment and erosion control measures, the Subcontractor is not responsible for damage to their sediment and erosion control measures caused by the negligence of others. If another contractor damages the sediment and erosion control measures so they must be replaced, the Subcontractor may be due compensation. If damages are determined due to negligence of another subcontractor so that it must be repaired, this Subcontractor may due compensation. Subcontractor shall repair areas on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

6) Due to grade changes during the site development of the project, the Subcontractor shall be responsible for adjusting the sediment and erosion control measures (silt fences, filter barriers, seeding, etc.) if required, to prevent erosion at no additional cost to Contractor.

7) All parties hereby agree that temporary diversion berms and/or ditches will be provided during construction to protect work areas from upslope runoff and/or to divert sediment laden water to appropriate traps or stable outlets and such areas shall be maintained throughout all phases of construction.

8) All parties hereby agree that Subcontractor shall sweep the existing/new streets as required to assure compliance with all Contract Documents and authorities having jurisdiction. Subcontractor has the sole responsibility to keep the roads and parking lots free of tracked mud, dirt, debris, gravel, or other material which could cause safety concerns or violations, and in compliance with governing authorities. This responsibility will remain in effect from the time that clearing begins, until the Subcontractor's work is substantially complete.

9) All parties hereby agree that Subcontractor shall perform all clearing and grubbing of all roadways, parking, and drainage and utility corridors and easements complete, as necessary to facilitate and complete construction as shown on the Contract Documents.

10) All parties hereby agree that Subcontractor shall submit "burn permit" to Contractor's Project Management Team, when applicable. Further, if a "burn permit" cannot be obtained from Governing Authorities then Subcontractor shall accomplish the completion of the project at no additional cost to Contractor.

11) All parties hereby agree that the Subcontractor shall remove any additional trees in their entirety as required by the Contract Documents.

12) All parties hereby agree that Subcontractor is responsible for disposal of any trees, brush, debris and any other matter which is in the clearing limits.

13) Construct embankments, perform dewatering and temporary water control including making provisions to control surface waters during construction in accordance with all permits, compact usable fill material; spread, compact and grade to lines, slopes and grades shown on the Contract Documents; and provide overall grading within and outside the roadways as shown on the Contract Documents; excavate temporary ditches for dewatering, if required, clear and grade electric utility transformer pad locations and clean-up of Subcontractor's debris as required throughout the project.

14) All parties hereby agree that Subcontractor shall strip existing topsoil and fill site as necessary to achieve final grades. This topsoil will be re-spread and fine graded to within plus or minus one-tenth of a foot by Subcontractor. Subcontractor will dress excess topsoil to the satisfaction of the Authority Having Jurisdiction. Additional topsoil not used will be removed from the project site by the Subcontractor and is included in the Subcontract Agreement. Bare ground areas are to be minimized during construction.

15) All parties hereby agree that grading of the project shall be completed in its entirety by the Subcontractor. This shall include but not limited to all fill and building pads in place as required by Contract Documents. The Subcontractor shall complete grading of all roadways, parking, sidewalks, retention ponds, courtyards, dog walks, trash compactor, maintenance, drainage and utility corridors and easements complete, as necessary to facilitate and complete construction as specified and shown on the Contract Documents. All work shall be performed in strict accordance with Geotechnical Exploration Report and Authorities Having Jurisdiction.

16) Subcontractor recognizes that grading activities will be required on multiple phases for the project. The first instance being the rough grading of project site to second grading occurrence shall be performed just prior to the exterior scaffolding being installed. The intention is that the Subcontractor shall perform the second fine grading while their equipment is mobilized on site.

17) All parties hereby agree that Subcontractor shall provide final grades as indicated on the Contract Documents or as directed by Engineer of Record. Where no grade is indicated, Subcontractor shall shape the finished surface to drain away from buildings or structures as directed by. Minimal hand raking and finishing may be required in restricted areas and is included in this Subcontractor.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

building line itself. Excavated materials onsite (or hauled-in usable material) used in structural fill areas shall meet and placed per all requirements defined by Geotechnical Exploratory Report or Geotechnical Consultant recommendations. Subcontractor shall provide rough grading for the Dog Park +/- 1/10th.

19) All parties hereby agree that Subcontractor shall clear and excavate in a manner and sequence that would always provide drainage and temporary water runoff. This shall include positive drainage away from all buildings during project construction. Further, Subcontractor shall be responsible to back-blade and seal with rubber-tired roller areas of work at the end of each day and maintain proper water runoff over the entire site including the utilization of temporary diversion swales, or mechanical water pumping to immediately de-water problem areas including ponding and standing water at no additional cost to Contractor.

20) All parties agree that excavations must not be left open overnight and must be backfilled daily.

21) Provide necessary allowance for re-spread all excess spoils generated by footings/pits/pools excavation, plumbing trenching, and electrical utility trenching. Other subcontractors shall stockpile materials outside the building pads and away from utility structures at an agreeable location by both parties. If determined that this excess material cannot be utilized on the project site, it will be this Subcontractor's responsibility for hauling it to the designated spoil site. Any material haul-off associated with this item shall be on unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

22) All parties hereby agree that Subcontractor shall dispose of any excess dirt/fill material generated by this Subcontractor's scopes of work.

23) All parties hereby agree that the Subcontractor furnish and maintain specified construction storage areas, temporary parking and gravel work area grade and stabilize the parking areas where the Contractor will have their trailer complex. Subcontractor shall have loads of rock or gravel imported to this location, and the Subcontractor shall spread and roll stone prior to Contractor installing their trailers. During the course of the project, after the Contractor has de-mobilized their trailer complex, the Subcontractor shall grade and install any dirt, base and/or paving in this area and finalize construction.

24) All parties hereby agree that Subcontractor shall be responsible for coordinating with the other subcontractors that are performing work in overlapping areas at concurrent times within the public right-of-way unless otherwise directed by Contractor

25) All parties hereby agree that Subcontractor shall be responsible for the installation of any landscape berms as per Contract Documents (*Civil, Landscape, Hardscape sheets*)

26) All parties hereby agree that Subcontractor shall be responsible for providing proper elevation for road subgrades and stabilization of same. Further, all parties agree that Subcontractor shall be responsible for the maintenance of permanent and temporary roadways (with onsite materials) for project duration. Any damage caused by others will be corrected as directed Contractor. Any costs will be mutually agreed upon prior to commencement of repairs.

27) All parties hereby agree that Subcontractor shall proof roll the subgrade areas to receive paving and structures on fill in accordance with Geotechnical Exploration Reports.

28) All parties hereby agree that Subcontractor shall properly barricade open holes and depressions occurring as part of this Subcontract Agreement. Further, Subcontractor shall protect structures, utilities, sidewalks, curbs, pavements, and any other product from damage caused by settlement, lateral movement, wash outs, or any other problems created by the operations under this scope of work.

29) All parties hereby agree that Subcontractor shall be responsible for the holding and protection of any berms or any other areas even if it requires a complete remobilization to correct this work.

30) All parties hereby agree that Subcontractor assumes responsibility for balancing the site without adjusting the benchmark. Any excess or surplus material will be the responsibility of this Subcontractor to place on site, haul off, or haul in, as necessary.

31) All parties hereby agree that Subcontractor shall remove all construction debris and back fill with planting soil and temporary seed all areas as indicated on Contract Documents, Permanent plantings and grasses will be by others.

32) All parties hereby agree that Subcontractor shall specifically provide proper finished grades and slopes for this scope of work as they pertain to ADA accessible routes. Subcontractor shall immediately notify Contractor of any discrepancies.

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

replace undercut material with materials in accordance with Geotechnical Exploration Reports.

34) All parties hereby agree that any excess dirt or materials from utility installation or any other source from the Subcontractor's scope shall be utilized as fill removed from jobsite or disposed of as directed by Contractor.

35) All parties hereby agree that Subcontractor shall perform excavation of every type of material encountered and properly fill and compact all areas under building structures, roads and parking areas necessary for construction of the structures shown, conforming to the elevations and dimensions shown on Contract Documents. *Rock excavation is not anticipated according to the boring, therefore shall be excluded from this scope of work.*

36) All parties hereby agree that all excavation, tie-in, and complete restoration of all disturbed areas are included in this Subcontract Agreement.

37) All parties herby agree that the Contract Documents and Geotechnical Exploration Reports and *Site Assessments which noted irregularities and/or concern that possible contaminated soils may be present at the site.* Subcontractor shall perform remedial work as directed by Geotechnical Consultant on a unit cost basis as noted in *Unit Cost* section below. All scopes, quantities and cost shall be agreed upon prior to commencement of work.

    a) This work shall be performed under the direction of Contractor and the Geotechnical Consultant. Prior to removal of the unusable material, an agreement upon all costs associated with the removal shall be made with the Contractor. Subcontractor explicitly includes all special handling and proper disposal of hazardous compounds, including any required documentation or chain-of-custody paperwork. Any materials removed and replaced without approval will be the sole responsibility of the Subcontractor to bear all associated costs.

## SANITARY SEWER

1) All parties hereby agree that Subcontractor shall complete the Wastewater Pump Station Sewage System. Provide and install a complete turnkey system, including but not limited to connection to existing manholes, raising and/or lowering of existing manholes, all pipe, manholes, valves, DIP & PVC, cleanouts, service connections, dewatering, television and lamp testing, removal of unusable material and replacement (where required), backfilling and compacting with usable onsite material, all piping, catch basin and manholes to lines and grades as shown on Contract Documents is included in this Subcontract Agreement. Cleanup and the furnishing of redline "As- Built" drawings and warranty bonds as required.

2) All parties hereby agree that Subcontractor will furnish and install a complete Sanitary Sewer collection system as indicated on Contract Documents, *Civil Sheets 11.0, 11.1, 11.2, 11.3, 26.0, 27.2 "Master Utility Plan, Utility and Lift Station".*

3) All parties hereby agree that all Sewer laterals will be run to within *5- feet* of the buildings and properly terminated, protected, and identified for plumbing Subcontractor to make final connections.

4) All project sewer lines must comply with specifications required by *City of Davenport, FL Utilities* and authorities having jurisdiction.

5) All parties hereby agree that all required thrust blocks, concrete encasements around sanitary clean-outs, standard concrete collars, and concrete bases as required are included in this Subcontract Agreement in accordance with all notes and details on the Contract Documents and *City of Davenport, FL Utilities*.

6) All parties hereby agree that Subcontractor shall furnish Contractor with all required As-Builts, certified surveys of utilities, warranty bonds if required and final releases necessary to dedicate all utilities to governing authorities, if applicable, prior to completion of all contract work.

7) All parties hereby agree that any required clean-outs per plans and specifications are included in this Subcontract Agreement including end of service line as applicable.

8) All parties hereby agree that Subcontractor will furnish and install all pipe bedding, backfill, and compact all trenches in strict accordance with all Contract Documents and *City of Davenport, FL Utilities*.

9) All parties hereby agree that Subcontractor will field verify and adjust top elevation of proposed sanitary sewer manholes to match proposed finished grade of roadways, parking lot and/or landscaped areas.

10) All parties hereby agree that Contractor will only pay for a complete sewer system only after all positive test results have been achieved by Subcontractor, therefore 15% of SOV line items will be held until provided with positive test results.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

acceptance from governing authority are included in this Subcontract Agreement.

12) All parties agree that Subcontractor is responsible for all utility tie-ins downstream regardless of location downstream.

13) All parties hereby agree that Subcontractor shall furnish and install *8-inch property service line* and connection as indicated on *Civil Sheet 10.1 "Utility Plan"*.

14) All parties hereby agree that all utilities (water, sewer, storm) services to adjacent neighborhood of the project must always remain in service and proper notice will be given of any planned interruptions. In addition, all neighbors and Contractor's Project Management staff must be notified immediately of any unforeseen/emergency/accidental disruptions.

15) All parties hereby agree Subcontractor shall provide and install all temporary and permanent line plugs and caps as required for constructability purposes.

16) All parties hereby agree Subcontractor has included all temporary bypass lines, valves, and materials to provide all utility services, as necessary.

17) All utility licenses will be in place if required by local governing authorities prior to beginning installation of the utility systems.

18) All parties hereby agree that any required clean-outs per Contract Documents are included in this Subcontract Agreement. End of service line, if applicable. Installations of all sanitary sewer laterals are to local construction and specifications as the standards and guidelines. Subcontractor will be responsible for adjusting all sanitary sewer clean outs to finish grade.

## SITE DOMESTIC WATER DISTRIBUTION

1) All parties hereby agree that Subcontractor shall furnish and install a complete all "On-Site" and "Off-Site" Domestic Water Distribution System as indicated on Contract Document and per *City of Davenport, FL Utilities standards/details*. The shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide.

2) Subcontractor shall furnish all "As-Built" drawings warranty bonds and final releases necessary to dedicate all water lines to governing authorities, if applicable, prior to completion of all contract work.

3) All parties hereby agree that upon completion of installation of site water main, Subcontractor shall run all service laterals for each building, including dog park, trash compactor and maintenance as required for the project to within 5-feet of building service. locations. Cap service to dog park, trash compactor and maintenance building and mark end of service. This Subcontractor shall coordinate with plumbing subcontractor and provide excavation for building tie-ins of "site" water system with plumber's 'building' water system (to connect within 5-feet of the building).

4) Subcontractor has included installation of irrigation line as indicated on Contract Documents, *City of Davenport, FL Utilities* and *Landscape Sheet 102, 103 "Irrigation Plan"*. They shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide. Cap service and mark end of service line.

5) Subcontractor has included installation of Fire Protection Main and Fire Hydrant Lateral lines as indicated on Contract Documents, *City of Davenport, FL Utilities*, Civil Sheets and Fire Protection Sheets. This shall include but not limited to, including connections/taps to existing mains (tap & meter fees by others), backflow preventers, *City of Davenport, FL Utilities* water meter (Meter provided by *City of Davenport, FL Utilities*), all installation details for all work included at water meters service connection that the *City of Davenport, FL Utilities* does not provide.

6) All parties agree that Subcontractor shall provide all fire hydrants assemblies per Contract Documents, *City of Davenport, FL Utilities*, Fire Marshal, or governing authorities. Adjustment to hydrants and hydrant valve boxes may be necessary upon completion of installation of hard surfaces and paving activities necessary and included in this Subcontractor's scope of work.

7) All parties hereby agree Subcontractor shall mark all fire hydrants in accordance with and conforming to the standard colors required by Contract Documents, *City of Davenport, FL Utilities*, Fire Marshal, or governing

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

8) Subcontractor has included install of lateral line for each building fire protection system as per Contract Documents and governing authorities. This scope shall include but not limited to install of building 2-inch lateral stub up to 1-foot above finished floor with a hub in designated "Pump Room", termination point to be coordinated and identified with fire protection subcontractor. Subcontractor shall coordinate all inspections of underground services and ensure all assemblies meet all standards and approved by Fire Marshal and governing authorities.

9) All utility crossings shall be in accordance with separations crossing tables requirements indicated in Contract Documents, *City of Davenport, FL Utilities* and governing authorities.

10) All connections of onsite and offsite water are to be coordinated with the *City of Davenport, FL Utilities* and governing authorities for such and shall be Subcontractor's responsibility to coordination and receive approvals of all connections.

11) All parties hereby agree that Subcontractor will provide temporary water line at or near the construction trailer as required by Contractor.

12) Site water lines, fittings, service connections, meters, and backflows must comply to specifications as indicated by Contract Documents and *City of Davenport, FL Utilities*.

13) All parties hereby agree that all required backflow preventers and proper insulation are included in this Subcontract Agreement as shown on Contract Documents and in accordance with *City of Davenport, FL Utilities standards/details*.

14) All parties hereby agree that any required valves, valve assemblies, manifolds, valve boxes, and traffic bearing valve covers (if required) per plans and specifications are included in this Subcontract Agreement as per Contract Documents.

15) All parties hereby agree that all required flushing, sterilizing, pressure testing and chlorinating of new potable water piping and/or fire riser piping is included in this Subcontract Agreement. All test reports to be submitted to the Authority Having Jurisdiction, State Health Department (if required) and *City of Davenport, FL Utilities*. This shall be done in a timely manner to prevent delays in building hookups.

16) All parties hereby agree that Subcontractor shall leave a "valve key" on site at all times during the construction process.

17) All parties hereby agree that Contractor will only pay for a complete water transmission system only after all positive test results have been achieved by Subcontractor, therefore 15% of SOV line items will be held until provided with positive test results.

18) All parties hereby agree the Subcontractor shall protect all cleanouts, valve boxes and fire hydrants until such items or systems have been turned over and accepted by the Owner or local utility company or entities. Negligent work causing damage by others is considered a reimbursable cost to Subcontractor.

## STORM DRAINAGE SYSTEM

1) All parties hereby agree that Subcontractor shall furnish and install the Storm Drainage System Complete including but not limited to, inlets, catch basins, manholes, detention pond outlet structure, filtration boxes, raising and/or lowering of existing manholes, and storm pipe, pipes, mitered end sections, concrete flume, inlets and any other structures required to provide a complete turnkey storm drainage system. Subcontractor shall be responsible for backfilling in accordance with the Contract Documents and *City of Davenport, FL Utilities standards/details* and authorities having jurisdiction. This shall include but not limited to removal and replacement of unusable material in pipe trenches and/or under structures as needed to facilitate construction of the work.

2) All parties hereby agree that this Subcontractor will ensure all storm drainage outside the right of way has a minimum coverage per Contract Documents and *City of Davenport, FL Utilities*. Subcontractor to contact Contractor and engineer of record should an irregularity occur. Subcontractor shall install pipe to lines and grades shown on plans.

3) All parties hereby agree that Subcontractor acknowledges final acceptance of all storm drainage lines shall be based on final approval and acceptance by *City of Davenport, FL Utilities* and all Federal, State, and Local governing authorities over this project. Further, Subcontractor shall be responsible for ensure final acceptance by these authorities.

4) All parties hereby agree that all necessary de-watering, pumping, permitting, and downstream protection required to complete this scope of work is included in this Subcontract Agreement.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

structures upon completion of paving operations All parties hereby agree that Subcontractor shall properly barricade open holes and depressions occurring as part of its work. Subcontractor shall further protect structures and utilities from damage caused by settlement, lateral movement, washouts, and other problems created by its operations.

6) All parties hereby agree that Subcontractor has reviewed the site conditions and fully understands sequencing required to maintain temporary storm drainage and utility service to adjacent businesses while constructing new utility services and permanent stormwater pond, in accordance with Contract Documents and Civil Sheet 10.1 "Utility Plan".

7) All parties hereby agree that Subcontractor has included all *underdrain stub outs* as required by Contract Documents and per *General Notes on Civil Sheet 02.0 "General Construction Notes Plan"*.

## SIDEWALKS ADA RAMPS, CURB & GUTTER and/or CURBING

1) All parties hereby agree that it shall be the responsibility of Subcontractor to install all curb and gutter to the elevations, lines and grades as shown on Contract Documents and Authorities Having Jurisdiction. All types of curbing types indicated on Contract Documents are included in scope of work.

2) All parties hereby agree that Subcontractor shall install curb and gutter to all catch basins and make any final adjustments to said catch basins. Any such adjustments shall have the approval of Engineer of Record (EOR).

3) All parties hereby agree that curbing installation adjacent to handicapped ramps shall be installed in accordance with all Contract Documents and governing authority. This shall include but not limited to all detectable warnings, tactile surfaces, required colors and shapes etc. Subcontractor shall assure all curbs, walks and ramps comply with associated ADA and FHA requirements.

4) All parties hereby agree that Subcontractor shall furnish and install all required curb backfill. Further, Subcontractor shall be responsible for the fine grading of these backfilled areas as required to meet intent of Contract Documents.

5) All parties herby agree that Subcontractor shall furnish and install all "On-Site" and "ROW" concrete sidewalks as indicated on Contract Documents. This shall include but not limited to: turndown sidewalks concrete aprons, handicap ramps, required concrete steps, all aspects of a complete sidewalk package, all in their entirety and in strict accordance with the Contract Documents, FDOT and governing authorities. Subcontractor shall make sure that all sidewalks, ramps, and civil work comply with the Civil drawing details, ADA requirements, and governing authorities' requirements. Any items poured or constructed in non-compliance with the authorities having jurisdiction shall be replaced by the Subcontractor.

6) All parties hereby agree that all "On-Site" and "ROW" sidewalks finishes shall be finished in a manner acceptable by Contract Documents, FDOT and governing authorities. All parties hereby agree that all form materials shall be removed promptly, and concrete rubbed to present a uniform finish. Subcontractor shall furnish and install all expansion joint materials between sidewalks and curbs, and between sidewalks and other structures.

7) All parties hereby agree that all curbs, sidewalks and handicap ramps stone subbase or bedding materials required by Contract Documents and Authority Having Jurisdiction is included in this Subcontract Agreement.

8) All parties hereby agree that Subcontractor shall be responsible for all reinforcing or formwork required for this scope of work.

9) All parties hereby agree that any required concrete pumping is included in this Subcontract Agreement. This shall pertain directly to this Subcontractor's scope of work.

10) All parties hereby agree that Subcontractor shall always adhere to the specified Concrete Mix Design and the recommendations of the Geotechnical Consultant. Concrete mix designs to be approved thru the Submittal Process prior to any pours.

11) All parties hereby agree that Subcontractor shall protect fresh or recently placed concrete from extreme hot or cold temperatures and raining conditions. In addition, this Subcontractor shall properly protect and cure all freshly poured curb and gutter as directed by Contract Documents and Engineer of Record (EOR).

12) All parties hereby agree that Subcontractor shall repair or replace any chipped, honeycombed, or broken areas of curb and gutter failing to comply with Contract Requirements. This does not apply to areas excessively damaged or broken by other subcontractors.

13) All parties hereby agree that any patching material used by Subcontractor shall be submitted for approval by

14) All parties hereby agree that Subcontractor shall immediately notify Contractor of any modification to curbs, sidewalks or ramps that prohibit installation per Contract Documents.

15) All parties hereby agree that Subcontractor is to repair any "bird bath" areas as directed by Contractor and/or Engineer of Record (EOR).

16) All parties hereby agree that all sidewalks shall be placed on compacted fill and edges thickened as necessary to prevent any cracking along the edges or on corners. Included in this agreement, sidewalk and ramp assembly as indicated in Contract Documents.

17) All parties hereby agree that the Subcontractor includes any required saw-cuts or demolition to adjacent existing conditions to provide a clean, smooth tie-in to the existing conditions.

18) All parties hereby agree that Subcontractor shall be responsible for obtaining an approved area from Contractor for the cleaning of concrete trucks as well as the disposing of excess concrete when concrete trucks are being cleaned and washed out at job site. Concrete wash will be in dumpsters provided by Contractor and washout process will meet all Contract Documents and governing authorities' standards.

19) All parties hereby agree that Subcontractor shall immediately remove any excess concrete left, splashed, or spilled at the job site by its work force upon direction of Contractor during the time frame of Subcontractor's scope of work.

20) All parties hereby agree that Subcontractor has included any handrails, if required, at sidewalks and specifically within or adjacent to FDOT Right of Way.

## ASPHALT PAVING & BASE

1) All parties hereby agree that Subcontractor shall provide all rigid (Concrete Paving) or flexible (Asphalt Paving Heavy & Light Duty) pavement sections as indicate on Contract Documents, Geotechnical Exploration Report and most recent FDOT standard. This shall include but not limited to roadways, drives, surface parking areas and required roadway repairs, compaction, stabilization, and grading activities of these areas, base course as required to completing the project.

2) All parties hereby agree that Subcontractor shall install paving in areas as sequenced by Contractor. Subcontractor fully understands this could require additional mobilizations to project to complete the entire paving process and any required mobilizations to install this scope of work is included in this Subcontract Agreement. Scope of work includes *four (4) each mobilization for 1-inch "binder" & four (4) each mobilization for 1-inch "surface" layer.* Surface paving layer will be installed immediately prior to the turnover of each phase for the project. Any required adjustments to manhole frames, covers, and valve boxes shall occur at this time.

3) All parties hereby agree that Subcontractor shall be responsible for identification and proper elevation for road subgrades and stabilization of same. Further, all parties agree that Subcontractor shall be responsible for the maintenance of permanent and temporary roadways in order for them to remain passable for all construction equipment for project duration.

4) The price of asphalt paving included in this subcontract is based on the *Florida Department of Transportation "FDOT" monthly "Fuel and Bituminous Average Price Index" for November 2020*. The material price will be adjusted up or down based on the *FDOT Bituminous Materials Index* at the time of placing paving materials. Subcontractor shall notify Contractor in writing of monthly changes to *FDOT Bituminous Materials Index*.

5) Where pavement terminates a neat and professional finish will be expected by the Contractor.

6) All parties hereby agree that Subcontractor shall not install any base material on a roadway or parking lot until the storm sewer, sub-grade, and utilities have been inspected and approved by Contractor and all required governing authorities.

7) All parties hereby agree that after Subcontractor installs this scope of work then Subcontractor shall repair any "bird bath" areas that do not conform with Contract Documents standards, identified by Engineer of Record and authorities having jurisdiction.

8) All parties hereby agree that Subcontractor shall install any asphalt meeting driveways, aprons, or garages flush with the lip of existing concrete. Protect all existing concrete edges from tack coat operations

9) All parties hereby agree that Subcontractor shall clean asphalt machinery only in areas as designated by Contractor. This process will meet all Contract Documents and governing authorities' standards.

10) All parties hereby agree that Subcontractor shall remove all asphalt spoils from the jobsite.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

11) All parties hereby agree that any asphalt attached to curbs or other surfaces deemed inappropriate shall be fully and completely removed by Subcontractor to the extent that there is no visual evidence of this incident having ever occurred

12) All parties hereby agree that Subcontractor shall be responsible for repairs/remediation to binder course caused by this Subcontractor's activities prior to final placement of wearing course at no additional charge to Contractor.

13) All parties hereby agree that Subcontractor shall taper pavement to sidewalk grades as required.

14) All parties hereby agree that after this scope of work has been installed Contractor shall have the right to inspect the *compacted "Lime rock" base* course for correctness. Subcontractor shall perform any corrective action required by Contractor at no additional cost to Contractor.

15) All parties hereby agree that Subcontractor shall coordinate with Contractor and Geotechnical Consultant to verify the paving base sections are incompliance with the Contract Documents once base has been completed.

16) All parties hereby agree that Subcontractor shall install all "On-Site" and "ROW" street signage, handicap parking signage, all traffic markings, pavement stripping and handicap striping as indicated on Contract Documents, FDOT, and governing authorities. This shall include but not limited to providing an appropriate parking and driving area required for Certificate(s) of Occupancy, in addition this may include Temporary or Partial Certificates of Occupancy based on project schedule.

17) All parties hereby agree that it shall be the responsibility of Subcontractor shall provide all final sweeping, washing and/or blowing, including all necessary handwork required to prepare the base, prime coat and initial layer of asphalt to receive the finish asphalt surface course installation with the exception of debris and materials belonging to other trades.

18) All parties hereby agree that Subcontractor shall obtain any applicable FDOT Permits, all required right-of-way permits/ROW bonds, etc. required to install this scope of work.

19) All parties hereby agree that Contractor may require Subcontractor to run base and binder in areas prior to placement of curbing for schedule reasons or to satisfy local authorities. If Contractor decides to sequence the work in this manner, the excess base and asphalt poured past the curb line would be priced and agreed upon prior to installation.

20) All parties hereby agree Subcontractor includes installation of any site sleeves as required by others (ex: irrigation or electrical sleeves). These conduit sleeves will be provided by others but installed under sidewalks and driveways related to this scope of work.

21) Contractor has eliminated the dumpster concrete pad scope of work from this subcontract agreement and shall be installed by others. Subcontractor shall be responsible for all other grading, utilities, etc.

**PROJECT SCOPE ALTERNATES**:

1) *N/A*.

**ALLOWANCES:** *The Subcontractor has not included any allowances.*

| Description | Unit Cost | Unit Measure |
|---|---|---|
| **Concrete Repairs** | | |
| Concrete curb repair | $9.50 | Per/LF |
| Concrete sidewalk repair | $6.00 | Per/SF |
| **Undercut / Export / Import** | | |
| Should unsuable soils be encountered, the subcontractor will remove, dispose of on site, replace with on-site suitable fill and compact as directed by the Geotechnical Consultant. | $195.00 | Per Loose Fill Truckload $11.75 CY |
| **Equipment and Operator Rates, Wet** | | |
| Posi-Trak / Skid Steer | $500.00 | Per Day |
| Track Hoe / Excavator | $975.00 | Per Day |

***All unit cost work shall be logged daily for verification of quantities. All scopes, quantities and cost shall be agreed upon prior to commencement of work. Quantities shall be documented on approved tracking log and/or haul tickets**

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

*Member, Subcontractor's foremen and Geotechnical Consultant. Executed Verification logs and/or tickets shall be required to support Subcontractor's "Request for Change". Any work performed without approval will be the sole responsibility of the Subcontractor to bear.*

## PROJECT SPECIFIC EXCLUSIONS:

- Dumpsters
- Concrete pavers indicated on Hardscape Drawings.

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**2     General Requirements:**

2.1     A redacted copy of the Prime Contract is available upon request from Contractor.

2.2     At the onset of Finishes being installed in any structure, no food or drink will be allowed inside the structure. Failure to comply with this item may be grounds for removal of any Subcontractor employee from the Project as directed by Contractor. Use of tobacco products are expressly prohibited except in designated areas.

2.3     Each Subcontractor shall include all layouts and engineering required to perform the work of each Subcontract. Benchmarks and baselines will be provided by others. It is each Subcontractor's responsibility to use and maintain these control points throughout the completion of the project.

2.4     All parties hereby agree the Work Schedule, use of the site and coordination of all on-site personnel will be performed under the complete direction of the Contractor's supervisory personnel. Contractor may enforce upon Subcontractor any of the following actions in order to expedite or coordinate work. However, Contractor does not assume any liability for delays to Subcontractor or third parties in connection with coordination of on-site personnel. These actions include, but are not limited to, the following:

2.4.1     Designated storage, designated unloading, and parking areas.

2.4.2     Require unacceptable materials, equipment, or vehicles to be removed from the project.

2.4.3     Limit the use of the site by Subcontractor's equipment, vehicles, personnel, or stored materials.

2.4.4     Temporarily or permanently bar specific personnel from the site. Listed below is a partial list of reasons to deny a person access to the project.

2.4.4.1     Drug or alcohol use

2.4.4.2     Fighting, possession of weapons

2.4.4.3     Theft

2.4.4.4     Harassment of anyone associated with project, while on or off the project site

2.4.4.5     Personal use of the areas near the project limits for parking, eating, sleeping, etc.

2.4.4.6     Failure to cooperate with Contractor's supervisory personnel or comply with project documents

2.4.4.7     Failure to follow Contractor's Safety Procedures

2.5     All parties hereby agree that Subcontractor is responsible for all related work, no matter what sections of the Contract Documents and Specifications it is detailed, to complete the scope of work as listed in Exhibit "A" to this Subcontract Agreement.

2.6     All parties hereby agree that this Subcontract Agreement hereby supersedes any prior proposal, both written and verbal, therefore any prior written or verbal proposal hereby becomes null and void at the signing of this Subcontract Agreement.

2.7     Each Subcontractor is responsible for providing all hoisting, lifting, loading, unloading, and scaffolding required to perform their scope of work. Each Subcontractor shall provide their own equipment and scaffolding for this Project. All must meet OSHA standards before being used and any equipment leaking fluid of any sort must be repaired before use or removed from the site. Remediation due to fluid leaks or spills will be at the expense of the responsible subcontractor.

2.8     Each Subcontractor is responsible to provide, install and remove all temporary protection of its Work. All protection will remain in place until substantial completion unless directed otherwise by the Contractor.

2.9     Each Subcontractor will coordinate all phases of construction with other Subcontractors to ensure smooth, continuous operations, productivity, and timely inspections.

2.10    Each Subcontractor will schedule all applicable inspections and tests of his Work as required by agencies having jurisdiction or industry standards. Each Subcontractor will notify the Contractor a minimum of 24 hours prior to inspections and/or tests.

2.11    Each Subcontractor will provide isolation for dissimilar materials in all instances where required.

2.12    If responsibility of connections is not specifically described in the Contract Documents, the Subcontractor providing the material, equipment or fixture that connects to the Service shall be responsible for performing the connection or termination. Additionally, if the Contract Documents do not specifically define which Subcontractor is to provide valves, disconnects or the like, then the Subcontractor providing the service is to furnish and install the valve, disconnect or the like.

2.13    Unless specifically indicated in the Contract Documents, all inserts (i.e., embeds, anchor bolts, hangers, etc.) are to be provided by the Subcontractor connecting to the insert. The Subcontractor that is constructing the assembly that receives the insert will install. The provider will furnish location and elevation information and be responsible for verifying and maintaining accuracy during and after installation.

2.14    Access Doors are to be provided by each trade requiring access doors but installed by the Subcontractor responsible for installing the assembly that will receive the access door. Location of access doors is to be determined by the Subcontractor requiring the access door and coordinated through the Contractor.

2.15    Each Subcontractor shall procure and pay for all applicable permits to perform his work.

2.16    Daily clean-up of all work areas is "Mandatory", and the cost shall be included in the bid. Each Subcontractor will include a line item in his Schedule of Values for cleanup of his work. Clean-up is to be a

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

daily activity and a prerequisite to being permitted to start the following day's work. A thorough clean up is to be conducted for all windblown construction materials and trash. Each Subcontractor is to include final cleaning of all areas and systems of their work prior to Final Acceptance.

2.17   Each Subcontractor shall maintain, on-site, accurately detailed as-built drawings indicating any changes, deviations, actual dimensions, locations, and any field modifications. As-builts will be reviewed monthly and are a condition of monthly payments.

2.18   Each Subcontractor acknowledges that equipment for portions of the work may be started, tested, run and otherwise utilized prior to the start of the warranty period. Each Subcontractor will be responsible for all costs associated with securing warranties effective from the time of substantial completion.

2.19   Each Subcontractor is responsible for all safety, clean up, shoring, bracing, barricades, and field quality control requirements necessary to perform their work safely and productively.

2.20   Each Subcontractor is responsible for all demolition, excavation, dewatering, backfill and compaction required for his work. This includes all grading after backfilling and compaction. The subcontractor shall remove excess material from excavations from the building confines and properly dispose of material off the site.

2.21   No cutting or drilling of holes in structural members will be permitted unless written permission has been obtained from the Architect/Engineer.

2.22   Each Subcontractor, at his own expense, may place on site an office trailer. Set up and demobilization will be at the Subcontractor's expense. Location will be coordinated with the Contractor's Project Superintendent. Telephone, water, sewage, and power service installation, maintenance, and usage will be at the Subcontractor's expense and coordinated with the proper authorities.

2.23   Location of employee and equipment parking, job signs or any temporary trailers will be subject to approval by the Contractor's Project Superintendent.

2.24   Each Subcontractor is responsible for all caulk, waterproofing, damp proofing, fire-safing, and fire rated caulk as specifically required to perform his respective scope of work unless described otherwise in Section 1 of Exhibit "A".

2.24.1 Each Subcontractor is responsible for all fire caulking associated with penetrations for their work that goes through or in fire and smoke rated walls.

2.25   If the Stamp of a Registered Engineer is required per Contract Documents or industry standards, the Engineer must be registered in the State of Florida. Subcontractors are responsible for any engineering required to perform their scope of work.

2.26   Subcontractor to review the submittal data from all associated structural, electrical, roofing, partitions, and other Subcontractors. Coordinate the interface of this work with that of these other trades. Connections, tie-ins, dimensions, rough-openings, clear access requirements shall be identified and highlighted so that no gaps, omissions, or errors will result after commencing work. Notify the Contractor and associated Subcontractors immediately if any deficiencies are identified. Further, the cost of any work performed or reliance on information other than in compliance with written instructions or information provided by Contractor's authorized representative, shall be borne by Subcontractor and any such cost is included in the Subcontract Agreement.

2.27   Any damage to other subcontractors' work, caused by the negligence of this Subcontractor and its employees, will be repaired at this Subcontractor's expense.

2.28   Wall assemblies will not be closed-up until each subcontractor has had sufficient time to perform their Work within the assembly and inspections have taken place. Work must be coordinated and performed in a timely fashion to not hold up scheduled progress.

2.29   Each subcontractor superintendent must have a mobile phone and that number provided to the Contractor's field staff. Mobile phone use on the project by workers making and receiving personal calls or texting should be discouraged by each subcontractor.

2.30   Items installed below grade where future tie-in or exposure is necessary will need to be identified with a 4x4 vertical post with three feet above grade exposed and color coded. Each subcontractor will be responsible for installing the posts at the time of burial. These locations must also be identified on as-built drawings maintained by each subcontractor and the Contractor.

2.31   Unless specifically stated otherwise, temporary water, electricity and portable toilets will be provided by the Contractor. Each subcontractor is responsible for providing their own non-leaking hoses, heavy duty

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR 

extension cords and GFIs. Unnecessary consumption of waste of water or electricity will be charged back to the subcontractor.

2.32   Each subcontractor is responsible for communicating and enforcing the rules of the project with their employees which will be posted and regularly discussed in weekly subcontractor meetings.

2.33   Graffiti of any kind, in any place, on the project will not be tolerated. This will be grounds for the responsible employee(s) being removed from the project and the employer being subject to all associated cleaning cost or replacement of damaged materials. This includes temporary toilets.

2.34   The Subcontractor will submit to Contractor, by 8:30 AM each workday, a complete Daily Report as required by Contractor for the incorporation into the RISE Daily Report.

2.35   Provide a competent representative at each weekly jobsite meeting, provided the subcontractor has work in progress or within 2 weeks of meeting date. This representative should be familiar with the project and should have the authority to make management decisions for the subcontractor with regard to crew size, equipment allocation, and execution of the project work. The name(s) of this person or persons shall be provided to RISE in writing prior to the start of work. Contractor shall be notified in writing for any change in this representative.

2.35.1 The sum of $300.00 will be deducted from the subcontract amount for each meeting not attended by the Subcontractor's authorized representative provided that: a) the subcontractor has work in progress or starting within two (2) weeks of the meeting date or b) the subcontractor has not received written approval from the RISE Project Manager to be absent.

**END OF EXHIBIT "A"**

## CONTRACT PRICE

| | |
|---|---|
| **BASE BID** | **$1,594,032.85** |
| | |
| | |
| **TOTAL** | **$1,594,032.85** |

## PAYMENT SCHEDULE

Pay applications, along with, but not limited to, interim waivers and releases from all subcontractors and suppliers and payroll documents are due to the Contractor on the **_20th_** of each month. Any pay applications received after the **_25th_** of the month will not be processed until the following month billing cycle.

## APPLICATION FOR PAYMENT

Subcontractor shall within ten (10) days of execution of this subcontract provide a schedule of values totaling the contract price on the Subcontractor Application for Payment Form provided by Contractor. Contract price, at a minimum, will be broken out on the schedule of values by labor, material, subcontract, area, building, level, and type of work.  Once approved by Contractor, this document will become a part of this subcontract agreement Exhibit "B-1".

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

## SCHEDULE OF VALUES

SUBCONTRACTOR NAME: _____
JOB NAME: _____
JOB NUMBER: _____

n tabulations below, amounts are stated to the nearest dollar.
Jse Column I on Agreements where variable retainage for line items may apply.

APPLICATION NO.: _____
APPLICATION DATE: _____
PERIOD TO: _____
ARCHITECT'S PROJECT NO: _____

| A ITEM NO. | A.1 Item Cost Code | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMLETED AND STORED TO DATE (D+E+F) | % (G / C) | H BALANCE TO FINISH (C - G) | I RETAINAGE 10% |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | Punch (5% of Scheduled Value Total) | | | | | | | | |
| | | Clean (5% Scheduled Value Total) | | | | | | | | |
| | | **GRAND TOTALS** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

INITIALED BY CONTRACTOR: _____ DS
INITIALED BY SUBCONTRACTOR: _____ DS

# RISE
## GENERAL CONTRACTORS

10161 Centurion Pkwy N Jacksonville, FL 32256

## SUBCONTRACTORS APPLICATION FOR PAYMENT

PROJECT NAME: _____
COMPANY: _____
INVOICE/PAY APP #: _____
REQUEST DATE: _____
PERIOD END DATE: _____
SUB-AGREEMENT #: _____

**EMAIL TO:  RISE General Contractors – teresa.koscielney@risere.com**

| | STATEMENT OF SUBCONTRACTOR ACCOUNT | | RISE USE ONLY |
|---|---|---|---|
| a) | Amount of original agreement | $_____ | _____ |
| b) | Net Change Orders #1 thru #_____ | $_____ | _____ |
| c) | Revised agreement amount (a+b) | $_____ | _____ |
| d) | Work completed to date | $_____ | _____ |
| e) | Value of stored materials (itemized inventory attached) | $_____ | _____ |
| f) | Total completed & stored to date (d+e) | $_____ | _____ |
| g) | Less previous applications (line f from previous draw) | $_____ | _____ |
| h) | Current application (f-g) | $_____ | _____ |
| i) | Less _____ % retainage (h*%) | $_____ | _____ |
| j) | Less other deductions (2% state if applicable) | $_____ | _____ |
| k) | Net amount this request (h-i-j) | $_____ | _____ |
| l) | Balance to complete agreement (c-f) | $_____ | _____ |
| m) | Job-To-Date Retainage Held | $_____ | _____ |

## CERTIFICATE OF THE SUBCONTRACTOR

I hereby certify that the work performed and the materials supplied to date, as shown on the above, represent the actual value of accomplishment under the terms of the subcontract (and all authorized changes thereto) between the undersigned and RISE General Contractors, LLC relating to the above referenced project

I also certify that all laborers, material suppliers, contractors and subcontractors use on or in connection with the performance of this subcontract have been paid in full, except as noted on reverse side.  I further certify I have complied with all Federal, State and Local tax laws, including Social Security laws insofar as applicable to the performance of this subcontract

**SIGNATURE MUST BE NOTARIZED**

Witness the hand and seal of the undersigned this _____ day of _____,20_____

By: _____

| Name of Company | Signature | Title |
|---|---|---|

| Address | | Phone |
|---|---|---|

Before me, the undersigned authority, personally appeared _____ who, by me being first duly sworn, did acknowledge that he or she is the _____ of _____ and as such has the authority to execute this document and that the facts stated therein are true.

Dated this _____ date of _____, 20_____.  My Commission Expires: _____

STATE OF _____ COUNTY OF _____

_____
Notary Public

CHECK DELIVERY (CIRCLE ONE) * DELIVER TO JOB SITE * REGULAR MAIL * OVERNIGHT-FEDEX/UPS # _____

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

**EXHIBIT "B-2"**
**SUPPLIER/SUB-SUBCONTRACTOR LIST**

**LIST OF ALL SUPPLIERS AND SUBCONTRACTORS**

SUBCONTRACTOR:_____          DATE:_____

LOWER---TIER SUBCONTRACTOR/SUPPLIER INFORMATION

| Company Name | Contact Name | Mailing Address | Office # | Fax # | Cell # | Email |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Contractor's Signature:_____          Printed Name:_____

[3668742/2]                                    PAGE 1 OF 1

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

1) <u>Subcontractors and Consultant Insurance Limits</u>

   a) General Contractor is responsible for ensuring all of its contractors, subcontractors, consultants, and vendors maintain the following insurance policies and limits:

| General Liability (GL) Per Occ/Agg | Umbrella / Excess | Professional Liability (E&O) | Workers' Comp | Employers Liability | Auto | Pollution |
|---|---|---|---|---|---|---|
| | | | | | | |
| $1MM/$2MM | See Chart in Section 2 (c) below | If Applicable | Statutory | $1MM | $1MM | $5MM for EIFS, Demolition, & Asbestos Contractors; Others as Applicable |

   b) Any policy required by this section must meet the coverage requirements in Section 1 above, except for limits, which are dictated in this section. General Contractor is responsible for requiring any additional coverage that is commercially reasonable for the scope of subcontracted work.

   c) Subcontractor/Trade Contractor Excess/Umbrella Insurance Limits:
      i) Ten Million ($10,000,000) for all Demolition, Excavation, Cranes & Hoists
      ii) Five Million ($5,000,000) for all Carpentry, Caulking/Waterproofing, Dewatering, Electrical, Elevators/Vertical Transportation, Exterior Brickwork/Façade, Foundations, HVAC, Metalwork, Plumbing, Pools, Powered Doors/Gates/Garage Doors, Railings, Roofing, Skylights, Spray Fireproofing, Stucco/EIFS, Structural Work (any and all), Window Washing (Exterior (3+ Stories), and all other subcontracts valued at over $750,000
      iii) Two Million ($2,000,000) for all other subcontracts valued at $750,000 or less.

2) <u>General Insurance Requirements Applicable to Contractor, Subcontractors, and Consultants</u>: The following requirements are applicable to all insurance coverages required under this Agreement, except where indicated otherwise.

   a) <u>Insurer Requirements</u>: Except for any state workers' compensation funds, each insurer providing insurance coverage as required in this Agreement shall be a licensed, admitted insurer authorized to issue such coverage in the state in which the Project is located, and shall have an A.M. Best rating of not less than "A-" and Financial Size Category Rating of not less than "VIII" according to the latest edition of Best's Key Rating Guide.

   b) <u>Additional Insureds</u>: All insurance required by this Agreement (excluding only Workers' Compensation and Professional Liability insurance) shall name Owner, the following parties, and each of their respective parents, members, affiliates, lenders, directors, officers, representatives, agents, and employees, and all other parties reasonably requested by Owner as additional insureds (hereinafter, collectively, the "Additional Insureds"). Those parties include:

      • *Citrus Ridge Properties II, LLC – Project Owner/Borrower*
      • *Citrus Ridge Properties I JV, LLC – JV Entity (owns 100% of Project Owner)*
      • *CRP Citrus Ridge Properties I Member, LLC – Equity Investor*
      • *IberiaBank, ISAOA, ATIMA – Lender*
       *200 West Congress Street*
       *Lafayette, LA 70501*

   c) <u>All policies (including General Liability, Umbrella/Excess, and Auto Liability) shall state that the insurance provided to the Additional Insureds is primary and non-contributory to any other insurance maintained by or available to the additional insureds</u>. With respect to the Commercial General Liability policy required under this Agreement, additional on ISO forms CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations), or equivalent endorsements that do not limit Additional Insured status to persons/entities in contractual privity with the named insured.

[3677082/1]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

d) <u>Scope of Coverage and Limits of Insurance</u>: The coverage provided to the Additional Insureds must be at least as broad as that provided to the first named insured on each policy. In the event that any policy provided in compliance with this Agreement states that the coverage provided to an additional insured shall be no broader than that required by contract, or words of similar meaning, the parties agree that nothing in this Agreement is intended to restrict or limit the breadth of such coverage. The limits of insurance stated above for each type of insurance are minimum limits only. If Contractor's or Subcontractor's policy provides greater limits, then the Additional Insureds shall be entitled to, or to share in, the full limits of such policy, and this Agreement shall be deemed to require such full limits.

e) <u>Severability of Interests (Cross Liability)</u>: No cross-liability exclusions are permitted that apply to the Additional Insureds, and there may not be any restrictions in any policy that limits coverage for a claim brought by an additional insured against a named insured.

f) <u>Waiver of Subrogation</u>: To the fullest extent permitted by law, all insurance maintained by Contractor and all subcontractors, in compliance with this Agreement, shall include a waiver of subrogation in favor of the Additional Insureds.

g) <u>Claims-Made Policies</u>: Any insurance policy written on a claims-made bases must include a retroactive date prior to the start of the work and must be maintained for or include an extended reporting period for at least ten (10) years after substantial completion and acceptance of the Project, or to the expiration of any applicable State of Repose in the jurisdiction where the Project is located, whichever is shorter

h) <u>Notice of Cancellation</u>: All policies required under this Agreement shall contain endorsements that confirm that said insurance policies shall not be cancelled, not renewed, or materially changed except upon thirty (30) days prior written notice to Owner (except for cancelation due to lack of payment of premium, for which a ten (10) day notice is allowed). If information concerning cancellation, non-renewal, or material change is not furnished by the insurer, Contractor shall, with reasonable promptness, provide Owner with such information.

i) <u>Deductibles & Self-Insured Retentions</u>: Contractor/subcontractors shall be responsible for any deductible under any insurance it provides, and the coverage afforded to the Additional Insureds shall not be conditioned on the payment of any deductible.

j) <u>Owner's Right to Procure Insurance</u>: In the event of a failure of Contractor to furnish and maintain any of the insurance required under this Agreement or to furnish satisfactory evidence thereof, Owner shall have the right, but not the obligation, to procure such insurance on Contractor's behalf, and Contractor shall furnish all necessary information in connection with Owner's procurement and either pay the costs thereof to Owner immediately upon presentation of a bill therefor, or have the cost thereof deducted from any payment otherwise due to Contractor at Owner's option.

k) <u>No Limitation</u>: The insurance coverages maintained by Contractor shall not limit any of Contractor's indemnity obligations or other liabilities under this or any other Agreement. Contractor agrees that any limitation of liability contained in the Agreement shall not apply to the extent that such liability is covered by Contractor's insurance.

3) **Proof of Coverage:**

a) <u>Prior to Contractor commencing any work under the Agreement, it shall furnish Owner with the following:</u>

    i) Certificates of insurance, on forms acceptable to Owner, evidencing that insurance policies are in full force and effect with the required limits, and that all parties required by this Agreement are named as additional insureds;

    ii) Full copies of all General and Umbrella/Excess Liability Policies (redacted for premium and other sensitive information)

      iii) A copy of the provisions/endorsements in the Commercial General Liability, Excess/Umbrella policies, and Auto Liability policies adding the required parties as additional insureds;

      iv) A copy of the provisions/endorsements in the Commercial General Liability and Excess/Umbrella policies providing that coverage for the Additional Insureds will be on a primary and noncontributory basis;

      v) A copy of the provisions/endorsements in the Commercial General Liability, Excess/Umbrella, and Workers' compensation policies providing that subrogation has been waived as to the Additional Insureds.

b) Contractor shall provide an updated certificate of insurance at least 5 days before the expiration of the term of any insurance required of it under this Agreement; if Contractor changes insurance carriers at any time, a full copy of the new policy is required.

c) Owner's failure to require Contractor to provide evidence of the insurance required under this Agreement, or Owner's acceptance of evidence that indicates that Contractor's insurance fails to satisfy the requirements of this Agreement, will not constitute a waiver of those requirements.

4) **No Waiver of Insurance Requirements:** Any waiver or modification of the insurance requirements stated in this Agreement must be agreed to, in writing, by Owner.

5) **Severability and Conformance to Law:** Each provision of this Agreement shall be construed in such a manner to be valid and enforceable under applicable law. If any provision of this Agreement is deemed invalid, illegal or otherwise unenforceable, then that provision will be deemed ineffective without impairing enforceability of the remaining provisions. If applicable law limits any of the insurance requirements in this Agreement, then Contractor shall be required to comply with the foregoing requirements to the fullest extent of coverage and limits allowed by applicable law.

6) **Consultants and Subcontractors:** Unless otherwise approved by Owner in writing, Contractor shall require its consultants and subcontractors to obtain and maintain the insurance consistent with this exhibit. Contractor acknowledges that it is responsible for defending and indemnifying Owner and all other Additional Insureds for all losses arising out of subcontractor acts or omissions, regardless of whether those acts are covered by any insurance. To the extent allowed by law, Contractor agrees to fully defend and indemnify Owner and all other Additional Insureds in the event of any claim made against Owner or another Additional Insured by one of Contractor's employees, subcontractors, subcontractors' employees, or sub-contractors.

7) **Waiver of Right of Recovery:** Contractor hereby waives, and will ensure that all subcontractors and consultants waive, all rights of recovery against the Owner, its liability insurers, and all Additional Insureds, on account of loss or damage occasioned to Contractor or others under Contractor's control or for whom it is responsible to the extent such loss or damage is insured against under any of Contractor's insurance policies which may be in force at the time of the loss or damage or would have been insured against if Contractor had complied with its obligations under this section.

8) **Priority:** The insurance requirements contained in this Insurance Exhibit will supersede any differences or conflicts that may exist or arise in this Agreement or in any attachments or amendments thereto. Any insurance provisions or other attachments that differ from those required by this Insurance Exhibit are not acknowledged by Owner as replacement or accepted changes and the requirements set forth herein will govern.

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**EXHIBIT "D"**

## SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT
### *FLORIDA WAIVER AND RELEASE OF LIEN*
### *UPON PROGRESS PAYMENT*

The undersigned lienor, in consideration of the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished through _____ to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

> Job Name
>
> Job Address
>
> City, State, Zip

This waiver and release does not cover any retention or labor, services, or materials furnished after the date specified.

DATED on _____, 20\_\_\_\_\_.

_____
(Subcontractor's Name)

By: _____

Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20\_\_, by_____, as _____ of _____, who is:
(Subcontractor's Name)

_____Personally known

_____Produced Identification

Type of Identification Produced_____

_____
NOTARY PUBLIC

My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**EXHIBIT "E"**
## SUBCONTRACTOR'S INTERIM AFFIDAVIT UPON PAYMENT

STATE OF _____
COUNTY OF _____


The undersigned subcontractor has been employed by <u>RISE GENERAL CONTRACTORS, LLC</u> ("**Contractor**") to furnish _____ (describe materials and/or labor) for the construction of improvements known as _____ (title of the project or building) which is located in the City of _____, County of _____ ("**the Property**"), which is owned by _____ _____ (name of owner) ("**Owner**").

The undersigned states that not including the payment referenced in its [Interim Waiver and Release Upon Payment/Waiver and Release of Lien Upon Progress Payment] (signed contemporaneously herewith), it thus far has been paid $_____ in the aggregate for its work and improvement to the Property, and the undersigned hereby acknowledges receipt of such payments for such work, and pursuant to its agreement for work at the Property the undersigned states that it is entitled to payment of (the amount referenced in its [Interim Waiver and Release Upon Payment/Waiver and Release of Lien Upon Progress Payment] signed contemporaneously herewith), plus an additional amount of $_____ for work still to be performed at the Property, plus $_____ being held in retainage.

The undersigned does hereby indemnify and save harmless Owner, Contractor, Contractor's Surety and their agents, representatives, affiliates, successors and assigns, from and against all loss, cost, damage or expense (including, without limitation, attorneys' fees) by reason of any and all manner of liens, claims or demands which anyone may have for labor performed, for material or equipment furnished to or, upon or by any reason or any matter, cause or thing whatsoever arising out of the undersigned's work at the Property.

The undersigned affirms, warrants and represents that the list attached hereto as <u>Attachment "B-2"</u> contains the names of all of the laborers, materialmen, mechanics, manufacturers, suppliers, and subcontractors who have furnished services, labor, fixture or materials, or any one of these items to the undersigned, and the undersigned further affirms, warrants and represents that all persons or entities listed on <u>Attachment "B-2"</u> hereto have been paid in full for all work performed and all materials, fixtures or services supplied to the undersigned for use at the Property through and including the date hereof, and that the undersigned is not indebted to any person or entity for labor or materials used in connection with or as a part of such construction job in any amount whatsoever through and including the date hereof, except as noted on <u>Attachment "A"</u> hereto.

Upon receipt of the current payment of $_____, the undersigned does hereby waive, release and discharge any and all claims, claims of lien, payment bond claims, lien rights and rights to file preliminary notices of lien which the undersigned may have in connection with the above-described project with respect to the Property.

The undersigned recognizes and acknowledges that security deed holders, subsequent transferees of and holder. of title to the Property, title insurance companies, Contractor, Contractor's surety and agents of title insurance companies shall and shall be entitled to rely on this instrument and the assertions, statements and averments made herein in making loans, the repayment of which are or may be secured in part or in full by the Property or in issuing title insurance policies covering or the subject of which is said Property.


Given under hand and seal this _____ day of _____, 20__.

(Name of Party)
_____[seal]


Sworn to and subscribed before me
this ___ day of _____, 20__.

_____

Notary Public My Commission expires: _____

[3668742/2]

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

**EXHIBIT "F"**
**SUPPLIER/SUB-SUBCONTRACTOR'S INTERIM WAIVER AND RELEASE UPON PAYMENT**
*FLORIDA WAIVER AND RELEASE OF LIEN*
*UPON PROGRESS PAYMENT*

The undersigned lienor, having received payment in the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished through _____ to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

> Job Name
>
> Job Address
>
> City, State, Zip

This waiver and release does not cover any retention or labor, services, or materials furnished after the date specified.

DATED on _____, 20_____.

_____
(Subcontractor's Name)

By: _____

Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20\_\_, by_____, as _____of _____, who is:

> (Subcontractor's Name)
>
> _____Personally known
>
> _____Produced Identification
>
> Type of Identification Produced_____

_____
NOTARY PUBLIC

My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

**EXHIBIT "G"**

## SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT
### *FLORIDA WAIVER AND RELEASE OF LIEN*
### UPON FINAL PAYMENT

The undersigned lienor, in consideration of the final payment in the amount of $\$$_____ , hereby

waives and releases its lien and right to claim a lien for labor, services or materials furnished to RISE General

Contractors, LLC, Inc. on the job of _____ , to the following described property:

      Job Name

      Street Address

      City, State, Zip

[This waiver and release is expressly conditioned on receipt of payment in the amount noted above. This waiver

and release shall be void and of no further force and effect if payment is not received.]

      DATED on _____, 20_____ .

                  _____

                     (Subcontractor's Name)

                  By: _____

                  Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20\_\_\_,

by_____ , as _____

of _____ , who is:

      (Subcontractor's Name)

      _____Personally known

      _____Produced Identification

      Type of Identification Produced_____

                  _____

                  NOTARY PUBLIC

                  My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:



**EXHIBIT "H"**

## SUBCONTRACTOR'S FINAL AFFIDAVIT

STATE OF _____
COUNTY OF _____

      In person before me, the undersigned officer authorized to administer oaths, came _____, who, being duly sworn, deposed upon oath and said:

1.    I am the authorized representative of _____ (the "Subcontractor") who, pursuant to a contract dated as of _____ (the "Subcontract") with RISE General Contractors, LLC (the "Contractor"), served as a _____ subcontractor in connection with the construction of a _____ and related improvements (the "Project") and improving the property owned by the _____ (the "Owner"), said property being located in the City of _____, _____ County, _____ (the "Property"), a full description of which is attached hereto and made a part hereof, marked Exhibit "A."

2.    I have personal knowledge of the matters herein stated, and I am authorized by Subcontractor and fully qualified to make this affidavit.

3.    Subcontractor has supervised the construction and completion of the improvements and buildings placed on the Property in accordance with the requirements of the Subcontract and, to the best of my knowledge and belief, said improvements have now been fully completed in accordance with the Subcontract.

4.    Upon receipt of $_____, representing the unpaid balance due Subcontractor pursuant to the terms of the Subcontract, the agreed price of all labor, services, or materials furnished shall have been paid to Subcontractor. Upon receipt of such final payment, all costs, bills, debts and other charges whatsoever incurred for the aforesaid Project will have been paid and satisfied in full or will be paid from the proceeds of such final payment, and no outstanding unpaid obligation or bill shall due any person, firm, or corporation for labor, services, materials or supplies furnished in connection with the Project. No subcontractor, laborer, or supplier or consultant has filed any claim or lien against the Property or any payment bond furnished by Contractor in connection with work performed or materials furnished to the Project that has not been previously satisfied. Upon receipt of the final payment referenced above and disbursement of the proceeds thereof, all subcontracts associated with the Project executed by Subcontractor and its subcontractors and consultants shall have been performed in full, and no disputes exist arising out of or regarding the Project.

5.    Upon receipt of the amount referenced in subparagraph 4 above, Subcontractor shall have received payment in full for all amounts due and owing for making improvements on the Property. Upon receipt of the amounts set forth in subparagraph 4 above, Subcontractor releases and waives any and claims, causes of actions, all liens, bond rights and claims, lien rights or claims of lien which it has or may have on or against the Property or Contractor's surety. Subcontractor agrees to indemnify and hold Contractor and its surety harmless from any and all costs, expenses, damages or losses, including reasonable attorneys' fees, by reason of any lien, claim of lien, bond claim or action for non-payment for work performed, materials furnished or equipment supplied in connection with the performance of the Project.

6.    This sworn statement is made to induce Contractor to make final disbursement of the contract price to Subcontractor, and also is made as part of a transaction involving a loan to be secured by the Property.

_____ (SEAL)
NAME

Sworn to and subscribed before
me this _____ day of
_____, 20___

_____
Notary Public (SEAL)
My Commission expires: _____

INITIALED BY CONTRACTOR: _____
INITIALED BY SUBCONTRACTOR: _____

**EXHIBIT "I"**

## SUPPLIER/SUB-SUBCONTRACTOR'S WAIVER AND RELEASE UPON FINAL PAYMENT
### *FLORIDA WAIVER AND RELEASE OF LIEN*
### *UPON FINAL PAYMENT*

The undersigned lienor, having received the final payment, hereby waives and releases its lien and right to claim a lien for labor, services or materials furnished to RISE General Contractors, LLC, Inc. on the job of _____, to the following described property:

       Job Name

       Street Address

       City, State, Zip

[This waiver and release is expressly conditioned on receipt of payment in the amount noted above. This waiver and release shall be void and of no further force and effect if payment is not received.]

       DATED on _____, 20_____.

                                 _____

                                     (Subcontractor's Name)

                      By: _____

                      Printed Name_____

STATE OF FLORIDA

COUNTY OF _____

The foregoing instrument was acknowledge before me this_____ day of _____, 20___, by_____, as _____ of _____, who is:

(Subcontractor's Name)

        _____Personally known

        _____Produced Identification

       Type of Identification Produced_____

                                   _____

                      NOTARY PUBLIC

                      My Commission Expires_____

NOTE: This is a statutory form prescribed by Section 713.20, Florida Statutes (2020).

[3668742/2]

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

EXHIBIT "J"
CONTRACT DOCUMENTS

TOWNE GROVE AT CITRUS RIDGE
Davenport, FL

| DRAWING NUMBER | DRAWING TITLE | PERMIT SET DATE |
|---|---|---|
| **GENERAL - TOWNHOMES** | | |
| CS-01 | COVER SHEET | 9/27/2021 |
| CS-02A | SHEET INDEX & GENERAL NOTES | 9/27/2021 |
| CS-02B | SHEET INDEX & GENERAL NOTES | 9/27/2021 |
| CS-02C | SHEET INDEX & GENERAL NOTES | 9/27/2021 |
| SP-01 | SITE PLAN | 9/27/2021 |
| SP-02 | ADDRESS FLOOR PLAN | 9/27/2021 |
| SP-03 | PHASING PLAN | 9/27/2021 |
| **CODE DATA - TOWNHOMES** | | |
| CD-00 | CODE REVIEW | 9/27/2021 |
| CD-01A | BUILDING A - EGRESS EXHIBIT | 9/27/2021 |
| CD-01B | BUILDING B - EGRESS EXHIBIT | 9/27/2021 |
| CD-01C | BUILDING C - EGRESS EXHIBIT | 9/27/2021 |
| CD-02 | UNIT MIX | 9/27/2021 |
| CD-11 | FLORIDA PRODUCT APPROVAL | 9/27/2021 |
| CD-21 | WALL TYPES / ASSEMBLIES | 9/27/2021 |
| **ARCHITECTURAL - TOWNHOMES** | | |
| A0-00A | BUILDING A - OVERALL SLAB PLAN | 9/27/2021 |
| A0-01A | BUILDING A - OVERALL FIRST FLOOR PLAN | 9/27/2021 |
| A0-02A | BUILDING A - OVERALL SECOND FLOOR PLAN | 9/27/2021 |
| A0-03A | BUILDING A - OVERALL THIRD FLOOR PLAN | 9/27/2021 |
| A0-04A | BUILDING A - OVERALL ROOF PLAN | 9/27/2021 |
| A1-00B | BUILDING B - OVERALL SLAB PLAN | 9/27/2021 |
| A1-01B | BUILDING B - OVERALL FIRST FLOOR PLAN | 9/27/2021 |
| A1-02B | BUILDING B - OVERALL SECOND FLOOR PLAN | 9/27/2021 |
| A1-03B | BUILDING B - OVERALL THIRD FLOOR PLAN | 9/27/2021 |
| A1-04B | BUILDING B - OVERALL ROOF PLAN | 9/27/2021 |
| A2-00C | BUILDING C - OVERALL SLAB PLAN | 9/27/2021 |
| A2-01C | BUILDING C - OVERALL FIRST FLOOR PLAN | 9/27/2021 |
| A2-02C | BUILDING C - OVERALL SECOND FLOOR PLAN | 9/27/2021 |
| A2-03C | BUILDING C - OVERALL THIRD FLOOR PLAN | 9/27/2021 |
| A2-04C | BUILDING C - OVERALL ROOF PLAN | 9/27/2021 |
| A3-00 | UNIT PLAN NOTES | 9/27/2021 |
| A3-01 | UNIT PLANS - A.1 | 9/27/2021 |
| A3-02 | UNIT PLANS - A.1 | 9/27/2021 |
| A3-03 | UNIT PLANS - B.1 | 9/27/2021 |
| A3-04 | **UNIT PLANS - B.1** | 9/27/2021 |
| A3-05 | **UNIT PLANS - B.1** | 9/27/2021 |
| A3-08 | UNIT FINISH SCHEDULES | 9/27/2021 |
| A4-01A | BUILDING ELEVATIONS | 9/27/2021 |
| A4-01B | BUILDING ELEVATIONS | 9/27/2021 |
| A4-01C | BUILDING ELEVATIONS | 9/27/2021 |
| A5-01A | BUILDING SECTIONS | 9/27/2021 |
| A5-01B | BUILDING SECTIONS | 9/27/2021 |
| A5-01C | BUILDING SECTIONS | 9/27/2021 |
| A5-10 | TYPICAL WALL SECTIONS - INTERIOR | 9/27/2021 |
| A5-20 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-21 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-22 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-23 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-24 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-25 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-26 | TYPICAL WALL SECTIONS | 9/27/2021 |
| A6-00 | FOUNDATION DETAILS | 9/27/2021 |
| A6-01 | EXTERIOR FRAMING DETAILS - PLAN | 9/27/2021 |
| A6-02 | EXTERIOR FRAMING DETAILS - SECTION | 9/27/2021 |
| A6-03 | EXTERIOR FRAMING DETAILS | 9/27/2021 |
| A6-04 | ROOF DETAILS | 9/27/2021 |
| A6-05 | ROOF DETAILS | 9/27/2021 |
| A6-06 | INTERIOR FRAMING DETAILS | 9/27/2021 |
| A6-07 | FLASHING DETAILS | 9/27/2021 |
| A6-08 | DETAILS | 9/27/2021 |
| A6-09 | DOOR DETAILS | 9/27/2021 |
| A6-10 | WINDOW HEAD, JAMB, AND SILL DETAILS | 9/27/2021 |
| A6-11 | WINDOW FLASHING DETAILS | 9/27/2021 |
| A7-00 | SCHEDULES | 9/27/2021 |
| **STRUCTURAL - TOWNHOMES** | | |
| S001 | STRUCTURAL GENERAL NOTES | 9/27/2021 |
| S101A | FOUNDATION PLAN - BUILDING A | 9/27/2021 |
| S101B | FOUNDATION PLAN - BUILDING B | 9/27/2021 |
| S101C | FOUNDATION PLAN - BUILDING C | 9/27/2021 |
| S102A | LEVEL 2 FRAMING PLAN - BUILDING A | 9/27/2021 |
| S102B | LEVEL 2 FRAMING PLAN - BUILDING B | 9/27/2021 |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR:



| | | |
|---|---|---|
| S102C | LEVEL 2 FRAMING PLAN - BUILDING C | 9/27/2021 |
| S103A | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING A | 9/27/2021 |
| S103B | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING B | 9/27/2021 |
| S103C | LEVEL 3 & LOW ROOF FRAMING PLAN - BUILDING C | 9/27/2021 |
| S104A | ROOF FRAMING PLAN - BUILDING A | 9/27/2021 |
| S104B | ROOF FRAMING PLAN - BUILDING B | 9/27/2021 |
| S104C | ROOF FRAMING PLAN - BUILDING C | 9/27/2021 |
| S201 | UNIT A.1 FOUNDATION AND FLOOR FRAMING PLANS | 9/27/2021 |
| S202 | UNIT B.1 FOUNDATION AND FLOOR FRAMING PLANS | 9/27/2021 |
| S301A | BUILDING A SHEAR WALL PLANS | 9/27/2021 |
| S301B | BUILDING B SHEAR WALL PLANS | 9/27/2021 |
| S301C | BUILDING C SHEAR WALL PLANS | 9/27/2021 |
| S302 | SHEAR WALL DETAILS | 9/27/2021 |
| S501 | TYPICAL FOUNDATION DETAILS | 9/27/2021 |
| S701 | TYPICAL WOOD FRAMING DETAILS | 9/27/2021 |
| S702 | WOOD FLOOR FRAMING DETAILS | 9/27/2021 |
| S801 | WOOD ROOF FRAMING DETAILS | 9/27/2021 |
| **MECHANICAL - TOWNHOMES** | | |
| M0-01 | MECHANICAL LEGEND AND SPECIFICATIONS | 9/27/2021 |
| M0-02 | MECHANICAL SCHEDULES | 9/27/2021 |
| M1-01A | FIRST FLOOR MECHANICAL PLAN - CONFIG. A | 9/27/2021 |
| M1-01B | FIRST FLOOR MECHANICAL PLAN - CONFIG. B | 9/27/2021 |
| M1-01C | FIRST FLOOR MECHANICAL PLAN - CONFIG. C | 9/27/2021 |
| M3-01 | MECHANICAL UNIT PLANS - A.1 | 9/27/2021 |
| M3-02 | MECHANICAL UNIT PLANS - B.1 | 9/27/2021 |
| M5-00 | MECHANICAL DETAILS | 9/27/2021 |
| **PLUMBING - TOWNHOMES** | | |
| P0-01 | PLUMBING LEGEND AND SPECIFICATIONS | 9/27/2021 |
| P0-02 | PLUMBING SCHEDULES | 9/27/2021 |
| P1-01A | FIRST FLOOR SEWER & VENT PLAN - CONFIG. A | 9/27/2021 |
| P1-01B | FIRST FLOOR SEWER & VENT PLAN - CONFIG. B | 9/27/2021 |
| P1-01C | FIRST FLOOR SEWER & VENT PLAN - CONFIG. C | 9/27/2021 |
| P2-01A | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. A | 9/27/2021 |
| P2-01B | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. B | 9/27/2021 |
| P2-01C | FIRST FLOOR DOMESTIC WATER PLAN - CONFIG. C | 9/27/2021 |
| P3-01 | SEWER & VENT UNIT PLANS - A.1 | 9/27/2021 |
| P3-02 | SEWER & VENT UNIT PLANS - B.1 | 9/27/2021 |
| P3-11 | DOMESTIC WATER UNIT PLANS - A.1 | 9/27/2021 |
| P3-12 | DOMESTIC WATER UNIT PLANS - B.1 | 9/27/2021 |
| P4-00 | PLUMBING RISER DIAGRAMS | 9/27/2021 |
| P5-00 | PLUMBING DETAILS | 9/27/2021 |
| **ELECTRICAL - TOWNHOMES** | | |
| E0-01 | SYMBOLS LEGENDS | 9/27/2021 |
| E0-02 | ELECTRICAL SPECIFICATIONS | 9/27/2021 |
| E1-00 | UNIT A.1 - ELECTRICAL PLANS | 9/27/2021 |
| E1-01 | UNIT B.1 - ELECTRICAL PLANS | 9/27/2021 |
| E2-00 | ELECTRICAL DETAILS | 9/27/2021 |
| E3-00 | ONE-LINE DIAGRAM | 9/27/2021 |
| E4-00 | ELECTRICAL SCHEDULES | 9/27/2021 |
| **INTERIORS - TOWNHOMES** | | |
| I-1.0 | FINISH PLANS | 9/27/2021 |
| I-1.1 | FINISH SCHEDULES | 9/27/2021 |
| **GENERAL - CLUBHOUSE** | | |
| CS-01 C | COVER SHEET | 9/27/2021 |
| CS-02 C | SHEET INDEX & GENERAL NOTES | 9/27/2021 |
| SP-01 C | ARCHITECTURAL SITE PLAN | 9/27/2021 |
| SP-02 C | SITE DETAILS | 9/27/2021 |
| **CODE DATA - CLUBHOUSE** | | |
| CD-01 C | CODE REVIEW SUMMARY | 9/27/2021 |
| CD-02 C | CODE REVIEW | 9/27/2021 |
| CD-03 C | FLORIDA PRODUCT APPROVAL | 9/27/2021 |
| CD-10 C | ACCESSIBLE STANDARDS | 9/27/2021 |
| CD-11 C | ACCESSIBLE STANDARDS | 9/27/2021 |
| CD-21 C | ASSEMBLIES | 9/27/2021 |
| **ARCHITECTURAL - CLUBHOUSE** | | |
| A0-00 C | OVERALL SLAB PLAN - CLUBHOUSE | 9/27/2021 |
| A0-01 C | FLOOR PLAN - CLUBHOUSE | 9/27/2021 |
| A0-02 C | TOWER PLAN - CLUBHOUSE | 9/27/2021 |
| A0-10 C | REFLECTED CEILING PLAN - CLUBHOUSE | 9/27/2021 |
| A0-20 C | ROOF PLAN - CLUBHOUSE | 9/27/2021 |
| A1-01 C | MAINTENANCE BUILDING FLOOR PLAN | 9/27/2021 |
| A1-02 C | MAINTENANCE BUILDING RCP & ROOF PLAN | 9/27/2021 |
| A2-02 C | MAIL KIOSK FLOOR PLAN & ELEVATIONS | 9/27/2021 |
| A2-04 C | POOL EQUIPMENT FLOOR PLAN & ELEVATIONS | 9/27/2021 |
| A3-03 C | TRASH COMPACTOR FLOOR PLAN & ELEVATIONS | 9/27/2021 |
| A4-01 C | OVERALL BUILDING ELEVATIONS - CLUBHOUSE | 9/27/2021 |
| A4-02 C | OVERALL BUILDING ELEVATIONS - MAINTENANCE BLDG | 9/27/2021 |
| A5-01 C | OVERALL BUILDING SECTIONS | 9/27/2021 |
| A5-02 C | OVERALL BUILDING SECTIONS | 9/27/2021 |
| A5-10 C | TYPICAL WALL SECTIONS | 9/27/2021 |
| A5-11 C | TYPICAL WALL SECTIONS | 9/27/2021 |

INITIALED BY CONTRACTOR: DS
INITIALED BY SUBCONTRACTOR:

| | | |
|---|---|---|
| A6-00 C | FOUNDATION DETAILS | 9/27/2021 |
| A6-01 C | EXTERIOR FRAMING DETAILS - PLAN | 9/27/2021 |
| A6-02 C | ROOF DETAILS | 9/27/2021 |
| A6-03 C | ROOF DETAILS | 9/27/2021 |
| A6-04 C | FLASHING DETAILS | 9/27/2021 |
| A6-05 C | DETAILS | 9/27/2021 |
| A6-06 C | DOOR DETAILS | 9/27/2021 |
| A6-07 C | WINDOW HEAD, JAMB, AND SILL DETAILS | 9/27/2021 |
| A6-08 C | WINDOW FLASHING DETAILS | 9/27/2021 |
| A7-00 C | SCHEDULES | 9/27/2021 |
| A7-01 C | SCHEDULES | 9/27/2021 |
| **STRUCTURAL - CLUBHOUSE** | | |
| S001 | STRUCTURAL GENERAL NOTES | 9/27/2021 |
| S002 | PLAN LOADING | 9/27/2021 |
| S101 | CLUBHOUSE FOUNDATION PLAN | 9/27/2021 |
| S102 | CLUBHOUSE ROOF FRAMING PLAN | 9/27/2021 |
| S103 | CLUBHOUSE HIGH ROOF FRAMING PLAN | 9/27/2021 |
| S111 | AUXILARY STRUCTURES FOUNDATION PLANS | 9/27/2021 |
| S112 | AUXILARY STRUCTURES ROOF FRAMING PLANS | 9/27/2021 |
| S301 | CLUBHOUSE SHEARWALL PLAN | 9/27/2021 |
| S302 | CLUBHOUSE HIGH ROOF SHEARWALL PLAN | 9/27/2021 |
| S311 | AUXILARY STRUCTURES SHEARWALL PLANS | 9/27/2021 |
| S501 | TYPICAL FOUNDATION DETAILS | 9/27/2021 |
| S701 | TYPICAL WOOD FRAMING DETAILS | 9/27/2021 |
| S801 | WOOD ROOF FRAMING DETAILS | 9/27/2021 |
| **MECHANICAL - CLUBHOUSE** | | |
| M0-01 C | MECHANICAL LEGEND AND NOTES | 9/27/2021 |
| M0-02 C | MECHANICAL SCHEDULES | 9/27/2021 |
| M1-01 C | MECHANICAL CLUBHOUSE PLAN | 9/27/2021 |
| M1-02 C | MECHANICAL MAINTENANCE PLAN | 9/27/2021 |
| M5-00 C | MECHANICAL DETAILS | 9/27/2021 |
| **PLUMBING - CLUBHOUSE** | | |
| P0-01 C | PLUMBING LEGEND AND NOTES | 9/27/2021 |
| P0-02 C | PLUMBING SCHEDULES | 9/27/2021 |
| P0-03 C | PLUMBING SITE PLAN | 9/27/2021 |
| P1-01 C | CLUBHOUSE PLAN - SEWER & VENT | 9/27/2021 |
| P1-02 C | MAINTENANCE PLAN - SEWER & VENT | 9/27/2021 |
| P2-01 C | CLUBHOUSE PLAN - WATER & GAS | 9/27/2021 |
| P2-02 C | MAINTENANCE PLAN - WATER & GAS | 9/27/2021 |
| P4-00 C | PLUMBING RISER DIAGRAMS | 9/27/2021 |
| P5-00 C | PLUMBING DETAILS | 9/27/2021 |
| **ELECTRICAL - CLUBHOUSE** | | |
| E0-01 C | SYMBOLS LEGENDS | 9/27/2021 |
| E1-01 C | LIGHTING CLUBHOUSE PLAN | 9/27/2021 |
| E1-02 C | LIGHTING MAINTENANCE PLAN | 9/27/2021 |
| E1-03 C | ELECTRICAL MAILROOM PLANS | 9/27/2021 |
| E2-01 C | POWER CLUBHOUSE PLAN | 9/27/2021 |
| E2-02 C | POWER MAINTENANCE PLAN | 9/27/2021 |
| E4-00 C | ELECTRICAL DETAILS | 9/27/2021 |
| E5-00 C | ONE-LINE DIAGRAM | 9/27/2021 |
| E6-00 C | ELECTRICAL SCHEDULES | 9/27/2021 |
| **INTERIORS - CLUBHOUSE** | | |
| I-1.0 | FINISH PLAN | 9/27/2021 |
| I-2.0 | REFLECTED CEILING PLAN, ELEVATIONS AND DETAILS | 9/27/2021 |
| I-3.0 | ELEVATIONS | 9/27/2021 |
| I-4.0 | SECTIONS AND DETAILS | 9/27/2021 |
| **LANDSCAPE** | | |
| L-1.0 | LANDSCAPE NOTES & SPECIFICATIONS | 9/27/2021 |
| L-1.1 | PLANTING PLAN & DETAILS | 9/27/2021 |
| L-1.2 | PLANTING PLAN | 9/27/2021 |
| L-1.3 | PLANTING PLAN - AMENITY AREAS | 9/27/2021 |
| LH-1.0 | HARDSCAPE NOTES & SPECIFICATIONS | 9/27/2021 |
| LH-1.1 | HARDSCAPE PLAN - TOWNHOMES | 9/27/2021 |
| LH-1.2 | HARDSCAPE PLAN - AMENITY AREAS | 9/27/2021 |
| LH-1.3 | CITRUS RIDGE ENTRANCE | 9/27/2021 |
| LH-1.4 | HARDSCAPE DETAILS | 9/27/2021 |
| LH-1.5 | HARDSCAPE DETAILS | 9/27/2021 |
| **CIVIL** | | |
| C01.0 | COVER SHEET *REVISION 2 ISSUED 10-3-2021 APPLIES to ALL 72 SHEETS* | 10/3/2021 |
| C02.0 | GENERAL CONSTRUCTION NOTES | 10/3/2021 |
| C03.0 | AERIAL SITE PLAN | 10/3/2021 |
| C04.0 | DEMOLITION & EROSION CONTROL PLAN | 10/3/2021 |
| C05.0 | MASTER SITE PLAN | 10/3/2021 |
| C06.0 | TYPICAL SECTIONS | 10/3/2021 |
| C07.0 | GEOMETRY PLAN | 10/3/2021 |
| C07.1 | GEOMETRY PLAN | 10/3/2021 |
| C08.0 | MASTER DRAINAGE PLAN | 10/3/2021 |
| C09.0 | PAVING & GRADING PLAN | 10/3/2021 |
| C09.1 | PAVING & GRADING PLAN | 10/3/2021 |
| C09.2 | PAVING & GRADING AMENITY PLAN | 10/3/2021 |

INITIALED BY CONTRACTOR
INITIALED BY SUBCONTRACTOR

| C10.0 | PAVING & GRADING DETAILS | 10/3/2021 |
|---|---|---|
| C10.1 | PAVING & GRADING DETAILS | 10/3/2021 |
| C11.0 | MASTER UTILITY PLAN | 10/3/2021 |
| C11.1 | UTILITY PLAN | 10/3/2021 |
| C11.2 | UTILITY PLAN | 10/3/2021 |
| C11.3 | LIFT STATION PLAN | 10/3/2021 |
| C12.0 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.1 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.2 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.3 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.4 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.5 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.6 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.7 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.8 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.9 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C12.10 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C13.0 | POND PLAN & DETAILS | 10/3/2021 |
| C13.1 | POND PLAN & DETAILS | 10/3/2021 |
| C14.0 | UTILITY DETAILS | 10/3/2021 |
| C14.1 | UTILITY DETAILS | 10/3/2021 |
| C14.2 | LIFTSTATION DETAILS | 10/3/2021 |
| C14.3 | LIFTSTATION DETAILS | 10/3/2021 |
| C14.4 | UTILITY DETAILS | 10/3/2021 |
| C14.5 | UTILITY DETAILS | 10/3/2021 |
| C15.0 | SIGNING AND PAVEMENT MARKINGS | 10/3/2021 |
| C16.0 | CURBING AND SIDEWALK MASTER PLAN | 10/3/2021 |
| C17.0 | STREET LIGHTING CONCEPT PLAN | 10/3/2021 |
| LP-101 | LANDSCAPE PLAN | 10/3/2021 |
| LP- 102 | IRRIGATION PLAN | 10/3/2021 |
| LP-103 | IRRIGATION PLAN | 10/3/2021 |
| C18.0 | AERIAL SITE PLAN | 10/3/2021 |
| C19.0 | DEMOLITION & EROSION CONTROL PLAN | 10/3/2021 |
| C20.0 | MASTER SITE PLAN | 10/3/2021 |
| C21.0 | TYPICAL CROSS SECTIONS | 10/3/2021 |
| C22.0 | GEOMETRY PLAN | 10/3/2021 |
| C23.0 | MASTER DRAINAGE PLAN | 10/3/2021 |
| C24.0 | PAVING & GRADING PLAN | 10/3/2021 |
| C24.1 | PAVING & GRADING PLAN | 10/3/2021 |
| C25.0 | PAVING & GRADING DETAILS | 10/3/2021 |
| C25.1 | PAVING & GRADING DETAILS | 10/3/2021 |
| C25.2 | POND PLAN | 10/3/2021 |
| C26.0 | MASTER UTILITY PLAN | 10/3/2021 |
| C27.0 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C27.1 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C27.2 | ROADWAY PLAN & PROFILE | 10/3/2021 |
| C28.0 | ROADWAY CROSS-SECTIONS | 10/3/2021 |
| C28.1 | ROADWAY CROSS-SECTIONS | 10/3/2021 |
| C28.2 | ROADWAY CROSS-SECTIONS | 10/3/2021 |
| C28.3 | ROADWAY CROSS-SECTIONS | 10/3/2021 |
| C28.4 | TEMPORARY ACCESS ROAD PLAN & PROFILE | 10/3/2021 |
| C28.5 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | 10/3/2021 |
| C28.6 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | 10/3/2021 |
| C28.7 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | 10/3/2021 |
| C28.8 | TEMPORARY ACCESS ROAD CROSS-SECTIONS | 10/3/2021 |
| C29.0 | UTILITY DETAILS | 10/3/2021 |
| C29.1 | UTILITY DETAILS | 10/3/2021 |
| C29.2 | UTILITY DETAILS | 10/3/2021 |
| C29.3 | UTILITY DETAILS | 10/3/2021 |
| C30.0 | SIGNING AND PAVEMENT MARKING PLAN | 10/3/2021 |
| GEOTECHINCAL EXPLORATION | | |
| | UES REPORT NO. 1893299v2 | 8/26/2021 |

INITIALED BY CONTRACTOR:
INITIALED BY SUBCONTRACTOR:

EXHIBIT "E"

<u>Initial Directives to Principal</u>

4860-0949-5500, v. 1

| | |
|---|---|
| **From:** | Adam Yorsaner |
| **To:** | Charles Clough |
| **Cc:** | Kirk Johnson; Scott Macaulay; Rory Guilfoy |
| **Subject:** | RE: Citrus Ridge: Fire Line Update |
| **Date:** | Tuesday, August 2, 2022 3:05:00 PM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

Charles,

This is a directive by us to move forward with the 4" pipe. We have to do this per the Fire Marshall. I'm giving you a directive. Submit your pipe, we'll approve it. Please don't stall this.

If something changes, we'll take care of the financial burden. Please get this done now.

**From:** Adam Yorsaner
**Sent:** Tuesday, August 2, 2022 2:38 PM
**To:** Charles Clough <Charles.Clough@mckenziecontractingllc.com>
**Cc:** Kirk Johnson <K.Johnson@mckenziecontractingllc.com>; Scott Macaulay <scott.macaulay@risere.com>; Rory Guilfoy <rory.guilfoy@risere.com>
**Subject:** RE: Citrus Ridge: Fire Line Update

We're working on it. I'll get you the approved stuff as soon as possible.

**From:** Charles Clough <Charles.Clough@mckenziecontractingllc.com>
**Sent:** Tuesday, August 2, 2022 2:36 PM
**To:** Adam Yorsaner <adam.yorsaner@risere.com>
**Cc:** Kirk Johnson <K.Johnson@mckenziecontractingllc.com>; Scott Macaulay <scott.macaulay@risere.com>; Rory Guilfoy <rory.guilfoy@risere.com>
**Subject:** RE: Citrus Ridge: Fire Line Update

Please provide me with Approved Design Plans so that I can request the proper submittals before ordering any Pipe or Fittings

**"THE BEAT GOES ON"**

**Charles R. Clough**
*7712 E. Broadway Ave*
*Tampa, FL 33619*
Cell: (727) 919-8118
Office: (813) 454-4429
Email: Charles.Clough@mckenziecontractingllc.com
Website: www.mckenziecontractingllc.com



*Hillsborough County DM/DWBE/SBE*
*City of Tampa MBE/SBE*
*Port of Tampa SBE*
*Certified DBE*
*FDOT Certified DBE*

The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email in error, please notify the system manager or the sender immediately and do not disclose the contents to anyone or make copies.

**From:** Adam Yorsaner
**Sent:** Monday, August 1, 2022 10:26 AM
**To:** Charles Clough
**Cc:** Kirk Johnson; Scott Macaulay; Rory Guilfoy
**Subject:** Citrus Ridge: Fire Line Update

Charlie,

We do not have the design drawings yet, but we have already spoke with the Fire Inspector and he has cleared what he wants to use. This is what we're going to use: 4" C-900 pipe, 4" saddles and a 4" sweep into the building. There will be a FDC that will be shown on the civils. However, we will not hold you responsible for the FDC coming out of the Fire Room. Please proceed with procurement as soon as possible.

Thanks.



Adam Yorsaner
Project Manager
516-242-5763 cell

LOVE SERVE CARE
10161 Centurion Parkway | Jacksonville, FL 32256



My word for 2022 is ***Justice***

**RISE Security Notice: This email came from someone outside of RISE. Think before you click!**

| | |
|---|---|
| **From:** | Adam Yorsaner |
| **To:** | Kirk Johnson |
| **Cc:** | Rory Guilfoy |
| **Subject:** | Fire Sweeps |
| **Date:** | Thursday, August 25, 2022 4:51:00 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

---

Kirk,

You are directed to proceed forward with the ordering of 4" Sweeps for the Fire Riser. If there is any deviation from the plan, Rise shall be responsible for the additional costs associated with the change.



Adam Yorsaner
Project Manager
516-242-5763 cell

LOVE  SERVE  CARE

10161 Centurion Parkway | Jacksonville, FL 32256



My word for 2022 is *Justice*

| | |
|---|---|
| **From:** | Adam Yorsaner |
| **To:** | Kirk Johnson; Clough (charles.clough@mckenziecontractingllc.com); Kenrick Callwood |
| **Cc:** | Rory Guilfoy; Scott Macaulay; Dan Fernandez |
| **Subject:** | CItrus Ridge: 4" Sweep |
| **Date:** | Wednesday, September 14, 2022 8:37:00 AM |
| **Attachments:** | DSS Citrus Ridge Apartments Fire Protection Plans - Rev01 - 8-9-22 - Reviewed - Approved.pdf |
| | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| **Importance:** | High |

Team McKenzie,

I need those 4" sweeps installed on the buildings. Attached is the approved Fire drawings. Also directed by the Polk County Fire Department, we need sleeves installed around the 4" penetration. Please proceed immediately.

The riser detail is as follows:



Please note, Hamilton Engineering is currently working on the details for the plans changes. I'll have those in your hands as soon as possible.

Adam Yorsaner
Project Manager
516-242-5763 cell

LOVE SERVE CARE
10161 Centurion Parkway | Jacksonville, FL 32256

My word for 2022 is *Justice*

EXHIBIT "F"

<u>Notice of Delay</u>

36

4860-0949-5500, v. 1

| From: | Adam Yorsaner |
|---|---|
| To: | Dan Fernandez; Clough (charles.clough@mckenziecontractingllc.com); Kirk Johnson; Kenrick Callwood |
| Cc: | Scott Macaulay; Joe Passkiewicz; Rory Guilfoy |
| Subject: | Citrus Ridge: Notice of Delay - Water Tap |
| Date: | Wednesday, September 14, 2022 2:44:00 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| Importance: | High |

Team McKenzie,

I was informed by Kirk, today, that Andrew Johnson, the individual responsible for handling water connections in Polk County, said the earliest that they can come out is the 26th. We called Andrew Johnson ourselves to find out the details and see if we could expedite. We could not. Furthermore, Mr. Johnson informed us that McKenzie had failed to file the proper paperwork (Request to Connect) and attempted to schedule the inspection today that which are the reasons for delay. Additionally, Polk County does not witness water taps on Friday. As of now, McKenzie has still not filed the application. Mr. Johnson said it takes a minimum of 5 days to review. This is why he **suggested the 26th**, but that in itself is not a guaranteed date to perform this work. Mr. Johnson also mentioned that McKenzie is fully aware of applying for this and the process thereof. In consideration that you did this several months ago, I'm surprised by his response.

Per the change order agreement, executed on August 11th, McKenzie had 10 days to mobilize and 2 days prosecute the work after receiving the MOT approval. We have requested a copy of the MOT and still haven't received it. We were told verbally that the MOT dates start the week of the 12th. We were also informed that the MOT was acquired Thursday, September 8th. With that in consideration, McKenzie is in serious risk of not be able to prosecute the work in the time promised. Due to this, I have no other choice but to put McKenzie Contracting, LLC on notice of breach of contract. I am specifically citing 12. Timing of Work (a) Scheduled Completion.

This is a significant delay that may result in damages as prescribed in section 12. Timing of Work, Provision (e). We would like to avoid this at all costs and encourage McKenzie Contracting, LLC to do everything that it can to expedite this process at any cost necessary to avoid further escalation.



Adam Yorsaner
Project Manager
516-242-5763 cell

LOVE SERVE CARE

10161 Centurion Parkway | Jacksonville, FL 32256

My word for 2022 is *Justice*

EXHIBIT "H"

February 2023 Revised Schedule

4860-0949-5500, v. 1

**RISE**

RISE General Contractors, LLC
10161 Centurion Parkway N. Suite 100
Jacksonville, Florida 32256
Phone: 229.247.2077

**Project:** 007-BR-784 - Citrus Ridge - Davenport, FL
2003 Palmer Road
Davenport, Florida 33837

## Subcontract Change Order #006: CE #037 - RAA #1 Changes

| | | | |
|---|---|---|---|
| **CONTRACT COMPANY:** | McKenzie Contracting LLC 7712 E. Broadway Ave. Tampa, Florida 33619 | **CONTRACT FOR:** | 784-SC-005:On-Site Site Work |
| **DATE CREATED:** | 2/17/2023 | **CREATED BY:** | Adam Yorsaner (RISE: A Real Estate Company) |
| **CONTRACT STATUS:** | Approved | **REVISION:** | 0 |
| **REQUEST RECEIVED FROM:** | | **LOCATION:** | |
| **DESIGNATED REVIEWER:** | Adam Yorsaner (RISE: A Real Estate Company) | **REVIEWED BY:** | |
| **DUE DATE:** | | **REVIEW DATE:** | 02/17/2023 |
| **INVOICED DATE:** | | **PAID DATE:** | |
| **REFERENCE:** | | **CHANGE REASON:** | Client Request |
| **PAID IN FULL:** | No | **EXECUTED:** | No |
| **ACCOUNTING METHOD:** | Amount Based | **SCHEDULE IMPACT:** | |
| **FIELD CHANGE:** | No | **SIGNED CHANGE ORDER RECEIVED DATE:** | |
| | | **TOTAL AMOUNT:** | $556,710.50 |

**DESCRIPTION:**
CE #037 - RAA #1 Changes
This Change Order is for the changes made by Hamilton Engineering on the Civil Drawings dated 12/22/22.

1. Subcontractor has reviewed all the changes in the plans and has priced this accordingly. All pricing escalation has been considered in this Change Order and Subcontractor shall not be allowed to request escalation to complete this scope of work.
2. Subcontractor's Fire Line Permitting was provided as an estimate of the cost. Contractor shall not be responsible for any amount above $57,120.00. Subcontractor shall submit all permitting fees paid with Pay Application. Subcontractor is entitled to the cost of permitting plus any markup percentage allowed by the Contract Documents. Should the permitting fees be less than $57,120.00, then Subcontractor agrees to a Deductive Change Order in the amount of the remaining balance.
3. Subcontractor acknowledges that all changes to Utilities, Roadwork (Paving, Curbs, Aprons, etc...), Concrete (Sitework only, excludes Building Pads, Dog Park and Monument Wall), Earthwork, Sitework and any other scope related to the original Subcontract agreement are covered in this Change Order to deliver a fully compliant site based on the revised Civil Drawings dated 12/22/22.
4. Subcontractor shall be completed with all onsite and Minute Maid Ramp Road 1 Utility work no later than 3/25/23. This includes all fire hydrants and laterals to the buildings. Subcontractor shall make arrangements to immediately pursue domestic water inspections to achieve potable water onsite. Time is of the essence in pursuit of potable water.
5. Subcontractor shall coordinate all inspections with Contractor. Contractor shall call in all inspections required.
6. Subcontractor shall adhere to the Sequencing Schedules that have been distributed during the weekly calls as a part of this Change Order. This Change Order shall not alter any of the dates prescribed in the 2/16/23 Sequencing Plan of Minute Maid Ramp Road 1.
7. Subcontractor shall notify Contractor of any obstacles or delays that may inhibit their work at least 48 business hours in advance. Failure to do so is the full responsibility of the Subcontractor. Should time be lost due to this, Subcontractor shall be responsible for all costs associated with the delay.
8. Subcontractor shall adhere to the following delivery schedule of each phase:

- Phase 1 Delivery – **6/30**
- Phase 2 Delivery – **9/6**
- Phase 3 Delivery – **9/16** for Building 17, 18 & 19. **12/26** for Buildings 14, 15 & 16.
- Phase 4 Delivery – **10/24**
- Phase 5 Delivery – **11/1**

Subcontractor shall make sure all necessary components of their scope of work are in place in time to deliver the Phases (attached to this Change Order). Subcontractor shall notify Contractor of any potential delays to meeting this time at the time of    discovery. Subcontractor shall make best

**CCO #006**

efforts to keep schedule in line with the expectations prescribed above. Subcontractor understands this schedule may Change and shall accept any reasonable timeline changes.

9. Subcontractor shall immediately turn in as-built drawings as they are completed by Subcontractor's surveyor. Subcontractor is responsible for all surveying as it relates to their scope of work.

10. Subcontractor shall coordinate all work with the Contractor. Any shutdowns of roads or areas to complete this scope of work must be made 1 week prior to the commencement of the work.

**ATTACHMENTS:**

**CHANGE ORDER LINE ITEMS:**

| # | Budget Code | Description | Amount |
|---|---|---|---|
| 1 | 02-31-1000.S Grading.Subcontract | RAA #1 Changes | $556,710.50 |
| | | **Grand Total:** | **$556,710.50** |

| | |
|---|---|
| The original (Contract Sum) | $ 3,920,736.77 |
| Net change by previously authorized Change Orders | $ 643,340.77 |
| The contract sum prior to this Change Order was | $ 4,564,077.54 |
| The contract sum will be increased by this Change Order in the amount of | $ 556,710.50 |
| The new contract sum including this Change Order will be | $ 5,120,788.04 |
| The contract time will not be changed by this Change Order. | |

**RISE General Contractors, LLC**
10161 Centurion Parkway N. Suite 100
Jacksonville, Florida 32256

DocuSigned by:

*Adam Yorsaner*                    2/22/2023

A60354337634446

**SIGNATURE**                          **DATE**

**McKenzie Contracting LLC**
7712 E. Broadway Ave.
Tampa, Florida 33619

DocuSigned by:

*Oliver D. Fernandez Jr.*          2/21/2023

53C65C0D38A0467

**SIGNATURE**                          **DATE**

**EXISTING DEVELOPMENT**

PRESTWICK VILLAGE
P.B. 169, PAGE 5-7
PARCEL ID 27-26-20-706019-000650
OWNER  BETTER BUILT HOMES RESIDENTIAL
GROUP LLC





Starts: 3/13
3/13: Sanitary (3 Days) Completes Thursday 3/16
3/17: Storm (3 Days) Completes Monday 3/20
3/20: FM & WM (2 Days) Completes 3/22

Closed Friday 3/17 and Saturday 3/18)

3/29: Water Main Tap Completes (5 Days) 4/5 (Depending on County Approval)

POND 5 0.07 AC

POND 4 0.13 AC

SEE PLAN & PROFILE SHEET FOR CROSSING DETAIL

PIPE X-ING #73
PIPE X-ING #74
PIPE X-ING #75
PIPE X-ING #76
PIPE X-ING #77
PIPE X-ING #78
PIPE X-ING #79



MINUTE MAID RAMP ROAD 1



| | RIM = 169.03'<br>STA = 74+37.98<br>4' DIA LINED SS<br>CONC. COLLAR<br>8"(W) INV (N = ?<br>8"(S) INV = 1<br>8"(NE) IN/OUT |
|---|---|
| SS-36 | |
| SS-37 | RIM = 169.96'<br>STA = 74+37.98<br>4' SSWR MH<br>8"(N) INV OUT = ? |

B

66+00

PIPE X-ING #77

PIPE X-ING #78
PIPE X-ING #79

POND 4
0.13 AC

65+00

PIPE X-ING #75
PIPE X-ING #76

SEE PLAN & PROFILE SHEET
FOR CROSSING DETAIL

PIPE X-ING #73

PIPE X-ING #74

64+00

POND 5 0.07 AC



**DocuSign**

## Certificate Of Completion

Envelope Id: 788F8E3198694FEBA8A064E3FECF715F
Subject: Citrus Ridge: RAA #1 Change Order
Source Envelope:
Document Pages: 7                     Signatures: 2
Certificate Pages: 5                  Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
Adam Yorsaner
129 N Patterson St
Valdosta, GA  31601
adam.yorsaner@risere.com
IP Address: 35.162.92.191

## Record Tracking

Status: Original
   2/17/2023 1:33:25 PM

Holder: Adam Yorsaner
         adam.yorsaner@risere.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Oliver D. Fernandez Jr. | *Oliver D. Fernandez Jr.* | Sent: 2/17/2023 1:38:49 PM |
| dan.fernandez@mckenziecontractingllc.com | E3C6EBDB38A0467... | Viewed: 2/19/2023 7:47:18 PM |
| Owner/Member |  | Signed: 2/21/2023 5:53:16 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: 47.198.89.138 |  |

Electronic Record and Signature Disclosure:
   Accepted: 2/19/2023 7:47:18 PM
   ID: e36621a0-dd4f-4b27-a1e2-24a80a319457

| | | |
|---|---|---|
| Adam Yorsaner | *Adam Yorsaner* | Sent: 2/21/2023 5:53:25 PM |
| adam.yorsaner@risere.com | A603E42375344A6... | Viewed: 2/22/2023 1:29:59 PM |
| Project Manager |  | Signed: 2/22/2023 1:30:24 PM |
| RISE General Contractors |  |  |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: 107.85.252.217 |  |

Electronic Record and Signature Disclosure:
   Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Teresa Koscielney | **COPIED** | Sent: 2/22/2023 1:30:33 PM |
| Teresa.Koscielney@risere.com |  |  |
| Project Coordinator |  |  |
| RISE General Contractors |  |  |
| Security Level: Email, Account Authentication (None) |  |  |

Electronic Record and Signature Disclosure:
   Accepted: 2/25/2022 11:57:55 AM
   ID: 5812a66e-9a1b-44cd-846f-bcce93ba2593

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/17/2023 1:38:49 PM |
| Certified Delivered | Security Checked | 2/22/2023 1:29:59 PM |
| Signing Complete | Security Checked | 2/22/2023 1:30:24 PM |
| Completed | Security Checked | 2/22/2023 1:30:33 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Parties agreed to: Oliver B. Fernandez Jr., Teresa Roscichey

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, RISE General Contractors LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact RISE General Contractors LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: logan.mallory@risere.com

**To advise RISE General Contractors LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at logan.mallory@risere.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from RISE General Contractors LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to logan.mallory@risere.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with RISE General Contractors LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to logan.mallory@risere.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify RISE General Contractors LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by RISE General Contractors LLC during the course of your relationship with RISE General Contractors LLC.

EXHIBIT "H"

Notice of Termination

38

June 8, 2023

Dan Fernandez                                    SENT VIA EMAIL AND FED EX
McKenzie Contracting, LLC
7712 E. Broadway Ave.
Tampa, FL 33619

RE:    NOTICE OF TERMINATION
       CITRUS RIDGE, DAVENPORT, FL

Dear Dan:

Please be advised that RISE GC is hereby terminating all Subcontract Agreements between RISE GC and McKenzie Contracting, LLC (hereafter, "McKenzie") with respect to the above-referenced project (collectively, the "Subcontracts") for default, pursuant to Section 21 of said Subcontracts.  RISE GC can no longer tolerate the slow progress on site.  McKenzie has failed on every schedule obligation and the project continues to suffer.  McKenzie has been notified repeatedly and has not responded with the additional manpower and resources necessary to recover from the schedule failures.  We have attempted to work around the schedule failures, shortages of manpower, lack of site supervision and vendor claims, however, we have reached a point where this is no longer possible. Below is a partial list of schedule failures:

**Schedule Failures- Weekly Meeting Minutes**
**2/16/23** - Paving per mutually agreed schedule was to be completed no later than 4/21 on Minute Maid Road. Directional bore under Citrus Ridge Drive per agreed scheduled to be completed by end of February – to date still not finished.
**2/22/23** – Citron South per mutually agreed schedule to be drivable by 3/31 with most utilities repaired (rework) and recovered – Road base completed week of 5/29 two months late.
**4/19/23** – Force main & water main work on Minute Maid per mutually agreed schedule to be finished 5/31. All storm work was supposed to be complete. As of today, force main connections and water tap still not completed. Still adjusting storm structures.
**5/17/23** – Minute Maid Road per mutually agreed schedule to be completely drivable by 6/5 with base. Not finished grading. No curbs installed. Yard drains schedule to start work on 5/15- not started.

**Schedule Failures- Change Orders and Emails**
**2/17/23**- Per Change Order #6 dated 2/17/23 – All Onsite utility work to be completed no later than **3/25/23**- Work is still not complete.
**3/20/23** - Directive via e-mail for lift station to start work due to critical path urgency.  Still not started.

Mr. Dan Fernandez
June 8, 2023
Page 2

**Failures- Change Orders and Emails (Cont.)**
**4/5/23** – Second directive for lift station to start with urgent start, request for survey data requested and not met, boring underneath Citrus Drive directive to start, pigging inspections needed to start April 24th

**4/13/23** – Email stating that they failed to meet storm crossing date. Concerns stated they won't have water active by May 5 as scheduled.

**4/13/23** – Requested lift station equipment be released.

**4/25/23** – Notified McKenzie that they haven't paid the balance for the lift station and that's why it wasn't delivered.

**5/3/23-** Expressed that lift station work needed to start immediately. Borings need to start immediately. Water is of the utmost importance.

**5/8/23-** Requested lift station start again.

**5/24/23-** McKenzie doesn't improve manpower.

**5/26/23-** Notice of the critical nature of failure to pave Minute Maid which was, per a mutually agreed schedule, to be paved out 4/21/23. Directed to increase manpower. No reaction from McKenzie.

Additionally, there has been extensive rework due to poor workmanship. LBRs have repeatedly failed. The lift station wet well was installed incorrectly and required complete removal and reinstallation. The storm system was installed incorrectly and required extensive rework tying up critical resources. The delay in completing Minute Maid has taken away the only secondary entrance to the project and this is absolutely critical to complete Citrus Ridge and Palmer paving so we are facing a potential work stoppage due to the lack of this access. The lift station requires extensive work and a long approval process from Polk County and the lack of progress threatens our ability to occupy the project as well as the new 7-Eleven. As discussed every week at our 9 am Wednesday meetings, the completion of McKenzie's work per the agreed schedule is absolutely critical to the project and McKenzie has consistently failed to meet every critical completion date.

Mr. Dan Fernandez
June 8, 2023
Page 3

You are hereby directed to cease all operations on site, cancel any and all open obligations, and surrender all materials for the project that are stored on site to the RISE GC field staff. We regret having to resort to this action, however, the financial damage is growing by the day. Additionally, RISE GC is notifying your bonding company of the failures on site, and we will be seeking to recover any and all damages resulting from slow progress and schedule failures against the bond.

All rights and remedies of RISE GC under the Subcontract Agreement and/or at law with respect to the acts, omissions and defaults of McKenzie are hereby expressly reserved, and nothing contained in this correspondence should be construed to the contrary or as admission or statement by RISE GC in conflict with such rights.

Sincerely,

RISE GENERAL CONTRACTORS, LLC

Joe Passkiewicz
Senior Vice President

Encl.

Cc:     C. Gordon
        S. Macaulay
        J. Scott
        A. Yorsaner
        Crum & Forster

EXHIBIT "I"

<u>Liens</u>

INSTR # 2023204367
BK 12819 Pgs 1386-1388 PG(s)3
RECORDED 08/31/2023 08:18:05 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES $27.00
RECORDED BY katrmccl

This Instrument Prepared by and Return to:
John H. Dannecker, Esquire
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1600
Orlando, Florida 32801

### WARNING!

**THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON THE REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE DATE OF RECORDING, AND SHALL EXPIRE AND BECOME NULL AND VOID THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.**

### CLAIM OF LIEN

State of TEXAS
County of DALLAS

Before me, the undersigned notary public, personally appeared JASMINE PANKEY, who was duly sworn and says that she is the CREDIT MANAGER for the lienor herein, FORTILINE, INC., whose address is 7025 Northwinds Drive NW, Concord, NC 28027, and that in accordance with a contract with MCKENZIE CONTRACTING, LLC, 7712 E. BROADWAY AVENUE, TAMPA, FL 33619 lienor furnished materials to make the real property below suitable as the site for construction of an improvement as described in Florida Statutes §713.04, for improvement of the real property located in Polk County, Florida, more particularly described in **Exhibit "A"**, owned by Citrus Ridge Properties II, LLC, whose address is 129 N Patterson Street, Valdosta, GA 31601 of a total value of $682,680.60, of which there remains unpaid $551,758.58 for materials plus finance charges per the lienor's contract. Lienor furnished the first of the items on April 11, 2022, and that the last of the items on June 2, 2023. On or about May 4, 2022, lienor served its Notice to Owner by Certified Mail on those referenced in the Notice of Commencement.

Fortiline, Inc.,

By: *Jasmine Pankey*
Name: Jasmine Pankey
Title:   Credit Manager

Sworn to (or affirmed) and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 25 day of August 2023, by Jasmine Pankey who is personally known to me or has produced _____ as identification.

JUSTINE JONES
Notary ID #132855463
My Commission Expires
January 7, 2025

NOTARY PUBLIC

x *Justine Jones*

**WARNING!**
**THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LEIN HAS BEEN PLACED OF THE**
**REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION**
**TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE**
**DATE OF RECORDING, AND SHALL EXPIRE AND BECOME NULL AND VOID THEREAFTER UNLESS**
**LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.**

# CLAIM OF LIEN

STATE OF FLORIDA
COUNTY OF POLK

BEFORE ME, the undersigned notary public, personally appeared Michael D. Crow who being duly sworn and says that he
is the owner of Michael D Crow & Associates, Inc, lienor, whose address is 509-B W Alexander St, Plant City, Florida
33563 and that in accordance with a contract with MCKENZIE CONTRACTING, LLC, 7712 E. BROADWAY AVE,
TAMPA, FL 33619, lienor furnished labor, services or materials consisting of Stake & Grade Yard drains on Palmer & Back
Flow Preventer @ SW Corner of Citron, Ponds, Curb Inlets & Edge of Pavement, Top Inlets, Stake out Water Sevice and
right of Way on citrus, Set Top Elevation for Lift Station, and Asbuilt of force main & Water Line on Minute Main rd on the
following described real property in Polk County, Florida:

Parcel ID's: 27-26-20-705500-030190        Town Grove At Citrus Ridge Dr, Davenport, Fl 33837
            27-26-20-705500-030301
            27-26-20-705500-030281

Owned by CITRUS RIDGE PROPERTIES II, LLC, 129 N PATTERSON ST, VALDOSTA, GA 31601-5538, for a total
value of $8,405.00 of which there remains unpaid $8,405.00 and furnished the first item on 5/10/23 and the last of the items
on 6/13/23.

*Signed, sealed and delivered in our presence:*

__Michael D Crow__                          __Linda Harrop__
Grantor (owner name)                        Witness

_[signature]_                               _[signature] Linda Harrop_
Owner name                                  Witness

**STATE OF** __Florida__
**COUNTY OF** __Hillsborough__

*I HEREBY CERTIFY* that the foregoing instrument was acknowledged before me by means of
✓ physical presence or _____ online notarization, this _18th_ day of _July_____, 2023, by _Michael D. Crow_
_____ **and** _Linda Harrup_____ who is (are) personally known to
me or ✓ has (have) produced _____ as identification and who did not take an oath.

_Benson Taylor [signature]_
Notary Public

Notary Public State of Florida
Benson K. Taylor
My Commission HH 119124
Expires 04/20/2025

R/E MICHAEL D CROW
509-B W. ALEXANDER ST
PLANT CITY, FL 33563

USPS CERTIFIED MAIL



WO 4439588 Florida
GW Trucking Inc
1001 W. Cypress Creek Road
Suite 203
Fort Lauderdale, FL 33309

9214 8901 0919 3640 1540 88

CITRUS RIDGE PROPERTIES II LLC - R GREGORY
HUNTER
10161 CENTURION PARKWAY N SUITE 100
JACKSONVILLE, FLORIDA 32256

**GW TRUCKING INC**
**PO BOX 616903, ORLANDO, FLORIDA 32861**
**352-223-0806**

August 14, 2023

CITRUS RIDGE PROPERTIES II LLC - R GREGORY HUNTER
10161 CENTURION PARKWAY N SUITE 100
JACKSONVILLE, FLORIDA 32256

Dear Sirs:

Enclosed you will find a copy of the Claim of Lien for the property described herein and has been sent to the Public Records in Polk, Florida.

2003 Palmer RD 2600 MINUTE MAID RAMP 1, Davenport, Florida 33837

**WARNING: YOUR FAILURE TO FURNISH THE REQUESTED STATEMENT WITHIN THIRTY DAYS OR THE FURNISHING OF A FALSE STATEMENT WILL RESULT IN THE LOSS OF YOUR RIGHT TO RECOVER ATTORNEY'S FEES IN ANY ACTION TO ENFORCE THE CLAIM OF LIEN OF THE PERSON REQUESTING THE STATEMENT.**

F.S. 713.16(5) I hereby demand from you a written statement under oath showing the amount of all direct contracts, the amount paid by or on your behalf for all labor, services, and materials furnished pursuant to the direct contracts, the dates and the amounts paid or to be paid by or on your behalf for all improvements described in any direct contracts, and the reasonable estimated cost of completing, according to the terms and specifications of the same, any direct contract under which construction has ceased. If known, the actual cost of completion must be provided.

Sincerely,
Garfield Walsh, PRESIDENT

| Recipient Type | Tracking # | Name | Address |
|---|---|---|---|
| Owner | 9214890109193640154088 | CITRUS RIDGE PROPERTIES II LLC - R GREGORY HUNTER | 10161 CENTURION PARKWAY N SUITE 100, Jacksonville, Florida 32256 |
| General Contractor | 9214890109193640154095 | RISE GENERAL CONTRACTORS LLC - GREGORY BLAIS | 10161 CENTURION PARKWAY N SUITE 100, Jacksonville, Florida 32256 |
| Lender | 9214890109193640154101 | IBERIABANK - CONSTRUCTION MONITORING DEPT | 315 E ROBINSON STREET SUITE 350, Orlando, Florida 32801 |
| Designated Recipient - Certified | 9214890109193640154118 | COLEMAN TALLEY LLP - JUSTIN SCOTT | 109 S Ashley St, Valdosta, Georgia 31601 |
| Designated Recipient - Certified | 9214890109193640154125 | CITRUS RIDGE PROPERTIES II LLC | 129 N PATTERSON ST, Valdosta, Georgia 31601 |
| Designated Recipient - Certified | 9214890109193640154132 | CITRUS RIDGE PROPERTIES II LLC - CT CORPORATION SYSTEM | 1200 S PINE ISLAND ROAD, Plantation, Florida 33324 |
| Designated Recipient - Certified | 9214890109193640154149 | RISE GENERAL CONTRACTORS LLC | 4312 Pablo Professional Ct, Jacksonville, Florida 32224 |
| Subcontractor | 9214890109193640154156 | Mckenzie Contracting LLC - Dan Fernandez | 7712 E Broadway Ave, Tampa, Florida 33619-2534 |

THIS INSTRUMENT WAS PREPARED BY AND PLEASE
RETURN TO:
Steven Fine, Esq.
GW TRUCKING INC
GARFIELD WALSH
PO BOX 616903 ORLANDO, FLORIDA 32861
352-223-0808
W/O #: 4439586

**WARNING!**
**THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON THE REAL PROPERTY LISTED HEREIN, UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE DATE OF RECORDING, AND SHALL EXPIRE, AND BECOME NULL AND VOID THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.**

# Claim of Lien

STATE OF FLORIDA
COUNTY OF POLK

BEFORE ME, the undersigned notary public, personally appeared Garfield Walsh, who being the duly sworn, says that he/she is PRESIDENT of the lienor herein, GW TRUCKING INC, whose principal address is PO Box 616903, Orlando, Florida 32861, and that in pursuance of agreement with MCKENZIE CONTRACTING LLC, whose address is 7712 E Broadway Ave, Tampa, Florida 33619-2534, lienor furnished labor, services and/or materials consisting of Road base, and Misc. Labor and/or Materials, on the following described real property in Polk County, Florida.

**Job Address: 2003 Palmer RD 2600 MINUTE MAID RAMP 1 Davenport, Florida 33837**
**Folio Number: 202627-705500-030190,202627-705500-030281,202627-705500-030301**
**Legal Description: (See attached document)**
**NOC: Recorded In OR Book: 12386 and Page: 1536 Instrument Number: 2022226604, according to the Public Records of Polk County, Florida**

Which property is owned by CITRUS RIDGE PROPERTIES II LLC, of total value of Forty Nine Thousand Eight Hundred and Eight Dollars and Seventy Cents ($49,808.70), of which there remains unpaid Forty Nine Thousand Eight Hundred and Eight Dollars and Seventy Cents ($49,808.70) plus interest, legal fees and collection costs, and furnished the first of the items on May 31, 2023, and the last of the items on June 01, 2023 and that the lienor served her/his notice to owner on June 26, 2023, by Certified Mail; and that the lienor served copies of the notice on the contractor and subcontractor on June 26, 2023.

GW TRUCKING INC
PO Box 616903
Orlando, Florida 32861
352-223-0808

By: _____
GARFIELD WALSH, PRESIDENT

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this 11th day of August 2023 by GARFIELD WALSH, PRESIDENT for GW TRUCKING INC, by online notarization, personally known or physical presence and who has produced _____ as identification, and who did/did not take an oath.

_____
Notary Public, State of Florida

JENNIFER ORGILL
MY COMMISSION # HH 197369
EXPIRES: November 11, 2025
Bonded Thru Notary Public Underwriters

## EXHIBIT "A"

## LEGAL DESCRIPTION

TRACTS 19, 28, 29 AND 30, IN THE NW 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, ACCORDING TO THE PLAT OF FLORIDA DEVELOPMENT COMPANY SUBDIVISION, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, POLK COUNTY, FLORIDA.

LESS AND EXCEPT THE FOLLOWING TWO PARCELS (REFERENCE 11956, PAGE 1389)

A PARCEL OF LAND BEING A PORTION OF TRACTS 28, 29, AND 30, FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE WEST 1/4 CORNER OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA; THENCE RUN N 89°45'29" E ALONG THE SOUTH LINE OF THE NORTHWEST 1/4 OF SAID SECTION 20, A DISTANCE OF 661.04 FEET; THENCE RUN N 00°17'34' W, A DISTANCE OF 15.00 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD, SAID POINT BEING THE POINT OF BEGINNING; THENCE CONTINUE N 00°17'34' W ALONG THE WEST LINE OF SAID TRACT 30, A DISTANCE OF 30.00 FEET; THENCE DEPARTING SAID WEST LINE RUN N 89°45'29" E, A DISTANCE OF 946.42 FEET; THENCE RUN S 00°15'00" E, A DISTANCE OF 24.82 FEET; THENCE RUN N 89°45'29" E, A DISTANCE OF 45.00 FEET TO A POINT ON THE EAST LINE OF SAID TRACT 28; THENCE RUN S 00°15'00" E ALONG THE SAID EAST LINE, A DISTANCE OF 5.18 FEET TO A POINT ON SAID NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD; THENCE RUN S 89°45'29" W ALONG SAID NORTH RIGHT OF WAY LINE, A DISTANCE OF 991.40 FEET TO THE POINT OF BEGINNING.

AND

THE NORTH 25.00 FEET OF THE FOLLOWING DESCRIBED PROPERTY: TRACT 19, IN THE NORTHWEST 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, OF FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

ALSO DESCRIBED AS FOLLOWS:

A PARCEL OF LAND BEING A PORTION OF TRACT 19, SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, FLORIDA DEVELOPMENT CO. TRACT, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF SAID TRACT 19, SAID POINT BEING ON THE SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD; THENCE RUN N 89°44'06" E ALONG SAID SOUTH RIGHT OF WAY LINE, A DISTANCE OF 330.85 FEET TO THE NORTHEAST CORNER OF SAID TRACT 19; THENCE RUN S 00°14'02" E ALONG THE EAST LINE OF SAID TRACT 19, A DISTANCE OF 25.00 FEET; THENCE RUN S 89°44'06" W, PARALLEL WITH SAID SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD, A DISTANCE OF 330.85 FEET TO A POINT ON THE WEST LINE OF TRACT 19; THENCE RUN N 00°17'34" W ALONG SAID WEST LINE, A DISTANCE OF 25.00 FEET TO THE POINT OF BEGINNING.

3

**LEGAL DESCRIPTION**

The land referred to herein below is situated in the County of POLK, State of Florida, and described as follows:

TRACTS 19, 28, 29 AND 30, IN THE NW 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, ACCORDING TO THE PLAT OF FLORIDA DEVELOPMENT COMPANY SUBDIVISION, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, POLK COUNTY, FLORIDA.

LESS AND EXCEPT THE FOLLOWING TWO PARCELS (REFERENCE 11956, PAGE 1389)

A PARCEL OF LAND BEING A PORTION OF TRACTS 28, 29, AND 30, FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE WEST 1/4 CORNER OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA; THENCE RUN N 89°45'29" E ALONG THE SOUTH LINE OF THE NORTHWEST 1/4 OF SAID SECTION 20, A DISTANCE OF 661.04 FEET; THENCE RUN N 00°17'34' W, A DISTANCE OF 15.00 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD, SAID POINT BEING THE POINT OF BEGINNING; THENCE CONTINUE N 00°17'34' W ALONG THE WEST LINE OF SAID TRACT 30, A DISTANCE OF 30.00 FEET; THENCE DEPARTING SAID WEST LINE RUN N 89°45'29" E, A DISTANCE OF 946.42 FEET; THENCE RUN S 00°15'00" E, A DISTANCE OF 24.82 FEET; THENCE RUN N 89°45'29" E, A DISTANCE OF 45.00 FEET TO A POINT ON THE EAST LINE OF SAID TRACT 28; THENCE RUN S 00°15'00" E ALONG THE SAID EAST LINE, A DISTANCE OF 5.18 FEET TO A POINT ON SAID NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD; THENCE RUN S 89°45'29" W ALONG SAID NORTH RIGHT OF WAY LINE, A DISTANCE OF 991.40 FEET TO THE POINT OF BEGINNING.

AND

THE NORTH 25.00 FEET OF THE FOLLOWING DESCRIBED PROPERTY: TRACT 19, IN THE NORTHWEST 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, OF FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

ALSO DESCRIBED AS FOLLOWS:

A PARCEL OF LAND BEING A PORTION OF TRACT 19, SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, FLORIDA DEVELOPMENT CO. TRACT, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK

4876-8471-2198, v. 3

COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF SAID TRACT 19, SAID POINT BEING ON THE SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD; THENCE RUN N 89°44'06" E ALONG SAID SOUTH RIGHT OF WAY LINE, A DISTANCE OF 330.85 FEET TO THE NORTHEAST CORNER OF SAID TRACT 19; THENCE RUN S 00°14'02" E ALONG THE EAST LINE OF SAID TRACT 19, A DISTANCE OF 25.00 FEET; THENCE RUN S 89°44'06" W, PARALLEL WITH SAID SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD, A DISTANCE OF 330.85 FEET TO A POINT ON THE WEST LINE OF TRACT 19; THENCE RUN N 00°17'34" W ALONG SAID WEST LINE, A DISTANCE OF 25.00 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH RIGHTS UNDER THE EASEMENT AND COST SHARING AGREEMENT, BETWEEN SHOPPES AT CITRUS RIDGES, LLC, A FLORIDA LIMITED LIABILITY COMPANY AND CITRUS RIDGE PROPERTIES II, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DATED DECEMBER 13, 2021, FILED DECEMBER 28, 2021 AND RECORDED IN OFFICIAL RECORDS BOOK 12043, PAGE 1843 IN THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

This instrument Prepared By: VERONICA ALFONSO

Veronica.Alfonso@RinkerPipe.com

HYDRO CONDUIT LLC DBA RINKER MATERIALS
13100 NW 118TH AVE
MIAMI FL 33178

REF #757587

INSTR # 2023125984
BK 12709 Pg 0983 PG(s)1
05/31/2023 08:52:19 AM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 10.00

## WARNING!

**THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON THE REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE DATE OF RECORDING, AND SHALL EXPIRE AND BECOME NULL AND VOID THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.**

## CLAIM OF LIEN

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

**BEFORE ME,** the undersigned notary public, personally appeared VERONICA ALFONSO, who was duly sworn and says that she is CREDIT MANAGER of HYDRO CONDUIT LLC DBA RINKER MATERIALS whose address is 13100 NW 118TH AVE, MIAMI, FL 33178; and that in accordance with a contract with MCKENZIE CONTRACTING LLC 7712 E BROADWAY AVE TAMPA FL 33619, lienor furnished labor, services, or materials consisting of PIPE, PRECAST STRUCTURES AND RELATED MATERIALS on the following described real property in POLK County, Florida:

**TOWNE GROVE AT CITRUS RIDGE 36, CITRUS RIDGE DRIVE, DAVENPORT, FLORIDA, US HWY 27 & CITRUS RIDGE DRIVE, 2600 MINUTE MAID RAMP #1, DAVENPORT, FLORIDA, CONSTRUCTION OF A NEW 226 UNIT APARTMENT COMPLEX, TRACTS 19, 28, 29 AND 30, A PORTION OF LAND LYING IN SECTION 20 TOWNSHIP 26 SOUTH RANGE 27 EAST, PLAT OF FLORIDA DEVELOPMENT COMPANY SUBDIVISION, AS PER PLAT BOOK 3, PAGES 60-63, AND BEING MORE PARTICULARLY DESCRIBED IN NOTICE OF COMMENCEMENT RECORDED IN OR BOOK 12043 PAGE 1915 PUBLIC RECORDS POLK COUNTY, FLORIDA.**

Owned by CITRUS RIDGE PROPERTIES, LLC 129 N PATTERSON ST VALDOSTA GA 31601, for a total value of **$25,869.93** of which there remains unpaid principal of **$25,869.93**, plus finance charges through MAY 25, 2023, in the amount of $0.00, and additional finance charges that accrue to the date of payment; and furnished the first of the items on FEBRUARY 27, 2023, and the last of the items on FEBRUARY 28, 2023; and (if the lien is claimed by one not in privity with the owner) that the lienor served his notice to owner on MARCH 30, 2023 by Certified Mail (9489009206017006710094); and (if required) that the lienor served copies of the notice on the contractor, RISE GENERAL CONTRACTORS LLC, on MARCH 30, 2023, by Certified Mail (9489009206017006710100) and on the subcontractor, MCKENZIE CONTRACTING LLC on March 30, 2023 via US Mail.

Signature of Lienor\Agent _____

Printed Name of Lienor\Agent: VERONICA ALFONSO

HYDRO CONDUIT LLC DBA RINKER
MATERIALS
13100 NW 118TH AVE
MIAMI FL 33178

Sworn to (or affirmed) and subscribed before me by means of physical presence, this 26 day of MAY, 2023 by VERONICA ALFONSO Personally known to me.

_____

Signature of Notary Public - State of Florida

MARCOS TURCIOS
Notary Public - State of Florida
Commission # HH 317092
My Comm Expires Sep 27, 2026
Bonded through National Notary Assn.

INSTR # 2023196940
BK 12847 Pg 1379 (1pgs)
RECORDED 08/22/2023 11:01:47 AM
STACY M. BUTTERFIELD, CLERK OF COURT
POLK COUNTY
RECORDING FEES $10.00
RECORDED BY jesscast

This Instrument Prepared By: Kelley Gold
SUNCOAST BUILDING MATERIALS TAMPA INC
12514 US HIGHWAY 41 SOUTH
GIBSONTON FL 33534

Town Groves @ Citrus Ridge

## WARNING!

**THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON THE REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE DATE OF RECORDING AND SHALL EXPIRE AND BECOME NULL AND VOID THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.**

### CLAIM OF LIEN

STATE OF FLORIDA
COUNTY OF POLK

**BEFORE ME**, the undersigned notary public, personally appeared DAVID LEONARD, who was duly sworn and says that she|he is PRESIDENT of:

SUNCOAST BUILDING MATERIALS TAMPA INC
12514 US HIGHWAY 41 SOUTH
GIBSONTON FL 33534

and that in accordance with a contract with PACHECO DRYWALL TEXTURING INC, lienor furnished labor, services, or materials consisting of METAL FRAMING AND DRYWALL AND/OR MISC BUILDING MATERIALS on the following described real property in Polk County, Florida:

**FLORIDA DEVELOPMENT COMPANY (WARNING ABSTRACTORS ALSO CHECK ACREAGE UNDERLYING, AS OF 1989 DOCUMENTS ARE NOT POSTED WITH UNDERLYING ACREAGE*EXCEPT LT 21-28 & 5-12 IN SEC 35-26-27) 2600 MINUTE MAID RAMP 1 DAVENPORT FL 33837 METES AND BOUNDS AND EXCEPT PORTION TRACT 19 28-30 QUARTER 2 SECTION 202627 FL DEVELOP COMPANY PLAT BOOK 3/60 PLAT BOOK 3 60 AMD OR 12043/1915**
DRYWALL MATERIALS PLUS TIME PRICED FEE'S AND LIEN FEE OF 150.00

Owned by CITRUS RIDGE PROP II L L C 10161 CENTURION PKWY N STE 100 JACKSONVILLE FL 32256

For a total value of $326,063.77 of which there remains unpaid principal of $113,988.22, together with finance charges of $9,728.03 and thereon at the rate of 20.4000 % per annum from MAY 31, 2023 to the date of payment; and furnished the first of the items on DECEMBER 1, 2022, and the last of the items on MAY 25, 2023; and (if the lien is claimed by one not in privity with the owner) that the lienor served her|his notice to owner on JANUARY 13, 2023 by Certified Mail (9489009206017006291692); and (if required) that the lienor served copies of the notice on the contractor, RISE GEN CONT L L C, on JANUARY 13, 2023, by Certified Mail (9489009206017006291708) and on the subcontractor, __PACHECO DRYWALL TEXTURING INC. on _01/13/2023 BY United States Postal Service (method of delivery).

Signature of Lienor\Agent _____
Printed Name of Lienor\Agent: DAVID LEONARD, PRESIDENT
SUNCOAST BUILDING MATERIALS TAMPA INC
ATTN: DAVID LEONARD
12514 US HIGHWAY 41 SOUTH
GIBSONTON FL 33534

Sworn to (or affirmed) and subscribed before me by means of [x] physical presence or [ ] online notarization, this 21 day of AUGUST, 2023 by DAVID LEONARD, PRESIDENT OF SUNCOAST BUILDING MATERIALS TAMPA, INC. (name of person making statement).

_____
Signature of Notary Public - State of Florida

Notary Public State of Florida
Teresa Lynn Bills
My Commission HH 47857
Expires 09/29/2024

Print, type or stamp name of notary public

[x] Personally Known OR [ ] Produced Identification

Type of Identification Produced _____

This instrument was prepared by
and should be returned to:
Andrew V. Showen
Board Certified Construction Lawyer
Hill Rugh Keller & Main, P.L.
390 N. Orange Avenue, Suite 1610
Orlando, Florida 32801
407-926-7460

## SATISFACTION OF LIEN

This is to certify that the claim of construction lien in the sum of *$16,852.50* filed by the undersigned, SITE PRO OF CENTRAL FLORIDA LLC on *October 4, 2022*, and recorded in Book *12438*, Pages 2260-2263 of the public records of *Polk County*, Florida, against the following described real property:  and upon the real property described as parcel numbers 27-26-20-705500-030190, 27-26-20-705500-030281, and 27-26-20-705500-030301, Polk County, Florida, having the legal descriptions set forth in the attached Exhibit A, owned by CITRUS RIDGE PROPERTIES II LLC, has been satisfied in full, and that the undersigned now releases *its* lien as to the whole of the above-described real property, and consents that the same be discharged of record.

Dated: *November 1, 2022*

SITE PRO OF CENTRAL FLORIDA LLC
By: Andrew Showen
Authorized agent

The foregoing instrument was acknowledged before me this ___1ST___ day of ___NOVEMBER___, __2022__, by ___ANDREW SHOWEN___, who is personally known to me or who has produced _____ as _____ identification.

Notary Public — State of Florida Name of Notary T

Signature of Notary Public

PATRICIA JO HENDERSON
Commission # HH 238212
Expires March 13, 2026

EXHIBIT "A"

LEGAL DESCRIPTION

TRACTS 19, 28, 29 AND 30, IN THE NW 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, ACCORDING TO THE PLAT OF FLORIDA DEVELOPMENT COMPANY SUBDIVISION, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, POLK COUNTY, FLORIDA.

LESS AND EXCEPT THE FOLLOWING TWO PARCELS (REFERENCE 11956, PAGE 1389)

A PARCEL OF LAND BEING A PORTION OF TRACTS 28, 29, AND 30, FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE WEST 1/4 CORNER OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA, THENCE RUN N 89°45'29" E ALONG THE SOUTH LINE OF THE NORTHWEST 1/4 OF SAID SECTION 20, A DISTANCE OF 661.04 FEET; THENCE RUN N 00°17'34' W, A DISTANCE OF 15.00 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD, SAID POINT BEING THE POINT OF BEGINNING; THENCE CONTINUE N 00°17'34' W ALONG THE WEST LINE OF SAID TRACT 30, A DISTANCE OF 30.00 FEET; THENCE DEPARTING SAID WEST LINE RUN N 89°45'29" E, A DISTANCE OF 946.42 FEET; THENCE RUN S 00°15'00" E, A DISTANCE OF 24.82 FEET; THENCE RUN N 89°45'29" E, A DISTANCE OF 45.00 FEET TO A POINT ON THE EAST LINE OF SAID TRACT 28; THENCE RUN S 00°15'00" E ALONG THE SAID EAST LINE, A DISTANCE OF 5.18 FEET TO A POINT ON SAID NORTH RIGHT OF WAY LINE OF MINUTE MAID RAMP ROAD; THENCE RUN S 89°45'29" W ALONG SAID NORTH RIGHT OF WAY LINE, A DISTANCE OF 991.40 FEET TO THE POINT OF BEGINNING.

AND

THE NORTH 25.00 FEET OF THE FOLLOWING DESCRIBED PROPERTY: TRACT 19, IN THE NORTHWEST 1/4 OF SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, OF FLORIDA DEVELOPMENT CO. TRACT, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 3, PAGES 60 THROUGH 63, INCLUSIVE, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

ALSO DESCRIBED AS FOLLOWS:

A PARCEL OF LAND BEING A PORTION OF TRACT 19, SECTION 20, TOWNSHIP 26 SOUTH, RANGE 27 EAST, FLORIDA DEVELOPMENT CO. TRACT, AS RECORDED IN PLAT BOOK 3, PAGES 60-63 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF SAID TRACT 19, SAID POINT BEING ON THE SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD; THENCE RUN N 89°44'06" E ALONG SAID SOUTH RIGHT OF WAY LINE, A DISTANCE OF 330.85 FEET TO THE NORTHEAST CORNER OF SAID TRACT 19; THENCE RUN S 00°14'02" E ALONG THE EAST LINE OF SAID TRACT 19, A DISTANCE OF 25.00 FEET; THENCE RUN S 89°44'06" W, PARALLEL WITH SAID SOUTH RIGHT OF WAY LINE OF CITRUS RIDGE ROAD, A DISTANCE OF 330.85 FEET TO A POINT ON THE WEST LINE OF TRACT 19; THENCE RUN N 00°17'34" W ALONG SAID WEST LINE, A DISTANCE OF 25.00 FEET TO THE POINT OF BEGINNING.

3

4890-6561-0243, v. 2

INSTR # 2023227028
BK 12555 PG 285 PG(s)285
09/27/2023 03:50:49 PM
STACY M. BUTTERFIELD,
CLERK OF COURT POLK COUNTY
RECORDING FEES 10.00

This document prepared by and should be returned to:
Samantha Mumper
Flash-Rite, Inc.
115 Atlantic Dr
Maitland, FL 32751

## WARNING!

THIS LEGAL DOCUMENT REFLECTS THAT A CONSTRUCTION LIEN HAS BEEN PLACED ON THE REAL PROPERTY LISTED HEREIN. UNLESS THE OWNER OF SUCH PROPERTY TAKES ACTION TO SHORTEN THE TIME PERIOD, THIS LIEN MAY REMAIN VALID FOR ONE YEAR FROM THE DATE OF RECORDING AND SHALL EXPIRE AND BECOME NULL AND VOID THEREAFTER UNLESS LEGAL PROCEEDINGS HAVE BEEN COMMENCED TO FORECLOSE OR TO DISCHARGE THIS LIEN.

### CLAIM OF LIEN

STATE OF FLORIDA
COUNTY OF SEMINOLE

BEFORE ME, the undersigned notary public, personally appeared **Fred Stilt** who being duly sworn and says that she or he is the **General Manager** of **FLASH-RITE, INC.**, Lienor, whose address is **115 Atlantic Drive, Maitland, Fl 32751**, and that in accordance with a contract with: **MCKENZIE CONTRACTING, LLC**
Lienor furnished labor, services or materials consisting of Maintenance of Traffic on the following described real property in **POLK** County, Florida

CITRUS RIDGE APARTMENTS
2003 PALMER ROAD/2600 MINUTE MAID RAMP 1
DAVENPORT, FLORIDA
TRACT 19 & 28-30
FORIDA DEVELOPMENT COMPANY SUBDIVISION
PLAT BOOK 3 PAGE 60
PUBLIC RECORDS OF POLK COUNTY, FLORIDA
NOTICE OF COMMENCEMENT AS RECORDED ON INSTRUMENT #2021335709 IS HEREIN INCORPORATED BY THIS REFERENCE.
PERMIT #LDRES-2021-33

owned by **CITRUS RIDGE PROPERTIES II LLC**
for a total value of $ **3,836.34**
which there remains unpaid $ **1,844.10**
and furnished the first of the items on **3/30/2023**
and the last of the items on **7/18/2023**
and that Lienor served her or his Notice to Owner on the Owner on **4/4/2023**
by U.S. Certified Mail, Return Receipt No. **70222410000154523590**
and that the Lienor served a copy of the notice on the contractor on **4/4/2023**
by U.S. Certified Mail, Return Receipt No. **70222410000154523606**

FLASH-RITE, INC
Fred Stilt General Manager

SWORN TO AND SUBSCRIBED BEFORE ME, by means of physical presence notarization, by Fred Stilt, who is personally known to me, and who did take an oath this 21 September 2023

SAMANTHA MUMPER
MY COMMISSION # HH 289467
EXPIRES: November 18, 2026

Notary Public, State of Florida
My Commission Expires

**Copies Provided to:**
RISE GENERAL CONTRACTORS LLC
4312 PABLO PROFESSIONAL COURT
LACKSONVILLE, FL 32224

MCKENZIE CONTRACTING, LLC
7712 EAST BROADWAY AVENUE
TAMPA, FL 33619

IBERIABANK
CONSTRUCTION MONITORING DEPT
315 EAST ROBINSON STREET SUITE 350
ORLANDO, FL 32801

CORPORATION SERVICE COMPANY
1201 HAYS STREET
TALLAHASSEE, FL 32301

CITRUS RIDGE PROPERTIES II LLC
R GREGORY HUNTER
129 NORTH PATTERSON STREET
VALDOSTA, GA 31601

RISE GENERAL CONTRACTORS LLC
10161 NORTH CENTURION PARKWAY SUITE 160
JACKSONVILLE, FL 32256

COLEMAN TALLEY LLP
JUSTIN SCOTT
109 SOUTH ASHLEY STREET
VALDOSTA, GA 31601